No. 2025-1712

# In the United States Court of Appeals for the Federal Circuit

SEOUL SEMICONDUCTOR CO., LTD., SEOUL VIOSYS CO., LTD.,
*Plaintiffs*

v.

FINELITE, INC.,
*Defendant/Third Party Plaintiff-Appellant*

v.

SAMSUNG SEMICONDUCTOR, INC.,
*Third-Party Defendant-Appellee.*

On Appeal from the U.S. District Court for the
Northern District of California, Hon. Trina L. Thompson
D. Ct. Case No. 3:22-cv-02869-TLT

**APPELLEE'S BRIEF**
**AS FILED IN THE NINTH CIRCUIT**

Ali R. Sharifahmadian
Jin-Suk Park
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001

Sean M. SeLegue
Douglas Winthrop
ARNOLD & PORTER
KAYE SCHOLER LLP
3 Embarcadero Center, Fl. 10
San Francisco, CA 94111
(415) 471-3100
sean.selegue@arnoldporter.com

Brian M. Williams
ARNOLD & PORTER
KAYE SCHOLER LLP
1144 15th Street, Suite 3100
Denver, CO 80202

*Counsel for Samsung Semiconductor, Inc.*

## CORPORATE DISCLOSURES

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Samsung Semiconductor, Inc. states that it is a wholly owned subsidiary of Samsung Electronics America, Inc. In turn, Samsung Electronics America, Inc. is a wholly owned subsidiary of Samsung Electronics Co., Ltd. No publicly held corporation owns 10% or more of Samsung Electronics Co., Ltd.'s stock, nor does it have a parent corporation. No other publicly held corporation owns 10% or more of Samsung Semiconductor, Inc.'s or Samsung Electronics America, Inc.'s stock.

Dated: November 6, 2024

*/s/ Sean M. SeLegue*
Sean M. SeLegue

## TABLE OF CONTENTS

CORPORATE DISCLOSURES ........ i

TABLE OF AUTHORITIES ........ v

ISSUES PRESENTED ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE CASE ........ 2

A. The 2012 Agreement ........ 2

B. Finelite's Purchase Orders and SSI's Acknowledgements ........ 7

C. Proceedings Below ........ 8

SUMMARY OF ARGUMENT ........ 11

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 15

I. THE 2012 AGREEMENT GOVERNS SSI'S INDEMNITY OBLIGATIONS. ........ 15

A. The 2012 Agreement Is A Single, Integrated Contract. ........ 16

B. The Final Sentence On Page 2 Of The 2012 Agreement Is A List Of Things To Which Finelite Agreed. ........ 17

C. The District Court Correctly Concluded That Adoption Of Finelite's Interpretation Would Erroneously Render Much Of The 2012 Agreement Surplusage. ........ 22

D. Finelite's Reliance On Parol Evidence Of The Parties' Course Of Performance Is Improper And Proves Nothing. ........ 23

1. Finelite improperly relies on parol evidence to attempt to contradict the 2012 Agreement's terms. ........ 23

2. The parties' failure to refer to the 2012 Agreement during the course of the four transactions is fully consistent with the 2012 Agreement and in no way undermines it. .....25

E. The Arguments Finelite Makes For The First Time On Appeal Are Waived And In Any Event Unpersuasive. .....28

1. Whether the final sentence of page 2 of the 2012 Agreement is a "loose sentence" has no bearing on its meaning. .....29

2. Contrary to Finelite's speculation, the District Court did not rely on the notion that the final sentence of page 2 of the 2012 Agreement contained prepositional or parallel phrases .....31

3. Absence of the phrase "including but not limited to" has no significance. .....35

4. Differing language regarding the shipping point does not support Finelite's interpretation. .....36

II. THE ORDER DENYING FINELITE'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE AFFIRMED. .....38

A. Because The 2012 Agreement Was In Effect, § 2207 Does Not Apply. .....39

B. Overview of Contract Formation Under § 2207. .....42

C. Even If § 2207 Applies, Finelite Did Not Establish That Its Hyperlinked Terms Were Incorporated Into Its Purchase Orders. .....46

1. A fact dispute exists regarding whether Finelite's hyperlinks were accessible. .....46

2. Even if Finelite's hyperlinks were accessible, they were not incorporated into its purchase orders. .....48

D. Even If Finelite's Indemnification Term Were Part Of Its Purchase Orders, Finelite Did Not Establish That Its Indemnification Term Applied To All Of The Transactions. .......51

1. No § 2207(1) contract was formed based on the parties' exchange of writings regarding the 2018 transaction. .......51

2. No § 2207(1) contract was formed based on the parties' exchange of writings regarding the 2021 transaction. .......53

3. Finelite's indemnification provision did not become a term of the parties' 2019 and 2020 contracts under § 2207. .......53

a. The national rule, adopted by the California Court of Appeal, is that conflicting terms in the offer and acceptance cancel out. .......54

b. Finelite advocates an erroneous interpretation based on dicta in a 1977 California Supreme Court decision. .......57

E. If A Gap-Filler Warranty Applies, Finelite Failed To Establish That The Seoul Plaintiffs' Claims Are "Rightful." .......60

F. Alternatively, Finelite Is Not Entitled To Summary Judgment On Its First Two Claims Because It Failed To Present Evidence Of Damages. .......64

CONCLUSION .......66

RULE 28-2.7 ADDENDUM ....... Add. 001

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Airborne San Diego, LLC v. Travelers Prop. Cas. Co. of Am.*,
538 F. Supp. 3d 1032 (S.D. Cal. 2021) .......... 19

*Allstate Ins. Co. v. Hughes*,
358 F.3d 1089 (9th Cir. 2004) .......... 2

*Am. Licorice Co. v. Total Sweeteners, Inc.*,
No. C-13-1929, 2013 WL 4396778 (N.D. Cal. Aug. 13, 2013) .......... 42

*Anhui Powerguard Technology Co. v. DRE Health Corp.*,
95 F.4th 1146 (8th Cir. 2024) .......... 34

*Autotel v. Nevada Bell Tel. Co.*,
697 F.3d 846 (9th Cir. 2012) .......... 41, 42

*Bramalea Cal., Inc. v. Reliable Interiors, Inc.*,
119 Cal. App. 4th 468 (2004) .......... 65

*Chan v. Drexel Burnham Lambert, Inc.*,
178 Cal. App. 3d 632 (1986) .......... 48, 50

*Channell Com. Corp. v. Wilmington Mach. Inc.*,
No. ED CV 14-2240, 2016 WL 7638180 (C.D. Cal.
June 17, 2016) .......... 44, 50, 52, 56

*Crowe v. Oregon State Bar*,
112 F.4th 1218 (9th Cir. 2024) .......... 15

*Daitom, Inc. v. Pennwalt Corp.*,
741 F.2d 1569 (10th Cir. 1984) .......... 56

*Diamond Fruit Growers, Inc. v. Krack Corp.*,
794 F.2d 1440 (9th Cir. 1986) .......... 43, 44, 56, 59, 60

*Doe v. Uber Techs., Inc.*,
90 F.4th 946 (9th Cir. 2024) .......... 59

*Dorton v. Collins & Aikman Corp.*,
453 F.2d 1161 (6th Cir. 1972) ........ 52

*ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*,
113 F.4th 1312 (11th Cir. 2024) ........ 19

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
No. 1:11-CV-00030, 2011 WL 5838214 (E.D. Cal. Nov. 21, 2011) ........ 63

*Frank M. Booth, Inc. v. Reynolds Metals Co.*,
754 F. Supp. 1441 (E.D. Cal. 1991) ........ 52

*Garmong v. Tahoe Reg'l Plan. Agency*,
No. 22-15869, 2023 WL 7122579 (9th Cir. Oct. 30, 2023) ........ 42

*Gee v. Tenneco, Inc.*,
615 F.2d 857 (9th Cir. 1980) ........ 59

*Germantown Tr. & Sav. Bank v. U.S. Bank*,
No. 19-CV-352, 2020 WL 8082408 (S.D. Ill. June 9, 2020) ........ 18

*Gutzi Assocs. v. Switzer*,
215 Cal. App. 3d 1636 (1989) ........ 28

*H & H Pharms., LLC v. Cambrex Charles City, Inc.*,
836 F. App'x 619 (9th Cir. 2021) ........ 40

*Hillis v. Heineman*,
626 F.3d 1014 (9th Cir. 2010) ........ 28, 29

*Hippler v. Allied Prop. & Cas. Ins. Co.*,
No. 2:12-CV-1039, 2013 WL 5448245 (D. Utah Sept. 30, 2013) ........ 18

*Hoover v. Switlik Parachute Co.*,
663 F.2d 964 (9th Cir. 1981) ........ 47

*Idaho Power Co. v. Westinghouse Elec. Corp.*,
596 F.2d 924 (9th Cir. 1979) ........ 52, 55

*Irving v. Divito*,
807 S.E.2d 741 (Va. 2017) ........ 33

*Killgore v. SpecPro Pro. Servs., LLC*,
51 F.4th 973 (9th Cir. 2022) ....................55

*Linear Tech. Corp. v. Tokyo Electron Ltd.*,
200 Cal. App. 4th 1527 (2011) ....................62, 63

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005) ....................64

*Murray v. BEJ Mins., LLC*,
924 F.3d 1070 (9th Cir. 2019) ....................60

*Mycoskie, LLC v. Ebuys, Inc.*,
293 F. Supp. 3d 1076 (C.D. Cal. 2017) ....................61

*Niagara Bottling, LLC v. Rite-Hite Co.*,
No. EDCV 18-2032, 2019 WL 1768875 (C.D. Cal. Feb. 11, 2019) ....................52

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ....................31

*Pac. Sunwear of Cal., Inc. v. Olaes Enters, Inc.*,
167 Cal. App. 4th 466 (2008) ....................61, 62

*Paladin Assocs. v. Mont. Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ....................40

*Phoenix Sols., Inc. v. Sony Elecs., Inc.*,
637 F. Supp. 2d 683 (N.D. Cal. 2009) ....................62, 63

*Plastoform Indus. Ltd. v. Monster LLC*,
No. 18-cv-02805, 2018 WL 10562845 (N.D. Cal. Sept. 6, 2018) ....................40

*Ramirez v. Charter Commc'ns, Inc.*,
16 Cal. 5th 478 (2024) ....................36

*Rojas v. Hamm*,
No. 18-cv-01779, 2019 WL 3779706 (N.D. Cal. Aug. 12, 2019) ....................6

*Scafidi v. Las Vegas Metro. Police Dep't*,
966 F.3d 960 (9th Cir. 2020) ....................26

*Schertzer v. Bank of Am., NA*,
109 F.4th 1200 (9th Cir. 2024) ....................17

*State v. Woodrum*,
845 S.E.2d 278 (W. Va. 2020)....................33

*Steiner v. Mobil Oil Corp.*,
20 Cal. 3d 90 (1977)....................57

*Steiny & Co. v. Cal. Elec. Supply Co.*,
79 Cal. App. 4th 285 (2000) ....................44, 56, 57, 59

*Textile Unlimited, Inc. v. A..BMH & Co.*,
240 F.3d 781 (9th Cir. 2001)....................43, 45, 46, 52, 53, 55

*Transwestern Pipeline Co. v. Monsanto Co.*,
46 Cal. App. 4th 502 (1996) ....................52

*United States v. Bass*,
404 U.S. 336 (1971)....................19

*Vulcan Auto. Equip., Ltd. v. Glob. Marine Engine & Parts, Inc.*,
240 F. Supp. 2d 156 (D.R.I. 2003) ....................56

*Water, Inc. v. Everpure, Inc.*,
No. CV 09-3389, 2012 WL 12949368 (C.D. Cal. Aug. 2, 2012) ....................65

*Weinberg v. Whatcom Cnty.*,
241 F.3d 746 (9th Cir. 2001)....................65

*Whitman v. Transtate Title Co.*,
165 Cal. App. 3d 312 (1985)....................18

**Statutes & Rules**

CAL. CIV. CODE
§ 1530....................10
§ 1641....................17

CAL. COM. CODE
§ 2312 .... 10, 60, 65
§ 2312(3) .... 10, 60, 65
§ 2207 .... 45, 54, 55, 58
§ 2207(1) .... 43, 44, 45
§ 2207(2) .... 44, 59
§ 2207(3) .... 45, 46

CAL. R. CT. 8.548(a) .... 60

**Other Authorities**

1 JAMES J. WHITE ET AL., UNIFORM COMMERCIAL CODE § 2:14 (6th ed. 2024 update) .... 54, 56

ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .... 19, 20

BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE: THE AUTHORITY ON GRAMMAR, USAGE, AND STYLE (5th ed. 2022) .... 29, 32

THE CHICAGO MANUAL OF STYLE (17th ed. 2017) .... 29, 32, 33

*Extended Rules for Using Commas*, The Writing Lab & The OWL at Purdue Univ., https://bit.ly/3YadRac .... 18

*Infinitives*, The Writing Lab & The OWL at Purdue Univ., https://bit.ly/3A5WShc .... 33

*Know Your Incoterms*, International Trade Administration (2020), https://bit.ly/3BOgjM7 .... 6

WILLIAM A. SABIN, THE GREGG REFERENCE MANUAL: A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING (llth ed. 2010) .... 29

WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE (4th ed. 2000) .... 30

## ISSUES PRESENTED

1. Regarding the District Court's grant of summary judgment to Appellee Samsung Semiconductor, Inc. ("SSI"): Does the 2012 Agreement specify SSI's indemnification obligations to Appellant Finelite, Inc. ("Finelite") concerning the underlying patent infringement action?

2. Regarding Finelite's cross-motion for summary judgment:

   a. Does the existence of the 2012 Agreement—regardless of how the Court resolves Issue 1—prevent formation of a contract pursuant to a battle of the forms under California Commercial Code § 2207?

   b. Were Finelite's hyperlinked terms incorporated into its purchase orders?

   c. Even if a contract was formed pursuant to § 2207, was Finelite's proposed indemnification term part of that contract?

   d. If the UCC "gap filler" warranty provided by California Commercial Code § 2312 applies, did Finelite submit undisputed evidence sufficient to demonstrate the required element of rightful infringement regarding its claim for breach of that warranty?

   e. Did Finelite present evidence of damages sufficient to obtain summary judgment on its first two causes of action?

* * *

Pertinent constitutional provisions, treaties, statutes, ordinances, regulations, or rules are included in the Rule 28-2.7 Addendum to this brief.

## JURISDICTIONAL STATEMENT

SSI agrees with Finelite's jurisdictional statement, except for its statement that this Court has appellate jurisdiction under 28 U.S.C. § 1291. SSI moved to transfer this case to the Federal Circuit, explaining that this Court lacks subject matter jurisdiction over this appeal because the underlying District Court action arises under the patent laws. ECF Nos. 15, 26.

The motions panel denied SSI's motion to transfer without prejudice to SSI renewing the issue before the merits panel. ECF No. 28. Accordingly, and mindful of the Court's obligation to assess subject matter jurisdiction, *Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093 (9th Cir. 2004), SSI respectfully refers the Court to the motion papers. ECF Nos. 15-16, 26.

## STATEMENT OF THE CASE

### A. The 2012 Agreement

In April 2012, Finelite transitioned from purchasing lighting products from a different Samsung entity to SSI. ER-136 ¶ 3. At the outset, SSI provided Finelite with an agreement setting forth terms of sale, including terms for the extension of credit. ER-136 ¶ 3; ER-139–43. That document—the 2012

Agreement—established various terms and conditions governing Finelite's purchase of products from SSI. ER-139–43. The 2012 Agreement comprises five pages that are sequentially numbered from "Page 1 of 5" through "Page 5 of 5." *Id.* The 2012 Agreement consists of three components: (1) a "credit application" and "credit agreement," (pages 1–2); (2) a "financial authorization to release confidential information" addressed to Finelite's bank (page 3); and (3) a "Samsung Semiconductor, Inc. Contract of Sale" (pages 4–5). ER-139–43.

Page 2 of the 2012 Agreement sets forth various conditions under which SSI agreed to sell products to Finelite, some—but not all—of which relate to extension of credit. For example, Finelite agreed to the following on page 2:

- "*As a condition of sales*, a monthly service charge equal to the maximum permitted by law can be assessed to all accounts not paid within 30 days from the due date."
- "[SSI] … takes no responsibility for material returned without our authorization."
- "Goods are sold C.I.P. [SSI's] designated shipping point unless otherwise specified."
- "Shortages or damage must be noted on the delivery receipt, and delivering carrier must be requested to make an inspection of such assertions."
- "Claims must be made on the carrier without delay. Claims for concealed loss or damage must also be handled immediately upon discovery."

ER-140 (emphasis added). Page 2 concludes with a final sentence that sets forth a list of three things to which Finelite agreed:

> [Finelite] understands and agrees to [SSI's] terms of sale (attached), to pay service charges assessed and to pay reasonable attorneys fees in the event of default.

*Id.*

The final sentence's reference to "terms of sale" refers—as the parties agree—to the "Samsung Semiconductor, Inc. Contract of Sale" on pages 4 and 5 of the 2012 Agreement. ER-22; ER-142–43; AOB 21–22. The 2012 Agreement covers all of Finelite's future purchases from SSI: "The following Terms and Conditions apply to *any* purchase of products ('Products') that you ('[Finelite]') make from [SSI]." ER-142 (emphasis added); *see also* ER-142 § 2 ("From time to time, [Finelite] shall place orders for products with [SSI].").

The 2012 Agreement anticipated that, in conducting future transactions, the parties would seek to impose terms on each other through a battle of the forms and specifically ruled out that practice:

- "**Application of Terms**. The terms and conditions in this document exclusively govern and control, and entirely supersede, and are in lieu of the terms and conditions in, [Finelite]'s purchase order or any other document offered or proposed by [Finelite]."
- "All other terms or conditions of sale proposed or offered by [Finelite] are hereby expressly rejected in the entirety."

- "No other terms shall be valid unless specifically agreed to in writing and signed by [SSI]."
- "Failure of [SSI] to object to the provisions in any document sent by [Finelite] shall not be deemed a waiver of these terms or acceptance of any terms [Finelite] may have requested."
- "[SSI's] sale of Products covered by this document are governed *only* by these terms and conditions of sale."
- "[Finelite] shall be deemed to have expressly accepted these terms and conditions of sale if [Finelite] requests or receives delivery of any Products."
- "These terms supersede all other terms submitted or proposed by [Finelite], as well as all prior terms in any quotation, purchase order, or otherwise."

ER-142 § 1 (emphasis added). The 2012 Agreement further clarifies that "[i]n the event that [SSI] consents to modify any of the following terms, such modification shall be in a signed writing between the parties which references the change to these terms or shall be expressly stated on the face of these terms and endorsed by [SSI]." *Id.* Further, any modifications must be "signed … by an authorized employee of [SSI]." ER-143 § 11.

The 2012 Agreement states that SSI's indemnity obligations to Finelite are limited to claims arising from infringement "*in the jurisdiction where title passes from [SSI] to [Finelite]*":

> [SSI] will at its expense defend or settle (at its option) any third party claim against [Finelite] *arising from the infringement* of any patent, copyright, mask work right, trade secret, or other intellectual property right by Product *in the jurisdiction where title passes from [SSI] to [Finelite],* and will pay any final judgment entered against [Finelite] in such claim …. THE FOREGOING STATES THE ENTIRE RESPONSIBILITY OF [SSI], *AND THE EXCLUSIVE REMEDY OF [FINELITE]*, WITH RESPECT TO ANY ALLEGED INTELLECTUAL PROPERTY RIGHT INFRINGEMENT OR TRADE SECRET VIOLATION BY THE PRODUCTS.

ER-142 § 10 (emphases added).

The 2012 Agreement also states that title would pass to Finelite "at the C.I.P. point."[1] ER-142 § 8. The 2012 Agreement further provides that the C.I.P. point defaults to SSI's California warehouse "*unless another location is specifically designated in writing*." *Id.* (emphasis added). As discussed below, in all of the relevant transactions, Finelite requested, and SSI agreed, that Hong Kong would be the C.I.P. point. *See infra* at 7. On April 17, 2012, Finelite signed the 2012 Agreement. ER-145–47.

---

[1] C.I.P. is an incoterm that stands for "Carriage and Insurance Paid to," followed by a place of destination. *See Rojas v. Hamm*, No. 18-cv-01779, 2019 WL 3779706, at *6 n.9 (N.D. Cal. Aug. 12, 2019) (citation omitted). "Incoterms are a set of internationally recognized rules which define the responsibilities of sellers and buyers in the export transaction." *Know Your Incoterms*, International Trade Administration (2020), https://bit.ly/3BOgjM7 (last visited Nov. 6, 2024).

### B. Finelite's Purchase Orders and SSI's Acknowledgements

Finelite's Third-Party Complaint focuses on four purchase orders that SSI fulfilled from 2018 to 2021. ER-189–90. Each of the four purchase orders identify the C.I.P. location as Hong Kong:

WAREHOUSE:
CIP Hong Kong

ER-152, ER-154, ER-157, ER-159. Each purchase order likewise identified a Hong Kong shipping address:

SHIP TO:
HK TaiRui Electronics
No.2,3/F Wang Lung Industrial Building
11 lung Tak Street, Tsuen Wan
N.T. Hong Kong

*Id.*

SSI responded to each purchase order with a "Sales Order Acknowledgment." ER-161–62, ER-164–66, ER-168–70, ER-172–74. Each of SSI's acknowledgments designated Hong Kong as the C.I.P. location:

***Ship To***
FINELITE, INC.
99
11 LUNG TAK STREET
TSUEN WAN, HONG KONG 0
HK

***Customer No.***
4237632

***We deliver according to the following terms and conditions:***

Currency is USD
Terms of payment: 30 Days from Doc. Date
IncoTerms: CIP DESTINATION

ER-161, ER-164, ER-168, ER-172.

### C. Proceedings Below

In May 2022, Seoul Semiconductor Co., Ltd. and Seoul Viosys Co., Ltd. (the "Seoul Plaintiffs") sued Finelite, alleging that Finelite's light fixtures infringed fourteen of their patents. *See generally* SER-117–62. Finelite requested that SSI defend and indemnify Finelite. ER-194 ¶ 22. SSI declined because Finelite's alleged infringement did not occur at the C.I.P. point, Hong Kong, and was therefore not within the 2012 Agreement's indemnity clause. SER-104.

In November 2022, Finelite filed a Third-Party Complaint against SSI. ER-188–97. Finelite alleged that it purchased a specific LED chip from SSI on four separate occasions between August 2018 and July 2021 that Finelite incorporated into its lighting products. ER-189–90 ¶¶ 7–8. Finelite further alleged that, because the Seoul Plaintiffs' infringement claims are based on

that same LED chip, SSI owed a duty to defend and indemnify Finelite against the infringement claims. ER-193 ¶¶ 20–21.

In May 2023, SSI moved for summary judgment. SER-99–116. Finelite opposed SSI's motion and filed a cross-motion for summary judgment. SER-77–98, SER-43–56. The District Court granted SSI's motion for summary judgment, denied Finelite's cross-motion and entered judgment under Rule 54(b) in SSI's favor. ER-13–34.[2]

The District Court rejected Finelite's contentions that the sole purpose of the 2012 Agreement was "to authorize a credit history check," ER-20, and "that the parties did not 'mutually intend' for the 2012 Agreement" to apply to future purchases of products by Finelite from SSI, ER-19–20. The court noted that "the 2012 Agreement covered a broad array of topics related to future sales." ER-26. The court also rejected Finelite's attempt to use the purchase orders and confirmations as parol evidence "to support its argument that the 2012 Agreement did not incorporate all of pages 4 and 5." ER-23.

Second, the District Court held—contrary to Finelite's argument—that the last sentence on page 2 meant that Finelite agreed to all the terms of sale

[2] The Seoul Plaintiffs' patent infringement claims against Finelite are currently stayed. Minute Entry, *Seoul Semiconductor Co., Ltd. et al v. Finelite, Inc.*, No. 3:22-cv-02869-TLT (N.D. Cal. Sept. 26, 2024), ECF No. 208.

on pages 4 and 5 of the 2012 Agreement. ER-22–24. Finelite's interpretation, the Court held, was "difficult to reconcile with the structure of the agreement" and would "result in nearly half of the 2012 Agreement as surplusage, which is strongly discouraged under California law." ER-23 (citation omitted).

Third, the District Court rejected Finelite's argument that the parties "entered into a novation when they exchanged Purchase Orders and Acknowledgments," thereby eliminating the 2012 Agreement. ER-26–27.[3] Finelite "[fell] short as to the second element of novation (*i.e.*, the parties formed a new contract)." ER-27. The court reasoned that California Commercial Code § 2207—which governs contract formation through a "battle of the forms"—"is only available where there is not an existing contract." ER-27.

Fourth, the District Court "agree[d] with Samsung" that the "gap filler" California Commercial Code § 2312(3) imposes did not apply because the parties had already agreed to terms of sale in the 2012 Agreement. ER-29–30; *see also* ER-33 ("Section 2207 does not apply where the parties have an existing contract.").[4]

---

[3] A novation "substitut[es] … a new obligation for an existing one." CAL. CIV. CODE § 1530.

[4] Section 2312(3) provides in pertinent part that "*[u]nless otherwise agreed* a seller who is a merchant regularly dealing in goods of the kind warrants that

Fifth, the District Court explained that Finelite's declaratory-judgment claim duplicated its breach-of-contract and UCC claims and thus granted SSI summary judgment on that claim as well. ER-30.

Finally, the District Court held that, even if it were to reach Finelite's battle of the forms argument, there was a genuine issue of material fact as to whether SSI "could access or assent to the Purchase Orders' terms and conditions," because Finelite's terms were contained in sometimes faulty hyperlinks. ER-31. The court also identified a disputed issue of fact regarding whether some of the products were delivered before the Seoul Plaintiffs' patents were issued and identified still more potential factual disputes it did not reach. ER-33. Those disputed factual issues required Finelite's cross-motion to be denied. ER-31, 33.

## SUMMARY OF ARGUMENT

The 2012 Agreement is a single, integrated contract comprising five consecutively numbered pages. Yet throughout its brief, Finelite erroneously treats page 2 of the 2012 Agreement as a separate "Credit Agreement." Finelite agreed to all of the contract's terms—not just those on certain

---

the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like …." (emphasis added).

pages—which included SSI's standard terms of sale. Part I(A). One of the 2012 Agreement's terms required SSI to indemnify Finelite for patent infringement claims related to SSI's products, but only in the jurisdiction where title passed from SSI to Finelite. Neither side disputes that, in the relevant transactions, title passed in Hong Kong. Because the Seoul Plaintiffs' patent infringement claims arose in the United States, SSI has no duty to indemnify Finelite.

Finelite nonetheless seeks to obtain indemnification principally based on a spurious interpretation of the last sentence on page 2 of the 2012 Agreement. That sentence states, "[Finelite] understands and agrees to [SSI's] terms of sale (attached), to pay service charges assessed and to pay reasonable attorneys fees in the event of default." ER-140. Under a plain reading of that sentence, Finelite agreed to three things: (1) SSI's terms of sale (the last two pages of the 2012 Agreement, which include the indemnity provision fatal to Finelite's case); (2) to pay service charges assessed; and (3) to pay reasonable attorney's fees in the event of default. Finelite argues implausibly that the second and third phrases almost entirely revoke its agreement to SSI's terms of sale and, as a result, the indemnity clause is excluded. However, Finelite's grammatical contortions fall flat. *See* Part I(B). And Finelite's interpretation

would render nearly half of the 2012 Agreement surplusage, while the District Court's interpretation gives effect to the entire agreement. *See* Part I(C).

In its effort to excise the indemnity clause from the 2012 Agreement, Finelite seeks to rely on parol evidence, primarily the fact that the parties purportedly did not refer back to the 2012 Agreement in the course of the four transactions at issue. However, parol evidence may be not be used—as Finelite asks—to alter or erase contractual terms. *See* Part I(D)(1). And a contract does not expire simply because the parties do not speak of it. *See* Part I(D)(2).

Finelite did not present most of its other arguments regarding the 2012 Agreement to the District Court and has thus waived them on appeal. But even if this Court considers them, none has merit. *See* Part I(E). For all of these reasons, Finelite's appeal of the order granting summary judgment to SSI should be affirmed.

The Court must next consider SSI's appeal of the denial of its cross-motion for summary judgment. That cross-motion was based on Finelite's assertion that, in each of the four transactions, a contract was formed through the so-called "battle of the forms" under California Commercial Code § 2207. However, as the District Court ruled, because the 2012 Agreement governs

the parties' transactions, no new contracts could have been formed. California courts have repeatedly recognized that § 2207 does not apply when the parties already have an existing agreement in place. For this reason alone, Finelite's appeal of the denial of its summary judgment motion fails. *See* Part II(A).

But even if § 2207 applies, Finelite did not establish that its hyperlinked terms were part of its purchase orders. Fact disputes exist regarding whether Finelite's hyperlinks were accessible, *see* Part II(C)(1), and even if they were accessible, Finelite did not incorporate the terms contained in the links into its purchase orders, *see* Part II(C)(2).

In addition, Finelite's contention that its indemnity term was part of any contract formed under § 2207 is wrong for various reasons, including Finelite's concession that one hyperlink was not operable and that the parties' forms contained conflicting indemnification terms. *See* Part II(D).

And even if the UCC "gap-filler" warranty provision applies, Finelite failed to prove the element of rightful infringement and fact disputes exist regarding at least that element. *See* Part II(E).

Finally, and in the alternative, even if the Court were not to affirm in its entirety the order denying Finelite's cross-motion, Finelite failed to submit evidence of damages sufficient to obtain summary judgment on its first two

claims (breach of contract and breach of the implied warranty). Accordingly, the order denying Finelite's cross-motion should be affirmed as to those two claims. *See* Part II(F).

The judgment should be affirmed.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's decision on cross motions for summary judgment." *Crowe v. Oregon State Bar*, 112 F.4th 1218, 1229 (9th Cir. 2024). The Court "consider[s], viewing the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## ARGUMENT

### I. THE 2012 AGREEMENT GOVERNS SSI'S INDEMNITY OBLIGATIONS.

Finelite does not dispute that under the indemnity term in the 2012 Agreement, SSI has no obligation to indemnify Finelite regarding the Seoul Plaintiffs' claims. Instead, it contends that the indemnity term is not actually part of the 2012 Agreement and, as a result, some other indemnity term applies. As the District Court correctly ruled, Finelite is mistaken.

### A. The 2012 Agreement Is A Single, Integrated Contract.

Finelite incorrectly treats page 2 of the 2012 Agreement as a "credit agreement" distinct from the 2012 Agreement as a whole. *E.g.*, AOB 11. As the District Court found, the 2012 Agreement constitutes a single contract, as shown by the document's pagination from page "1 of 5" to page "5 of 5." *See* ER-22. And the final sentence of page 2, which Finelite signed, expressly incorporates the "terms of sale" set forth on pages 4 and 5, as discussed in the next section.[5]

Finelite repeatedly claims that the sole "object" of the "Credit Agreement" (*i.e.*, page 2 of the 2012 Agreement) was the extension of credit. *E.g.*, AOB 3, 22, 27, 36–37. But that is not true even as to page 2 standing alone, because page 2 contains provisions unrelated to credit, such as unauthorized returns, C.I.P. designation, damage-notice requirements, claims requirements, and SSI's agreement to assist with transportation company settlements. ER-140.

And even if Finelite's point about the object of page 2 had any force, it does not advance the interpretation of the 2012 Agreement as a whole. That

[5] The parties agree that the "terms of sale" incorporated on page 2 of the 2012 Agreement are those contained on pages 4 and 5. *See* AOB 4.

one part of an agreement may have a particular object does not mean that is the sole object of the contract. *Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1210 (9th Cir. 2024) ("Contracts are interpreted as a whole 'so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'") (quoting CAL. CIV. CODE § 1641).

### B. The Final Sentence On Page 2 Of The 2012 Agreement Is A List Of Things To Which Finelite Agreed.

Finelite relies on grammatical principles to argue that the final sentence of page 2 incorporated only two aspects of the terms of sale on pages 4 and 5. It asserts that the second and third phrases of that sentence served to modify or restrict the first clause, in which Finelite agreed to all of the terms of sale. Finelite's interpretation lacks any logical basis because Finelite ignores multiple indicia that the final sentence on page 2 of the 2012 Agreement is a list of things to which Finelite agreed, not an agreement to the terms of sale followed by limitations on the scope of that agreement.

First, Finelite ignores the comma that separates the first clause from the second and third phrases. Indeed, Finelite's brief repeatedly omits the comma altogether from its supposed quotations of the final sentence, pretending the comma does not exist. *See* AOB 9 (Issues 1, 2 and 3), 27 (point heading II(B)), 39. That comma—combined with the coordinating conjunction

"and" between the second and third phrases—makes the three sentence elements a *list* (or series) of things to which Finelite agreed, rather than—as Finelite contends—an agreement to the terms of sale followed by limitations on the scope of that agreement.

Numerous courts have recognized that "items in a series separated by commas and joined at the end by a conjunction constitute a single list or series." *Hippler v. Allied Prop. & Cas. Ins. Co.*, No. 2:12-CV-1039, 2013 WL 5448245, at *4 (D. Utah Sept. 30, 2013); *see also Whitman v. Transtate Title Co.*, 165 Cal. App. 3d 312, 319 (1985) ("Grammatically, the three situations, separated by commas, constitute a series."); *Germantown Tr. & Sav. Bank v. U.S. Bank*, No. 19-CV-352, 2020 WL 8082408, at *4 (S.D. Ill. June 9, 2020) ("Basic grammar rules say that a list of items separated by commas with an 'and' prior to the last item is conjunctive, that is, it includes all the items jointly. Under that rule, 'A, B and C' or 'A, B, and C' (if you are a fan of the serial/Oxford/Harvard comma) refers to all the items jointly rather than alternatively."). Grammar authorities agree. *See, e.g.*, *Extended Rules for Using Commas*, The Writing Lab & The OWL at Purdue Univ., https://bit.ly/3YadRac (last visited Nov. 6, 2024) ("Use commas to separate three or more words, phrases, or clauses written in a series.").

Second, the absence of a comma between the second and third phrases—which, if included, would be an "Oxford" or "serial" comma—does not make the last sentence of page 2 any less a list of things to which Finelite agreed. "[M]any leading grammarians, while sometimes noting that commas at the end of a series can avoid ambiguity, concede that use of such commas is discretionary. When grammarians are divided, and surely where they are cheerfully tolerant, we will not attach significance to an omitted comma." *United States v. Bass*, 404 U.S. 336, 340 n.6 (1971) (citations omitted). Indeed, numerous courts have rejected litigants' attempts to distort the plain meaning of a contract by overemphasizing a serial comma's absence. As one wrote:

> [W]e can't discern any meaning in the absence of a comma between 'asset recovery' and 'and strategy planning.' … The last serial comma that should go between 'asset recovery' and 'and strategy planning'—a so-called Oxford comma—is often dropped at the end of a list. There isn't any ambiguity about whether the 'and' before 'strategy planning' indicates that 'strategy planning' closes the list—it does."

*ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*, 113 F.4th 1312, 1325 (11th Cir. 2024); *see also Airborne San Diego, LLC v. Travelers Prop. Cas. Co. of Am.*, 538 F. Supp. 3d 1032, 1041–42 (S.D. Cal. 2021) ("[O]mission of a serial comma to separate 'non-metal part' from 'any part or tool' does not affect the plain meaning of the exclusion.") (footnote omitted); *see also* ANTONIN SCALIA

& BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 166 (2012) (criticizing an Arizona Supreme Court decision that "wrongly attributed meaning" to the lack of an Oxford comma in a statute).[6] For that reason, even those who suggest "the better practice is to use the serial comma" stress that "courts should not rely much if any on its omission." SCALIA & GARNER, *supra*, at 166.

Third, Finelite's contention turns on its assumption that the final two phrases incorporate only two specific portions of the terms of sale, rather than all of them. However, Finelite never explains why that might be so, and the words used in the sentence show that this cannot be true. The language used in the final two phrases does not track the language on pages 4 and 5. Finelite posits that the term "service charges" refers to and incorporates the discussion of "late charges" on page 4. AOB 13–14, 38–39.[7] Finelite never explains why a reference to "service charges," ER-140, incorporates language about "late charges" two pages later, ER-142 § 7. Further, page 4's discussion

---

[6] Finelite apparently agrees, as its own brief omits the Oxford comma: "the second half serves *to modify, explain or qualify* the main clause." AOB 27–28 (emphasis added).

[7] Finelite discusses this point (and its similar point regarding the final phrase) only in its Statement of the Case and Facts and under an argument point heading discussing a different point. AOB 13–14, 39.

of late charges is in the middle of a dense paragraph titled "Prices and Payment," *id.*; Finelite offers no reason why the parties would pluck out just that one term for incorporation.

The only reasonable interpretation of the term "service charges" in the last sentence of page 2 is that it refers back to the same term earlier on the same page. The third paragraph of that page states in pertinent part that "[a]s a condition of sales, a monthly *service charge* equal to the maximum permitted by law can be assessed to all accounts not paid within 30 days from the due date." ER-140 (emphasis added). In the final sentence on page 2, Finelite agreed expressly to pay such service charges if SSI assessed them, something the third paragraph does not expressly accomplish.[8]

Finelite's contention that the final sentence's use of the term "attorneys fees" incorporates only a part of the terms on pages 4 and 5 fares no better. Here, Finelite assumes, without any explanation, that "reasonable attorneys fees" incorporates language about "collection costs" on page 4. AOB 13–14,

[8] Page 4 states that "[o]verdue amounts are subject to a *late charge* at the lesser of 1.5% of amount outstanding per month or the maximum rate permitted by law," ER-142 § 7 (emphasis added), while page 2 provides that "service charges" may be assessed for late payments in an amount "equal to the maximum permitted by law," ER-140. As a result, while the 2012 Agreement could be viewed as ambiguous regarding how to calculate a service charge or late fee for late payments, that issue has no bearing on the present dispute.

38–39. Finelite's argument again falls flat because attorney's fees are not the same as "collection costs."

In fact, page 4 discusses "collection costs (*including* attorneys' fees …)." ER-142 § 7 (emphasis added). Construing the attorney's fees clause on page 2 as an incorporation of a different concept (collection costs) on page 4 makes no sense.[9]

### C. The District Court Correctly Concluded That Adoption Of Finelite's Interpretation Would Erroneously Render Much Of The 2012 Agreement Surplusage.

Finelite acknowledges the legal precept that "an interpretation which renders part of the instrument to be surplusage should be avoided." AOB 37 (internal quotation marks omitted); *see also* ER-23 (same). Accepting that concept as controlling, it seeks to avoid its application here by arguing that the terms of sale constituted "an entirely separate document" from the rest of the 2012 Agreement. AOB 38. As discussed earlier, that is not so, as the District Court specifically ruled.

The District Court noted that the 2012 Agreement was specifically designated to be five pages total because it was paginated as "1 of 5" through

[9] Finelite notes that the term "attorneys fees" on page 2 is not possessive, characterizing that as a grammatical error. AOB 9 n.2. Finelite does not ascribe any interpretive significance to this supposed error, and it has none.

"5 of 5." ER-22. The District Court's interpretation gives effect to the entirety of the 2012 Agreement, by contrast to Finelite's, which would not.[10]

### D. Finelite's Reliance On Parol Evidence Of The Parties' Course Of Performance Is Improper And Proves Nothing.

Finelite argues that, because the parties did not refer to the 2012 Agreement when carrying out transactions the agreement anticipated, the "parties' behavior was entirely consistent with Finelite's construction of the last sentence of the Credit Agreement." AOB 36. Finelite thereby improperly attempts to use parol evidence to contradict the 2012 Agreement's language, but the evidence, even if considered, proves nothing.

#### *1. Finelite improperly relies on parol evidence to attempt to contradict the 2012 Agreement's terms.*

Finelite acknowledges that "extrinsic evidence"—here, the parties' subsequent conduct—"may not be relied upon to alter or add to the terms of the writing." AOB 35 n.13 (quoting *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1174 (2013)). But that is exactly what Finelite seeks because Finelite's interpretation would negate all of the

[10] One could say that Finelite's interpretation nullifies 40% of the Agreement because it knocks out two out of five pages; however, Finelite's position is even more extreme because pages 4 and 5 include the majority of words in the 2012 Agreement.

following terms of the 2012 Agreement that specifically prohibit exactly what Finelite asks this Court to hold:

- "These terms may *only* be modified in a signed writing by an authorized employee of [SSI]." ER-143 § 11 (emphasis added);
- "The terms and conditions in this document *exclusively* govern and control, and entirely supersede, and are in lieu of the terms and conditions in, the Customer's purchase order or any other document offered or proposed by Customer." ER-142 § 1 (emphasis added);
- "*No other terms* shall be valid unless specifically agreed to in writing and signed by [SSI]." *Id.* (emphasis added);
- "Failure of [SSI] to object to the provisions in any document sent by Customer shall not be deemed a waiver of these terms or acceptance of any terms the Customer may have requested." *Id.*; and
- "[SSI's] sale of Products covered by this document are governed only by these terms and conditions of sale." *Id.*

Finelite's use of extrinsic evidence in an attempt to remake the 2012 Agreement to its liking is exactly what the parol evidence rule prohibits.

Finelite's conclusory argument that the parties' exchanges of purchase orders and acknowledgements in connection with the four transactions at issue somehow "confirms the plain meaning of the [2012] [A]greement" (AOB 35 n.13, 36) is absurd. Finelite does not rely on the parties' conduct to interpret any words in the 2012 Agreement but rather to contend that the parties substituted the terms in the purchase orders and acknowledgements for those in the 2012 Agreement. That is not interpretation of the 2012 Agreement; it is complete elimination.

Indeed, this is a back-door attempt by Finelite to resuscitate the meritless novation argument it made below but abandoned on appeal. *See* SER-94–95 ("the parties entered into a novation when they exchanged purchase orders and sales acknowledgment forms;" "[t]hese new contracts extinguished and replaced the old contract[]"); ER-27 (District Court rejecting novation argument).

*2. The parties' failure to refer to the 2012 Agreement during the course of the four transactions is fully consistent with the 2012 Agreement and in no way undermines it.*

Even if the Court were to consider parol evidence of the parties' course of conduct, Finelite's contention fails.

Finelite effectively asks the Court to adopt a rule that requires commercial parties to speak of—or periodically refer to—their contracts to maintain their vitality. California recognize no such rule. If this Court were to do so, it would be a sea change in California contract law and violate the rule that this Court must apply state law as would the state's highest court. *See Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960, 962–63 (9th Cir. 2020) (when "adjudicat[ing] a state-law claim," federal courts must "approximate state law as closely as possible").

The 2012 Agreement specifically contemplated that, as is routine, each party would attempt to impose its preferred terms on the other in a "battle of the forms." As the quotations from the 2012 Agreement in the prior section demonstrate, the 2012 Agreement expressly ruled out reliance on terms set forth in the parties' forms and provided that any change to the 2012 Agreement would be effective only if signed by an SSI employee. None of SSI's sales acknowledgements were signed by an SSI employee, nor were any of Finelite's purchase orders. Therefore, none of those documents could modify the 2012 Agreement. Neither Finelite nor SSI had any reason to remind the other that their routine exchange of forms would not change the terms of the 2012 Agreement, as previously agreed.

Finelite's contention (AOB 36) that it "defies reason that Samsung would have provided Finelite with alternate—and at times differing—terms and conditions than those in its Contract of Sale if the parties (including Samsung as drafter) intended the entirety of the much earlier Contract of Sale to govern their transactions" is simply wrong. For one thing, it is undisputed that SSI's indemnity provision in the 2012 Agreement is the same as the corresponding term in each of the four order acknowledgements. ER-143, ER-162, ER-166, ER-170, ER-174.

More generally, commercial buyers and sellers routinely attempt to include terms favorable to them in boilerplate purchase orders and confirmations. Indeed, Finelite's boilerplate terms were not included in its purchase orders but instead in a link included below the email signature of its personnel. *See, e.g.*, ER-123–28. Finelite therefore indiscriminately promulgated those terms to every party with which it dealt without regard to what pre-existing contractual relationship might be in place; in fact, the relevant Finelite employees appear to have sent that link with every email they sent, regardless of whether the email was even part of a purchase or sale transaction. *Id.* Similarly, the undisputed evidence here showed that SSI's system automatically generated acknowledgements based on Finelite's purchase orders.

ER-149 ¶ 3. No evidence shows that either side made a thoughtful assessment of their pre-existing contractual arrangement before exchanging routine form documents to effectuate the purchase transactions at issue.[11]

### E. The Arguments Finelite Makes For The First Time On Appeal Are Waived And In Any Event Unpersuasive.

Finelite raises several new arguments on appeal that it never presented to the District Court. Those arguments are waived, and the Court should not reach them. *See Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010) ("These arguments are raised for the first time on appeal, and because they were never argued before the district court, we deem them waived.").

[11] Finelite also contends that "to the extent the last sentence of the credit agreement is construed to be ambiguous, that ambiguity must be construed against Samsung" as the drafter. AOB 39 (capitalization altered). However, Finelite fails to explain what the supposed ambiguity is, other than to retread the meritless parol evidence/stealth novation argument refuted above. Regardless, as the District Court noted, the doctrine that contractual ambiguities may be construed unfavorably to the drafter applies only when *other* rules of construction are not determinative. *See* ER-22 n.5; *Gutzi Assocs. v. Switzer*, 215 Cal. App. 3d 1636, 1641–42 (1989) (reversing ruling that resorted to construing contract against the drafter without considering "other rules of construction" that dispelled the supposed ambiguity). Finelite fails to demonstrate that other rules of interpretation are not determinative and does not challenge the District Court's ruling that such a showing is a prerequisite to construing ambiguity against the drafter. Accordingly, Finelite's contention fails.

Even if the Court were to consider Finelite's waived points, none is persuasive.

1. *Whether the final sentence of page 2 of the 2012 Agreement is a "loose sentence" has no bearing on its meaning.*

Finelite contends for the first time on appeal that the final sentence on page 2 is not a simple list but "is categorized by grammarians as a 'loose sentence.'" *See* AOB 27–28. Finelite waived this argument by not raising it below. *Hillis*, 626 F.3d at 1019. Even if the Court were to consider the point, it does not advance Finelite's argument.

As an initial matter, "loose sentence" appears to be an obscure term little discussed by grammarians: besides the book Finelite cites to define it, *none* of its other cited grammar authorities discusses it. *See* THE CHICAGO MANUAL OF STYLE §§ 5.217-5.220, at 293–94 (17th ed. 2017) (describing the "four traditional types of sentence structures," none of which is a "loose sentence"); WILLIAM A. SABIN, THE GREGG REFERENCE MANUAL: A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING 674 (llth ed. 2010) (listing *nine* types of sentences, with no mention of a "loose sentence"); BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE: THE AUTHORITY ON GRAMMAR, USAGE, AND STYLE 1238–39 (5th ed. 2022) (same, despite listing *ten* sentence types). Nor has SSI identified a *single* judicial opinion discussing the phrase,

confirmed by Finelite's failure to cite any legal authority supporting its theory. A Westlaw search for "loose sentence" across all state and federal cases produced four results, none of which use the term as Finelite does.

Finelite never explains how classifying the final sentence on page 2 of the 2012 Agreement as "loose" supports its interpretation of that sentence. It seems to suggest that the "second half" of a loose sentence *always* consists of modifiers because, after discussing the meaning of a loose sentence, Finelite immediately turns to an *ipse dixit* that the second half of the sentence "added modifiers," with no explanation of, or support for, that contention. AOB 27–28. But Finelite's implication that the second half of a loose sentence *always* consists of modifiers is contradicted by the very definition of loose sentence it relies upon. According to Finelite, a loose sentence "begins with the main idea and then attaches modifiers, qualifiers, *and additional details*." AOB 28 (quoting WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE 92 (4th ed. 2000) (emphasis added)).

Further, the only example Strunk & White give of a loose sentence involves the addition of details, not modifiers, further refuting Finelite's contention: "He was determined to succeed, with or without the promotion he was hoping for and in spite of the difficulties he was confronting at every turn."

STRUNK & WHITE, *supra*, at 92. As that example shows, the dependent clauses following the main clause in a "loose sentence" do not necessarily—or even ordinarily—change the meaning of the independent clause.

2. *Contrary to Finelite's speculation, the District Court did not rely on the notion that the final sentence of page 2 of the 2012 Agreement contained prepositional or parallel phrases.*

Finelite posits that the "District Court may have been led astray" by SSI's contention that the last sentence on page 2 of the 2012 Agreement consisted of "three parallel prepositional phrases" when in fact the final two phrases in the list are infinitive phrases. AOB 30–31. Finelite's argument is waived and also wrong on multiple levels.

First, the District Court's order does not discuss in any way whether the phrases are infinitive, prepositional or parallel. *See* ER-13–34.

Second, Finelite, not SSI, introduced the concept that the last two phrases of the final sentence on page 2 of the 2012 Agreement employed prepositional phrases. SER-93 ("The Credit Agreement's *concluding prepositional phrase* ….") (emphasis added). SSI merely acquiesced in that framework in its reply. SER-67–68. Thus, to the extent Finelite's contention on appeal regarding prepositional phrases could somehow (and implausibly) be construed as persuasive, it invited any resulting error. *See In re Oracle*

*Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010) ("The doctrine of invited error prevents a [party] from complaining of an error that was his own fault.").

Third, despite devoting two pages to the issue, Finelite never explains why it would matter if the clauses were deemed prepositional phrases or whether the sentence is parallel. It doesn't. That the final sentence on page 2 of the 2012 Agreement contains a list of three things to which Finelite agreed is evident, as already explained. Indeed, as Finelite's own authorities recognize, while writers should endeavor to keep items in a series parallel, even experienced writers sometimes fall short. *See, e.g.*, GARNER'S MODERN ENGLISH USAGE, *supra*, at 801.

Fourth, insofar as it could be considered to matter, the sentence *is* parallel. As Finelite recognizes, "[e]very element of a parallel series must be a functional match (word, phrase, clause, sentence) and serve the same grammatical function in the sentence (*e.g.*, noun, verb, adjective, adverb)." AOB 31 (quoting CHICAGO MANUAL OF STYLE, *supra*, § 5.242). Finelite argues that the sentence is not parallel because "[t]he first element—'[SSI]'s terms of sale (attached)'—is a noun," but "[t]he second and third elements—beginning with 'to pay'—are verbs." AOB 31.

Where Finelite errs is its misconception that "[t]he second and third elements—beginning with 'to pay'—are verbs." *Id.* To the contrary, "infinitives primarily function as nouns, adjectives, or adverbs." *State v. Woodrum*, 845 S.E.2d 278, 285 (W. Va. 2020). The Chicago Manual of Style clarifies that infinitives function as nouns when they serve as the direct object of a verb: "*As a noun*, the infinitive can perform as (1) the subject of a finite verb … or (2) *the object of a transitive verb* or participle {I want **to hire** a new assistant}." CHICAGO MANUAL OF STYLE, *supra*, § 5.107 (first and second emphases added). Perdue Owl provides an on-point example:

> Phil agreed **to give** me a ride.
>
> **The infinitive phrase functions as the direct object of the verb *agreed*.**

*Infinitives*, The Writing Lab & The OWL at Purdue Univ., https://bit.ly/3A5WShc (last visited Nov. 6, 2024). Like the example above, the two infinitive phrases in the last sentence on page 2 of the 2012 Agreement function as nouns because they are the direct objects of "agrees." *Cf. Irving v. Divito*, 807 S.E.2d 741, 746 (Va. 2017) (in the sentence "'I wish to remove Patrick named as my son from this will' … the infinitive 'to remove' is a noun operating as the object of the verb 'wish.'") (emphasis omitted) (citing CHICAGO MANUAL OF STYLE, *supra*, § 5.107).

A sentence can exhibit parallel structure even without three matching infinitive phrases. In *Anhui Powerguard Technology Co. v. DRE Health Corp.*, 95 F.4th 1146 (8th Cir. 2024), the Eighth Circuit recently considered the following sentence in a contract:

> AFTER THE INITIAL PAYMENT OF $1,970,000.00 USD … , ANHUI POWERGUARD ***AGREES TO RELEASE*** DRE Health FROM ALL LEGAL CLAIMS (GRANTED DRE COMPLETES INSTALLMENT PAYMENTS), ***AGREE THAT*** THE VENUE FOR ANY FUTURE DISPUTES SHALL BE BINDING ARBITRATION WITH HONG KONG INTERNATIONAL ARBITRATION CENTRE (HKIAC) UNDER THE TERMS OF ORIGINAL PO, AND ***AGREE TO DELIVER*** NITRILE GLOVES TO DRE Health.

*Id.* at 1148, 1150 (emphasis added). Even though only two of the three phrases are infinitive phrases, the court concluded that the sentence "indicate[d] a parallel construction," both because the verb "agree" or "agrees" preceded all three obligations and because "the three obligations form a series because they pertain to a common subject matter: the business relationship between the parties." *Id.* As in *Anhui*, the three repeated "to" phrases and the common subject matter of the three obligations Finelite agreed to indicate parallel structure. *See id.*

### 3. *Absence of the phrase "including but not limited to" has no significance.*

Finelite contends (AOB 33–34) that page 2's use of the phrase "including but not limited to" twice at the beginning of that page, coupled with omission of that term from the final sentence on that same page, somehow supports its contention that the final two phrases of the final sentence limited the scope of Finelite's agreement to the terms of sale. This contention is yet another new argument that is waived and also baseless.

Finelite contends that SSI should have written the final sentence as follows: "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached), **including but not limited to the obligation** to pay service charges assessed and to pay reasonable attorneys fees in the event of default." AOB 34 (Finelite's rewrite indicated in bold, underline).

This argument assumes to be true a point that has already been shown to be false: that the last two phrases of the final sentence incorporated portions of the terms of sale. *See* Part I(B), *supra*. As shown above, the first of the two phrases supplemented a discussion of service charges earlier on the same page, and the attorney's fees provision was a freestanding term to which Finelite agreed. *See supra* at 20–22.

Finelite's hypothetical edit to the 2012 Agreement proves nothing other than that a wholesale revision of the final sentence on page 2 could change its meaning. Finelite offers no valid reason why its revised version of the final sentence should be deemed to reflect what the parties intended when, as shown above, the final sentence was unambiguously a list of three things to which Finelite agreed. Needless to say, courts do not rewrite contracts but rather examine and enforce the parties' expressed intent. *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 516 (2024) ("Courts cannot rewrite agreements and impose terms to which neither party has agreed") (citation and internal quotation marks omitted).

*4. Differing language regarding the shipping point does not support Finelite's interpretation.*

In yet another point made for the first time on appeal, Finelite contends that the 2012 Agreement has differing language regarding identification of the shipping point when the parties do not specify one in connection with a particular transaction. Based on that observation, Finelite argues that the final sentence on page 2 could not have been intended to incorporate the entirety of the terms of sale. AOB 34–35. This argument—which is of course waived—also lacks merit. The definition of shipping points has nothing to do with the

meaning of the relevant sentence because that sentence does not refer to shipping points. Finelite's argument is wrong for multiple additional reasons.

First, Finelite's argument that the referenced shipping provisions are "in direct conflict" (AOB 34) is belied by the record. Finelite points to no record evidence—and there is none—suggesting that SSI's "designated shipping point" referred to on page 2 of the 2012 Agreement differs from the terms of sale's designation of "Samsung's warehouse in California" as the default shipping point if one is not specified by the parties. To the extent anything in the record sheds light on this purported "conflict," it contradicts Finelite's argument: the first and third pages of the 2012 Agreement list SSI's address in San Jose, California. ER-139, ER-141. The same California address is listed on each of SSI's sales acknowledgments. ER-161, ER-164, ER-168, ER-172. In other words, all the record evidence suggests the default "designated shipping point" on page 2 refers to California, which means the conflict Finelite hypothesizes is non-existent.

Second, no conflict arises between the provisions in this case because, as discussed above, the parties agreed in writing to a different C.I.P. point in the purchase orders and acknowledgements for the relevant transactions. Finelite's quotations omit critical language on this point. Page 2 of the 2012

Agreement states that "Goods are sold C.I.P. Samsung Semiconductor, Inc.'s designated shipping point ***unless otherwise specified***." ER-140 (bold, italics indicates language Finelite omitted). Finelite also elides similar language in the terms of sale, which provide that "All product is sold … C.I.P. Samsung's warehouse in California ***unless another location is specifically designated in writing by Samsung***." ER-143 § 8 (same). Here, the parties specifically designated, in writing, Hong Kong as the C.I.P. point. *See supra* at 7. Any hypothetical conflict was thus addressed by the parties' communications regarding each of the four transactions.

Finally, even if Finelite were correct that the 2012 Agreement's definition of "shipping point" is different on pages 2 and 5, that in no way undermines the fact that the final sentence of page 2 of the 2012 Agreement is a list of three things to which Finelite agreed. Any potential ambiguity in the definition of the default "shipping point" has nothing to do with the meaning of that sentence.

## II. THE ORDER DENYING FINELITE'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE AFFIRMED.

Finelite's cross-motion for summary judgment contended that four separate contracts were created under a § 2207 battle of the forms based on the parties' exchanges of writings in each transaction. Finelite's appeal seeks

reversal of the order denying its cross motion. Its arguments fail for multiple reasons.

### A. Because The 2012 Agreement Was In Effect, § 2207 Does Not Apply.

Finelite contends that the parties' exchanges of purchase orders and acknowledgements in connection with the four transactions created four new contracts. AOB 41–48. Finelite applies a § 2207 battle of the forms analysis to argue both that those contracts were formed and that their terms require SSI to indemnify Finelite against the Seoul Plaintiffs' claims. AOB 48–55.

However, while Finelite mentions the District Court's ruling that § 2207 "does not apply where there is already an existing contract between the parties" (AOB 20 (quoting ER-31)), it does not challenge that ruling on appeal. Finelite states—only in its Statement of the Case and Facts—that the "District Court's erroneous conclusion resulted from the faulty premise that [SSI's] form Credit Agreement 'provides the operative terms for this third-party dispute' because the final sentence of the Credit Agreement incorporates by reference the entirety of [SSI's] Contract of Sale." AOB 20 (quoting ER-26). Finelite thus implicitly concedes that, if this Court agrees with the District Court's interpretation of the 2012 Agreement (and with SSI's contentions in Part I, *supra*), then this Court would not reach Finelite's § 2207

arguments. In addition, Finelite has waived any such challenge by not mounting one in its Opening Brief. *H & H Pharms., LLC v. Cambrex Charles City, Inc.*, 836 F. App'x 619, 620 (9th Cir. 2021) ("[A]ppellant's failure to develop any challenge to a conclusion by the district court waives the issue.") (citing *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003)). If the Court agrees, then it should affirm the judgment without further analysis.

In addition, Finelite does not address the effect of the 2012 Agreement on a § 2207 analysis in the event this Court were to interpret that agreement as Finelite urges: namely, that only the terms on page 2 along with two specific terms on pages 4 and 5, not including the indemnity provision, are binding on the parties. Finelite seems to assume that if the 2012 Agreement were interpreted as it advocates, then the Court would proceed to a § 2207 battle of the forms analysis. Finelite is incorrect because, even if the 2012 Agreement were to be interpreted as Finelite urges, the existence of that agreement still bars a § 2207 analysis. When the parties to a sales transaction have already agreed on the terms of sale, application of § 2207 to create a contract, and to determine its terms, is unnecessary. *Plastoform Indus. Ltd. v. Monster LLC*, No. 18-cv-02805, 2018 WL 10562845, at *4 (N.D. Cal. Sept. 6, 2018) (rejecting plaintiff's

argument that the terms contained in its purchase orders "supersede[d]" terms in the parties' earlier agreement; § 2207 did not apply).

Finelite does not dispute that even the portions of the 2012 Agreement that Finelite concedes are part of the 2012 Agreement include key terms of sale for future transactions unrelated to SSI's decision whether to allow Finelite to purchase goods on credit. Those terms include due dates for invoices, service charges for late payments, attorney's fees in the event of default and that goods "are sold C.I.P. Samsung Semiconductor, Inc.'s designated shipping point." ER-140.

Nor does Finelite dispute that the 2012 Agreement was in full force and effect during the four transactions at issue here and has waived any argument to the contrary, including the novation argument it presented below, *see supra* at 10, 25. Finelite's colorful but inaccurate comment that SSI pulled the 2012 Agreement from "the grave" (AOB 36) is, of course, insufficient to preserve a point on appeal. *Autotel v. Nevada Bell Tel. Co.*, 697 F.3d 846, 857 n.9 (9th Cir. 2012) (appellant's "conclusory statement in its opening brief, unaccompanied by argument or citation to the record" was "insufficient to preserve the issue for appeal").

In short, the existence of the 2012 Agreement bars Finelite's attempt to use § 2207 to obtain a ruling that four new contracts came into being and what the terms of those contracts were, and that is so regardless of how the Court interprets the 2012 Agreement. Consequently, Finelite's appeal regarding its summary judgment motion fails, and the judgment should be affirmed without further analysis.[12]

**B. Overview of Contract Formation Under § 2207.**

The Court should reach Finelite's § 2207 arguments only if the Court disagrees with Part II(A), *supra*.

---

[12] The District Court held that, when a contract has been formed to govern future sales, "the effect of subsequent purchase orders [proposing additional or differing terms] must be analyzed under UCC provisions that govern[] modifications" to a contract, not under a § 2207 analysis. ER-27 (citing *Am. Licorice Co. v. Total Sweeteners, Inc.*, No. C-13-1929, 2013 WL 4396778, at *6 (N.D. Cal. Aug. 13, 2013)). Finelite does not challenge this ruling and therefore accepts it. Nor does Finelite respond to that ruling with an argument that the parties' exchanges of purchase orders and acknowledgements somehow modified the 2012 Agreement under § 2209 of the California Commercial Code. Accordingly, Finelite has waived that issue as well.

Finelite cannot argue contract modification (or any of its other waived points) in its reply brief because SSI would have no opportunity to respond. *Garmong v. Tahoe Reg'l Plan. Agency*, No. 22-15869, 2023 WL 7122579, at *2 (9th Cir. Oct. 30, 2023) ("[Appellant]'s arguments raised for the first time in his reply brief are also forfeited because Appellees had no opportunity to respond." (citing *Autotel v. Nevada Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012))). Accordingly, Finelite's § 2207 arguments are of no consequence.

Section 2207 provides a framework for resolving disputes that arise when parties to a sales transaction have not expressly agreed in advance to the terms of sale. In such situations in the commercial world, the buyer and seller typically each send the other a form packed with terms that favor the sender's self-interest—the so-called battle of the forms. *See Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 787 (9th Cir. 2001). The UCC sought to reform the impractical common law rules that governed this situation.

Section 2207 "change[d] the common law's mirror-image rule for transactions that fall within article 2 of the U.C.C." *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1443 (9th Cir. 1986). Whereas under the common law an acceptance that varied in any respect from the terms of the offer was treated as a rejection and counteroffer, § 2207(1) "converts a common law counteroffer into an acceptance *even though* it states additional or different terms," *id.* (internal quotation marks omitted) (emphasis added), "unless acceptance is expressly made conditional on assent to the additional or different terms," CAL. COM. CODE § 2207(1). Section 2207(2) then addresses how to determine the terms of a contract so formed.

Regarding contract formation, § 2207(1) provides the following:

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

If a contract is formed under § 2207(1), then § 2207(2) provides that

> additional terms [in the acceptance] are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > (a) The offer expressly limits acceptance to the terms of the offer;
> >
> > (b) They materially alter it; or
> >
> > (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

CAL. COM. CODE § 2207(1)–(2); *Diamond Fruit Growers*, 794 F.2d at 1443.

To the extent the acceptance involves *different*—as opposed to additional—terms, any terms that conflict cancel out, and the contract consists of the terms on which the parties' documents agree, plus any provisions supplied by the UCC "gap fillers." *Steiny & Co. v. Cal. Elec. Supply Co.*, 79 Cal. App. 4th 285, 295 (2000) (where parties' forms contained "materially differing terms," the contract "consisted of the terms on which the two writings agreed, supplemented by the provisions of the Code"); *Channell Com. Corp. v. Wilmington Mach. Inc.*, No. ED CV 14-2240, 2016 WL 7638180, at *5 (C.D. Cal.

June 17, 2016) ("Because these terms are inherently in conflict, they are not part of the agreement between the parties. These issues will therefore be addressed by the UCC's gap-filler provisions ...."). The official commentary to § 2207 states this rule expressly:

> Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract.

CAL. COM. CODE § 2207 cmt. 6.

The analysis proceeds differently, however, when "acceptance is expressly made conditional on assent to the additional or different terms." CAL. COM. CODE § 2207(1). In that case, no contract is formed, and the acceptance operates as a counteroffer. *Textile Unlimited*, 240 F.3d at 787. The counteroffer is deemed accepted—and a contract formed—only if the offeror "give[s] specific and unequivocal assent" to the supplemental terms. *Id.* Absent the offeror's assent, no contract is formed by the parties' writings.

That's where § 2207(3) may kick in. If the parties proceed with the transaction without a contract having been formed by the exchange of writings, an implied contract may be formed even though "the writings of the parties do not otherwise establish a contract." CAL. COM. CODE § 2207(3). In that

scenario, the contract "consist[s] of those terms on which the writings of the parties agree," plus any "supplementary terms," *id.*—often referred to as "gap-filler" provisions—the UCC supplies, *Textile Unlimited*, 240 F.3d at 787–88.

### C. Even If § 2207 Applies, Finelite Did Not Establish That Its Hyperlinked Terms Were Incorporated Into Its Purchase Orders.

#### *1. A fact dispute exists regarding whether Finelite's hyperlinks were accessible.*

To obtain summary judgment against SSI, Finelite had to establish with undisputed evidence that the hyperlink was operable for all four transactions. That is because Finelite's indemnification term could not have become part of the parties' contract if it were not incorporated into Finelite's purchase orders.

As an initial matter, Finelite conceded that the link was not working for the final transaction in 2021. ER-32. Moreover, with respect to the other transactions, the District Court identified a factual dispute regarding whether the link in Finelite's emails transmitting the purchase orders was operable. ER-31 (fact dispute regarding whether SSI "could access or assent to the Purchase Orders' terms and conditions"). Finelite does not even mention this ruling in its Opening Brief and therefore has waived its right to challenge it. These undisputed rulings require affirmance of the order denying Finelite's

cross-motion with no further analysis. And, even if not waived, a battle of the forms analysis cannot proceed without the factual dispute being resolved on remand.

In addition, the contradictory declarations of Finelite's key witness also created a dispute of material fact. John Shue, Finelite's supply chain director, initially swore that "*[f]or each of the 2018–2021 Purchases*, Finelite's cover email to Samsung accompanying the purchase order contained a hyperlink located towards the bottom of the email *that directed Samsung to Finelite's standard terms and conditions of purchase.*" ER-120 ¶ 7 (emphases added). After SSI challenged that assertion with evidence that clicking on the relevant hyperlink generated an error message (ER-111–12), Mr. Shue backtracked in a second declaration filed with Finelite's reply. There, he conceded that "the hyperlink available to Samsung on the email accompanying the fourth [2021] purchase order was not functioning properly." ER-108 ¶ 7.

Mr. Shue's lack of credibility presents a triable issue of fact: "Questions of credibility, of course, are particularly appropriate for jury determination." *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 968 (9th Cir. 1981) ("discrepancies in [witness's] deposition testimony" created material fact dispute). If the jury were to disbelieve Mr. Shue's second declaration regarding the other

three hyperlinks, then SSI's hyperlinked terms could not have become part of the contract. This fact dispute must be resolved by a jury before a § 2207 legal analysis may be undertaken. Accordingly, the order denying Finelite's cross-motion should be affirmed and the matter remanded.

*2. Even if Finelite's hyperlinks were accessible, they were not incorporated into its purchase orders.*

Even if the Court were to assume that the hyperlink was operable for all four transactions (despite Finelite's admission that the 2021 link was inoperable), Finelite's attempt to rely on those hyperlinked terms fails as a matter of law.

"For the terms of another document [here, the hyperlinked terms] to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference *must be called to the attention of the other party* and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 641 (1986) (emphasis altered). In assessing whether "the terms of some other document" were incorporated by reference, "each case must turn on its facts." *Id.*

Finelite's purchase orders do not come close to satisfying *Chan*. Each of Finelite's cover emails directed SSI's attention to an attached file that

consisted of a purchase order, with no mention of a hyperlink. For instance, the 2018 email said, "Please view *attached file* and provide order confirmation when available." ER-123 (emphasis added); *see also* ER-125, ER-127, ER-128. None of the purchase orders contained, or referred to in any way, Finelite's hyperlinked terms. ER-154–59. For example, the image below shows the entirety of a Finelite purchase order:

Case: 24-711, 06/03/2024, DktEntry: 11.1, Page 159 of 297

Case 3:22-cv-02869-TLT Document 105-8 Filed 05/19/23 Page 2 of 2

FINELITE, INC.
30500 Whipple Road
Union City, CA 94587
FAX: 510-441-2973
PHONE: 510-441-1100

PAGE: 1
PURCHASE ORDER: 122738-00
DATE: 07/08/21
ORDER TYPE: Normal
STATUS:Release

VENDOR:
Samsung Semiconductor, Inc
3655 North 1st Street

San Jose CA 95134
CONTACT:Jon Cole
PHONE:408-544-4000
FAX:

SHIP TO:
HK TaiRui Electronics
No.2,3/F Wang Lung Industrial Building
11 lung Tak Street, Tsuen Wan
N.T. Hong Kong

| BUYER: | TERMS: | CONFIRM: | WAREHOUSE: | SHIP VIA: | COL/PPD |
|---|---|---|---|---|---|
| Crystal Rowland | net 30 day | No | CIP Hong Kong | bst way | |

| | QUANTITY | ITEM NO./DESCRIPTION | | EXPECTED COST | PROMISE DATE |
|---|---|---|---|---|---|
| 1 | 10,000,000 EA | 77062<br>Chip, 3500K 561B+ Samsung LED<br>SPMWHT541MP5W1UMS4 (S4/S5) | 00/00/00 | [redacted]<br>Ext Price = [redacted] | 08/30/21 |
| 2 | [redacted] EA | [redacted]<br>Chip, [redacted] Samsung LED | 00/00/00 | [redacted]<br>Ext Price = [redacted] | 08/30/21 |
| 3 | [redacted] EA | [redacted]<br>Chip, [redacted] Samsung LED | 00/00/00 | [redacted]<br>Ext Price = [redacted] | 08/30/21 |
| 4 | [redacted] EA | [redacted]<br>Chip, [redacted] LED, [redacted] | 00/00/00 | [redacted]<br>Ext Price = [redacted] | 08/30/21 |

MATERIAL IS NON-TAXABLE! Total Ext Price = [redacted]

**ER-159**

ER-159. In other words, Finelite's cover email *misdirected* SSI *to the attachment*, rather than—as *Chan* requires—expressly referring SSI to the hyperlink at the bottom of the cover email.

The facts here contrast with the typical situation in which an offer or acceptance *expressly* incorporates terms and conditions, either on its face or by informing the recipient where they could find any additional terms. *See, e.g.*, *Channell Com. Corp.*, 2016 WL 7638180, at *5 ("This offer is made in accordance with [Company's] Standard Terms and Conditions *as found in the attached page for the LP1000WP Machine*." (emphasis added)). SSI's sales acknowledgments followed this practice by including SSI's terms. *See, e.g.*, ER-164–66. Accordingly, Finelite has failed to meet its burden as the moving party, and the order denying its cross-motion should be affirmed and the matter remanded for this independent reason. *See Chan*, 178 Cal. App. 3d at 645 (arbitration provision in a stock exchange's rules not incorporated by reference into the parties' contract).

### D. Even If Finelite's Indemnification Term Were Part Of Its Purchase Orders, Finelite Did Not Establish That Its Indemnification Term Applied To All Of The Transactions.

#### *1. No § 2207(1) contract was formed based on the parties' exchange of writings regarding the 2018 transaction.*

As Finelite acknowledges (AOB 42), § 2207 provides that an exchange of forms does not create a contract when the seller's acceptance is expressly conditioned on the buyer assenting to the seller's additional or different terms. While Finelite argues that SSI's acknowledgements "were not expressly made conditional on Finelite's assent to [SSI's] additional or different terms" (AOB 45 (cleaned up)), that is incorrect as to SSI's 2018 acknowledgement. That document states that "[o]rder acceptance is: (A) *expressly conditioned upon and subject to* the terms and conditions of sale in this order acknowledgment …." ER-162 (emphasis added). Therefore, no contract was created by the parties' writings.[13]

Finelite's cited authorities confirm *SSI*'s position. In the cases Finelite cites as examples of situations in which acceptance *was* expressly conditioned

[13] As noted above, the 2018 acknowledgement's terms differ from the other three. Finelite acknowledges that SSI's "[t]erms changed somewhat between 2018 and 2019," but states incorrectly that "in relevant part they remained the same for each of the 2018-2021 [p]urchases." AOB 16. As shown above, the 2018 acknowledgment was materially different from the others.

on assent to the different terms (AOB 47), the courts' conclusions were based on language nearly identical to that found in SSI's 2018 acknowledgment. *See Textile Unlimited*, 240 F.3d at 788 ("Seller's willingness to sell yarn to you is conditioned on your acceptance of these Terms of Sale."); *Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 513 (1996) (similar); *Niagara Bottling, LLC v. Rite-Hite Co.,* No. EDCV 18-2032, 2019 WL 1768875, at *8 (C.D. Cal. Feb. 11, 2019) (similar); *Frank M. Booth, Inc. v. Reynolds Metals Co.*, 754 F. Supp. 1441, 1444 (E.D. Cal. 1991) (similar).[14]

In short, because SSI's 2018 acceptance was expressly conditioned on SSI's new terms, that acceptance "operate[d] as … [a] counteroffer." *Textile Unlimited, Inc.*, 240 F.3d at 787. And because Finelite did not "give specific and unequivocal assent" to the supplemental terms, no contract was formed via the parties' writings regarding the 2018 transaction. *Id.* Consequently, Finelite's indemnification provision does not apply to the 2018 transaction.

---

[14] Finelite cites various cases to argue that Samsung's acceptances were not expressly conditioned on Finelite's assent to the new terms. *See* AOB 45–47. But, *unlike* Samsung's 2018 acknowledgment, *none* of the acceptances in those decisions included language *expressly conditioning acceptance* on the different terms. *See Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 927 (9th Cir. 1979) ("Acceptance of this order shall be deemed to constitute an agreement to the conditions named hereon and supersedes all previous agreements."); *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1164 (6th Cir. 1972) (similar); *Channell Com. Corp.*, 2016 WL 7638180, at *5 (similar).

*2. No § 2207(1) contract was formed based on the parties' exchange of writings regarding the 2021 transaction.*

Finelite concedes that, at the time of the 2021 purchase order, the hyperlink that normally would have contained Finelite's terms was not functioning. AOB 54–55. Based on that concession, Finelite's indemnification term could not have become part of the parties' 2021 contract.

*3. Finelite's indemnification provision did not become a term of the parties' 2019 and 2020 contracts under § 2207.*

Unlike SSI's 2018 sales acknowledgment, its 2019 and 2020 sales acknowledgments did not expressly condition SSI's acceptance on Finelite's assent to SSI's terms. ER-165–66, ER-169–70, ER-173–74. Accordingly, to the extent that the 2012 Agreement does not control, SSI agrees with Finelite that those acknowledgments operated as acceptances notwithstanding the different and additional terms SSI's acknowledgements proposed. AOB 48; *see also Textile Unlimited*, 240 F.3d at 787. Therefore, a contract would have been formed from each exchange of forms under § 2207(1). AOB 48.

Finelite contends that its indemnity provision became a term of these contracts because Finelite's offer expressly limited acceptance to the terms of its offer, meaning that SSI's differing indemnification clause was rejected, leaving only Finelite's indemnification clause to become part of the contract. AOB 51. Finelite presents its legal contention in this regard as being plain

and uncontroversial, *see id.*, but in fact California cases are in conflict. In addition, the legal rule Finelite advocates represents the minority view nationwide, and for good reason: adoption of Finelite's provision would lead to arbitrary results based on which side sends its form first, contrary to the UCC's policy goal.

a. *The national rule, adopted by the California Court of Appeal, is that conflicting terms in the offer and acceptance cancel out.*

Nationally, most courts hold that when a contract is formed under § 2207(1) notwithstanding different terms, any conflicting terms "cancel one another." 1 JAMES J. WHITE ET AL., UNIFORM COMMERCIAL CODE § 2:14 (6th ed. 2024 update) (surveying cases). Finelite's third-party complaint acknowledges that this is the rule. ER-195 ("If, and to the extent, the warranty and indemnity provisions in Finelite's Purchase Orders and [SSI]'s Sales Order Acknowledgements conflict, the differing terms on which the parties' forms do not agree drop out …."). The majority view comports with official comment 6 to UCC § 2-207, which states that an acceptance's proposal of a conflicting term constitutes an objection to the offer's term, causing each side's proposal to cancel out the other. *See* CAL. COM. CODE § 2207 cmt. 6 (quoted in full, *supra*, at 45). Under the minority view, by contrast, the different terms in the

acceptance "fall[] out," leaving the offeror's terms to govern, effectively sanctioning a first-shot rule. *Id.*

California Commercial Code § 2207 adopted UCC § 2-207 verbatim in 1965 and remains unchanged to this day. *Textile Unlimited*, 240 F.3d at 787 & n.2. Because the California Supreme Court has never considered official comment 6 or the competing lines of national authority, this Court must decide whether the California Supreme Court would adopt the majority or minority position: "Absent controlling authority from the state supreme court, a federal court must predict how the highest state court would decide the state law issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 982 (9th Cir. 2022) (brackets and internal quotation marks omitted). Here, decisions of California's appellate courts (as well as federal courts applying California law), decisions from other jurisdictions, and secondary sources all suggest that the California Supreme Court would adopt the majority rule.

The overwhelming majority of courts nationally have adopted the majority interpretation of UCC § 2-207. *See, e.g.*, *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926–27 (9th Cir. 1979) (applying Idaho law);

*Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1579 (10th Cir. 1984) (majority rule is the "preferable approach;" predicting that the Pennsylvania Supreme Court would adopt it); *Vulcan Auto. Equip., Ltd. v. Glob. Marine Engine & Parts, Inc.*, 240 F. Supp. 2d 156, 165 (D.R.I. 2003) ("[A]t the end of the day, the clear majority position is to apply the 'knock out' rule to conflicting terms.") (collecting cases); 1 JAMES J. WHITE ET AL., UNIFORM COMMERCIAL CODE, *supra*, § 2:14 (surveying cases). That's because the majority approach aligns with the "purpose behind the adoption of § 2-207," which is to eliminate advantages based on when the parties sent their respective forms. *Daitom*, 741 F.2d at 1580. By contrast, to adopt the minority approach "would serve to reenshrine the undue advantages derived solely from the fortuit[y] … of when a party sent a form." *Id.*; *see also Diamond Fruit Growers,* 794 F.2d at 1444.

Two courts have applied § 2207(2) pursuant to the majority interpretation. *Steiny & Co.*, 79 Cal. App. 4th at 295 (where parties' forms contained "materially differing terms," they canceled out); *Channell Com. Corp.*, 2016 WL 7638180, at *5 ("Because these terms are inherently in conflict, they are not part of the agreement between the parties."). In *Steiny & Co.*, buyer "Steiny's purchase order and [seller's] invoice contained materially differing terms: the former imposed broad warranty coverage; the latter disclaimed all

warranties." 79 Cal. App. 4th at 295. Because those terms directly conflicted, they canceled out and neither became part of the contract. *Id.* Similarly here, the parties' indemnification provisions conflict, so neither term became part of the parties' contract.

*b. Finelite advocates an erroneous interpretation based on dicta in a 1977 California Supreme Court decision.*

Finelite points to a footnote in a 1977 California Supreme Court decision that stated, as an abstract matter, that "'additional' and 'different' terms are treated identically under § 2207(2)." AOB 50 (quoting *Steiner v. Mobil Oil Corp.*, 20 Cal. 3d 90, 102 n.5 (1977)). According to Finelite, this footnote means that California has adopted a minority "first shot" rule, although Finelite does not discuss the differing opinions among courts nationwide and within California. *See id.* at 50–51. Finelite is wrong.

As an initial matter, the footnote on which Finelite relies is pure dicta, as the opinion itself states: the dispute in *Steiner* did not "turn[] upon whether the terms of [the] acceptance were additional to, or instead different from, [the] offer," and the parties did not even brief the issue. *Steiner*, 20 Cal. 3d at 102 n.5. It is unlikely that the California Supreme Court would follow this dicta

were it to consider the issue in light of official comment 6 and the national consensus just described.

The footnote notes accurately that while § 2207(1) refers to "additional or different" terms in an acceptance, § 2207(2) addresses only the significance of "additional" terms. However, the footnote fails to take account of the fact that official comment 6 expressly states that an acceptance's inclusion of a conflicting term constitutes an objection to the corresponding term in the offer, which means "the conflicting terms do not become a part of the contract." CAL. COM. CODE § 2207 cmt. 6 (quoted in full, *supra*, at 45).

The footnote instead reasons that, as of 1977, "several courts and commentators ha[d] concluded that section 2207, subdivision (2), applies if an acceptance adds terms to an offer, but does not apply if an acceptance alters the terms of an offer." *Id.* According to the footnote, the terms of a § 2207(1) contract "should not turn upon a characterization of the varying terms of an acceptance as 'additional' or 'different.'" As already explained, in the intervening decades, the majority of courts have not agreed. The majority has instead embraced the analysis found in comment 6 that an acceptance's proposal of a conflicting term constitutes an objection to the offer's term, causing each side's proposal to cancel out the other. *See* CAL. COM. CODE § 2207 cmt. 6. Such an

objection causes the contract as formed to be silent as to the term about which the forms disagree. CAL. COM. CODE § 2207(2)(c).

This Court has held that "*reasoned* dicta" in a California Supreme Court's decision is binding as to California law. *Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024) (emphasis added). The *Steiner* dicta cannot be considered reasoned when the issue was not before the court and neither party briefed it. While state high-court dicta "should not be ignored," *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980), neither should it be treated as dispositive when all signs indicate that the state high court would not—with the benefit of decades of precedent from other jurisdictions and full briefing that calls official comment 6 to the court's attention—follow the *Steiner* dicta. Indeed, no published California appellate decision has cited the *Steiner* dicta, and *Steiny* adopted the majority approach to § 2207(2) without viewing *Steiner* as worthy of discussion. *Steiny & Co.*, 79 Cal. App. 4th at 295.

Undoubtedly the California Supreme Court would agree that "[o]ne of the principles underlying section 2-207 is neutrality." *Diamond Fruit Growers,* 794 F.2d at 1444. Section 2207 should "give neither party to a contract an advantage *simply because it happened to send the first or in some cases the last form.*" *Id.* (citation omitted) (emphasis added). Yet Finelite's argument,

if adopted, would do exactly that. Under Finelite's logic, the outcome turns on the fortuity that Finelite sent the first form, and the result would be reversed had SSI sent its form first. Section 2207 was meant to "do[] away with this result …." *Id.*

To the extent this Court harbors any doubt about how the California Supreme Court would resolve this issue, the Court should certify the question to the California Supreme Court. CAL. R. CT. 8.548(a) (California Supreme Court "may decide a question of California law" "[o]n request of … a United States Court of Appeals"); *see also Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1071 (9th Cir. 2019) ("We may elect to certify a question *sua sponte*.").

### E. If A Gap-Filler Warranty Applies, Finelite Failed To Establish That The Seoul Plaintiffs' Claims Are "Rightful."

As just shown, Finelite's express indemnity provision was not a term of any contract between the parties. Finelite relies on the UCC gap-filler warranty as a backup but that cannot support its appeal from the order denying its cross-motion for summary judgment. That is because Finelite did not prove the requisite elements for a claim of breach of the implied warranty under § 2312(3).

Section 2312(3) provides the following:

> Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer a who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

To prevail on a claim for breach, Finelite must among other things prove that "the goods were subject to a rightful infringement claim of a third party upon delivery." *Mycoskie, LLC v. Ebuys, Inc.*, 293 F. Supp. 3d 1076, 1081 (C.D. Cal. 2017). "A rightful claim … is a nonfrivolous claim of infringement that has any significant adverse effect, through the prospect of litigation or otherwise, on the buyer's ability to make use of the purchased goods." *Pac. Sunwear of Cal., Inc. v. Olaes Enters, Inc.*, 167 Cal. App. 4th 466, 482 (2008).

The District Court determined that a fact dispute existed regarding rightful claim of infringement. ER-33; *see also Mycoskie*, 293 F. Supp. 3d at 1081. Because Finelite did not address this ruling in its opening brief, it waived any challenge to it. Moreover, even if not waived, Finelite did not even establish a prima facie showing of this required element, plus—as the District Court ruled—factual disputes bar summary judgment in Finelite's favor.

"[T]he mere filing of litigation" does not suffice to establish that an infringement claim is rightful: "were we to agree that the warranty is triggered

by the filing of litigation, *without any evaluative inquiry into the merits of the underlying claim itself*, we would effectively be reading the term 'rightful' out of the statute." *Pac. Sunwear*, 167 Cal. App. 4th at 482 & n.10 (emphasis added). Whether the underlying infringement claim is "rightful" is generally "a question of fact" that is "properly submitted to [a] jury." *Linear Tech. Corp. v. Tokyo Electron Ltd.*, 200 Cal. App. 4th 1527, 1533 (2011). As the plaintiff and moving party, Finelite bore the burden of proof on this issue. *Phoenix Sols., Inc. v. Sony Elecs., Inc.*, 637 F. Supp. 2d 683, 697 (N.D. Cal. 2009). Finelite's attempt to foist the burden on SSI to prove that the Seoul Plaintiffs' claims against Finelite "are frivolous or not 'rightful claims' under § 2312" (AOB 59) has it backwards.

Despite Finelite's claim that it "clearly established that the LEDs are subject to a rightful infringement claim" (AOB 58), Finelite points to no record evidence whatsoever. Finelite merely argues that the litigation is "more than three (3) years old" and the Seoul Plaintiffs' claims "have survived three separate motions to dismiss." AOB 59. *Linear Tech. Corp.* shows that Finelite had to do much more. There, the third-party plaintiff settled the underlying patent infringement claims for *$70 million* before proceeding to trial against the third-party defendants. 200 Cal. App. 4th at 1530–31. Even that massive

settlement was not enough to convince the jury that the third-party plaintiff had been subjected to a rightful infringement claim. *See id.*

And, even if Finelite could be said to have established a prima facie showing of rightful infringement, the District Court correctly concluded the issue was not subject to summary adjudication due to factual disputes. In fact, at least two factual disputes regarding the gap-filler warranty preclude summary judgment for Finelite.

First, if a patent had not issued at the time allegedly infringing goods were delivered, "any claim for patent infringement … would have been frivolous." *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, No. 1:11-CV-00030, 2011 WL 5838214, at *7 (E.D. Cal. Nov. 21, 2011) (dismissing implied warranty claim where plaintiff's alleged goods were delivered before patent issuance); *see also Phoenix Sols.*, 637 F. Supp. 2d at 695, 697–98 (similar). Here, 4 of the 14 asserted patents issued after at least one of the purchase orders dated August 27, 2018; June 21, 2019; May 29, 2020; and July 9, 2021. ER-149 ¶ 2.[15]

[15] The following patents-in-suit issued after at least one of the Purchase Orders: No. 10,134,967, issued Nov. 20, 2018 (post-dates one purchase order), SER-188; No. 10,418,514, issued Sept. 17, 2019 (post-dates two purchase orders), SER-176; No. 10,510,933, issued Dec. 17, 2019 (post-dates two purchase

Second, there is no dispute that title for all the goods at issue passed from SSI to Finelite *in Hong Kong*, and the Seoul Plaintiffs assert infringement of only *U.S.* patents. SER-163–90. This means that questions remain regarding whether the components were subject to a claim of infringement of U.S. patents *at the time the goods were delivered in Hong Kong*. *See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1377 (Fed. Cir. 2005) (while location of a "sale" is "not necessarily" where legal title passes, a patentee must present evidence of activity within the United States to establish liability for direct infringement under 35 U.S.C. § 271(a)). Finelite presented no such evidence and therefore was not entitled to summary judgment; consequently, the order denying Finelite's cross-motion should be affirmed and the matter remanded.

### F. Alternatively, Finelite Is Not Entitled To Summary Judgment On Its First Two Claims Because It Failed To Present Evidence Of Damages.

Even if the Court were not to affirm the order denying Finelite's cross-motion in its entirety, the Court should in the alternative affirm the denial as to Finelite's first two claims because Finelite failed to prove damages.

---

orders), SER-190; and No. 10,672,952, issued June 2, 2020 (post-dates three purchase orders), SER-182.

Finelite brought claims for (1) breach of contract based on four contracts supposedly formed by the purchase orders and sales order acknowledgements, (2) breach of the implied warranty under CAL. COM. CODE § 2312, and (3) declaratory judgment that SSI is obligated to defend and indemnify Finelite in the action below. ER-194–96. Finelite sought summary judgment on its entire third-party complaint (SER-46–47), but its Opening Brief fails to show that it is entitled to that relief as to the first two claims.

To obtain summary judgment on its first claim, Finelite had to establish, among other things, damages. "[B]reach of contract is not actionable without damage." *Bramalea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal. App. 4th 468, 473 (2004); *see also Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) (affirming summary judgment "[b]ecause [Plaintiff] failed to offer competent evidence of damages"); *Water, Inc. v. Everpure, Inc.*, No. CV 09-3389, 2012 WL 12949368, at *10 (C.D. Cal. Aug. 2, 2012) (granting summary judgment where plaintiff did not submit damages evidence).

Finelite was also required to establish damages under its second claim for breach of the implied warranty under § 2312. As Finelite acknowledges, if that gap-filler indemnification provision applied, it "would be incorporated into the parties' contracts," and SSI would owe a "*contractual duty* to indemnify

Finelite." AOB 57 (emphasis added). Accordingly, the same breach-of-contract elements (including damages) that apply to Finelite's first claim apply equally to its second claim.

Finelite's failure to submit any evidence of damages is an alternative ground for affirmance of the order denying its cross-motion as to its first two claims.

## CONCLUSION

The judgment should be affirmed.

Dated: November 6, 2024

Respectfully submitted,

*/s/ Sean M. SeLegue*

Sean M. SeLegue
Douglas Winthrop
ARNOLD & PORTER
KAYE SCHOLER LLP
3 Embarcadero Center, Fl. 10
San Francisco, CA 94111
(415) 471-3100
sean.selegue@arnoldporter.com

Ali R. Sharifahmadian
Jin-Suk Park
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001

Brian Williams
ARNOLD & PORTER
KAYE SCHOLER LLP
1144 15th Street, Suite 3100
Denver, CO 80202

*Counsel for Samsung Semiconductor, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-711

I am the attorney or self-represented party.

**This brief contains** 13,960 **words,** including 65 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ____.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Sean M. SeLegue **Date** 11/06/2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

## RULE 28-2.7 ADDENDUM

CAL. COM. CODE § 2207 ........................................ Add. 2

CAL. COM. CODE § 2312 ........................................ Add. 3

THE CHICAGO MANUAL OF STYLE (17th ed. 2017) ........................................ Add. 4

BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE: THE AUTHORITY ON GRAMMAR, USAGE, AND STYLE (5th ed. 2022) ........ Add. 13

WILLIAM A. SABIN, THE GREGG REFERENCE MANUAL: A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING (1lth ed. 2010) ........................................ Add. 20

WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE (4th ed. 2000)........................................ Add. 25

*Extended Rules for Using Commas*, The Writing Lab & The OWL at Purdue Univ., https://bit.ly/3YadRac ........................................ Add. 29

*Infinitives*, The Writing Lab & The OWL at Purdue Univ., https://bit.ly/3A5WShc ........................................ Add. 38

## Cal. Com. Code § 2207
## Additional terms in acceptance or confirmation

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code.

## Cal. Com. Code § 2312
## Warranty of title and against infringement; buyer's obligation against infringement

(1) Subject to subdivision (2) there is in a contract for sale a warranty by the seller that

(a) The title conveyed shall be good, and its transfer rightful; and

(b) The goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

(2) A warranty under subdivision (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

# The Chicago Manual of Style

SEVENTEENTH EDITION

THE ESSENTIAL GUIDE
for Writers, Editors, and Publishers

# The Chicago Manual of Style

SEVENTEENTH EDITION

*The University of Chicago Press*
CHICAGO AND LONDON

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London
© 2017 by The University of Chicago
All rights reserved. No part of this book may be used or reproduced in any manner whatsoever without written permission, except in the case of brief quotations in critical articles and reviews. For more information, contact the University of Chicago Press, 1427 E. 60th St., Chicago, IL 60637.
First edition published 1906. Seventeenth edition 2017.
Printed in the United States of America

26 25 24 23 22 21 20 2 3 4 5

ISBN-13: 978-0-226-28705-8 (cloth)
DOI: https://doi.org/10.7208/cmos17

Library of Congress Cataloging-in-Publication Data

Title: The Chicago manual of style.
Description: Seventeenth edition. | Chicago ; London : The University of Chicago Press, 2017. | Includes bibliographical references and indexes.
Identifiers: LCCN 2017020712 | ISBN 9780226287058 (cloth : alk. paper)
Subjects: LCSH: Printing—Style manuals. | Authorship—Style manuals. | Authorship—Handbooks, manuals, etc. | Publishers and publishing—United States—Handbooks, manuals, etc.
Classification: LCC Z253 .U69 2017 | DDC 808/.0270973—dc23
LC record available at https://lccn.loc.gov/2017020712

♾ This paper meets the requirements of ANSI/NISO Z39.48-1992 (Permanence of Paper).

The Chicago Manual of Style is a registered trademark of The University of Chicago.

natural {**don't you** want more?}. Most negative forms can be contracted {we do not–we don't} {I will not–I won't} {he has not–he hasn't} {she does not–she doesn't}, but *I am not* is contracted to *I'm not* (never *I amn't*). The corresponding interrogative form is *aren't I?* Sometimes the negative is emphasized if the auxiliary is contracted with the pronoun and the negative is left standing alone {he is not–he isn't–he's not} {we are not–we aren't–we're not} {they have not–they haven't–they've not}.

5.105 **Contractions.** Most types of writing benefit from the use of contractions. If used thoughtfully, contractions in prose sound natural and relaxed and make reading more enjoyable. *Be*-verbs and most of the auxiliary verbs are contracted when followed by *not*: *are not–aren't*, *was not–wasn't*, *cannot–can't*, *could not–couldn't*, *do not–don't*, and so on. A few, such as *ought not–oughtn't*, look or sound awkward and are best avoided. Pronouns can be contracted with auxiliaries, with forms of *have*, and with some *be*-verbs. Think before using one of the less common contractions, which often don't work well in prose, except perhaps in dialogue or quotations. Some examples are *I'd've* (I would have), *she'd've* (she would have), *it'd* (it would), *should've* (should have), *there're* (there are), *who're* (who are), and *would've* (would have). Also, some contracted forms can have more than one meaning. For instance, *there's* may be *there is* or *there has*, and *I'd* may be *I had* or *I would*. The particular meaning may not always be clear from the context.

## INFINITIVES

5.106 **Infinitives defined.** An infinitive verb, also called the verb's *root* or *stem*, is a verb that in its principal uninflected form may be preceded by *to* {to dance} {to dive}. It is the basic form of the verb, the one listed in dictionary entries. The preposition *to* is sometimes called the *sign* of the infinitive {he tried **to open** the door}, and it is sometimes classed as an adverb. In the active voice, *to* is generally dropped when the infinitive follows an auxiliary verb {you must **flee**} and can be dropped after several verbs, such as *bid*, *dare*, *feel*, *hear*, *help*, *let*, *make*, *need*, and *see* {you dare **say** that to me?}. But when the infinitive follows one of these verbs in the passive voice, *to* should be retained {he cannot be heard **to deny** it} {they cannot be made **to listen**}. The *to* should also be retained after *ought* and *ought not* (see 5.149).

5.107 **Uses of the infinitive.** The infinitive has great versatility. It is sometimes called a *verbal noun* because it can function as part of a verb phrase {someone has **to tell** her} or a noun {**to walk** away now seems rash}. The

infinitive also has limited uses as an adjective or an adverb. As a verb, it can take (1) a subject {we wanted **the lesson** to end}, (2) an object {try to throw **the javelin** higher}, (3) a predicate complement {want to race **home**?}, or (4) an adverbial modifier {you need to think **quickly** in chess}. As a noun, the infinitive can perform as (1) the subject of a finite verb {**to fly** is a lofty goal} or (2) the object of a transitive verb or participle {I want **to hire** a new assistant}. An infinitive may be governed by a verb {**cease to do** evil}, a noun {we all have **talents to be improved**}, an adjective {she is **eager to learn**}, a participle {they are **preparing to go**}, or a pronoun {let **him do** it}.

5.108 **Split infinitive.** Although from about 1850 to 1925 many grammarians stated otherwise, it is now widely acknowledged that adverbs sometimes justifiably separate the *to* from the principal verb {they expect **to more than double** their income next year}. See also 5.171.

5.109 **Dangling infinitive.** An infinitive phrase can be used, often loosely, to modify a verb—in which case the sentence must have a grammatical subject (or an unexpressed subject of an imperative) that could logically perform the action of the infinitive. If there is none, then the sentence may be confusing. For example, in *To repair your car properly, it must be sent to a mechanic*, the infinitive *repair* does not have a logical subject; the infinitive phrase *to repair your car* is left dangling. But if the sentence is rewritten as *To repair your car properly, you must take it to a mechanic*, the logical subject is *you*.

## PARTICIPLES AND GERUNDS

5.110 **Participles generally.** A participle is a nonfinite verb that is not limi by person, number, or mood but does have tense. Two participles formed from the verb stem: the present participle invariably ends in and the past participle usually ends in *-ed*. The present participle den the verb's action as being in progress or incomplete at the time expre by the sentence's principal verb {**watching** intently for a mouse, th settled in to wait} {**hearing** his name, Jon turned to answer}. The participle denotes the verb's action as being completed {**planted** i spring} {**written** last year}.

5.111 **Participial phrases.** A participial phrase is made up of a participle plus any closely associated word or words, such as modifiers or complements. It can be used (1) as an adjective to modify a noun or pronoun {**nailed to the roof**, the slate stopped the leaks} {she pointed to the clerk **drooping**

5.216 **Exclamations.** An exclamation expresses the extent to which a speaker is moved, aroused, impressed, or disgusted by something. It can take the form of a simple interjection {by golly!} {pishposh!}. Or it can follow a sentence structure consisting of *what* or *how* followed by a subject and verb {what an extraordinary novel this is!} {how well she writes!}. Exclamations are sometimes elliptically expressed {what finery!} {how pretty!} {how ugly!}. In formal, literary English, exclamations can be signaled by inverted word order {little did I expect such unfair treatment}.

## *The Four Traditional Types of Sentence Structures*

5.217 **Simple sentence.** A simple sentence consists of a single independent clause with no dependent clause {no man is an island}. A sentence can be simple despite having internal compound constructions serving as subjects, main verbs, objects of prepositions, and others {time and tide wait for no man}.

5.218 **Compound sentence.** A compound sentence contains two independent clauses (called *coordinate clauses*) with no dependent clause {the rain was heavy, and my umbrella was not much help}. Grammarians are divided on the question whether one type of sentence should be labeled compound or simple: *She arrived early and stayed late.* Traditional grammarians have tended to call this a simple sentence with a compound predicate (where *arrived* and *stayed* are coordinate verbs). Transformational grammarians have tended to call it a compound sentence with an elided subject in the second clause {she arrived early[,] and [she] stayed late}.

5.219 **Complex sentence.** A complex sentence contains a single independent clause with one or more dependent clauses {I'll be home after I finish work}. Such a sentence may have only one dependent clause {she won **because she practiced so hard**}, or it may contain a variety of dependent clauses {the books **that were nominated** argued **that most behavioral differences among people aren't genetic in origin** [*that were nominated* is an adjective clause; *that most behavioral differences among people aren't genetic in origin* is a noun clause]}.

5.220 **Compound-complex sentence.** A compound-complex sentence contains multiple independent clauses and at least one dependent clause {it was a beautiful evening, so after we left work we went for a walk [*after we left work* is a dependent clause between two independent clauses]}. It

differs from a complex sentence only in containing more than one independent clause. Like the independent clauses of a compound sentence, those of a compound-complex sentence are called *coordinate clauses*.

## *English Sentence Patterns*

5.221 **Importance of word order.** English is known as an *analytic language*—one that depends largely on word order. (A *synthetic language*, such as Latin, depends largely on inflectional forms of words.) In the transition from Old English (AD 450–1100) to Middle English (1100–1500), the language lost most of its inflected forms—except those for pronouns (*I-me-mine* etc.). Nouns no longer have nominative and accusative cases. Instead, word order governs meaning. Consider this example: *Michael likes crystal. Michael* is the subject, *likes* the verb, and *crystal* the object. It's the basic subject-verb-object (SVO) pattern. We deduce the meaning from the position of the words: Michael is an admirer and perhaps a collector of fine glass. If we change it to *Crystal likes Michael*, the meaning is transformed because of the SVO order. We now infer that someone named Crystal thinks fondly about someone named Michael. The SVO pattern is highly significant: it governs the meaning of most English statements. Departures from it typically signal either unusual emphasis or the posing of a question (as opposed to the making of a statement).

5.222 **The basic SVO pattern.** Despite the seeming potential for monotony in having sentence after sentence using the same fundamental word order, English offers enough variety in vocabulary and in sentence elements that can function as subjects, verbs, and objects to keep things interesting. Consider these examples, all of which use the pattern but with interesting levels of sophistication:

| | | |
|---|---|---|
| Mary | likes | pomegranates. |
| S | V | O |
| The umpire we were talking about | rejected | our arguments. |
| S | V | O |
| The woman down the street | is selling | loaves of bread. |
| S | V | O |
| The obstacles that we face | create | opportunities. |
| S | V | O |

reader "what" it is foolish to ignore and emphasizes "facts." An expletive *it* may also take the position of a direct object, especially when the real object is a clause or noun phrase {some people don't like **it** that stores are open for business on Thanksgiving [some people don't like **stores being open for business** on Thanksgiving]}. Using an expletive in this way can tighten a verb phrase and emphasize the object. Compare *it was taken for granted that our team would win* with *we took for granted that our team would win.*

5.240 **Expletive "it."** Whereas the pronoun *it* adds meaning to a sentence because it has an antecedent or else is the formal subject of a *be*-verb in the sense of "a person" or "a thing," an expletive *it* adds no meaning and takes the subject's or object's place when the subject or object shifts to the predicate: *It is not known what happened* can be restated as *What happened is not known.* Usually readers have no difficulty intuitively understanding whether they're encountering a pronoun *it* or an expletive *it.* But when the expletive and the pronoun appear close together, they may cause the reader to stumble {The much-anticipated feast was a disappointment; **it** was poorly cooked and presented. **It** is hard to believe that such a famous chef thought **it** would be edible, let alone delight gourmands.}. Avoid having several *its* in a passage clash in this way. Some other names for the expletive *it* are *ambient it*, *anticipatory it*, *dummy it*, *empty it*, *introductory it*, *nonreferential it*, and *prop it.*

5.241 **Expletive "there."** The word *there* is also frequently used as an expletive with *be* or an intransitive verb (especially a linking verb) followed by the subject {there are many different viewpoints presented in the students' essays} {there were several hundred members present at the conference}. An expletive *there* shouldn't be confused with *there* as an adverb of place. Compare *There seemed to be someone* with *Someone seemed to be there.*

## *Parallel Structure*

5.242 **Parallel structure generally.** Parallel constructions—series of like sentence elements—are common in good writing. Compound structures may link words {win, lose, or draw}, phrases {government of the people, by the people, for the people}, dependent clauses {that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness}, or sentences {I came; I saw; I conquered}. Every element of a parallel series must be a functional match (word, phrase, clause, sentence) and

serve the same grammatical function in the sentence (e.g., noun, verb, adjective, adverb). This syntactic linking of matching elements is called *coordination*. When linked items do not match, the syntax of the uncoordinated sentence breaks down:

POOR: She did volunteer work in the community kitchen, the homeless shelter, and taught free ESL classes offered by her church.
BETTER: She did volunteer work in the community kitchen, the homeless shelter, and her church, where she taught free ESL classes.

POOR: The candidate is a former county judge, state senator, and served two terms as attorney general.
BETTER: The candidate is a former county judge, state senator, and two-term attorney general.

In the second example, for instance, the subject, verb, and modifier (*the candidate is a former*) fit with the noun phrases *county judge* and *state senator*, but the third item in the series renders nonsense: *The candidate is a former served two terms as attorney general.* The first two elements in the series are nouns, while the third is a separate predicate. The corrected version makes each item in the series a noun element.

5.243 **Prepositions and parallel structure.** In a parallel series of prepositional phrases, repeat the preposition with every element unless they all use the same preposition. A common error occurs when a writer lets two or more of the phrases share a single preposition but inserts a different one with another element:

POOR: I looked for my lost keys in the sock drawer, the laundry hamper, the bathroom, and under the bed.
BETTER: I looked for my lost keys in the sock drawer, in the laundry hamper, in the bathroom, and under the bed.

If the series had not included *under the bed*, the preposition could have been used once to apply to all the objects: *I looked for my lost keys in the sock drawer, the laundry hamper, and the bathroom.*

5.244 **Paired joining terms and parallel structure.** Correlative conjunctions such as *either–or*, *neither–nor*, *both–and*, and *not only–but also* and some adverb pairs such as *where–there*, *as–so*, and *if–then* must join grammatically parallel sentence elements. It is a common error to mismatch elements framed by correlatives.


BRYAN A. GARNER
Garner's Modern English Usage
The Authority on Grammar, Usage, and Style
Fifth Edition

# GARNER'S MODERN ENGLISH USAGE

FIFTH EDITION

Bryan A. Garner

OXFORD
UNIVERSITY PRESS

OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide. Oxford is a registered trademark of Oxford University Press in the U.K. and certain other countries.

Published in the United States of America by Oxford University Press, 198 Madison Avenue, New York, NY 10016.

© Bryan A. Garner 2022

First Edition published in 1998
Second Edition published in 2003
Third Edition published in 2009
(The first three editions bore the title *Garner's Modern American Usage*.)
Fourth Edition published in 2016
Fifth Edition published in 2022

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, without the prior written permission of Oxford University Press, or as expressly permitted by law, by license, or under terms agreed with the appropriate reproduction-rights organization. Inquiries concerning reproduction outside the scope of the above should be sent to the Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form, and you must impose this same condition on any acquirer.

Cataloguing-in-Publication data is on file at Library of Congress.

Library of Congress Control Number: 2022945705

ISBN 978–0–19–759902–0

Sheridan Books, Inc., United States of America

**paralipsis; *paralepsis; *paraleipsis.** Although the more classical spelling **paraleipsis* predominated until about 1960, *paralipsis* has become standard among rhetoricians since that time. **Paralepsis* is the second most common spelling. Let's not fully discuss the degree to which **paraleipsis* has fallen into disfavor. For the meaning of this rare term, see p. 1019.

Current ratio in print (*paralipsis* vs. **paralepsis* vs. **paraleipsis*): 5:2.2:1

**parallel,** vb., makes *paralleled* and *paralleling* in AmE and BrE alike—not **parallelled* and **parallelling*. See SPELLING (C).

**PARALLELISM. A. Generally.** *Parallelism*—the matching of sentence parts for logical balance, especially by using grammatically coordinate structures—helps satisfy every reader's innate craving for order and rhythm. In a list, for example, you might have noun + noun + noun, or verb + verb + verb, or adjective + adjective + adjective. By phrasing parallel ideas in parallel grammatical constructions, you show the reader how one idea relates to another. You supply correspondences. Stylists have long emphasized the importance of matching phrase to like phrase:

- **1926:** "One of the first requisites for the writing of good clean sentences is to have acquired the art of enumeration, that is, of stringing together three or four words or phrases of identical grammatical value without going wrong." H.W. Fowler, *FMEU1* at 142.
- **1966:** "Everyone who tries to write—at least, everyone not afflicted with what is sometimes called a tin ear—has a degree of natural instinct for putting like thoughts into like constructions. Some have the instinct *in excelsis*. . . . [But] most of us possess the instinct for matching parts in no more than a variable and inferior degree and must strengthen it by self-discipline and taking thought." Wilson Follett, *MAU* at 211.
- **1993:** "How do you make ideas parallel? In a series, all the items should be alike, whether all nouns, all gerunds, all infinitives, all phrases or all clauses. If a series of verbs is used, they should all be in the same tense, voice and mood. Subjects of parallel clauses should be in the same person and number. When two phrasal prepositions or conjunctions are used together, both need to be present in their entirety." Brian S. Brooks & James L. Pinson, *Working with Words* 73 (2d ed. 1993).
- **1998:** "No long complex sentence will hold up without parallel construction. Paralleling can be very simple. Any word will seek its own kind, noun to noun, adjective to adjective, infinitive to infinitive." Sheridan Baker, *The Practical Stylist* 101 (8th ed. 1998).
- **2005:** "The use of parallel structures helps produce cohesion and coherence in a text. Aim for parallelism in sentences and in longer passages. The structures can be clauses or phrases." Ann Raimes, *Keys for Writers* 325 (4th ed. 2005).

**B. Parts of Speech.** With CORRELATIVE CONJUNCTIONS and with lists (even short ones), noun should be matched with noun, adjective with adjective, adverb with adverb, etc. Avoid mixtures—e.g.:

- "The poem is derivative, ceremonial, and *an elegy* [read *elegiacal*]." D.S. Brewer, *Chaucer* 44 (2d ed. 1960). (Another possible revision: *The poem is a derivative and ceremonial elegy.* The original list consisted of adjective + adjective + noun.)
- "John Baker is conservative and *a traditionalist*." Murray Teigh Bloom, *The Trouble with Lawyers* 223 (1970). (A possible revision: *John Baker is conservative and traditional.* Or: *John Baker is a conservative traditionalist.* The original list consisted of adjective + noun.)
- "Webb, who batted .104 last season, had two doubles, three walks *and scored three times* [read *and three runs*]." Rick Cantu, "Freshman Sits in Driver's Seat as Longhorns Cruise," *Austin Am.-Statesman*, 5 Feb. 1995, at E1, E8. (The original list consisted of noun + noun + verb phrase.)
- "Her French-Canadian husband, Jean Marc, 50, was *gentle, generous and a millionaire* [read *a gentle, generous millionaire*]." Adam Fresco & Ian Cobain, "Weetabix Wife Lived a Life of Novel Charm," *Times* (London), 23 Mar. 2001, at 5. (The original list consisted of adjective + adjective + noun.)

A clear thinker presents lists logically so that grammatical and commonsense relationships are clear.

**C. Phrases and Clauses.** One of the most common mistakes in falling into a nonparallel construction involves mixing phrases and clauses by introducing a verb late in the game. "Orthopedic surgeons study for four years in a college or university, four years in an orthopedic residency program and may have one optional year of specialized education." "Podiatry vs. Orthopedics," *USA Today*, 14 Apr. 2003, at D7. The writer follows two *four years* phrases with the clause *may have one optional year of specialized education*. Worse, the first two elements are objects of the shared preposition *for*, a job that the *may have* clause can't serve. A suggested revision: *Orthopedic surgeons study for four years in a college or university and four years in an orthopedic residency program; they may also have one optional year of specialized education.*

**D. Content.** To the true stylist, mere grammatical parallelism isn't enough: the grammar should match the ideas. That is, you should strive for notional parallelism. It seems obvious that you shouldn't say that someone is *hungry, tall, and Italian*. But subtler problems arise: "The poetic opening stiffens, dreamily relaxes, then mightily reclenches: an instability of mood and texture both *symptomatic* of the mature Schubert and *disorienting* to generations of frustrated admirers, beginning with Robert Schumann." Joseph Horowitz, "A Symphony Is Where You Find It," *N.Y. Times*, 24 May 1992, § 2, at 1. Although both *symptomatic* and *disorienting* begin adjective phrases, the ideas expressed aren't coordinate. A possible revision: *The poetic opening stiffens, dreamily relaxes, and then mightily reclenches. The instability of mood and texture—symptomatic of the mature Schubert—has*

*been disorienting to generations of frustrated admirers, beginning with Robert Schumann.* The revision subordinates one phrase (*symptomatic*) to the other (*disorienting*), so that frustrated readers themselves aren't disoriented by writing that is symptomatically unparallel.

**paralyse.** See **paralyze.**

**paralysis; *paralyzation.** The first is standard. The second is a NONWORD that arose in the mid-1800s and today appears with some frequency—e.g.:

- "Part 1 includes a special-effects shot depicting the *paralyzation* [read *paralysis*] of New York City." Tom Shales, "Doomsday: The Miniseries," *Wash. Post*, 7 May 1994, at G1.
- "Already, *paralyzation* [read *paralysis*] of arterial expressways running through the Kobe area from Tokyo and Nagoya to Hiroshima and Fukuoka was beginning to take a toll." Sam Jameson, "Criticism of Quake Response Rises in Japan," *L.A. Times*, 19 Jan. 1995, at A1.
- "A federal appeals court tossed out his conviction, calling the *paralyzation* [read *paralysis*] 'shocking to the conscience.'" Jamie Satterfield, "Judge Allows Lawsuit to Proceed," *Knoxville News-Sentinel*, 14 Apr. 2015, at A1.

For the similar NONWORD **analyzation*, see **analysis.**

LANGUAGE-CHANGE INDEX
**paralyzation* for *paralysis*: Stage 1
Current ratio in print (*paralysis* vs. **paralyzation*): 669:1

**paralyze; paralyse.** The first is the AmE spelling; the second is the predominant BrE spelling.

**parameters. A. Generally.** Technical contexts aside, this jargonistic word is widely shunned by those with a heightened sensitivity to language. To begin with, only a specialist in mathematics or computing knows the technical sense, and elsewhere it's a mush word. Second, when it does have a discernible meaning, it's typically usurping the place of a far simpler and more straightforward term, such as *boundaries*, *limits*, or *guidelines*. *Parameters* became a VOGUE TERM in the late 20th century and remains so—e.g.:

- "Similarly, his [Frank Zappa's] music broke down barriers even as it expanded *parameters*." Harry Sumrall, "Mother of Invention," *Austin Am.-Statesman*, 18 May 1995, Entertainment §, at 13. (How could it not expand "parameters" if it is breaking down barriers? A possible revision: delete *even as it expanded parameters*.)
- "At 14 months, babies already know a lot about the *parameters* [read *limits*] of their safe little world." Elisabeth Kallick Dyssegaard, "The Danes Call It Fresh Air," *N.Y. Times*, 17 May 1997, § 1, at 19.
- "Students appreciate having some *parameters set on* [read *boundaries for*?] their writing." Shelley S. Peterson, *Writing Across the Curriculum* 4 (2008).

Rarely is the word used in the singular, but it does occur: "How many corporations inhabit a world so neat that one *parameter* can summarize it?" "The Limitations of WACC," *Harv. Bus. Rev.*, May–June 1997, at 136. How many indeed?

**B. And *perimeter*.** Sometimes *perimeter*, the meaning of which has influenced the senses of *parameter*, is used ostensibly so that the writer can sidestep any criticisms for the use of *parameter*. Although this usage makes literal sense, a clearer expression is available—e.g.: "Some of the nation's foremost experts in medicine, law and politics will discuss the 25th Amendment to the U.S. Constitution, which *sets perimeters for* [read *establishes procedures in the event of*] presidential disability and [determines] when the president must transfer power to the vice president." "Wake Forest Forum Features Address by President Ford," *News & Record* (Greensboro), 10 Nov. 1995, at B2. And in any event, *perimeter* is best left to physical senses <the fort's perimeter>.

LANGUAGE-CHANGE INDEX
1. *parameters* for the idea of limits, guidelines, or characteristics: Stage 4
2. *perimeters* for the same idea: Stage 1

**paramount** means "superior to all others" or "most important"—not merely "important." E.g.: "It is *extremely paramount* [read *extremely important* or *paramount*] that effective deployment of sworn deputies must begin with the distribution of these workers on a proportionate-need basis." Letter of Michael J. Robinson, "Sheriff's Defeatist Attitude Is a Cop-Out," *St. Petersburg Times* (Fla.), 13 Sept. 1989, at 2. See **tantamount** & ADJECTIVES (B). Cf. **penultimate.**

LANGUAGE-CHANGE INDEX
*paramount* in the sense "important" (rather than "most important"): Stage 2

**paramountcy** is the noun corresponding to the adjective *paramount*. It's not often seen but quite proper—e.g.: "Deng Xiaoping the economic pragmatist was always shadowed by Deng Xiaoping the political ideologue, who asserted, at every critical juncture, the *paramountcy* of the Chinese Communist Party in his nation's affairs." Frank Viviano, "China's Supreme Leader Dies," *S.F. Chron.*, 20 Feb. 1997, at A1. **Paramouncy* is a variant spelling to be avoided.

A more familiar word, such as *supremacy* or *preeminence*, will almost always be a better choice.

Current ratio in print (*paramountcy* vs. **paramouncy*): 102:1

***paramutual; *paramutuel.** See **parimutuel.**

**paraphrase,** n. & vb., is sometimes misspelled **paraphraze.*

Current ratio in print (*paraphrase* vs. **paraphraze*): 22,278:1

**paraplegic** (= someone who is immobile from the waist down) has four syllables: /par-ə-**plee**-jik/—not /par-ə-pə-**lee**-jik/ (with an epenthetic schwa).

**parasitic** (= [1] living on other organisms, as a parasite does; or [2] fawning for favors; sycophantic) is the predominant form of the word across World Englishes. **Parasitical* is a NEEDLESS VARIANT.

rhotic (see, e.g., [among the main entries in this book] **bursar, primer, tartar**).

**rhyparography** /rip-ə-**rog**-rə-fee/, n. The literary or artistic depiction of a subject thought to be low, sordid, unworthy, or otherwise unpleasant. — **rhyparographic,** adj. — **rhyparographer,** n.

**right-branching sentence.** A complicated sentence that has most of its complexity—the conditions, exceptions, etc.—after the principal verb; one that has a majority of its constituents on the right side of the tree diagram. See DIAGRAMMING. Cf. LEFT-BRANCHING SENTENCE.

**rigmarole** /**rig**-[ə-]mə-rohl/, n. A rambling, unintelligible, or unduly elaborate speech or writing, often painfully long; a succession of confused, nonsensical, or disjointed statements. — Also termed *rigamarole* /**rig**-ə-mə-rohl/.

**rodomontade** /rod-ə-mən-**tahd**/, n. The rant of a blustering braggart or demagogue.

**root,** n. The most basic part of a word, from which another word or words can be formed or derived; the form of a word to which affixes are attached. • The root or inflectional stem of a word constitutes the most meaningful part of an English word. — Also termed *base*; *theme*. See ETYMON; SYNTHETIC LANGUAGE.

**royal *we*.** The use of the first-person plural pronoun by a king, queen, or similar high dignitary. Cf. EDITORIAL *WE*; NOSISM. — Also termed *majestic plural*.

**run-on sentence.** A sentence in which two or more main clauses are used together without punctuation or a conjunction between them. • For example, *Cyndi spoke highly of her new assistant she hired him last week.* The run-on can be corrected by making two sentences <Cyndi spoke highly of her new assistant. She hired him last week.> or by recasting and inserting an appropriate conjunction. Cf. COMMA SPLICE. See pp. 962–63.

**sandhi** /**san**-dee/, n. [Sanskrit "a placing together"] The change of the sound of a morpheme in a specific context (e.g., *the* in *the woman* vs. *the elderly woman*).

**sans serif.** A style of typeface in which the letters do not have any projections. • Sans serif type is considered more legible than serif type in headlines and short passages, but not in extended text. Cf. SERIF.

**Sapir–Whorf hypothesis.** The doctrine that the structure of one's native tongue partly determines how one experiences reality and understands the world. • The hypothesis was first posited by Edward Sapir (1884–1939) in 1929 and was elaborated by his student Benjamin Lee Whorf (1897–1941) in books and articles. The names were coupled as Sapir–Whorf in learned journals beginning in the 1950s.

**sarcasm,** n. Sharp, ironic, or humorous language intended to mock a person, thing, or situation by using words to show that the speaker intends the opposite meaning. • Sarcasm is more easily expressed in speech than in writing. In speech, vocal intonations help to convey the speaker's real meaning when making a statement such as, "Well, isn't that special?" when something isn't. Sarcasm is more difficult to express in writing because there are few visual and no aural cues to the speaker's meaning. In informal writing, people sometimes use emphatic fonts or capitalization, emojis, or special characters to convey sarcasm. But since some of these devices are used for other purposes, such as expressing sincerity or excitement, misinterpretations are common. Cf. HYPERBOLE; IRONY; LITOTES.

**scansion** /**skan**-shən/, n. The act of dividing lines of verse to show its metrical parts, according to the rules of quantity and accent.

**scesis onomaton.** See SYNONYMIA.

**scholiast** /**skoh**-lee-ast/, n. Someone who writes explanatory notes and comments about a text or its author; a writer of scholia. See SCHOLIUM. — **scholiastic,** adj.

**scholium** /**skoh**-lee-əm/, n. An explanatory note or comment of an erudite nature; esp., an exegetical note or comment on the work of an ancient author. Pl. **scholia.**

**schriftsprache** /**shrift**-sprahk-ə/, n. The written form of a standard language; literary language.

**schwa,** n. A neutral vowel sound, spelled with various letters, such as the *a* in *alone* and the *e* in *system*. • In pronunciation systems, it is symbolized by an inverted, backward *e*: ə.

**screed,** n. **1.** A prolonged tirade or harangue. See POLEMIC. **2.** Any writing that is being referred to dysphemistically.

**scribblative** /**skrib**-lə-tiv/, adj. Of, relating to, or involving scribbles or scribblers; specif., pertaining to the production of hasty, careless, and worthless writing.

**scribblemania** /skrib-əl-**may**-nee-ə/, n. A mania for writing; an intense impulse to write. See CACOETHES SCRIBENDI.

**scripturient** /skrip-**tyʊ**-ree-ənt/, adj. Having a desire or passion for writing.

**scurrility** /skə-**ril**-i-tee/, n. **1.** The character or quality of being indecent or vulgar; vileness of language. **2.** That which is foul, obscene, low, and vile.

**second person.** See PERSON.

**second possessive.** See POSSESSIVE.

**semantic,** adj. Of, relating to, or involving the meaning of words.

**semantics,** n. The study of the ways in which languages (or a particular language) systematically structure meaning, esp. in words and in sentences; specif., the branch of linguistics dealing with the meaning of words, phrases, and clauses, together with the origins of and shifts of meaning. — Also termed *semasiology*. See LINGUISTICS. Cf. GENERAL SEMANTICS.

**semasiology** /sə-may-zee-**ol**-ə-jee/. See SEMANTICS.

**sememe,** n. The meaning of a morpheme; the smallest possible unit of meaning.

**semivowel,** n. A sound that functions as a consonant but has the resonance of a vowel. • The most common are *w* <water> and *y* <yellow>. Cf. CONSONANT; VOWEL.

**sense stress.** See SENTENCE STRESS.

**sentence,** n. A minimum complete utterance; a grammatical and rhetorical device for expressing relationships among the elements of an idea segment, which the writer or speaker wants to separate and present as a unit, and that the reader or listener can accept as capable of standing alone. • The old idea that a sentence is "a group of words expressing a complete thought" has been widely discredited—even though it contains a good deal of truth. But it is true that many single words can be sentences, as C.T. Onions (1873–1965) observed: "Many single words or self-contained groups of words, of any size, may perform the work of a sentence; e.g., *Speaking*; *Thanks*; *Down!*; *Sh!*; *Out with it!*; *Farewell*; *Goodbye*; *What?*; *Murder!*; *Nonsense!*; *Splendid! Yes* and *no* are long-established sentence-words; they are equivalent to sentences; e.g., *Will you come?—Yes. I will come.*"[1] The grammarian James Sledd (1914–2003) wrote aptly that "no useful definition can be framed to include all and only the things which are often called sentences."[2]

[1] C.T. Onions, *Modern English Syntax* 1 (rev. B.D.H. Miller 1971).

[2] James Sledd, *A Short Introduction to English Grammar* 246 (1959).

▸**cleft sentence.** In transformational grammar, a two-clause sentence made from a single clause in order to emphasize a specific element of the clause, so that the resulting sentence begins with *it is* or another *be*-verb <it is peanuts that we want> (resulting from the clauses *We want peanuts* and *It is . . .*). — Also termed *cleft construction.*

▸**complex sentence.** A sentence that has an independent clause and one or more dependent clauses joined by a subordinating conjunction <I don't know whether it will rain today>.

▸**compound–complex sentence.** A sentence that consists of at least two independent clauses and at least one dependent clause <either the cat goes or I go, whether you like it or not> <I don't know if he'll be allowed to watch the football game, but he hasn't finished those chores that he was assigned>.

▸**compound sentence.** A sentence that has at least two coordinate independent clauses linked by a coordinating conjunction <I told him to go away, so he left> <the cat goes or I go>. See *coordinating conjunction* under CONJUNCTION.

▸**conditional sentence.** A sentence that states a condition and the consequence or outcome of that condition's occurring. • Example: *If we lose this game, we'll be excluded from the tournament.* The condition does not have to be stated before the consequence <we'll be late unless we take a shortcut>.

▸**declarative sentence.** A sentence that makes a statement or assertion <the day was long> <it's wise not to fret about what cannot be changed>. — Often shortened to *declarative.*

▸**exclamatory sentence.** A sentence that expresses surprise or other strong emotion. — Also termed *exclamative sentence*; *exclamative.*

▸**imperative sentence.** A sentence that constitutes a command, order, or firm request <get your gear and leave> <march down to the bank and tell the manager what you think!>. — Often shortened to *imperative.*

▸**interrogative sentence.** A sentence that asks a question <why did you agree on that price?>. — Often shortened to *interrogative.*

▸**simple sentence.** A sentence consisting of only one independent clause and no dependent clauses <I called her> <I saw him only yesterday>.

**sentence accent.** See SENTENCE STRESS.

**sentence adverb.** See ADVERB.

**sentence stress.** The stress patterns associated with words in a given language when considered contextually as arranged in sentences. Cf. WORD STRESS. — Also termed *sense stress*; *sentence accent.*

**sententious** /sen-**ten**-shəs/, adj. **1.** Giving terse expression to thought. **2.** Habitually using pithy, concise language.

**separative coordinating conjunction.** See *disjunctive conjunction* under CONJUNCTION.

**sequence of tenses.** The fixed pattern by which the tense of one verbal or the form of one verb phrase demands that another verbal or verb phrase be of a particular tense or form <when she arrived, I left> (the past-tense *arrived* demanding the past-tense *left*) <as I peruse books, I mark them> (the present-tense *peruse* demanding the present-tense *mark*). See p. 1081.

**serif,** n. A style of typeface in which the letters have slight finishing strokes, such as "feet." • The serifs enhance the readability of significant blocks of text. Cf. SANS SERIF. — **serif, serifed,** adj.

**sermocination** /sər-moh-si-**nay**-shən/, n. *Rhetoric.* The practice of posing a problem or question and then immediately answering it.

**sesquipedality** /ses-kwi-pi-**dal**-i-tee/, n. The use of long, arcane words. See INKHORNISM. — **sesquipedalian,** adj. See also pp. 986–88.

**set phrase.** A group of words in an arrangement fixed by long-standing usage. • Proverbs, catchphrases, and idioms are types of set phrases. — Also termed *set expression.* See CLICHÉ; IDIOM. See also p. 988.

**sexisyllable** /**seks**-i-sil-ə-bəl/, n. A line or word of six syllables. — **sexisyllabic** /seks-i-si-**lab**-ik/, adj.

**shoptalk,** n. **1.** The discussion of matters relating to one's trade or profession, esp. when some people present cannot understand or have no interest. **2.** The jargon of a particular field or specialty.

**sibilant,** n. & adj. **1.** A hissing or hushing sound, as in /s/, /z/, or /sh/. **2.** A letter pronounced with this sound. — **sibilance,** n.

**significacio** /sig-ni-fi-**kah**-see-oh/, n. *Rhetoric.* An implied meaning that is not directly stated; esp., the deeper sense of an allegory, parable, symbol, or emblem.

**simile,** n. *Rhetoric.* An explicit comparison of two usu. quite different things, signaled by the use of a word such as *like* or *as* <like a gentle breeze> <as brave as a lion>. • Examples:

- Tall men, like tall houses, are usually ill furnished in the upper story. (Sir Francis Bacon [1561–1626])
- The man who has not any thing to boast of but his illustrious ancestors is like a potato—the only good belonging to him is under ground. (Sir Thomas Overbury [1581–1613])
- She was like an apple pudding tied in the middle. (James Kirk Paulding [1778–1860])

See FIGURE OF SPEECH. Cf. METAPHOR.

**simple,** adj. **1.** Made up of a single grammatical element. **2.** Having no modifiers, complements, or other elements.

**simple adverb.** See ADVERB.

**simple conjunction.** See CONJUNCTION.

**simple infinitive.** See INFINITIVE.

**simple predicate.** See PREDICATE.

**simple sentence.** See SENTENCE.

**simple subject.** See SUBJECT.

**simple tense.** See TENSE.

**simplex.** See KERNEL SENTENCE.

**singular,** n. The form of a word that denotes or refers to one person or thing. See CONCORD. Cf. PLURAL.

***singulare tantum*** /sing-gyoo-**lair**-ee **tan**-təm/, n. A noun that is invariably singular in form. • This term usually applies to mass nouns. Cf. PLURALE TANTUM.

**slang,** n. Nonstandard language that has any two of these four characteristics: (1) it is informal, and significantly lower in status than STANDARD ENGLISH; (2) it first arises in the language of the street or popular culture; (3) it is more or less unacceptable in formal or polite settings; and (4) it displaces a conventional term with one that is vivid and may even be taboo. • Slang changes very quickly in English and is often used within groups, particularly small or close ones, to help keep the group together and strengthen ties. See DIALECT; IDIOLECT. — **slangy,** adj. See also pp. 1006–07.

**slogan,** n. **1.** A battle cry. **2.** By extension, a distinctive motto, saying, or phrase used by a political party, club, or other group to establish a bond. **3.** A striking catchphrase used in advertising.

**sloganeering,** n. The use of rallying cries or attention-getting phrases in an attempt to convince, persuade, or bias people. — **sloganeer,** vb.

**slur,** n. **1.** An utterance or sound made carelessly or hastily by indistinctly combining or eliding syllables. **2.** A stain or discredit incurred by a person, institution, etc. **3.** A disparaging innuendo. **4.** A stigmatized word or phrase that is intended to discredit one or more people on the basis esp. of race, ethnicity, religion, gender,



# The Gregg Reference Manual

William A. Sabin

*tribute edition* 11

# The Gregg Reference Manual

A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING

11

*tribute edition*

# The Gregg Reference Manual

A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING

William A. Sabin

tribute edition 11

McGraw Hill
Connect Learn Succeed™

The McGraw·Hill Companies

Mc Graw Hill Connect Learn Succeed™

THE GREGG REFERENCE MANUAL: A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING: TRIBUTE EDITION, ELEVENTH EDITION

Published by McGraw-Hill, a business unit of The McGraw-Hill Companies, Inc., 1221 Avenue of the Americas, New York, NY, 10020. Copyright © 2011 by The McGraw-Hill Companies, Inc. All rights reserved. Previous editions © 1951, 1956, 1961, 1970, 1977, 1985, 1992, 1996, 2001, and 2005. No part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written consent of The McGraw-Hill Companies, Inc., including, but not limited to, in any network or other electronic storage or transmission, or broadcast for distance learning.

Some ancillaries, including electronic and print components, may not be available to customers outside the United States.

This book is printed on acid-free paper.

11 LCR 24 23 22

ISBN 978-0-07-339710-8

MHID 0-07-339710-5

Vice President/Editor in Chief: *Elizabeth Haefele*
Vice President/Director of Marketing: *John E. Biernat*
Publisher: *Kenneth S. Kasee Jr.*
Sponsoring editor: *Natalie J. Ruffatto*
Director of Development: *Sarah Wood*
Senior developmental editor: *Michelle L. Flomenhoft*
Editorial coordinator: *Parissa DJangi*
Marketing manager: *Kelly Curran*
Lead digital product manager: *Damian Moshak*
Digital developmental editor: *Kevin White*
Director, Editing/Design/Production: *Jess Ann Kosic*
Lead project manager: *Rick Hecker*
Senior production supervisor: *Janean A. Utley*
Senior designer: *Srdjan Savanovic*
Senior photo research coordinator: *Lori Kramer*
Media project manager: *Cathy L. Tepper*
Cover design: *Srdjan Savanovic*
Interior design: *Karen LaFond*
Typeface: *10/12 Cushing Book*
Compositor: *MPS Limited, A Macmillan Company*
Printer: *LSC Communications*
Cover credit: *Jody Series #7, 2008, courtesy of Nancy Freeman*

**Library of Congress Cataloging-in-Publication Data**

Sabin, William A.
The Gregg reference manual : a manual of style, grammar, usage, and formatting / William A. Sabin.—Tribute ed., 11th ed.
p. cm.
Includes index.
ISBN-13: 978-0-07-339710-8 (alk. paper)
ISBN-10: 0-07-339710-5 (alk. paper)
1. English language—Business English—Handbooks, manuals, etc. 2. English language—Grammar—Handbooks, manuals, etc. 3. English language—Transcription—Handbooks, manuals, etc. 4. Business writing—Handbooks, manuals, etc. I. Title.
PE1479.B87S23 2011
808'.042—dc22

2009052625

**Quotation.**

**Direct quotation.** A quotation of words exactly as spoken or written.

I myself heard Ed say, "I will arrive in Santa Fe on Tuesday."

**Indirect quotation.** A restatement of a quotation without the use of the exact words of the speaker.

I myself heard Ed say that he would arrive in Santa Fe on Tuesday.

**Sentence.** A group of words representing a complete thought and containing a subject and a predicate (a verb along with any complements and modifiers).

**Simple sentence.** A sentence consisting of one independent clause.

I have no recollection of the meeting.

**Compound sentence.** A sentence consisting of two or more independent clauses.

Our Boston office will be closed, and our Dallas office will be relocated.

**Complex sentence.** A sentence consisting of one independent clause (also called the *main clause*) and one or more dependent clauses.

We will make an exception to the policy if circumstances warrant.

**Compound-complex sentence.** A sentence consisting of two independent clauses and one or more dependent clauses.

I tried to handle the monthly report alone, but when I began to analyze the data, I realized that I needed your help.

**Elliptical sentence.** A word or phrase that forms a complete sentence because the subject and the verb are understood, though one or both may be unstated. (See ¶¶101b–c, 111, 119a.)

Been there. Done that. Enough on that subject. Why not?

**Declarative sentence.** A sentence that makes a statement.

Our company is continually testing cutting-edge technologies.

**Interrogative sentence.** A sentence that asks a question.

When will the conference begin?

**Exclamatory sentence.** A sentence that expresses strong feeling.

Don't even think of smoking here!

**Imperative sentence.** A sentence that expresses a command or a request. (The subject *you* is understood if it is not expressed.)

Send a check at once. Please let us hear from you.

**Sentence fragment.** A phrase or clause that is incorrectly treated as a sentence. (See ¶101c.)

**Squinting modifier.** A modifier placed in such a way that it can be interpreted as modifying either what precedes or what follows. (See ¶1087.)

**Statement.** A sentence that asserts a fact. (See also *Sentence.*)

NEW EDITION

WILLIAM STRUNK JR.
AND
E.B. WHITE

*"...still a little book, small enough and important enough to carry in your pocket, as I carry mine."*
***— Charles Osgood***

# The Elements of Style

FOURTH EDITION



FOREWORD BY ROGER ANGELL

# THE ELEMENTS OF *Style*

BY

WILLIAM STRUNK Jr.

*With Revisions, an Introduction, and a Chapter on Writing*

BY

E. B. WHITE

FOURTH EDITION

Longman

New York San Francisco Boston
London Toronto Sydney Tokyo Singapore Madrid
Mexico City Munich Paris Cape Town Hong Kong Montreal

COPYRIGHT © 2000, 1979, ALLYN & BACON
A Pearson Education Company
Needham Heights, Massachusetts 02494

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the Publisher.

Earlier editions © 1959, 1972 by Macmillan Publishing Co., Inc.

The Introduction originally appeared, in slightly different form, in *The New Yorker*, and was copyrighted in 1957 by The New Yorker Magazine, Inc.

*The Elements of Style*, Revised Edition, by William Strunk Jr. and Edward A. Tenney, copyright 1935 by Oliver Strunk.

**Library of Congress Cataloging-in-Publication Data**

Strunk, William, 1869–1946.
The elements of style / by William Strunk, Jr. ; with revisions, an introduction, and a chapter on writing by E. B. White. — 4th ed.
p. cm.
Includes index.
ISBN 0-205-30902-X (paperback). — ISBN 0-205-31342-6 (casebound)
1. English language—Rhetoric. 2. English language—Style.
3. Report writing. I. White, E. B. (Elwyn Brooks), 1899– .
II. Title.
PE1408.S772 1999
808'.042—dc21 99-16419
CIP

PRINTED IN THE UNITED STATES OF AMERICA

15 14 06 07 08 09

**linking verb** A verb that joins the subject of a sentence to its complement. Professor Chapman *is* a philosophy teacher. They *were* ecstatic.

**loose sentence** A sentence that begins with the main idea and then attaches modifiers, qualifiers, and additional details: He was determined to succeed, with or without the promotion he was hoping for and in spite of the difficulties he was confronting at every turn.

**main clause** An independent clause, which can stand alone as a grammatically complete sentence. Grammarians quibble.

**modal auxiliaries** Any of the verbs that combine with the main verb to express necessity (*must*), obligation (*should*), permission (*may*), probability (*might*), possibility (*could*), ability (*can*), or tentativeness (*would*). Mary *might* wash the car.

**modifier** A word or phrase that qualifies, describes, or limits the meaning of a word, phrase, or clause. *Frayed* ribbon, *dancing* flowers, *worldly* wisdom.

**nominative pronoun** A pronoun that functions as a subject or a subject complement: *I, we, you, he, she, it, they, who.*

**nonrestrictive modifier** A phrase or clause that does not limit or restrict the essential meaning of the element it modifies. My youngest niece, *who lives in Ann Arbor,* is a magazine editor.

**noun** A word that names a person, place, thing, or idea. Most nouns have a plural form and a possessive form. *Carol;* the *park;* the *cup; democracy.*

**number** A feature of nouns, pronouns, and a few verbs, referring to singular or plural. A subject and its corresponding verb must be consistent in number; a pronoun should agree in number with its antecedent. A solo *flute plays;* two *oboes join* in.

Purdue OWL > General Writing > Punctuation > Commas >
**Extended Rules for Using Commas**

# Extended Rules for Using Commas

## Welcome to the Purdue OWL

https://owl.purdue.edu/owl/general_writing/punctuation/commas/extended_rules_for_commas.html

This page is brought to you by the OWL at Purdue University. When printing this page, you must include the entire legal notice.

---

Copyright ©1995-2018 by The Writing Lab & The OWL at Purdue and Purdue University. All rights reserved. This material may not be published, reproduced, broadcast, rewritten, or redistributed without permission. Use of this site constitutes acceptance of our terms and conditions of fair use.

---

## COMMA USE

**1. Use commas to separate independent clauses when they are joined by any of these seven coordinating conjunctions: *and, but, for, or, nor, so, yet.***

The game was over**, but** the crowd refused to leave.

The student explained her question, **yet** the instructor still didn't seem to understand.

Yesterday was her brother's birthday, **so** she took him out to dinner.

**2. Use commas after introductory a) clauses, b) phrases, or c) words that come before the main clause.**

a. Common starter words for introductory clauses that should be followed by a comma include *after, although, as, because, if, since, when, while.*

**While** I was eating, the cat scratched at the door.

**Because** her alarm clock was broken, she was late for class.

**If** you are ill, you ought to see a doctor.

**When** the snow stops falling, we'll shovel the driveway.

However, don't put a comma after the main clause when a dependent (subordinate) clause follows it (except for cases of extreme contrast).

**INCORRECT:** The cat scratched at the door, while I was eating.

**CORRECT:** She was still quite upset, although she had won the Oscar. (This comma use is correct, because it is an example of extreme contrast.)

b. Common introductory phrases that should be followed by a comma include participial and infinitive phrases, absolute phrases, nonessential appositive phrases, and long prepositional phrases (over four words).

**Having finished the test,** he left the room.

**To get a seat,** you'd better come early.

**After the test but before lunch,** I went jogging.

**The sun radiating intense heat,** we sought shelter in the cafe.

c. Common introductory words that should be followed by a comma include *yes, however, well.*

**Well,** perhaps he meant no harm.

**Yes,** the package should arrive tomorrow morning.

**However,** you may not be satisfied with the results.

**3. Use a pair of commas in the middle of a sentence to set off clauses, phrases, and words that are not essential to the meaning of the sentence. Use one comma before to indicate the beginning of the pause and one at the end to indicate the end of the pause.**

Here are some clues to help you decide whether the sentence element is essential:

- If you leave out the clause, phrase, or word, does the sentence still make sense?
- Does the clause, phrase, or word interrupt the flow of words in the original sentence?
- If you move the element to a different position in the sentence, does the sentence still make sense?

If you answer "yes" to one or more of these questions, then the element in question is nonessential and should be set off with commas. Here are some example sentences with nonessential elements:

***Clause*:** That Tuesday***, which happens to be my birthday,*** is the only day when I am available to meet.

***Phrase*:** This restaurant has an exciting atmosphere. The food***, on the other hand,*** is rather bland.

***Word*:** I appreciate your hard work. In this case***, however,*** you seem to have over-exerted yourself.

**4. Do not use commas to set off essential elements of the sentence, such as clauses beginning with *that* (relative clauses). *That* clauses after nouns are always essential. *That* clauses following a verb expressing mental action are always essential.**

*That* clauses after nouns:

The book *that I borrowed from you* is excellent.

The apples *that fell out of the basket* are bruised.

*That* clauses following a verb expressing mental action:

She believes *that she will be able to earn an A*.

He is dreaming *that he can fly.*

I contend *that it was wrong to mislead her.*

They wished *that warm weather would finally arrive.*

Examples of other **essential** elements (no commas):

Students *who cheat* only harm themselves.

The baby *wearing a yellow jumpsuit* is my niece.

The candidate *who had the least money* lost the election.

Examples of **nonessential** elements (set off by commas):

Fred***, who o en cheats,*** is just harming himself.

My niece***, wearing a yellow jumpsuit,*** is playing in the living room.

The Green party candidate***, who had the least money,*** lost the election.

Apples***, which are my favorite fruit,*** are the main ingredient in this recipe.

Professor Benson***, grinning from ear to ear,*** announced that the exam would be tomorrow.

Tom***, the captain of the team,*** was injured in the game.

It is up to you, ***Jane,*** to finish.

She was, ***however,*** too tired to make the trip.

Two hundred dollars***, I think,*** is sufficient.

**5. Use commas to separate three or more words, phrases, or clauses written in a series.**

The Constitution establishes the legislative**,** executive**,** and judicial branches of government.

The candidate promised to lower taxes**,** protect the environment**,** reduce crime**,** and end unemployment.

The prosecutor argued that the defendant, who was at the scene of the crime**,** who had a strong revenge motive**,** and who had access to the murder weapon**,** was guilty of homicide.

**6. Use commas to separate two or more coordinate adjectives that describe the same noun. Be sure never to add an extra comma between the final adjective and the noun itself or to use commas with non-coordinate adjectives.**

Coordinate adjectives are adjectives with equal ("co"-ordinate) status in describing the noun; neither adjective is subordinate to the other. You can decide if two adjectives in a row are coordinate by asking the following questions:

- Does the sentence make sense if the adjectives are written in reverse order?
- Does the sentence make sense if the adjectives are written with *and* between them?

If you answer yes to these questions, then the adjectives are coordinate and should be separated by a comma. Here are some examples of coordinate and non-coordinate adjectives:

> He was a difficult, stubborn child. (coordinate)

> They lived in a white frame house. (non-coordinate)

> She often wore a gray wool shawl. (non-coordinate)

> Your cousin has an easy, happy smile. (coordinate)

The 1) relentless, 2) powerful 3) summer sun beat down on them. (1-2 are coordinate; 2-3 are non-coordinate.)

The 1) relentless, 2) powerful, 3) oppressive sun beat down on them. (Both 1-2 and 2-3 are coordinate.)

**7. Use a comma near the end of a sentence to separate contrasted coordinate elements or to indicate a distinct pause or shift.**

> He was merely ignorant, not stupid.

The chimpanzee seemed reflective, almost human.

You're one of the senator's close friends, aren't you?

The speaker seemed innocent, even gullible.

**8. Use commas to set off phrases at the end of the sentence that refer to the beginning or middle of the sentence. Such phrases are free modifiers that can be placed anywhere in the sentence without causing confusion. (If the placement of the modifier causes confusion, then it is not "free" and must remain "bound" to the word it modifies.)**

Nancy waved enthusiastically at the docking ship, laughing joyously. (correct)

**INCORRECT:** Lisa waved at Nancy, laughing joyously. (Who is laughing, Lisa or Nancy?)

Laughing joyously, Lisa waved at Nancy. (correct)

Lisa waved at Nancy, who was laughing joyously. (correct)

**9. Use commas to set off all geographical names, items in dates (except the month and day), addresses (except the street number and name), and titles in names.**

Birmingham, Alabama, gets its name from Birmingham, England.

July 22, 1959, was a momentous day in his life. Who lives at 1600 Pennsylvania Avenue, Washington, DC?

Rachel B. Lake, MD, will be the principal speaker.

(When you use just the month and the year, no comma is necessary after the month or year: "The average temperatures for July 1998 are the highest on record for that month.")

**10. Use a comma to shift between the main discourse and a quotation.**

John said without emotion, "I'll see you tomorrow."

"I was able," she answered, "to complete the assignment."

In 1848, Marx wrote, "Workers of the world, unite!"

**11. Use commas wherever necessary to prevent possible confusion or misreading.**

To George, Harrison had been a sort of idol.

## COMMA ABUSE

Commas in the wrong places can break a sentence into illogical segments or confuse readers with unnecessary and unexpected pauses.

**12. Don't use a comma to separate the subject from the verb.**

**INCORRECT:** An eighteen-year-old in California, is now considered an adult.

**INCORRECT:** The most important attribute of a ball player, is quick reflex actions.

**13. Don't put a comma between the two verbs or verb phrases in a compound predicate.**

**INCORRECT:** We laid out our music and snacks, and began to study.

**INCORRECT:** I turned the corner, and ran smack into a patrol car.

**14. Don't put a comma between the two nouns, noun phrases, or noun clauses in a compound subject or compound object.**

**INCORRECT (compound subject):** The music teacher from your high school, and the football coach from mine are married.

**INCORRECT (compound object):** Jeff told me that the job was still available, and that the manager wanted to interview me.

**15. Don't put a comma after the main clause when a dependent (subordinate) clause follows it (except for cases of extreme contrast).**

**INCORRECT:** The cat scratched at the door, while I was eating.

**CORRECT:** She was still quite upset, although she had won the Oscar. (This comma use is correct, because it is an example of extreme contrast)

# Infinitives

# Welcome to the Purdue OWL

https://owl.purdue.edu/owl/general_writing/mechanics/gerunds_participles_and_infinitives/infinitives.html

This page is brought to you by the OWL at Purdue University. When printing this page, you must include the entire legal notice.

---

Copyright ©1995-2018 by The Writing Lab & The OWL at Purdue and Purdue University. All rights reserved. This material may not be published, reproduced, broadcast, rewritten, or redistributed without permission. Use of this site constitutes acceptance of our terms and conditions of fair use.

---

An infinitive is a verbal consisting of the word to plus a verb (in its simplest "stem" form) and functioning as a noun, adjective, or adverb. The term *verbal* indicates that an infinitive, like the other two kinds of verbals, is based on a verb and therefore expresses action or a state of being. However, the infinitive may function as a subject, direct object, subject complement, adjective, or adverb in a sentence. Although an infinitive is easy to locate because of the *to* + verb form, deciding what function it has in a sentence can sometimes be confusing.

- *To wait* seemed foolish when decisive action was required. (subject)
- Everyone wanted *to go*. (direct object)
- His ambition is *to fly*. (subject complement)
- He lacked the strength *to resist*. (adjective)
- We must study *to learn*. (adverb)

Be sure not to confuse an infinitive—a verbal consisting of to plus a verb—with a prepositional phrase beginning with to, which consists of to plus a noun or pronoun and any modifiers.

- **Infinitives:** to fly, to draw, to become, to enter, to stand, to catch, to belong
- **Prepositional Phrases:** to him, to the committee, to my house, to the mountains, to us, to this address

**An Infinitive Phrase** is a group of words consisting of an infinitive and the modifier(s) and/or (pro)noun(s) or noun phrase(s) that function as the actor(s), direct object(s), or complement(s) of the action or state expressed in the infinitive, such as:

> We intended **to leave** **early**.

**The infinitive phrase functions as the direct object of the verb *intended*.**
**to leave** (infinitive)
**early** (adverb)

> I have a paper **to write** **before class**.

**The infinitive phrase functions as an adjective modifying *paper*.**
**to write** (infinitive)
**before class** (prepositional phrase as adverb)

Phil agreed **to give** **me** **a ride**.

**The infinitive phrase functions as the direct object of the verb *agreed*.**
**to give** (infinitive)
**me** (indirect object of action expressed in infinitive)
**a ride** (direct object of action expressed in infinitive)

They asked **me** **to bring** **some food**.

**The infinitive phrase functions as the direct object of the verb *asked*.**
**me** (actor or "subject" of infinitive phrase)
**to bring** (infinitive)
**some food** (direct object of action expressed in infinitive)

Everyone wanted Carol to be the captain of the team.

**The infinitive phrase functions as the direct object of the verb *wanted*.**
**Carol** (actor or "subject" of infinitive phrase)
**to be** (infinitive)
**the captain** (subject complement for Carol, via state of being expressed in infinitive)
**of the team** (prepositional phrase as adjective)

**Actors:** In these last two examples the actor of the infinitive phrase could be roughly characterized as the "subject" of the action or state expressed in the infinitive. It is somewhat misleading to use the word *subject*, however, since an infinitive phrase is not a full clause with a subject and a finite verb. Also notice that when it is a pronoun, the actor appears in the objective case (*me*, not *I*, in the fourth example). Certain verbs, when they take an infinitive direct object, require an actor for the infinitive phrase; others can't have an actor. Still other verbs can go either way, as the charts below illustrate.

## VERBS THAT TAKE INFINITIVE OBJECTS WITHOUT ACTORS:

| agree | begin | continue | decide |
|---|---|---|---|
| fail | hesitate | hope | intend |
| learn | neglect | offer | plan |
| prefer | pretend | promise | refuse |
| remember | start | try | |

**Examples:**

- Most students *plan* to study.
- We *began* to learn.
- They *offered* to pay.
- They *neglected* to pay.
- She *promised* to return.

In all of these examples no actor can come between the italicized main (finite) verb and the infinitive direct-object phrase.

## VERBS THAT TAKE INFINITIVE OBJECTS WITH ACTORS:

| advise | allow | convince | remind |
|---|---|---|---|
| encourage | force | hire | teach |
| instruct | invite | permit | tell |
| implore | incite | appoint | order |

**Examples:**

- He *reminded* me to buy milk.
- Their fathers *advise* them to study.
- She *forced* the defendant to admit the truth.
- You've *convinced* the director of the program to change her position.
- I *invite* you to consider the evidence.

In all of these examples an actor is required after the italicized main (finite) verb and before the infinitive direct-object phrase.

## VERBS THAT USE EITHER PATTERN:

| | | | | |
|---|---|---|---|---|
| ask | expect | (would) like | want | need |

**Examples:**

- I *asked* to see the records.
- I *asked* him to show me the records.
- Trent *expected* his group to win.
- Trent *expected* to win.
- Brenda *likes* to drive fast.
- Brenda *likes* her friend to drive fast.

In all of these examples the italicized main verb can take an infinitive object with or without an actor.

**Punctuation:** If the infinitive is used as an adverb and is the beginning phrase in a sentence, it should be set off with a comma; otherwise, no punctuation is needed for an infinitive phrase.

- *To buy a basket of flowers,* John had to spend his last dollar.
- *To improve your writing,* you must consider your purpose and audience.

## POINTS TO REMEMBER

1. An infinitive is a verbal consisting of the word to plus a verb; it may be used as a noun, adjective, or adverb.
2. An infinitive phrase consists of an infinitive plus modifier(s), object(s), complement(s), and/or actor(s).
3. An infinitive phrase requires a comma only if it is used as an adverb at the beginning of a sentence.

## SPLIT INFINITIVES

Split infinitives occur when additional words are included between to and the verb in an infinitive. Many readers find a single adverb splitting the infinitive to be acceptable, but this practice should be avoided in formal writing.

**Examples:**

- I like *to* on a nice day *walk* in the woods. * (unacceptable)
  On a nice day, I like *to walk* in the woods. (revised)
- I needed *to* quickly *gather* my personal possessions. (acceptable in informal contexts)
  I needed *to gather* my personal possessions quickly. (revised for formal contexts)