**Case No. 2025-1712**

# United States Court of Appeals for the Federal Circuit

SEOUL SEMICONDUCTOR CO., LTD.,

*Plaintiff,*

– v. –

FINELITE, INC.,

*Appellant.*

*On Appeal from the United States District Court*
*for the Northern District of California*
*No. 3:22-cv-02869-TLT*
*Hon. Trina L. Thompson*

# APPELLANT'S REPLY BRIEF AS FILED IN THE NINTH CIRCUIT

THOMAS J. RECHEN
MARK D. GIARRATANA
KEVIN REINER
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
(860) 275-6700
trechen@mccarter.com
mgiarratana@mccarter.com
kreiner@mccarter.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........ 1

ARGUMENT ........ 2

I. The only terms of sale that became part of the Credit Agreement were "to pay service charges assessed and to pay reasonable attorneys [sic] fees in the event of default" ........ 2

A. The infinitive phrases in the final sentence of the Credit Agreement limit and identify the "terms of sale (attached)" in the main clause ........ 2

1. The final sentence is a loose sentence. ........ 2

2. The comma and the conjunction do not transform the sentence into a list ........ 5

3. Lacking parallelism, the final sentence cannot be a list ........ 6

B. Samsung's argument that the infinitive phrases in the final sentence do not refer to the "terms of sale (attached)" is meritless ........ 10

C. Samsung's interpretation of the final sentence violates California's doctrine of incorporation by reference ........ 11

D. Evidence of the parties' course of conduct is proper to confirm the plain meaning of the Credit Agreement ........ 13

E. The conflicting terms in the Contract of Sale and Credit Agreement further evidence the intent to limit incorporation ........ 14

F. If the Court finds an ambiguity, then such ambiguity must be resolved in Finelite's favor ........ 15

G. Finelite neither waived its grammatical arguments nor invited the District Court's error ........ 15

II. Absent incorporation of the entirety of Samsung's Contract of Sale, the Credit Agreement cannot govern the 2018-2021 Purchases ........ 17

III. Finelite's third-party claims are governed by the § 2207 contracts created through the parties' exchange of written forms ................................ 18

A. Because Samsung failed to expressly require Finelite's assent to the terms and conditions of the 2018 sales acknowledgment form, the § 2207(1) proviso is inapplicable and a contract was formed by the parties' exchange of written forms .......................................... 19

B. Steiner resolved that "different" terms are treated the same as "additional" terms under Cal. Comm. Code § 2207 ........................... 20

C. Even if Steiner does not control, the parties' competing indemnification provisions drop out and are replaced by Cal. Comm. Code § 2312 ..................................................................... 22

D. There is no disputed issue of material fact precluding summary judgment for Finelite on the 2018-2021 Purchases ............................ 22

1. There is no genuine dispute that Finelite's Purchasing Terms and Conditions were incorporated by reference into each of the parties' 2207 contracts .......................................... 23

2. There is no dispute of material fact precluding summary judgment for Finelite on the 2021 Purchase ............................ 25

3. There is no dispute of material fact precluding summary judgment for Finelite on its Cal. Comm. Code § 2312 breach of warranty claim ......................................................... 27

CONCLUSION ............................................................................................. 30



ME1 53123660v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anhui Powerguard Tech. Co. Ltd. v. DRE Health Corp.*,
95 F.4th 1146 (8th Cir. 2024) ....................................................................9

*Doe v. Uber Techs., Inc.*,
90 F.4th 946 (9th Cir. 2024) ....................................................................21

*Germantown Trust and Sav. Bank v U.S. Bank*,
No. 19-CV-352-JPG, 2020 WL 8082408 (S.D. Ill. June 9, 2020) ........................5

*Hippler v. Allied Prop. and Cas. Ins. Co.*,
No. 2:12-CV-1039-PMW, 2013 WL 5448245 (D. Utah Sept. 30, 2013) ....................................................................5

*Katana Silicon Techs. LLC v. Micron Tech., Inc.*,
671 F.Supp.3d 1138 (D. Idaho 2023) ....................................................................29

*Killgore v. SpecPro Pro. Servs., LLC*,
51 F.4th 973 (9th Cir. 2022) ....................................................................21

*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) ....................................................................29

*Phoenix Sols., Inc. v. Sony Elecs., Inc.*,
637 F. Supp. 2d 683 (N.D. Cal. 2009) ....................................................................29

*Plastoform Indus. Ltd. v. Monster LLC*,
No. 18-CV-02805, 2018 WL 10562845 (N.D. Cal. Sept. 6, 2018) ....................17

*Semiconductor Co. v. Finelite, Inc.*,
No. 22-CV-02869-TLT, 2023 WL 7106480 (N.D. Cal. Jan. 27, 2023) ....................................................................27

*Textile Unlimited, Inc. v. A. BMH and Co., Inc.*,
240 F.3d 781 (9th Cir. 2001) ....................................................................22

*U.S. v. Bass*,
404 U.S. 336 (1971) ....................................................................4

*U.S. v. Nader*,
542 F.3d 713 (9th Cir. 2008) ....................4

*Universal Title Inc. Co. v. United States*,
942 F.2d 1311 (8th Cir. 1991)....................16

*Whittaker Corp. v. Execuair Corp.*,
953 F.2d 510 (9th Cir. 1992) ....................15

**State Cases**

*Burke v. Award, Inc.*,
No. G042606, 2011 WL 2556029 (Cal. Ct. App. June 28, 2011)....................12

*Chan v. Drexel Burnham Lambert, Inc.*,
178 Cal.App.3d 632 (1986) ....................11, 12, 23

*C9 Ventures v. SVC-W., L.P.*,
202 Cal.App.4th 1483 (2012) ....................25, 26

*In re Cipro Cases I & II*,
134 Cal.Rptr.3d 165 (Cal. App. 2011), *review granted and opinion superseded*, 269 P.3d 653 (Cal. 2012) *and rev'd on other grounds*, 61 Cal.4th 116 (2015) ....................29

*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*,
176 Cal.App.4th 697 (2009) ....................23

*Hayter Trucking, Inc. v. Shell W. E&P, Inc.*,
18 Cal.App.4th 1 (1993) ....................13

*Irving v. Divito*,
807 S.E.2d 741 (Va. 2017) ....................8

*Long v. Provide Com., Inc.*,
245 Cal.App.4th 855 (2016) ....................23, 24

*Pac. Sunwear of Cal., Inc. v. Olaes Enters.*,
167 Cal.App.4th 466 (2008) ....................27, 28

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*,
55 Cal.4th 1169 (2013) ....................13

*State v. Woodrum*,
845 S.E.2d 278 (W. Va. 2020)........................................................................8

*Steiner v. Mobil Oil Corp.*,
20 Cal.3d 90 (1977) ..................................................................................20, 21

*Tomlinson v. Qualcomm, Inc.*,
97 Cal.App.4th 934 (2002) ..........................................................................18

*Whitman v. Transtate Title Co.*,
165 Cal.App.3d 312 (1985) ..........................................................................5

*Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*,
14 Cal.5th 58 (2022) ....................................................................................4

**Federal Statutes**

35 U.S.C. § 271(a) ........................................................................................28

**State Statutes**

Cal. Civ. Code § 1638........................................................................................9

Cal. Civ. Code § 1639........................................................................................9

Cal. Civ. Proc. Code § 1856 ..............................................................................13

Cal. Comm. Code § 2207..............................................................................*passim*

Cal. Comm. Code § 2312..............................................................................*passim*

**Other Authorities**

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012).................................................9, 10

Bryan A. Garner, *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style* 801 (5th Ed. 2022) ..........................................4, 6, 9

*Chicago Manual of Style*, The Univ. of Chicago Press (17th ed. 2017) ..........*passim*

*Loose Sentence,* THE RANDOM HOUSE COLLEGE DICTIONARY (Rev. Ed. 1984)..................................................................................................3

*Loose Sentence,* WEBSTER'S NINTH COLLEGIATE DICTIONARY (1st Ed. 1983) ....................3

UCC § 2-207 ....................19, 20

William Strunk, Jr. and E.B. White, *The Elements of Style* 92 (4th ed. 2000) ....................*passim*

## JURISDICTIONAL STATEMENT

Appellant Finelite, Inc. ("Finelite") refers this Court to the jurisdictional statement in Finelite's Opening Brief ("FOB"), ECF No. 10.1 at 6.[1]

If this Court determines that Samsung has sufficiently preserved its request to transfer by referencing its prior moving papers, Samsung's Answering Brief ("SAB"), ECF No. 35.1 at 2, Finelite similarly refers this Court to its opposition to Samsung's motion to transfer and sur-reply. ECF Nos. 16 and 27.

---

[1]Unless otherwise stated, "ECF No." citations are to the docket entries in this appeal, No. 24-711.

# ARGUMENT

## I. The only terms of sale that became part of the Credit Agreement were "to pay service charges assessed and to pay reasonable attorneys [sic] fees in the event of default"

Like the District Court's decision below, ER-13–34, Samsung's Answering Brief ignores long-standing and undisputed rules of contract interpretation and grammar.

### A. The infinitive phrases in the final sentence of the Credit Agreement limit and identify the "terms of sale (attached)" in the main clause

#### 1. The final sentence is a loose sentence.

It is uncontroverted that the final sentence[2] begins with a grammatically-complete main clause punctuated with a comma, followed by two grammatically-incomplete infinitive phrases—"to pay service charges assessed" and "to pay reasonable attorneys [sic] fees in the event of default"—each beginning with the infinitive verb "to pay." FOB at 27-32. The main clause, "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached)," can stand alone as a sentence. *See* FOB at 28-29. The infinitive phrases cannot. Accordingly, they modify, qualify and explain the main clause. *See* FOB at 28 (*citing* William Strunk, Jr. and E.B. White, *The Elements of Style* 92 (4th ed. 2000) (hereinafter "Strunk &

[2] "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached), to pay service charges assessed and to pay reasonable attorneys fees in the event of default." ER-147.

White")). Under well-established grammar rules, the infinitive phrases identify the only terms in Samsung's "terms of sale" that were made part of the Credit Agreement.

On appeal, Samsung abandons its argument before the District Court that "to pay service charges assessed" and "to pay reasonable attorneys fees in the event of default" are prepositional phrases.[3] SAB at 32-33. It also admits that "Samsung Semiconductor, Inc.'s terms of sale (attached)" in the main clause is a noun. *Id.* Samsung's admissions, and the sentence's undisputed grammatical components, establish that the infinitive phrases modify the main clause and limit incorporation from Samsung's Contract of Sale to "service charges" and "reasonable attorneys fees."

Samsung argues that "loose sentence" is "an obscure term little discussed by grammarians." *Id*. at 29. The term's popularity, though irrelevant, is far from obscure. Indeed, multiple dictionaries define the term consistent with Strunk & White. *See, e.g.*, *Loose Sentence*, THE RANDOM HOUSE COLLEGE DICTIONARY (Rev. Ed. 1984), Reply Add.-56;[4] *Loose Sentence*, WEBSTER'S NINTH COLLEGIATE DICTIONARY (1st

[3]*See* Samsung's Reply in Support of Motion for Summary Judgment, SER-67–69; *see also* Transcript of Hearing on Cross-Motions for Summary Judgment, ER-231–33.

[4]Secondary sources not already included in the addenda to Finelite's Opening Brief or Samsung's Answering Brief are attached as an "Addendum of Sources" and cited as "Reply Add.-__."

Ed. 1983), Reply Add.-52. And, of course, Strunk & White itself is an authoritative reference. *See, e.g., U.S. v. Bass*, 404 U.S. 336, 340 n. 6 (1971) (relying thereon); *U.S. v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) (same); *Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*, 14 Cal.5th 58, 68 (2022) (same).

Samsung argues that Strunk & White's exemplary loose sentence[5] involves "the addition of details," whereas the final sentence of the Credit Agreement does not. SAB at 30-31. But structurally, both sentences begin with a grammatically-complete main clause punctuated by a comma, followed by two grammatically-incomplete phrases joined by the conjunction "and." In both sentences the post-comma phrases modify the main clause.[6] In Strunk & White, the phrases specify the conditions under which "[h]e was determined to succeed"—"with or without the promotion …" and "in spite of the difficulties …." FOB at Add.-13. In the Credit Agreement, the phrases specify the "terms of sale (attached)" that Finelite agreed to, and provide additional details. ER-147; *see infra* § I.C. Both are loose sentences.

---

[5]"He was determined to succeed, with or without the promotion he was hoping for and in spite of the difficulties he was confronting at every turn." FOB at Add.-13.

[6]The phrases in Strunk & White's example are not "clauses" as Samsung contends. They lack a subject and a verb and thus are phrases like the disputed infinitive phrases here. *See* Bryan A. Garner, *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style* 1199 (5th Ed. 2022) (hereinafter "Garner"), Reply Add.-35.

### 2. The comma and the conjunction do not transform the sentence into a list

Samsung's only grammatical argument that the sentence is a list is that it contains a comma and a conjunction. SAB at 17-18. But that does not make the sentence a list.

"And" is merely "[a] word that joins words, phrases, clauses or sentences." Strunk & White 91, Reply Add.-31 (defining "conjunction"). A comma generally "denotes a slight pause," *e.g.*, "to set off phrases at the end of the sentence that refer to the beginning [] of the sentence." *Chicago Manual of Style*, The Univ. of Chicago Press, § 6.16 (17th ed. 2017) (hereinafter "Chicago Manual"), Reply Add.-7; SAB at Add.-035 ¶ 8. The comma at issue here does just that, setting off the infinitive phrases from the main/independent clause.

None of Samsung's cases support its position. SAB at 18. The presence of a list was undisputed in each case. *See Hippler v. Allied Prop. and Cas. Ins. Co.*, No. 2:12-CV-1039-PMW, 2013 WL 5448245 at *1, 3 (D. Utah Sept. 30, 2013); *Whitman v. Transtate Title Co.*, 165 Cal.App.3d 312, 318-19 (1985); *Germantown Trust and Sav. Bank v U.S. Bank*, No. 19-CV-352-JPG, 2020 WL 8082408, at *1-4 (S.D. Ill. June 9, 2020). Thus, those cases are irrelevant.

Samsung also contends that the Purdue University website supports its position. SAB at 18. But that website merely states the well-known rule that, ***if*** a

sentence contains a list, commas should be used between the listed items. SAB at Add.-033.[7]

### 3. Lacking parallelism, the final sentence cannot be a list[8]

"Items in a list should consist of parallel elements." Chicago Manual § 6.127, Reply Add.-27. "[W]ith lists (even short ones), noun should be matched with noun, adjective with adjective, adverb with adverb, etc." Garner 801, Reply Add.-34. Lists employ parallel structure "to show that two or more ideas have the same level of importance." FOB at Add.-33; *accord* Garner 1228, FOB at Add.-19 (*Parallelism*: "the presentation of ideas bearing equivalent weight by putting them into identical grammatical form").

The phrases in the final sentence are not parallel. First, the phrases lack "identical grammatical structure." *See* FOB at 31; Garner 1228, FOB at Add.-19. Samsung does not dispute that the second and third phrases, "to pay service charges assessed" and "to pay reasonable attorneys fees in the event of default" are infinitive verb phrases, while the first phrase, "to Samsung Semiconductor, Inc.'s terms of sale (attached)," is not. *See supra* Section I.A.1; SAB at 33.

---

[7]Samsung admits that an "Oxford" or "serial" comma is irrelevant to whether a sentence constitutes a list. SAB at 19-20. It fails to explain why another type of comma is determinative of a list when an Oxford comma is not.

[8]SAB at 32.

Moreover, as Samsung acknowledges, to be parallel, all three phrases "***must*** … serve the same grammatical function in the sentence." Chicago Manual § 5.242 (emphasis added), FOB at Add.-8–9; *see* SAB at 32 (quoting rule). Here, they do not. The infinitive phrases function as verbs but, as the parties agree, the prepositional phrase in the main clause does not. This is confirmed by the Chicago Manual: "As a verb, it [the infinitive] can take … an object {try to throw **the javelin** higher}." Chicago Manual § 5.107 (emphasis in original), Reply Add.-3–4. The infinitive verb "to throw" takes the object "the javelin." *See id.* Similarly, in the Credit Agreement, "to pay" in the first infinitive phrase takes the object "service charges," and "to pay" in the second phrase takes the object "attorneys fees." Thus, just like the Chicago Manual example, both infinitive phrases function as verbs. *See id.*

Samsung makes a new argument on appeal that the infinitive phrases "function as nouns" because they are purportedly "the direct objects of 'agrees'" in the main clause. SAB at 32-34. But Samsung never disputes that the sentence's three phrases lack identical structure and never explains why the infinitive phrases are direct objects of "agrees." They are not. "Agrees" already has a direct object. "Samsung Semiconductor, Inc.'s terms of sale (attached)" is the "noun … that receives the action" of the verb "agrees." *See* Strunk & White 91, Reply Add.-31

(defining "direct object"). Accordingly, the infinitive phrases do not serve as direct objects.

Samsung's cited authorities on this topic are inapposite. The infinitive phrases in *State v. Woodrum* functioned as adjectives, not nouns. 845 S.E.2d 278, 285 (W. Va. 2020) (the phrases were "adjectival, infinitive phrases … that must describe a noun"). That case teaches nothing regarding infinitive phrases functioning as nouns or direct objects.[9]

Samsung's remaining examples—*Irving*, the Purdue University website, and the Chicago Manual—fare no better. In each, the direct object is (1) adjacent to a verb; (2) in the main clause of the sentence; and (3) the only phrase in the sentence that can function as the direct object of the verb to make the sentence grammatical. *See Irving v. Divito*, 807 S.E.2d 741, 743 (Va. 2017); SAB at Add.-40; SAB at 32 (*citing* the Chicago Manual). In contrast, the infinitive phrases in the sentence at issue here lack those characteristics and thus have a significantly different structure. They are not adjacent to the verb, are not even in the main clause, and are not required to function as the direct object of "agrees" or otherwise as a noun to make the sentence grammatically correct. ER-147.

[9]Samsung implies that, per *Woodrum*, infinitive phrases cannot function as verbs. SAB at 32. This is directly contradicted by the Chicago Manual § 5.107. *See* SAB at 33 (citing same).

Samsung's reliance on *Anhui Powerguard Tech. Co. Ltd. v. DRE Health Corp.*, 95 F.4th 1146 (8th Cir. 2024) is also misplaced. SAB at 34. As Samsung acknowledges, that court expressly stated that the disputed sentence had "a parallel construction" because "the verbs 'agrees' or 'agree' precede ***all three***" phrases at issue. *Anhui* 95 F.4th at 1150 (emphasis added). In sharp contrast, the sentence before this Court does not contain three repetitions of the verb "agrees." "Agrees" appears once in the main clause and the infinitive phrases do not contain that word at all. Thus, in stark contrast to *Anhui Powerguard*, the three phrases here do not have "identical syntactical elements." *See id*. at 1150 ("parallel" structure requires "identical syntactical elements").

Samsung also improperly relies on the court's comment in *Anhui* that the phrases "pertain[ed] to common subject matter: the business relationship between the parties." SAB at 34. Perhaps true, but it does not follow that every such sentence is a series, particularly where, as here, it lacks the grammatical markers of such.

Citing Garner, Samsung says that "even experienced writers fall short." *Id*. at 32. Indeed. But Garner stresses the importance of parallelism and expressly instructs that mixing nouns and verb phrases as Samsung does in the Credit Agreement is not parallelism. Garner 801, Reply Add.-34. Further, the parties' intention is determined from what they wrote, not from what one of them claims it intended but failed to write. Cal. Civ. Code §§ 1638 and 1639. Drafters of legal documents "are presumed

to be grammatical in their compositions," and to understand "the principles of correct English word choice." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012), Reply Add.-43; *see also id.* 51, Reply Add.-42 (legal documents are not typically "slapped together thoughtlessly"). These presumptions apply to the sentence Samsung drafted.

### B. Samsung's argument that the infinitive phrases in the final sentence do not refer to the "terms of sale (attached)" is meritless[10]

Samsung argues that the phrase "service charges assessed" refers only to the "monthly service charge" or "late charge" for "accounts not paid within 30 days" appearing earlier in the Credit Agreement. ER-147; SAB at 21. However, the Credit Agreement does not define the service charge that Finelite agreed to pay. Rather, it states only that such charges "can be assessed" and that Finelite will pay any "charges assessed." ER-147. Section 7 of the "terms of sale" provides the missing details. It defines the service charges that Finelite agreed to pay, *i.e.*, "the lesser of 1.5% … per month or the maximum rate permitted by law." ER-142. Accordingly, the phrase "to pay service charges assessed" necessarily refers to this sentence in the Contract of Sale.

Samsung next argues that "to pay reasonable attorneys fees in the event of default" does not refer to the "terms of sale" because attorney's fees "are not the

[10] SAB at 20-22.

same as 'collection costs.'" SAB at 21-22. But Samsung's Contract of Sale specifically states that collection costs include "attorneys' fees incurred in obtaining and enforcing any judgement." ER-142. There is no question that such attorneys' fees may be incurred in the event of default, and therefore the second infinitive phrase necessarily refers to this sentence in the Contract of Sale.

### C. Samsung's interpretation of the final sentence violates California's doctrine of incorporation by reference

Samsung claims that Finelite executed a single, five-page document called "the 2012 Agreement" and that "Finelite's interpretation nullifies 40%" of that "Agreement." SAB at 2-3, 22-23. This is a fiction. Samsung sent Finelite four, separately-titled documents—a "Credit Application," a "Credit Agreement," a "Financial Authorization," and a "Samsung Semiconductor, Inc. Contract of Sale" tacked onto the very end. ER-139–143. Finelite signed only the "Credit Agreement" and "Financial Authorization," and omitted Samsung's "Contract of Sale" when returning the signed documents to Samsung. ER-139–147.

Under California law, the intent to incorporate must be "clear and unequivocal." *See Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal.App.3d 632, 641 (1986) ("*For the terms of another document to be incorporated … the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent* …") (emphasis in original). California courts interpret

this doctrine "strictly." *Burke v. Award, Inc.*, No. G042606, 2011 WL 2556029, at *3 (Cal. Ct. App. June 28, 2011).

Neither the Credit Agreement nor the Financial Authorization unequivocally express an intent to incorporate the entire Contract of Sale. To the contrary, the clear expression of intent limits incorporation to "service charges assessed" and "reasonable attorneys fees in the event of default." *Supra*, Sections I.A.1-4.

Samsung's argument regarding the sequential pagination of the four documents fares no better. SAB at 3, 11, 16, 22-23. There is no record evidence concerning the purpose of the page numbers. Further, although the Credit Agreement (Page 2 of 5) refers to "terms of sale," the document purportedly referenced is entitled "Contract of Sale" (Page 4 of 5), which comes after the Financial Authorization (Page 3 of 5) and is not referenced in any of the other documents. That this somewhat haphazard collection of four documents has sequential page numbering proves nothing, and neither constitutes a clear and unequivocal reference, nor establishes Finelite's consent. *See Chan*, 178 Cal.App.3d at 642-43.

In addition, Finelite's interpretation neither "nullifies" nor renders as "surplusage" any part of the Credit Agreement. A provision can't be nullified if it was never part of the parties' agreement in the first place.

### D. Evidence of the parties' course of conduct is proper to confirm the plain meaning of the Credit Agreement

The parties' conduct related to the 2018-2021 LED Purchases is relevant because it supports the plain, grammatical interpretation of the final sentence. FOB at 35-36. While parol evidence "may not be relied upon to alter or add to the terms" of an integrated contract, *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 55 Cal.4th 1169, 1174 (2013), it may be used to confirm a contract's plain meaning. Cal. Civ. Proc. Code § 1856 ("The terms set forth in a writing … may be explained or supplemented by course of dealing … or by course of performance."); *see also* FOB at 35; *Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 18 Cal.App.4th 1 (1993) ("extrinsic evidence of custom and practice" is "admissible[] to explain terms of parties' integrated agreement").

The evidence offered by Finelite establishes that the parties' post-Credit Agreement conduct is consistent with Finelite's interpretation of that Agreement. Samsung argues that Finelite's interpretation would negate almost the entire "Contract of Sale." SAB at 23-24. But that could only be so if the entire Contract of Sale was made part of the Credit Agreement. Here, the parties' subsequent conduct reinforces what a proper grammatical construction establishes—that the entire Contract of Sale was never part of the bargain. Indeed, Samsung took no issue with either party's post-contract behavior until there was litigation. The parties' conduct simply confirms the limited scope of their incorporation.

### E. The conflicting terms in the Contract of Sale and Credit Agreement further evidence the parties' intent to limit incorporation

Samsung does not dispute that the Credit Agreement and Contract of Sale contain competing shipping terms. The Credit Agreement states in pertinent part that the LEDs are sold "C.I.P. Samsung Semiconductor, Inc.'s designated shipping point" (ER-147), whereas the Contract of Sale states in pertinent part that the LEDs are sold "C.I.P. Samsung's warehouse in California" (ER-143). These contradictions can only be reconciled by limiting incorporation of the "terms of sale" to "service charges assessed" and "reasonable attorneys fees in the event of default."

Samsung shrugs off this contradiction by arguing that the conflicting terms allowed the parties to agree to a different C.I.P. location, and the parties separately agreed years later in their purchasing forms to the same location. ER-152–174. But that does not change the fact that the competing terms in the Credit Agreement and Contract of Sale conflict. A reasonable drafter would not allow such a conflict to creep into the parties' contract, and such conflict reinforces the parties' intent to limit incorporation to those terms specifically identified in the infinitive phrases of the last sentence of the Credit Agreement.[11]

[11]Samsung argues that the "designated shipping point" in the Credit Agreement is the same location as "Samsung's warehouse in California" and therefore there is no conflict. SAB at 37. However, none of Samsung's record citations establish such shipping point and therefore Samsung's argument must be disregarded.

### F. If the Court finds an ambiguity, then such ambiguity must be resolved in Finelite's favor

Applicable rules of construction establish that Finelite's interpretation of the last sentence of the Credit Agreement is correct. But if this Court finds that Samsung has proposed an equally reasonable interpretation, then it must construe the ambiguity against Samsung. Cal. Civ. Code. § 1654.

### G. Finelite neither waived its grammatical arguments nor invited the District Court's error[12]

An argument "raised sufficiently for the trial court to rule on it" is not waived. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992). Finelite argued in the District Court, as it does here, that the language "to pay service charges assessed and to pay reasonable attorneys fees in the event of default" limits the scope of what is incorporated from the Contract of Sale.[13] SER-92–93; ER-225–234; *see supra* Section I.A.1; FOB at 27-30. Thus, Finelite not only expressly raised its argument sufficiently for the District Court to rule on it, the District Court in fact ruled on it. ER-22–23; *see Whittaker Corp.*, 953 F.2d at 515.[14]

---

[12]SAB at 28, 31, 35.

[13]The fact that Finelite's argument below did not include the words "loose sentence" did not waive the point.

[14]Preserving an argument for appeal does not require a trial court to rule on the argument. *See id.*

Samsung's further contention that Finelite waived its argument that the final sentence did not contain "three parallel prepositional phrases" is belied by Samsung's contention just two sentences later that it was Finelite who "introduced the concept." SAB at 31. Regardless, Finelite vigorously opposed Samsung's contention that the sentence "has three parallel prepositional phrases." *See, e.g.*, SER-67–69; ER-231–233. Thus, Finelite's argument was raised "sufficiently for the trial court to rule on it." *See Whittaker Corp.*, 953 F.2d at 515.

In fact, Finelite's appeal raises no new issues. The issues raised in Finelite's summary judgment motion before the District Court are the same issues before this Court, including whether the Credit Agreement incorporated by reference the entirety of the "terms of sale (attached)," or only those terms identified in the final sentence. While Finelite's Opening Brief might now focus or expand the arguments in order to expose the District Court's error, there is nothing improper about that. "[O]ne of the primary purposes of appellate review" would be undermined if appellate courts "refuse[d] to consider each nuance or shift in approach urged by a party simply because it was not similarly urged below." *Universal Title Inc. Co. v. United States*, 942 F.2d 1311, 1314 (8th Cir. 1991). Put differently, if parties were limited to verbatim recitals of the arguments made below, appellate briefing would be unnecessary and reference to their summary judgment briefing would suffice.

## II. Absent incorporation of the entirety of Samsung's Contract of Sale, the Credit Agreement cannot govern the 2018-2021 Purchases

Samsung argues that even if the Contract of Sale was not incorporated in its entirety, a § 2207 battle of the forms analysis can "not apply where there is already an existing contract between the parties." SAB at 39.

Samsung's entire argument hinges on the first sentence of the Contract of Sale: "[t]he following Terms and Conditions apply to any purchase of products ('Products') that you ('Customer') make from Samsung Semiconductor, Inc." But as set forth *supra* at Sections I.A-C, this language was not incorporated into the Credit Agreement. Moreover, the Credit Agreement did not address any of the material terms—identification of product, quantity, price—of potential future purchases. *Id*. Thus, the Credit Agreement could not possibly govern the 2018-2021 transactions.

Second, under the correct construction of the Credit Agreement, it has <u>no</u> merger or modification provision. Reliance on these provisions by the District Court assumed away the issue (*i.e.*, what, exactly, was incorporated?) and was fundamental to its error. ER-26. The District Court specifically stated that "California courts have held that subsequent terms, such as purchase orders, do not *modify* or supersede an existing *integrated* contract." *Id*. (emphasis added). And the case law relied upon by the District Court involved integrated contracts with "restrictive" modification provisions. *See Plastoform Indus. Ltd. v. Monster LLC*, No. 18-CV-02805, 2018 WL

10562845, at *3-4 (N.D. Cal. Sept. 6, 2018) (involving an integrated agreement with a restrictive modification clause) and *Tomlinson v. Qualcomm, Inc.*, 97 Cal.App.4th 934, 946 (2002) (same). The District Court wrongly interpreted the Credit Agreement to include the entirety of Samsung's Contract of Sale, and then interpreted the wrongly incorporated integration and modification clauses to shut down any application of Cal. Comm. Code § 2207. Once the provisions wrongly relied upon by the District Court are stripped away, a § 2207 "battle of the forms" analysis must follow.

## III. Finelite's third-party claims are governed by the § 2207 contracts created through the parties' exchange of written forms

Because the 2012 Credit Agreement does not govern, this Court must proceed to a Cal. Comm. Code § 2207 analysis to determine the terms of the parties' 2018-2021 Purchases. When that analysis is complete, Samsung's motion for summary judgment necessarily fails and should have been denied by the District Court. Samsung recognizes this. SAB at 38-66. In its Answering Brief, Samsung's argument is that Finelite's cross-motion for summary judgment similarly should have been denied. *Id.* Yet Samsung's arguments for why Finelite's cross-motion was properly denied are actually quite limited: (1) the 2018 sales acknowledgment form expressly conditioned Samsung's acceptance on Finelite's assent to its terms (it did not), (2) the 2019-2020 sales acknowledgment forms proposed "differing," as opposed to "additional" terms (it doesn't matter); and (3) the hyperlink associated

with the 2021 Purchase was malfunctioning in 2023 (it's irrelevant). Each of Samsung's arguments fails for different reasons that follow. But even if they succeeded Finelite would still be entitled to summary judgment because the "gap-filler" provisions of the UCC, namely Cal. Comm. Code § 2312, require that result.

### A. Because Samsung failed to expressly require Finelite's assent to the terms and conditions of the 2018 sales acknowledgment form, the § 2207(1) proviso is inapplicable and a contract was formed by the parties' exchange of written forms

Samsung argues that no contract was created by the parties' exchange of written forms in 2018 because Samsung's 2018 sales acknowledgment form was "expressly conditioned on assent to Samsung's different terms." SAB at 51. Samsung's argument fails because the 2018 sales acknowledgment form was not so conditioned. That form states only that Samsung's acceptance is "expressly conditioned upon and subject to the terms and conditions of sale in this order acknowledgment." FOB at 44-48; ER-162. It does not expressly request Finelite's assent.

The proviso of Cal. Comm. Code § 2207(1) should be "construed narrowly" because it was "intended to apply 'only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured *of the offeror's assent to the additional or different terms therein*." FOB at 45 quoting *Idaho Power Co. v. Westinghouse Elec. Corp.*, 598 F.2d 924 (9th Cir. 1979) (emphasis added).

### B. *Steiner* resolved that "different" terms are treated the same as "additional" terms under Cal. Comm. Code § 2207

Samsung's reliance on the jurisdictional split concerning the treatment of "different" terms under UCC § 2-207 is misplaced, and ignores controlling California Supreme Court law. SAB at 54-57.

In *Steiner v. Mobil Oil Corp*., 20 Cal.3d 90, 102 n.5 (1977), the California Supreme Court analyzed the relevance of the distinction between "additional" and "different" terms in a UCC 2-207 context and held that "the applicability of section 2207, subdivision (2), should not turn upon a characterization of the varying terms of acceptance as 'additional' or 'different.'" *Id*. The court came to this conclusion after a detailed, three-paragraph analysis, wherein it specifically referenced the jurisdictional split as a result of official comment 6 to UCC § 2-207. *See id.* (discussing how "several courts and commentators have concluded that section 2207, subdivision (2), applies if an acceptance adds terms to an offer, but does not apply if an acceptance alters the terms of an offer," while others "suggest that section 2207, subdivision (2) applies without regard to whether the varying terms of an acceptance differ from or add to an offer"). The court did exactly what Samsung argues it had to do for the court's decision to be binding: it analyzed "the competing lines of national authority" and "decide[d] whether California would adopt the majority or minority position," opting for the latter. SAB at 55.

This was not a passing, standalone comment buried deep in an obscure opinion, as Samsung implies. *Id*. Further, Cal. Comm. Code § 2207 adopted UCC § 2-207 verbatim in 1965 (including official comment 6) and the California adoption remains unchanged to this day. *Id.* at 55. By the time of the *Steiner* opinion in 1977, the jurisdictional split had been evolving for approximately twelve years and a majority view had developed. The *Steiner* court called out the dichotomy, analyzed the issue, and decided that there was no reason to treat "additional" and "different" terms differently under California's adoption of the code. *Steiner*, 20 Cal.3d at 102 n.5. Thus, *Steiner* is controlling and is the best indicator of how the same court would decide the same question today.[15] Under *Steiner*, Finelite's Purchasing Terms and Conditions apply to the 2018-2020 Purchases.

Nor, in light of *Steiner*, is there any reason to certify this question to the California Supreme Court. A federal court sitting in diversity is tasked with predicting, based upon existing precedent, how a question of law would be decided by the forum state's highest court. *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 982 (9th Cir. 2022). Doing so is a simple matter in light of what the California Supreme Court said in *Steiner*. Accordingly, Samsung's request that this Court certify the question should be rejected. *Id.*

[15] At minimum, it is reasoned dicta, which is binding as to California law. *Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024).

### C. Even if *Steiner* does not control, the parties' competing indemnification provisions drop out and are replaced by Cal. Comm. Code § 2312

To the extent this Court finds that *Steiner* is not binding and that the California Supreme Court would hold that the differing indemnification terms in the parties' forms would cancel each other out, summary judgment in Finelite's favor is nevertheless required. In that scenario, the parties' indemnification provisions are replaced by Cal. Comm. Code § 2312. *See Textile Unlimited, Inc. v. A. BMH and Co., Inc.*, 240 F.3d 781, 789 (9th Cir. 2001) (A contract formed pursuant to § 2207 consists of "those terms upon which the parties expressly agreed, coupled with the standard 'gap-filler' provisions of Article Two.").

### D. There is no disputed issue of material fact precluding summary judgment for Finelite on the 2018-2021 Purchases

Samsung does not dispute that if a § 2207 analysis applies, the District Court erred by granting Samsung's motion for summary judgment. SAB at 38-66. If this Court agrees that § 2207 applies, then the District Court's order granting Samsung's motion for summary judgment, ER-13–34, must be reversed. But it must go further because, for the reasons set forth below, there is no issue of material fact that precludes summary judgment in favor of Finelite.

### 1. There is no genuine dispute that Finelite's Purchasing Terms and Conditions were incorporated by reference into each of the parties' 2207 contracts

Samsung argues that there is a factual dispute as to whether Finelite's Purchasing Terms and Conditions ("Finelite's Terms") were properly incorporated into the parties' Cal. Comm. Code § 2207 contracts.[16] SAB at 48-50. However, there is no such factual dispute and the issue can be decided as a matter of law. *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*, 176 Cal.App.4th 697, 713 (2009) ("interpretation of a contract generally presents a question of law," including whether an exhibit to a contract was properly incorporated by reference). While it is true that hyperlinked terms are incorporated only if the reference is "clear and unequivocal," Finelite's hyperlink satisfies this requirement. *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 641 (1986).

Under California law, hyperlinks are an accepted method by which parties may exchange binding terms and conditions. Hyperlinks are disfavored only when they are "located on a submerged page, requiring the [user] to scroll below layers of order summary details, advertisement banners, hyperlinks . . . logos . . . and customer service contact information." *See, e.g., Long v. Provide Com., Inc.*, 245 Cal.App.4th

[16]The parties' Cal. Comm. Code § 2207 contracts consist of all of the forms that were exchanged between the parties, including Finelite's cover emails, Finelite's Terms and Conditions, Finelite's purchase orders, and Samsung's sales acknowledgment forms.

855, 866 (2016). Finelite's hyperlinks, by contrast, state "Click to view Purchasing Terms and Conditions." Each hyperlink is underlined in a contrasting blue font for emphasis, and located immediately adjacent to the signature block in each email transmitting a purchase order. *See* ER-123–128. Each signature block immediately follows a one-to-three sentence message stating an unequivocal invitation to "view" or "see" the purchase order.[17] *Id*. Far from being buried, or difficult to find, Finelite's hyperlinks are plainly apparent when viewing each email.

But even if this Court found that Finelite's Purchasing Terms and Conditions were not incorporated into the parties' § 2207 contracts, there still would be no disputed issue of fact precluding summary judgment for Finelite because the Court would then proceed to determine, as a matter of law, that Samsung owes Finelite a duty of indemnification under Cal. Comm. Code § 2312. The undisputed facts dictating summary judgment for Finelite are as follows:

- Finelite sent purchase orders, *i.e.*, initial written forms, to Samsung, constituting offers under Cal. Comm. Code § 2207, ER-123–34; *id*. at 151–59; and
- Samsung responded with its own written forms—the sales acknowledgment forms—thereby accepting Finelite's offers and proposing additional or different terms concerning, *inter alia*, indemnification and warranty

[17] *See* ER-123 ("Please view attached file and provide order confirmation when available"); ER124 ("Po updated"); ER-125 ("Please view attached July PO."); ER-127 ("Please view attached file and provide order confirmation when available."); ER-128 ("Please see the attached PO, please kindly provide confirmation when available.").

obligations, ER-160–74, which would not become part of the parties' contracts under Cal. Comm. Code § 2207(2)(b). *See* FOB at 52-54.

As a matter of law, the parties' exchange of written purchase orders and sales order acknowledgments created § 2207 contracts. But Samsung's proposed additional or different terms would not be incorporated into such contracts because, pursuant to § 2207(2)(b), they constituted material changes. *See C9 Ventures v. SVC-W., L.P.*, 202 Cal.App.4th 1483, 1506 (2012) ("[a]n indemnification provision would constitute a material alteration, as a matter of law."). Accordingly, the Court would then turn to the "gap-filler" provisions of the California Commercial Code, which impose an obligation to indemnify against any "rightful claim of any third person by way of infringement." Cal. Comm. Code § 2312(3).

#### 2. There is no dispute of material fact precluding summary judgment for Finelite on the 2021 Purchase

Samsung cites no evidence or authority to support its argument that there exists a factual dispute regarding the 2021 Purchase, except for its reference to the District Court's decision.[18] SAB at 46; ER-31.

There is no factual dispute that Samsung had access to Finelite's Purchasing Terms and Conditions for the 2018-2020 Purchases. FOB at 44. The only issue raised by Samsung (via an inadmissible attorney affidavit) concerns the hyperlink in

[18] Samsung argues that Finelite has "waived its right to challenge" the District Court's finding that there is a factual dispute by failing to address it in Finelite's Opening Brief. SAB at 46. This is not true. *See, e.g.*, FOB at 44.

Finelite's 2021 cover email. Samsung claims that it was inoperative when tested by Samsung's counsel **in 2023**. SAB at 47. But this does not prevent summary judgment in favor of Finelite.

Whether the hyperlink was operative in 2023 is irrelevant. Samsung offered no other temporal evidence concerning the hyperlink. Finelite, however, conceded that the 2021 hyperlink to Finelite's Terms and Conditions was unintentionally inactive at the time of the 2021 Purchase Order. As explained in the Declaration of Chia Liau, ER-35, and the Second Declaration of John Shue, ER-106, this resulted from a clerical error on the part of a Finelite employee who failed to correctly update his signature block in or around October 2020. Thus, this relevant fact is not in dispute. The only dispute concerns the legal effect of Finelite's concession. The Court must apply the applicable law to the undisputed facts to determine: (1) whether a § 2207 contract was created; and (2) the resulting terms of any such contract. Once again, the parties' exchange of written purchase orders and sales order acknowledgments created § 2207 contracts, and Samsung's proposed additional or different terms would not be incorporated into such contracts because, pursuant to § 2207(2)(b), they constituted material changes. *See C9 Ventures*, 202 Cal.App.4th at 1506. So, once again, as to the 2021 Purchase, this Court turns to the gap-filler provisions of California Commercial Code § 2312(3).

### 3. There is no dispute of material fact precluding summary judgment for Finelite on its Cal. Comm. Code § 2312 breach of warranty claim

Samsung argues that "Finelite points to no record evidence whatsoever" to "establish[] that the LEDs are subject to a rightful infringement claim." SAB at 62 (internal quotations omitted). Not true. Finelite established that (i) the Seoul plaintiffs brought a 14-count complaint alleging that Samsung's LEDs infringe 14 patents, and (ii) Finelite filed three separate motions to dismiss the complaint over a 10-month period vigorously attacking the merits of every count of the complaint. FOB at 59 (*citing Seoul Semiconductor, Co., Ltd. et al. v. Finelite, Inc. v. Samsung Semiconductor, Inc.*, No. 3:22-cv-02869-TLT, ECF Nos. 24, 44 and 97). Finelite's motions attacked 13 counts for failure to plausibly state claims for infringement and all counts for failure to plausibly plead pre-suit damages. *Id*. The District Court carefully examined the infringement allegations and found that some counts plausibly pled claims for infringement, while others did not. *Semiconductor Co. v. Finelite, Inc.*, No. 22-CV-02869-TLT, 2023 WL 7106480, at *6 (N.D. Cal. Jan. 27, 2023). Ultimately, the Seoul plaintiffs amended their complaint to address the deficiencies and overcame Finelite's motions. *Id.*; *see also Seoul Semiconductor, Co., Ltd., supra,* ECF Nos. 40 and 93.

A "rightful claim … broadly encompasses any nonfrivolous claim of infringement." *Pac. Sunwear of Cal., Inc. v. Olaes Enters.*, 167 Cal.App.4th 466,

475 (2008). A frivolous claim is "totally and completely without merit," or "indisputably ha[s] no merit." *Id*. at 482 (internal quotations omitted). After surviving Finelite's three motions to dismiss attacking every count on the merits, the infringement claims indisputably meet the "rightful claim" standard because they are nonfrivolous.

Samsung next argues that a factual dispute exists because "4 of the 14 asserted patents issued after at least one of the purchase orders." SAB at 63. The dates of all purchase orders and patents are undisputed. Ten of the patents issued prior to every purchase order and delivery, and all fourteen patents issued before the 2021 purchase order and delivery. *See* SER-15 and SER-36. Accordingly, all LEDs were delivered subject to rightful claims of infringement of ten patents, and the LEDs of the 2021 Purchase Order were subject to rightful claims regarding all 14 patents.

Nor is there a disputed fact because the LEDs were delivered to Hong Kong for preassembly prior to shipment into the United States. SAB at 64. Samsung's argument that Finelite failed to "present evidence of activity within the United States to establish direct infringement under 35 U.S.C. § 271(a)" is ludicrous. SAB at 64 (internal quotations omitted). "[W]hoever without authority makes, uses, ***offers to sell, or sells*** any patented invention, within the United States … infringes the patent." 35 U.S.C. § 271(a) (emphasis added). Samsung and Finelite are both located in California, the offer for sale and sale of every LED occurred in the U.S., and

therefore every LED was the subject of a rightful claim of infringement in the U.S. at the time of delivery.[19]

Finally, Samsung argues that Finelite is not entitled to summary judgment because it failed to present evidence of damages.

First, damages are not a required element for a Cal. Comm. Code § 2312 claim. *See Phoenix Sols., Inc. v. Sony Elecs., Inc.*, 637 F. Supp. 2d 683 (N.D. Cal. 2009).

Second, the District Court docket shows that the patent infringement claims have been heavily litigated. *See Seoul Semiconductor, Co., Ltd. et al. v. Finelite, Inc. v. Samsung Semiconductor, Inc.,* No. 3:22-cv-02869-TLT. Patent litigation is hideously expensive. *See, e.g., In re Cipro Cases I & II*, 134 Cal.Rptr.3d 165, 182 (Cal. App. 2011) ("Patent litigation breeds a litany of direct and indirect costs, ranging from attorney and expert fees to the expenses associated with discovery compliance."), *review granted and opinion superseded*, 269 P.3d 653 (Cal. 2012), *and rev'd on other grounds*, 61 Cal.4th 116 (2015); *see also Katana Silicon Techs. LLC v. Micron Tech., Inc.*, 671 F.Supp.3d 1138, 1160 (D. Idaho 2023) ("patent litigation … become[s] more expensive the more patents are at issue"). There is no need for an affidavit of attorneys' fees to establish the obvious harm to Finelite.

---

[19] Contrary to Samsung's assertion (SAB at 64), location of title passage is irrelevant to the location of infringement. *See Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1370 (Fed. Cir. 2008).

Third, Finelite's motion for summary judgment is for liability on its breach of contract, breach of warranty and declaratory judgment claims. SER-43–56. A summary judgment of liability in Finelite's favor is sufficient. The parties can then proceed to a hearing to precisely establish Finelite's damages.

## CONCLUSION

For all of the foregoing reasons, and those set forth in Finelite's Opening Brief, the relief requested by Finelite in the Conclusion of its Opening Brief is warranted. FOB at 60-61.

Dated: December 27, 2024

/s/ *Thomas J. Rechen*
Thomas J. Rechen
trechen@mccarter.com
Mark D. Giarratana
mgiarratana@mccarter.com
Joseph Boccia
jboccia@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

# CERTIFICATE OF COMPLIANCE

WE HEREBY CERTIFY that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains approximately 6,802 words and uses a Times New Roman 14-point font.

/s/ *Thomas J. Rechen*
Thomas J. Rechen
trechen@mccarter.com
Mark D. Giarratana
mgiarratana@mccarter.com
Joseph Boccia
jboccia@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 27, 2024, which will send a notice of electronic filing to all counsel of record on the attached service list. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Thomas J. Rechen*
Thomas J. Rechen
trechen@mccarter.com
Mark D. Giarratana
mgiarratana@mccarter.com
Joseph Boccia
jboccia@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

# ADDENDUM OF SOURCES

**INDEX**


| Source | Page |
|---|---|
| *The Chicago Manual of Style*, The Univ. of Chicago Press, (17th ed. 2017) | 1 |
| *Elements of Style*, William Strunk, Jr. and E.B. White, (4th ed. 2000) | 28 |
| *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style,* Bryan A. Garner, (5th ed. 2022) | 32 |
| *Reading Law: The Interpretation of Legal Texts,* Antonin Scalia and Bryan A. Garner, (2012) | 39 |
| *Webster's Ninth New Collegiate Dictionary*, (1986) | 49 |
| *The Random House College Dictionary, Revised Edition*, (1984) | 53 |

# The Chicago Manual of Style

SEVENTEENTH EDITION

*The University of Chicago Press*
CHICAGO AND LONDON

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London
© 2017 by The University of Chicago
All rights reserved. No part of this book may be used or reproduced in any manner whatsoever without written permission, except in the case of brief quotations in critical articles and reviews. For more information, contact the University of Chicago Press, 1427 E. 60th St., Chicago, IL 60637.
First edition published 1906. Seventeenth edition 2017.
Printed in the United States of America.

26 25 24 23 22    4 5

ISBN-13: 978-0-226-28705-8 (cloth)
DOI: https://doi.org/10.7208/cmos17

Library of Congress Cataloging-in-Publication Data

Title: The Chicago manual of style.
Description: Seventeenth edition. | Chicago ; London : The University of Chicago Press, 2017. | Includes bibliographical references and index.
Identifiers: LCCN 2017020712 | ISBN 9780226287058 (cloth : alk. paper)
Subjects: LCSH: Printing—Style manuals. | Authorship—Style manuals. | Authorship—Handbooks, manuals, etc. | Publishers and publishing—United States—Handbooks, manuals, etc.
Classification: LCC Z253 .U69 2017 | DDC 808.02/0973—dc23
LC record available at https://lccn.loc.gov/2017020712

∞ This paper meets the requirements of ANSI/NISO Z39.48-1992 (Permanence of Paper).

The Chicago Manual of Style is a registered trademark of The University of Chicago.

inverted (**don't you** want more?). Most negative forms can be contracted (we do not–we don't) (I will not–I won't) (he has not–he hasn't) (she does not–she doesn't), and *I am not* is contracted to *I'm not* (never *amn't*). The corresponding interrogative form is *aren't I?* Sometimes the negative is emphasized if the auxiliary is contracted with the pronoun and the negative is left standing alone (he is not "busier"–he's not) (we are not–we aren't–we're not) (they have not–they haven't–they've not).

5.106 **Contractions.** Most types of writing benefit from the use of contractions. If used thoughtfully, contractions in prose sound natural and relaxed and make reading more enjoyable. *Be*-verbs and most of the auxiliary verbs are contracted when followed by *not*: *are not–aren't*, *was not–wasn't*, *cannot–can't*, *could not–couldn't*, *do not–don't*, and so on. A few, such as *ought not–oughtn't*, look or sound awkward and are best avoided. Pronouns can be contracted with auxiliaries, with forms of *have*, and with some *be*-verbs. Think before using one of the less common contractions, which often don't work well in prose except perhaps in dialogue or quotations. Some examples are *I'd've* (I would have), *she'd've* (she would have), *it'd* (it would), *should've* (should have), *there're* (there are), *who're* (who are), and *would've* (would have). Also, some contracted forms can have more than one meaning. For instance, *there's* may be *there is* or *there has*, and *I'd* may be *I had* or *I would*. The particular meaning may not always be clear from the context.

INFINITIVES

5.107 **Infinitives defined.** An infinitive verb, also called the verb's *root* or *stem*, is a verb that in its principal uninflected form may be preceded by *to* (to dance) (to dive). It is the basic form of the verb, the one listed in dictionary entries. The preposition *to* is sometimes called the *sign* of the infinitive (he tried **to open** the door), and it is sometimes classed as an adverb. In the active voice, *to* is generally dropped when the infinitive follows an auxiliary verb (you must **flee**) and can be dropped after several verbs, such as *bid*, *dare*, *feel*, *hear*, *help*, *let*, *make*, *need*, and *see* (you dare **say** that to me?). But when the infinitive follows any of these verbs in the passive voice, *to* should be retained (he was never heard **to deny** it) (they cannot be made **to listen**). The *to* should also be retained after *ought* and *ought not* (see 5.148).

5.108 **Uses of the infinitive.** The infinitive has great versatility. It is sometimes called a *verbal noun* because it can function as part of a verb phrase (someone has **to tell** her) or a noun (**to walk** away now seems rash). The

Case: 25-1712      Document: 18      Page: 45      Filed: 05/14/2025



infinitive also has limited uses as an adjective or an adverb. As a verb, it can take (1) a subject {we wanted **the lesson to end**}, (2) an object {try to throw **the javelin** higher}, (3) a predicate complement {I want to race **home**!}, or (4) an adverbial modifier {you need to think **quickly** in class}. As a noun, the infinitive can perform as (1) the subject of a finite verb {**to fly** is a lofty goal} or (2) the object of a transitive verb or participle {I want **to hire a new assistant**}. An infinitive may be governed by a verb {**cease to do** evil}, a noun {we all have **talents to be improved**}, an adjective {she is **eager to learn**}, a participle {they are **preparing to go**}, or a pronoun {**let him do** it}.

5.108 **Split infinitive.** Although from about 1850 to 1925 many grammarians stated otherwise, it is now widely acknowledged that adverbs sometimes justifiably separate the *to* from the principal verb {they expect **to more than double** their income next year}. See also 5.171.

5.109 **Dangling infinitive.** An infinitive phrase can be used, often loosely, to modify a verb, in which case the sentence must have a grammatical subject (or an unexpressed subject of an imperative) that could logically perform the action of the infinitive. If there is none, then the sentence may be confusing. For example, in *To repair your car properly, it must be sent to a mechanic*, the infinitive *repair* does not have a logical subject; the infinitive phrase *to repair your car* is left dangling. But if the sentence is rewritten as *To repair your car properly, you must take it to a mechanic*, the logical subject is *you*.

PARTICIPLES AND GERUNDS

5.110 **Participles generally.** A participle is a nonfinite verb that is not limited by person, number, or mood but does have tense. Two participles are formed from the verb stem: the present participle invariably ends in *-ing*, and the past participle usually ends in *-ed*. The present participle denotes the verb's action as being in progress or incomplete at the time expressed by the sentence's principal verb {**watching** intently for a mouse, the cat settled in to wait} {**hearing** his name, Tom turned to answer}. The past participle denotes the verb's action as being completed {**planted** in the spring} {**written** last year}.

5.111 **Participial phrases.** A participial phrase is made up of a participle plus any closely associated word or words, such as modifiers or complements. It can be used (1) as an adjective to modify a noun or pronoun {**nailed to the roof**, the slate stopped the leaks} {she pointed to the clerk **drooping**

unequal (*adj.*) to [a challenge]; in [attributes]
used (*adj.*) to ("accustomed"); for ("applied to")
vexed (*adj.*) with [someone]; about or at [something]

## *Conjunctions*

5.196 **Conjunctions defined.** A conjunction is a function word that connects sentences, clauses, or words within a clause {my daughter graduated from college in December. And my son will graduate from high school in May} {*and* connects two sentences} {I said hello, but no one answered} {*but* connects two clauses} {we're making progress slowly but surely} {*but* joins two adverbs within a clause}. In Standard English, conjunctions connect pronouns in the same case {he and she are colleagues} {the teacher encouraged her and me}. A pronoun following the conjunction *than* or *as* is normally in the nominative case even when the clause that follows is understood {you are wiser than I [am]} {you seem as pleased as she [does]}—except in informal or colloquial English {you are wiser than me}. In the latter instance, *than* can be read as a preposition (see 5.183).

5.197 **Simple versus compound conjunctions.** A conjunction may be a single word such as *and*, *but*, *if*, *or*, or *though*. Most are derived from prepositions. Compound conjunctions are single words formed by combining two or more words that are relatively modern formations; they include words such as *although*, *because*, *nevertheless*, *notwithstanding*, and *unless*. Phrasal conjunctions are connectives made up of two or more separate words. Examples are *as though*, *inasmuch as*, *in case*, *provided that*, *so that*, and *supposing that*. The two main classes of conjunctions are coordinating and subordinating.

5.198 **Coordinating conjunctions.** Coordinating conjunctions join words or groups of words of equal grammatical rank, such as two nouns, two verbs, two phrases, or two clauses {are you speaking to him or to me?} {the results are disappointing but not discouraging}. Coordinating conjunctions are further broken down into copulative, adversative, disjunctive, and final. A coordinating conjunction may be either a single word or a correlative conjunction.

5.199 **Correlative conjunctions.** Correlative conjunctions are conjunctions used in pairs, often to join successive clauses that depend on each other to form a complete thought. Some examples of correlative conjunctions are *as–as*, *if–then*, *either–or*, *neither–nor*, *both–and*, *where–there*, *so–as*, and



Reply Addendum-5

inherently bound.) Correlative conjunctions must frame structurally identical or matching sentence parts {she wanted **both** to win the gold medal **and** to set a new record}; in other words, each member of the pair should immediately precede the same part of speech {they **not only** read the book **but also** saw the movie} {**if** the first claim is true, **then** the second claim must be false}.

5.200 **Subordinating conjunctions.** A subordinating conjunction connects clauses of unequal grammatical rank. The conjunction introduces a clause that is dependent on the independent clause {follow this road **until** you reach the highway} {that squirrel is friendly **because** people feed it} {Marcus promised **that** he would help}. A pure subordinating conjunction has no antecedent and is not a pronoun or an adverb {take a message **if** someone calls}.

5.201 **Special uses of subordinating conjunctions.** Subordinating conjunctions or conjunctive phrases often denote the following relationships: (1) *Comparison or degree*—e.g., *than* (if it follows comparative adverbs or adjectives, or if it follows *else*, *rather*, *other*, or *otherwise*), *as*, *else than*, *rather*, *as much as*, *as far as*, and *as well as* {a raven is less clever **than** a magpie} {these amateur musicians play **as well as** professionals} {it's not true **as far as** I can discover}. (2) *Time*—e.g., *since*, *until*, *as long as*, *as soon as*, *before*, *after*, *when*, *as*, and *while* {**while** we waited, it began to snow} {the tire went flat **as** we were turning the corner} {we'll start the game **as soon as** everyone understands the rules} {the audience returned to the auditorium **after** the concert's resumption was announced}. (3) *Condition or assumption*—e.g., *if*, *though*, *unless*, *except*, *without*, and *once* {**once** you sign the agreement, we can begin remodeling the house} {your thesis must be presented next week **unless** you have a good reason to postpone it} {I'll go on this business trip **if** I can fly first class}. (4) *Reason or concession*—e.g., *as*, *inasmuch as*, *why*, *because*, *for*, *since*, *though*, *although*, and *albeit* {**since** you won't share the information, I can't help you} {Sir John decided to purchase the painting **although** it was very expensive} {she deserved credit **because** it was her idea}. (5) *Purpose or result*—e.g., *that*, *so that*, *in order that*, and *such that* {we dug up the yard **so that** a new water garden could be laid out} {he sang **so loudly that** he became hoarse}. (6) *Place*—e.g., *where* {I found a great restaurant **where** I didn't expect one to be}. (7) *Manner*—e.g., *as if* and *as though* {he swaggers around the office **as if** he were an executive}. (8) *Apposition*—e.g., *and*, *or*, *that is*, and *that* {the buffalo, **or** American bison, was once nearly extinct}. (9) *Indirect questions*—e.g., *whether*, *why*, and *when* {he could not say **whether** we were going the right way}.

period (e.g., an abbreviation) falls at the end of a sentence, no additional period follows (see 6.123; but see 6.13). For use or omission of the period in lists and outline style, see 6.127–32. For punctuation with URLs and email addresses, see 6.8.

6.15 **Periods in ellipses.** An ellipsis—a series of three periods, or dots (sometimes referred to as suspension points)—may be used to indicate an omission in quoted material; for a full discussion of this use, see 13.50–58. An ellipsis may also be used to indicate faltering speech or an incomplete sentence or thought (see 13.41, 13.56). For the use of ellipses in languages other than English, see 11.19, 11.29, 11.40, 11.56, 11.102. For the use of the em dash to indicate a sudden break or interruption, see 6.87.

## Commas

6.16 **Use of the comma.** The comma, aside from its technical uses in scientific, bibliographical, and other contexts, indicates the smallest break in sentence structure. It usually denotes a slight pause. In formal prose, however, logical considerations come first. Effective use of the comma involves good judgment, with the goal being ease of reading.

6.17 **Commas in pairs.** Whenever a comma is placed before an element to set it off from the surrounding text (such as "1920" or "Minnesota" in the first two examples below), a second comma is required if the phrase or sentence continues beyond the element being set off. This principle applies to many of the uses for commas described in this section. An exception is made for commas within the title of a work (third example); such commas are considered to be independent of the surrounding sentence.

August 18, 1920, was a good day for American women.
Settling in Duluth, Minnesota, she learned to love the city's hills and frigid winters.
*Look Homeward, Angel* was not the working title of Wolfe's manuscript.

6.18 **Commas relative to parentheses and brackets.** When the context calls for a comma at the end of material in parentheses or brackets, the comma should follow the closing parenthesis or bracket. A comma never precedes a closing parenthesis. (For its rare appearance before an opening parenthesis, see the examples in 6.129.) Rarely, a comma may appear inside and immediately before a closing bracket as part of an editorial interpolation (as in the last example; see also 13.59).

After several drummers had tried out for the part (the last having destroyed the kit), the band decided that a drum machine was their steadiest option.

Her delivery, especially when she would turn to address the audience (almost as if to spot a long-lost friend), was universally praised.

"Conrad told his assistant [Martin], who was clearly exhausted, to rest."

"The contents of the vault included fennel seeds, tweezers, [straight-edged razors,] and empty Coca-Cola cans."

## *Series and the Serial Comma*

6.19 **Serial commas.** Items in a series are normally separated by commas (but see 6.60). When a conjunction joins the last two elements in a series of three or more, a comma—known as the serial or series comma or the Oxford comma—should appear before the conjunction. Chicago strongly recommends this widely practiced usage, blessed by Fowler and other authorities (see bibliog. 1.2), since it prevents ambiguity. If the last element consists of a pair joined by *and*, the pair should still be preceded by a serial comma and the first *and* (as in the last two examples below).

She posted pictures of her parents, the president, and the vice president.

Before heading out the door, he took note of the typical outlines of sweet gum, ginkgo, and elm leaves.

I want no ifs, ands, or buts.

Paul put the kettle on, Don fetched the teapot, and I made tea.

Their wartime rations included cabbage, turnips, and bread and butter.

Ahmed was configuring updates, Jean was installing new hardware, and Alan was running errands and furnishing food.

If the sentence continues beyond the series, add a comma only if one is required by the syntax of the surrounding sentence.

Apples, plums, and grapes can all be used to make wine.

*but*

Apples, plums, and grapes, available at most large grocery stores, can all be used to make wine.

In the rare case where the serial comma does not prevent ambiguity, it may be necessary to reword. In the following example, the repetition of *and* makes it clear that Lady Gaga is not the writer's mother (and see the examples at the end of this paragraph). In the second example, "Lady Gaga" might be read as an appositive (see 6.28).

I thanked my mother and Lady Gaga and Madonna.

*not*

I thanked my mother, Lady Gaga, and Madonna.

Note that the phrase *as well as* cannot substitute for *and* in a series of items.

The team fielded one Mazda, two Corvettes, and three Bugattis, as well as a battered Plymouth Belvedere.

*not*

The team fielded one Mazda, two Corvettes, three Bugattis, as well as a battered Plymouth Belvedere.

In a series whose elements are all joined by conjunctions, no commas are needed unless the elements are long and delimiters would be helpful.

Would you prefer Mendelssohn or Schumann or Liszt?

You can turn left at the second fountain and right when you reach the camphor tree or left at the third fountain and left again at the statue of Venus or in whatever direction Google sends you.

6.20 **Commas with "etc." and "et al."** The abbreviation *etc.* (*et cetera*, literally "and others of the same kind") and such equivalents as *and so forth* and *and the like* are preceded by a comma; they are followed by a comma only if required by the surrounding text. (This small departure from the recommendation in previous editions treats such terms as equivalent to the final element in a series (see 6.19). According to traditional usage, such terms were often set off by two commas.) In formal prose, Chicago prefers to limit the abbreviation *etc.* to parentheses, notes, and tabular matter. See also 5.250 under *etc.*

The map was far from complete, lacking many of the streets, alleys, etc., needed to arrive at locations.

The philosopher's papers, letters, classic textbooks, class notes, and so forth were found in the attic.

*but*

For a discussion of periods, commas, and the like, see chapter 6.

The abbreviation *et al.* (*et alia*, neuter, *et alii* [masc.], or *et aliae* [fem.]; literally "and others"), whether used in regular text or in source citations or bibliographical references, should be treated ... If *et al.* follows a single item, however (e.g., "Jones et al."), it requires no preceding comma. (Note

is a preceding comma required in the rare case that etc. follows a single item.) Note that neither etc. nor et al. is italicized in normal prose (see the first example above).

6.21 **Omitting serial commas before ampersands.** When an ampersand is used instead of the word *and* (as in company names), the serial comma is omitted.

Winken, Blinken & Nod is a purveyor of nightwear.

See also 14.88, 14.135.

## *Commas with Independent Clauses*

6.22 **Commas with independent clauses joined by coordinating conjunctions.** When independent clauses are joined by *and, but, or, so, yet,* or any other coordinating conjunction, a comma usually precedes the conjunction. If the clauses are very short and closely connected, the comma may be omitted (as in the last two examples) unless the clauses are part of a series. These recommendations apply equally to imperative sentences, in which the subject (*you*) is omitted but understood (as in the fifth and last examples). (For the use of a semicolon between independent clauses, see 6.56.)

We activated the alarm, but the intruder was already inside.
All watches display the time, and some of them do so accurately.
Do we want to foster creativity, or are we interested only in our intellectual property?
The bus never came, so we took a taxi.
Wait for me at the bottom of the hill on Buffalo Street, or walk up to Tioga Street and meet me next to the Yield sign.
Donald cooked, Sally poured the wine, and Maddie and Sammie offered hors d'oeuvres.
*but*
Electra played the guitar and [illegible] sang.
Raise your right hand and repeat after me.

6.23 **Commas with compound predicates.** A comma is not normally used to separate a two-part compound predicate joined by a coordinating conjunction (see 6.22). (A compound predicate occurs when a subject that is shared by two or more clauses is not repeated after the first clause.) A

comma may occasionally be needed, however, to prevent a misreading (as in the fourth example).

He printed out a week's worth of crossword puzzles and arranged them on his clipboard.
Kelleher tried to contact the mayor but was informed that she had stopped accepting unsolicited calls.
He stood up and opened his mouth but failed to remember his question.
*but*
She recognized the man who entered the room, and gasped.

When *then* is used as a shorthand for *and then*, a comma usually precedes the adverb. (See also 6.57.)

She filled in the last square in Sunday's puzzle, then yawned.
*but*
She filled in the last square in Sunday's puzzle and then yawned.

Compound predicates of three or more parts treated as a series are punctuated accordingly (see 6.19).

She scrubbed the floors, washed the dishes, and studied her assortment of twenty-first-century labor-saving technologies.

## *Commas with Dependent Clauses*

6.24 **Commas with introductory dependent clauses.** When a dependent clause precedes the main, independent clause, it should be followed by a comma. A dependent clause is generally introduced by a subordinating conjunction such as *if*, *because*, or *when* (see 5.200, 5.201).

If you accept our conditions, we shall agree to the proposal.
Until we have seen the light, we cannot guarantee a safe exit from the tunnel.
Whether you agree with her or not, she has a point.

Compare 6.25.

6.25 **Commas with dependent clauses following the main clause.** A dependent clause that follows a main, independent clause should *not* be preceded by a comma if it is restrictive—that is, essential to fully understanding the meaning of the main clause (see also 6.27). For instance, in

the first example below, it is not necessarily true that "we will agree to the proposal"; the dependent *if* clause adds essential information.

We will agree to the proposal if you accept our conditions.
Paul started when he heard the news.
He wasn't running because he was afraid; he was running because he was late.

If the dependent clause is merely supplementary or parenthetical (i.e., nonrestrictive, or not essential to the meaning of the main clause), it should be preceded by a comma. Such distinctions are occasionally tenuous. In the fourth example below, the meaning—and whether the subject is running or not—depends almost entirely on the presence of the comma (compare with the third example above). If in doubt, rephrase.

I'd like the lasagna, if you don't mind.
At last she arrived, when the food was cold.
She has a point, whether you agree with her or not.
He wasn't running, because he was afraid of the dark.
*or*
Because he was afraid of the dark, he wasn't running.

Compare 6.31.

6.26 **Commas with intervening dependent clauses (two consecutive conjunctions).** When a dependent clause intervenes between two other clauses joined by a coordinating conjunction, causing the coordinating and subordinating conjunctions to appear next to each other (e.g., *and if*, *but if*), the conjunctions need not be separated by a comma. See also 6.22, 6.24.

Watson examined the documents for over an hour, and if Smedley had not intervened, the forgery would have been revealed.
She claimed to have seen the whole film, but when we pressed her for details, she failed to recall the name of Rhett and Scarlett's only child.

By similar logic, when a dependent clause intervenes between an independent clause and a dependent clause introduced by a subordinating conjunction, no comma is needed between the two subordinating conjunctions (e.g., *that if*).

They decided that if it rained, they would reschedule the game.

Strictly speaking, it would not be wrong to add a comma between the conjunctions in any of the examples above. Such usage, which would extend the logic of commas in pairs (see 6.17), may be preferred in certain cases for emphasis or clarity. See also 6.32.

## *Commas with Relative Clauses, Appositives, and Descriptive Phrases*

6.27 **Commas with relative clauses—"that" versus "which."** A clause is said to be restrictive (or defining) if it provides information that is essential to understanding the intended meaning of the rest of the sentence. Restrictive relative clauses are usually introduced by *that* (or by *who/whom/whose*) and are never set off by commas from the rest of the sentence. The pronouns *that* and *who* or *whom* may occasionally be omitted (but need not be) if the sentence is just as clear without them, as in the second and fourth examples (before "I" [*that*] and "we" [*whom*], respectively).

The manuscript that the editors submitted to the publisher was well formatted.
The book I have just finished is due back to the library on June 23.
I prefer to share the road with drivers who focus on the road rather than on what they happen to be reading.
The drivers we hire to make deliveries must have good driving records.
The author whose work I admire the most is generally the one whose books I have most recently read.

A clause is said to be nonrestrictive (or nondefining or parenthetical) if it could be omitted without obscuring the identity of the noun to which it refers or otherwise changing the intended meaning of the rest of the sentence. Nonrestrictive relative clauses are usually introduced by *which* (or *who/whom/whose*) and are set off from the rest of the sentence by commas.

The final manuscript, which was well formatted, was submitted to the publisher on time.
*Ulysses*, which I finished early this morning, is due back on June 23.
I prefer to share the road with illiterate drivers, who are unlikely to read books while driving.
Boris Pasternak, whose most famous creation was a doctor, wrote what is arguably the best novel about the Russian Revolution.

Although *which* can be substituted for *that* in a restrictive clause (a common practice in British English), many writers preserve the distinction

between restrictive *that* (with no commas) and nonrestrictive *which* (with commas). See also 5.250 under *that; which*.

6.28 **Commas with appositives.** A word, abbreviation, phrase, or clause that is placed in apposition to a noun (i.e., providing an explanatory equivalent) is normally set off by commas if it is nonrestrictive—that is, if it can be omitted without obscuring the identity of the noun to which it refers.

Lester's poetry collection, *Odes & an Apocryphal Miscellany*, first appeared as a series of mimeographs. (The collection has been identified as his only one; the title provides additional rather than essential information.)

This year's poet laureate, B. Lester, spoke first. (There is only one laureate this year.)

Ursula's husband, Jay, is a fiction writer. (Ursula has only one husband.)

Ursula's son, Clifford, has been a student of Norman Maclean's. (Ursula has only one son.)

If, however, the word or phrase is restrictive—that is, it provides (or may provide) essential information about the noun (or nouns) to which it refers—no commas should appear.

O'Neill's play *The Hairy Ape* was being revived. (O'Neill wrote a number of plays; the title identifies the one being revived.)

The renowned poet and historian B. Lester scheduled a six-city tour for April. (B. Lester is not the world's only renowned poet and historian.)

Caligula's sister Drusilla has been the subject of much speculation. (Caligula had three sisters.)

The playwright's son [illegible]. (Whether the playwright has sons in addition to Julio is not known.)

Though the possessive may be used with a restrictive appositive (e.g., Caligula's sister Drusilla's son), avoid such a construction with a nonrestrictive appositive. Instead, reword as needed.

The motorcycle belonging to Ursula's mother, Philippa, was a Harley.
*not*
Ursula's mother, Philippa's, motorcycle was a Harley.

See also 5.23, 6.27.

6.29 **Commas with descriptive phrases.** A descriptive phrase that is restrictive—that is, essential to the meaning (and often the identity) of the noun it belongs to—should not be set off by commas. A nonrestrictive phrase, however, should be enclosed in commas (or, if at the end of a sentence,

preceded by a comma). In the first example, the descriptive phrase ("with the guitar over her shoulder") is essential information that identifies which woman is the mother. In the second example, the identity of the person who turned to the drummer ("My mother") is clear; the fact that she has a guitar over her shoulder is not essential information. See also 6.27.

The woman with the guitar over her shoulder is my mother.
My mother, with her guitar over her shoulder, turned to the drummer and gave the signal to begin.

## *Commas with Participial and Adverbial Phrases*

6.31 **Commas with participial phrases.** An introductory participial phrase is normally set off from the rest of the sentence by a comma.

Exhilarated by her morning workout, she headed for the ocean.
Having forgotten his lines, the actor was forced to ad-lib.

When such a phrase occurs in the middle of a sentence, it should be set off by commas unless it is used restrictively, providing essential information about the main clause (see also 6.29).

The actor, having forgotten his lines, was forced to ad-lib.
*but*
Actors forgetting their lines may be forced to ad-lib. (The phrase "forgetting their lines" specifies which actors may be forced to ad-lib.)

Likewise, a comma sets off such a phrase at the end of a sentence unless the phrase is used restrictively.

She headed for the ocean, exhilarated by her morning workout.
The actor was forced to ad-lib, having forgotten his lines.
*but*
She always headed for the ocean exhilarated by her morning workout. (It is *not* true that she always headed for the ocean; it *is* true that she always headed for the ocean in a state of exhilaration from her morning workout.)

A comma should *not* be used if the participial phrase modifies the subject of a sentence by means of a linking verb (see 5.101), even if the sentence is inverted.

Running along behind the wagon was the archduke himself!

6.31 **Commas with adverbial phrases.** Although an introductory adverbial phrase can usually be followed by a comma, it need not be unless misreading is likely. Shorter adverbial phrases are less likely to need a comma than longer ones.

On the other hand, his vices could be considered virtues.
With three consecutive swings, Jackson made history.
In 1931 Henrietta turned fifty.
*but*
Before eating, the members of the committee met in the assembly room.
To Anthony, Blake remained an enigma.

When such a phrase occurs in the middle of a sentence, it is normally set off by commas (cf. 6.29).

Jackson, with three consecutive swings, made history.
His vices, on the other hand, could be considered virtues.

At the end of a sentence, a comma is necessary only when the phrase is used in a nonrestrictive sense, providing information that is not essential to the meaning of the rest of the sentence.

Jackson made history with three consecutive swings.
Henrietta turned fifty in 1931.
*but*
Henrietta turned fifty a decade later, in 1931.

A comma should *not* be used to set off an adverbial phrase that introduces an inverted sentence.

Before the footlights stood one of the most notorious fakes of the twenty-first century.

6.32 **Commas with a participial or adverbial phrase plus a conjunction.** When a participial or adverbial phrase immediately follows a coordinating conjunction, the use of commas depends on whether the conjunction joins two independent sentences. If the conjunction is simply a part of the predicate or joins a compound predicate, the first comma follows the conjunction (see also 6.23).

We were extremely tired and, in light of our binge the night before, anxious to go home.

The Packers trailed at halftime but, buoyed by Rodgers's arm, stormed back to win.

If the conjunction joins two independent clauses, however, the comma precedes the conjunction (see also 6.22).

We were elated, but realizing that the day was almost over, we decided to go to bed.

Strictly speaking, it would not be wrong to add a second comma after *but* in the last example. Such usage, which would extend the logic of commas in pairs (see 6.17), may be preferred in certain cases for emphasis or clarity. See also 6.26.

### *Commas with Introductory Words and Phrases*

6.33 **Commas with introductory phrases.** Whether to use a comma to set off an introductory phrase can depend on the type of phrase, its relationship to the rest of the sentence, and its length. For participial phrases, see 6.30; for adverbial phrases, see 6.31. Some cases involving specific words are discussed below (6.34 and 6.35). For dependent clauses, see 6.24.

6.34 **Commas with an introductory "yes," "no," or the like.** A comma should follow an introductory *yes*, *no*, *OK*, *well*, and the like, except in certain instances more likely to be encountered in informal prose or dialogue.

Yes, it is true that 78 percent of the subjects are 50 percent more loyal than they reported.
No, neither scenario improved the subjects' memory.
OK, I'll try the quince.
Well then, we shall have to take a vote.
*but*
No you will not!

6.35 **Commas with an introductory "oh" or "ah."** A comma usually follows an exclamatory *oh* or *ah* unless it is followed by an exclamation mark (or a dash) or forms part of a phrase (e.g., "oh boy," "ah yes"). No comma follows a vocative *oh* or *O* (mainly poetic and largely archaic). See also 7.51.

| | |
|---|---|
| Oh, you're here again. | My oh my! |
| Ah, here we are at last. | Oh mighty king! |
| Oh no! Ah yes! Oh yeah? | "O wild West Wind . . ." |

## *Commas with Two or More Adjectives Preceding a Noun*

6.33 **Commas with coordinate adjectives.** As a general rule, when a noun is preceded by two or more adjectives that could, without affecting the meaning, be joined by *and*, the adjectives are separated by commas. Such adjectives, which are called coordinate adjectives, can also usually be reversed in order and still make sense. If, on the other hand, the adjectives are not coordinate—that is, if one or more of the adjectives are essential to (i.e., form a unit with) the noun being modified—no commas are used. See also 5.91.

Shelly had proved a faithful, sincere friend. (Shelly's friendship has proved faithful *and* sincere.)

It is going to be a long, hot, exhausting summer. (The summer is going to be long *and* hot *and* exhausting.)

*but*

She has many faithful friends.

He has rejected traditional religious affiliations.

She opted for an inexpensive quartz watch.

6.34 **Commas with repeated adjectives.** When an adjective is repeated before a noun, a comma normally appears between the pair.

Many, many people have enjoyed the book.

## *Commas with Dates and Addresses*

6.38 **Commas with dates.** In the month-day-year style of dates, commas must be used to set off the year—a traditional usage that not only applies the logic of commas in pairs (see 6.17) but also serves to separate the numerals for day and year. By a similar logic, when the day of the week is given, it is separated from the month and day by a comma. Commas are usually unnecessary, however, between the name for the day and the ordinal in references where the month is not expressed (see also 9.31). Commas are also unnecessary where month and year only are given, or where a named day (such as a holiday) is given with a year. For dates used adjectivally, see 5.88. See also 9.29–36.

The performance took place on February 2, 2006, at the State Theatre in Ithaca.

The hearing was scheduled for Friday, August 11, 2017.

Monday, May 5, was a holiday; Tuesday the sixth was not.

My license expires sometime in April 2025.
On Thanksgiving Day 1998 they celebrated the recovery with champagne.

In the day-month-year system—useful in material that requires many full dates (and standard in British English)—no commas are needed to set off the year. For the year-month-day (ISO) date style, see 9.36.

The general gradually came to accept the verdict. (See his journal entries of 6 October 2016 and 8 January 2017.)

6.39 **Commas with addresses.** Commas are used to set off the individual elements in addresses or place-names that are run in to the text (see also 6.17). In a mailing address, commas should be used sparingly, mainly to set off the separate lines of the address, but also to separate city and state or province (but not the postal code), apartment numbers, and the like. If in doubt about the accuracy of an address, consult the applicable postal service. (Preferred postal usage will be tailored for use on address labels and may consist of all capital letters and spare punctuation, a style that need not be emulated in regular text and related contexts.) For place-names used adjectivally, see 5.69.

A postcard was sent to the author at 743 Olga Drive NE, Ashtabula, OH 44044, in May.
Queries can be sent to the author at 175 Main St., Apt. 111, Montreal, QC H3Z 2Y7.
Waukegan, Illinois, is not far from the Wisconsin border.
The plane landed in Kampala, Uganda, that evening.

Some institutional names include place-names set off by commas. When such a name appears in the middle of a clause, a second comma is required to set off the place-name. See also 6.87.

California State University, Northridge, has an enrollment of . . .
*but*
The University of Wisconsin–Madison has an enrollment of . . .

## *Commas with Quotations and Questions*

6.40 **Commas with quotations.** An independent clause quoted in the form of dialogue or from text and introduced with *said*, *replied*, *asked*, *wrote*, and the like (including variations of such terms) is usually introduced with a comma (but see 6.65, 13.16). This traditional usage considers the grammar and syntax of the quoted material to be separate from the text that introduces it.

It was Thoreau who wrote, "One generation abandons the enterprises of another like stranded vessels."
She replied, "I hope you aren't referring to us."

Commas are required regardless of the position of the explanatory text relative to the quotation (but see 6.125).

"I hope," she replied, "you aren't referring to us."
"I hope you aren't referring to us," she replied.

If, however, such a quotation is introduced by *that*, *whether*, *if*, or a similar conjunction (see 5.200), no comma is normally needed.

Was it Stevenson who said that "the cruelest lies are often told in silence"?
He wondered whether "to dine is to live."

For the location of a comma in relation to closing quotation marks, see 6.9. For quoted titles and expressions, see 6.41; for questions, see 6.42. For words such as *yes* and *no*, see 13.40. For a more detailed discussion and illustration of the use or omission of commas before and after quoted material, including dialogue, see 13.13–17, 13.50–58, and the examples throughout chapter 13.

6.41 **Commas with quoted or italicized titles and expressions.** Titles or expressions set off from the surrounding text with quotation marks or italics are usually treated like noun forms; commas are used or omitted as they would be with any other noun.

His favorite story in Joyce's *Dubliners* is "Counterparts."
She recites the poem "One Art" every night before bed.
Of her many favorites, "One Art" is the one she knows best.

A common mistake is to use a comma before a title or expression whenever it follows a noun that describes it (e.g., *story*, *novel*, or *poem*). In fact, the rule for appositives applies: the title or expression is set off by commas only if it is nonrestrictive—that is, if it can be omitted without obscuring the identity of the noun (i.e., *story*, *novel*, etc.) to which it refers (see 6.28). In the first example below, the quoted or italicized titles identify *which* poem by Bishop (she wrote many) and *which* novel by Walker (she has published more than one). In the third example, the quoted words tell us *which* motto appears over the door. In the second and fourth examples, *which* story (the last one in the collection) and *which* proverb (Tom's favorite) have already been identified.

Elizabeth Bishop's poem "One Art" was featured in Jennifer Weiner's novel *In Her Shoes* and read by Cameron Diaz in the movie adaptation of the book.
In the collection's last story, "Negocios," Junot Díaz gives us a portrait of Papi.
The motto "All for one and one for all" appears over the door.
Tom's favorite proverb, "A rolling stone gathers no moss," proved wrong.

For quotation marks versus italics for the titles of works, see 8.163. See also 7.62.

6.43 **Commas with questions.** A direct question is sometimes included within a sentence but not enclosed in quotation marks. Such a question is usually introduced by a comma (unless it comes at the beginning of a sentence) and begins with a capital letter. This slight departure from earlier editions of the manual recognizes that such a question is analogous to (and can be treated like) a direct quotation (see 6.40; see also 6.45).

She wondered, What am I doing?
Legislators will need to be asking themselves, Can the fund be used for the current emergency, or must it remain dedicated to its original purpose?

If the question ends before the end of the sentence, no comma is required after the question mark (see also 6.125).

What am I doing? she wondered.

If the result seems awkward, rephrase as an indirect question. An indirect question does not require a question mark, nor does it need to be set off with a comma. Indirect questions are never capitalized (except at the beginning of a sentence). See also 6.69.

She wondered what she was doing.
The question of how to tell her was on everyone's mind.
Ursula wondered why her watch had stopped ticking.
Where to find a reliable clock is the question of the hour.

## *Commas in Personal and Corporate Names*

6.44 **Commas with "Jr.," "Sr.," and the like.** Commas are not required with *Jr.* and *Sr.*, and they are never used to set off *II*, *III*, and the like when these are used as part of a name. In an inverted name, however (as in an index; see 16.41), a comma is required before such an element, which comes last.

Case: 25-1712 Document: 18 Page: 63 Filed: 05/14/2025



John Doe Sr. continues to cast a shadow over his son.
Jason Doe III has turned over ownership of the family business to his cousin.
*but*
Doe, John, Sr.
Doe, Jason, III

If a comma is used to set off *Jr.* or *Sr.*, a second comma is normally required in the middle of a sentence (see 6.17); rephrase as needed to avoid the possessive.

the speech made by John Doe, Sr. (*not* John Doe, Sr.'s, speech)

6.44 **Commas with "Inc.," "Ltd.," and the like.** Commas are not required with *Inc.*, *Ltd.*, and such as part of a company's name. A particular company may use such commas in its corporate documentation; articles and books about such companies, however, should generally opt for a consistent style rather than make exceptions for particular cases.

Quarrk Movers Inc. was just one such company affected.

If a comma is used to set off the abbreviation, a second comma is normally required in the middle of a sentence (see 6.17); rephrase as needed to avoid the possessive. See also 6.43.

## *Commas with Antithetical Elements*

6.45 **Commas with "not" phrases.** When a phrase beginning with *not* is interjected in order to clarify a particular noun, commas should be used to set off the phrase. See also 6.46.

We hoped the mayor herself, not her assistant, would attend the meeting.
They used you, not him.

6.46 **Commas with "not . . . but," "not only . . . but also," and the like.** With an interjected phrase of the type *not . . . but* or *not only . . . but also*, commas are usually unnecessary.

Works of art are created not by inspiration but by persistence.
Being almost perfectly ambidextrous, she wore not one watch but two.
They marched to Washington not only armed with petitions and determined to get their senators' attention but also hoping to demonstrate their solidarity with one another.

If, however, such a phrase seems to require special emphasis or clarification (usually a matter of editorial judgment), commas may be used to set off the *not* phrase. Alternatively, a dash may be used in place of the first comma, in which case a second comma usually becomes unnecessary.

> She went to the trouble of placing her orders two months ahead of the competition—not only as a matter of personal pride but also to bolster her credibility as an early adopter.

6.47 **Commas with "the more," "the less," and so on.** A comma is customarily used between clauses of *the more . . . the more* type. Shorter phrases of that type, however, rarely merit commas.

> The more I discover about the workings of hundreds of movements, the less I seem to care about the holy grail of perfectly accurate timekeeping.
>
> *but*
>
> The more the merrier.

## *Other Uses of the Comma*

6.48 **Commas with parenthetical elements.** If only a slight break is intended, commas may be used to set off a parenthetical element inserted into a sentence as an explanation or comment. Such elements are occasionally awkward, especially if they are inserted between an adjective and the noun it modifies; in such cases, rewording may help.

> All the test participants, in spite of their initial fears, recovered.
>
> The hooligan's point was, to say the least, a bombshell.
>
> Most children fail to consider the history behind new technologies, if they think of it at all.
>
> She was the fastest, not to mention the strongest, runner on her team.
>
> *or better*
>
> She was the fastest runner on her team, not to mention the strongest.

If a stronger break is needed or if there are commas within the parenthetical element, em dashes (6.85) or parentheses (6.95) should be used instead of commas.

6.49 **Commas with "however," "therefore," "indeed," and the like.** Commas—sometimes paired with semicolons (see 6.57)—are traditionally used to set off conjunctive adverbs such as *however*, *therefore*, and *indeed*. When

the adverb is essential to the meaning of the clause, or if the emphasis is on the adverb itself, commas are usually unnecessary (as in the last two examples).

> A truly efficient gasoline-powered engine remains, however, a pipe dream.
> Indeed, not one test subject accurately predicted the amount of soup in the bowl.
> *but*
> If you cheat and are therefore disqualified, you may also risk losing your scholarship.
> That was indeed the outcome of the study.

6.50 **Commas with "such as" and "including."** The principles delineated in 6.29 apply also to phrases introduced by *such as* or *including*. Nonrestrictive phrases introduced by these terms are set off by commas (because they are not essential to the meaning or identity of the noun they modify). When such phrases are restrictive (i.e., essential to the meaning or identity of the noun), commas are not used.

> [illegible] travel, including [illegible], nevertheless [illegible].
> Some words, such as *matutinal* and *onomatopoetic*, are best avoided in everyday speech.
> *but*
> Words such as *matutinal* and *onomatopoetic* are best avoided in everyday speech.

6.51 **Commas with "that is," "namely," "for example," and the like.** Expressions of the type *that is* are traditionally followed by a comma. They are best preceded by an em dash or a semicolon rather than a comma, or the entire phrase they introduce may be enclosed in parentheses or em dashes.

> There are simple alternatives to the stigmatized plastic shopping bag—namely, reusable cloth bags and foldable carts.
> The committee (that is, its more influential members) wanted to drop the matter.
> Keller managed to change the subject; that is, he introduced a tangential issue.
> Bones from various small animals—for example, a squirrel and [illegible] pigeons [illegible]—were found in the director's cabinet.

When *or* is used in a sense analogous to *that is* (to mean "in other words"), the phrase it introduces is usually set off by commas.

> The compass stand, or binnacle, was situated within the helmsman's field of vision.

Note that in formal writing, Chicago prefers to confine the abbreviations i.e. ("that is") and e.g. ("for example") to parentheses or notes, where they are followed by a comma.

The most noticeable difference between male and female ginkgo trees (i.e., the presence of berries in the latter) is also the species' most controversial feature.

6.52 **Commas with "too" and "either."** The adverbs *too* and *either* used in the sense of "also" generally need not be preceded by a comma.

I had my cake and ate it too.
Andrew likes the Beatles; his sister does too.
The airport lacked charging stations; there were no comfortable chairs either.

When *too* comes in the middle of the sentence or clause, however, a comma aids comprehension.

She, too, decided against the early showing.

See also 6.31.

6.53 **Commas with direct address.** A comma is used to set off names or words used in direct address.

Ms. Jones, please come in.
James, your order is ready.
Hello, Ms. Philips.
Hi, Prakash. Please sit down.
Take that, you devil.
Kiss me, you fool!
Are you listening, class?
It's time to go, Maria.
I am not here, my friends, to discuss punctuation.

In correspondence, a comma typically follows the greeting, though a colon may be used instead (especially in formal correspondence; see 6.66).

Dear Lucas,

If the greeting itself consists of a direct address, two marks of punctuation are needed (i.e., the comma for the direct address and the colon or comma following the greeting). (The first mark is often left out in casual correspondence.)

Greetings, Board Members: . . .
Hi, Sara, . . .

6.54 **Commas to indicate elision.** A comma is often used to indicate the omission of a word or words readily understood from the context.

In Illinois there are seventeen such schools; in Ohio, twenty; in Indiana, thirteen.
Thousands rushed to serve him in victory; in defeat, none.

The comma may be omitted if the elliptical construction is clear without it.

One student excels in composition, another in mathematics and the third in sports.
Jasper missed the bus and Sheila the train.

6.55 **Commas between homonyms.** For ease of reading and subject to editorial discretion, two words that are spelled alike but have different functions may be separated by a comma if such clarification seems advisable.

Let us march in, in twos.
Whatever is, is good.
*but*
"It depends on what *is* means."

## Semicolons

6.56 **Use of the semicolon.** In regular prose, a semicolon is most commonly used between two independent clauses not joined by a conjunction to signal a closer connection between them than a period would. (For the similar use of a colon, see 6.63.)

She spent much of her free time immersed in the ocean; no mere water-resistant watch would do.
Though a skilled writer, Miqueas has never bothered to master the semicolon; he insists that half a colon is no colon at all.

For the use of the semicolon in index entries, see 16.96; for its use in parenthetical text citations, see 15.30. For its use with a second subtitle of a work, see 14.90.

6.57 **Semicolons with "however," "therefore," "indeed," and the like.** Certain adverbs, when they are used to join two independent clauses, should

All the band's soundtrack albums—*A Hard Day's Night*, *Help!*, *Yellow Submarine*, and *Magical Mystery Tour*—were popular.

6.126 **Question mark with exclamation point.** In the rare case of a question or exclamation ending with a title or quotation that ends in a question mark or exclamation point, include both marks only if they are different and the sentence punctuation seems essential.

Have you seen *Help!*?
Who shouted, "Long live the king!"?
I just love *Who's Afraid of Virginia Woolf?*!
*but*
Who starred opposite Richard Burton in *Who's Afraid of Virginia Woolf?*
Who wrote "Are You a Doctor?"
What was on your mind when you asked, "Why so close?"

The question mark is sometimes used in combination with the exclamation point to express excitement or disbelief, a practice that is best avoided in formal prose. See also 6.72.

## Lists and Outline Style

6.127 **Lists and outlines—general principles.** Items in a list should consist of parallel elements. Unless introductory numerals or letters serve a purpose—to indicate the order in which tasks should be done, to suggest chronology or relative importance among the items, to facilitate cross-references, or, in a run-in list, to clearly separate the items—they may be omitted. Where similar lists are fairly close together, consistent treatment is essential. Note that the advice in this section applies primarily to lists that occur in the text. For lists of illustrations and tables, see 1.39; for lists of abbreviations, see 1.45; for glossaries, see 1.61; for indexes, see chapter 16.

6.128 **Run-in versus vertical lists.** Lists may be either run in to the text or set vertically. Short, simple lists are usually better run in, especially if the introductory text and the items in the list together form a sentence (see 6.129). Lists that require typographic prominence, that are relatively long, or that contain multiple levels (see 6.132) should be set vertically.

6.129 **Run-in lists.** If numerals or letters are used to mark the divisions in a run-in list, enclose them in parentheses. If letters are used, they are


NEW EDITION
WILLIAM STRUNK JR.
AND
E.B. WHITE
— Charles Osgood
The ELEMENTS of STYLE
FOURTH EDITION
FOREWORD BY ROGER ANGELL

# THE ELEMENTS OF *Style*

BY

WILLIAM STRUNK Jr.

*With Revisions, an Introduction, and a Chapter on Writing*

BY

E. B. WHITE

FOURTH EDITION

ALLYN AND BACON
*Boston London Toronto Sydney Tokyo Singapore*

COPYRIGHT © 2000, 1979, ALLYN & BACON
A Pearson Education Company
Needham Heights, Massachusetts 02494

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the Publisher.

Earlier editions © 1959, 1972 by Macmillan Publishing Co., Inc.

The Introduction originally appeared, in slightly different form, in *The New Yorker* and was copyrighted in 1957 by The New Yorker Magazine, Inc.

*The Elements of Style* Revised Edition by William Strunk Jr. and Edward A. Tenney copyright 1935 by Oliver Strunk.

**Library of Congress Cataloging-in-Publication Data**

Strunk, William, 1869–1946
The elements of style / by William Strunk, Jr.; with revisions, an introduction, and a chapter on writing by E. B. White.—4th ed.
p. cm.
Includes index.
ISBN 0-205-30902-X (paperback).—ISBN 0-205-31342-6 (casebound)
1. English language—Rhetoric. 2. English language—Style.
3. Report writing. I. White, E. B. (Elwyn Brooks), 1899–
II. Title.
PE1408.S772 1999
808'.042—dc21 99-10119
CIP

PRINTED IN THE UNITED STATES OF AMERICA

10 9 8 7 6 5 4 3 04 03 02 01 00

**conjunction** A word that joins words, phrases, clauses, or sentences. The coordinating conjunctions (*and, but, or, nor, yet, so, for*) join grammatically equivalent elements. Correlative conjunctions (*both, and; either, or; neither, nor*) join the same kinds of elements.

**contraction** A shortened form of a word or group of words: *can't* for cannot, *they're* for they are.

**correlative expression** See *conjunction*.

**dependent clause** A group of words that includes a subject and verb but is subordinate to an independent clause in a sentence. Dependent clauses begin with either a subordinating conjunction such as *if, because, since*, or a relative pronoun, such as *who, which, that*. *When it gets dark*, we'll find a restaurant *that has music*.

**direct object** A noun or pronoun that receives the action of a transitive verb. Pearson publishes *books*.

**gerund** The *-ing* form of a verb that functions as a noun: *Hiking* is good exercise. She was praised for her *playing*.

**indefinite pronoun** A pronoun that refers to an unspecified person (*anybody*) or thing (*something*).

**independent clause** A group of words with a subject and verb that can stand alone as a sentence. *Raccoons steal food.*

**indirect object** A noun or pronoun that indicates to whom or for whom, to what or for what the action of a transitive verb is performed. I asked *her* a question. Ed gave *the door* a kick.

**infinitive/split infinitive** In the present tense, a verb phrase consisting of *to* followed by the base form of the verb (*to write*). A split infinitive occurs when one or more words separate *to* and the verb (*to boldly go*).

**intransitive verb** A verb that does not take a direct object. His nerve *failed*.

# GARNER'S MODERN ENGLISH USAGE

FIFTH EDITION

Bryan A. Garner

OXFORD
UNIVERSITY PRESS

OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and certain other countries.

Published in the United States of America by Oxford University Press,
198 Madison Avenue, New York, NY 10016.

© Bryan A. Garner 2022

First Edition published in 1998
Second Edition published in 2003
Third Edition published in 2009
(The first three editions bore the title Garner's Modern American Usage.)
Fourth Edition published in 2016
Fifth Edition published in 2022

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior written permission of Oxford University Press,
or as expressly permitted by law, by license, or under terms agreed with
the appropriate reproduction rights organization. Inquiries concerning
reproduction outside the scope of the above should be sent to the
Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Cataloging-in-Publication data is on file at the Library of Congress

Library of Congress Control Number: 2022945705

ISBN 978-0-19-759902-0

1 3 5 7 9 8 6 4 2
Sheridan Books, Inc., United States of America

**paralipsis; *paralepsis; *paraleipsis.** Although the more classical spelling *paraleipsis* predominated until about 1960, *paralipsis* has become standard among [illegible] since that time. *Paralepsis* is the second most common spelling [illegible] the degree to which *paralipsis* has [illegible] the meaning of [illegible] 1019.

Current ratio (in print): *paralipsis* vs. *paralepsis* vs. *paraleipsis*: [illegible]

**parallel,** [illegible] makes *paralleled* and *paralleling* in AmE and BrE alike — not *parallelled* and *parallelling*. See [illegible] (B).

**Parallelism.** **A. Generally.** *Parallelism*—the matching of sentence parts for logical balance, especially by using grammatically coordinate structures—helps satisfy every reader's innate craving for order and rhythm. In a list, for example, one might have noun + noun + noun, or verb + verb + verb, or adjective + adjective + adjective. By phrasing parallel ideas in parallel grammatical structures, you show the reader how one idea relates to another. [illegible] correspondences. Stylists have long emphasized the importance of matching phrases in like clauses:

- 1926: "One of the first requisites for the writing of good [illegible] to have acquired the art of [illegible] of [illegible] words or phrases of identical grammatical value without going wrong." H.W. Fowler, *FMEU* [illegible].
- 1960: "[illegible] or at least [illegible] called a series. [illegible] [illegible] thought into [illegible] [illegible] matching parts [illegible] and strengthen it, parallelism [illegible] thought." Wilson Follett, *MAU* [illegible].
- 1995: "How do you make ideas parallel? If a series, all [illegible] should be alike: all nouns, all [illegible], all infinitives, all phrases or all clauses. If a series of verbs is used, they should all be in the same tense [illegible] [illegible] and number. When two parallel propositions are [illegible] together, both [illegible]." [illegible] *Writing and [illegible]* (1995).
- 1998: "[illegible] long complex sentences [illegible] parallel construction. Parallelism [illegible]. Any word will serve its own kind: common noun, adjective to adjective, infinitive to infinitive." [illegible] Baker, *The Practical Stylist* [illegible] 1998).
- 2005: "The use of parallel structures helps produce cohesion and coherence in a text [illegible] parallelism in sentences and in longer passages. The structures can be clauses or phrases." [illegible] *Rules for Writers* [illegible] (5th ed. 2005).

**B. Parts of Speech.** With [illegible] parallel-ism and with [illegible] should [illegible] with adverb [illegible]. Avoid [illegible]:

- "The poem is [illegible] ceremonial, and [illegible]." U.S. [illegible] (A [illegible] revision: *The poem is a [illegible] ceremonial elegy.* The original [illegible] consisted of adjective [illegible].)
- "John Baker is conservative and a traditionalist." [illegible], *The [illegible]* (1970). (A possible revision: *John Baker is conservative and traditional.* Or: *John Baker is a conservative and a traditionalist.* The original [illegible] adjective [illegible] noun.)
- "[illegible] two [illegible] [illegible]." [illegible], "Freshmen [illegible]" [illegible] 5 Feb. [illegible] (The [illegible].)
- "The French-Canadian [illegible], [illegible] [illegible] and a millionaire. [illegible]" [illegible], "Westlake [illegible]" [illegible] 2001, at [illegible] (The original [illegible] adjective [illegible].)

A clear [illegible] its logic [illegible] and commonsense relationships are clear.

**C. Phrases and Clauses.** [illegible] mistakes in [illegible] unparallel construction [illegible] phrases and clauses by introducing a verb [illegible] the game: "Orthopedic surgeons study for four years [illegible] a college or university, four years in an orthopedic residency program and may have one optional year of specialized education." "[illegible] Orthopedics," *USA Today*, [illegible] 2003, at [illegible]. (The writer follows two *four years* phrases with the clause *may have one optional year of specialized education*. Worse, the first two elements [illegible] a job that [illegible]. A suggested revision: *Orthopedic surgeons study for four years in a college or university and four years in an orthopedic residency program; some also have one optional year of specialized education.*)

**D. Content.** To the [illegible] grammatical parallelism isn't enough: the grammar should match the ideas. That is, you should strive for notional parallelism. It seems obvious that you shouldn't say that someone is *hungry, tall, and Italian*. Yet subtler problems arise: "The poetic opening stiffens, dreamily relaxes, then [illegible] of mood and texture both *symptomatic* of the mature Schubert and *disorienting* to generations [illegible] beginning with Robert Schumann." Joseph Horowitz, "A Symphony Is Where You Find It," *N.Y. Times*, [illegible] May 1992, [illegible]. (Although both *symptomatic* and *disorienting* begin adjective phrases, the [illegible] aren't coordinate. A possible revision: *The poetic opening stiffens, dreamily relaxes, and then [illegible]. The [illegible] of mood and texture is symptomatic of the mature Schubert.* [illegible])

whether the first word should be capitalized. The first three illustrated examples in the preceding paragraph follow the prevalent journalistic practice: the first word is capitalized. But the other view—using the lowercase word following the colon—is probably sounder: the lowercase use in this very sentence more closely ties the two clauses together. That's the style used throughout this book. It's also the house style for *The New Yorker*—e.g.:

- "Though retired, El Moth isn't doing anything at the moment: [illegible] *Acapulco* [illegible] the [illegible] along the [illegible] where [illegible] will some[illegible] flow." [illegible] "[illegible]," *New Yorker*, [illegible], at 46, 48.
- "[illegible] are not to be confused with [illegible]: [illegible] a [illegible] phrase [illegible]." [illegible] "[illegible]," *New Yorker*, [illegible] 2009, at [illegible].

Although the uppercase convention is a signpost to the reader that a complete sentence is ahead, that signpost generally isn't needed.

Those who follow the lowercase convention typically recognize an exception and capitalize what follows the colon when the colon introduces a series of sentences: "He made three points: He wanted some water. He needed sleep. And he wanted to go home."

Second, the colon can introduce a list of items, often after expressions such as *the following* [illegible] *follows*—e.g.: "The meetings are as follows: Central, Dec. 11 at the [illegible] Auditorium, 5:30 p.m.–7:30 p.m.; South, Dec. 13 at the [illegible] Cultural Institute, 5:30 p.m.–7:30 p.m." Megan Kamerick, "[illegible] Considered as Site of Museum on Mexican History," *San Antonio Bus. J.*, 13 Dec. 1996, at 6.

Third, the colon formally introduces a quotation, whether short or long. If the quotation is in block [illegible], the colon is mandatory, but if it's run in with the text, a comma is also permissible. E.g.: "By 1750 it seemed clear to numerous inhabitants of the western areas of the Connecticut River valley that the fight against tyranny had assumed a two-fold character: 'We are contending against the same enemy [illegible] that make without.'" Gordon S. Wood, *Creation of the American Republic 1776–1787* [illegible].

Fourth, the colon often appears after the salutation in formal correspondence: Dear Ms. Johnson:

Finally, the colon separates elements such as a book's title and subtitle (*[illegible]: A Biography*), chapter and verse in a biblical citation (*[illegible]* 1:15), hours and minutes in time (9:15 a.m.), and similar uses.

Some [illegible] misuses of the colon: (1) Don't put one between a verb and its object or complement (e.g., [illegible] watching plays [illegible], and [illegible] shows). (2) Don't put a colon after *including*. (3) Don't put a colon between a preposition and its object (They [illegible] of fine books, bone china, and [illegible]). (The colon after *of* [illegible].) (4) Don't [illegible] after the conjunction *that* (She declared that all the [illegible] must be quarantined). (5) Don't put a colon after an introductory word or phrase such as *for example*, *including*, *such as*, or *namely*. (Several dignitaries were present, including Vice President Kamala Harris, Senator [illegible], and Justice Elena Kagan—no colon after *including*.) Even so, as noted above, a colon is often appropriate after a phrase that more formally announces a list (e.g., *as follows*, *the following*, *including these*).

**D. Comma [,].** This punctuation mark, the most important of them all, is the one used in the greatest variety of circumstances. Two styles result in different treatments: the "close" style of punctuation results in relatively heavy uses of commas; the "open" style results in fairly light use of commas. In the 20th century, the movement was very much toward the open style. The byword was "When in doubt, leave it out." Indeed, some writers and editors went too far in omitting commas that would aid clarity. What follows is an explanation tending slightly toward the open style, but with a steady view toward enhancing clarity.

Essentially, the comma has [illegible].

First, the comma separates items, including the last from the next-to-last in a list of more than two—e.g.: "The [illegible], the Smiths, and the Nelsons." In this position, it's called variously the *serial comma*, the Oxford comma, or the Harvard comma. Whether to include the serial comma has sparked many arguments. Although newspaper journalists typically omit the serial comma as a "space-saving" device, most writing authorities outside that field recommend keeping it. Why [illegible].

A [illegible] of this comma essentially [illegible] as a [illegible] equivalent of *and*, especially in headlines and often with only two items: "[illegible] to raise funds." In that example, the inclusion of the comma is particularly important. When a church newsletter omitted it, embarrassment ensued.

Second, the comma separates two coordinated main clauses—e.g.: "I [illegible] will turn here[,] and [illegible] will go straight." There are two exceptions: (1) when the [illegible] clauses are closely linked—[illegible] the comma and [illegible]; and (2) when the subject of the second independent clause, being the same as in the first, is not repeated. (Sentences that [illegible] often better for the public [illegible] and are closer to the [illegible] in [illegible] sentences.) (Another way of referring to the construction in that sentence is that it contains a "compound predicate.") Omitting the comma before

---

LANGUAGE-CHANGE INDEX (For the full key, see front matter pp. [illegible])
Stage 1: Rejected; Stage 2: Widely shunned; Stage 3: Widespread but [illegible]; Stage 4: Ubiquitous but [illegible]; Stage 5: Fully accepted.
Invariably inferior forms marked by asterisk (*). • Ratios represent frequency of [illegible] in [illegible] books.

Case: 25-1712 Document: 18 Page: 77 Filed: 05/14/2025



Because people learn one convention or the other at a fairly impressionable age, they become wedded to it. They hold their conventions almost as tenaciously as they might their religious beliefs. It's difficult to change such a deeply held tenet.

What follows might strike you as overdone. But the authorities on the question, to my knowledge, have never been thoroughly canvassed. And the issue is one of the most recurrent in prose composition—as well as one of the most controversial among amateurs. So read closely if you like, or just browse through to see who's been quoted. The examples are worth pondering.

What are the merits on each side of the argument?

**A. Favoring the Serial Comma.** Proponents say that the comma is both logical and helpful. They point out that including it never creates an ambiguity, whereas omitting it fairly often does. It's a preventive measure that requires no real thought. The serial comma precludes ambiguities and annoyances at a negligible cost.

Evidence grows more and more when the items in the series become longer and more complex. Let's say the example is a list of couples: "We'll invite Ruth and Myra, Mary and Marie Ellen, John and Robert, and Ivy and Lee." Delete the comma after *Robert*, and you have uncertainty about the relationships. And these items in the series aren't even especially complex. Also, of course, there's a pause after *Robert*—and the comma is mandated by a normal oral delivery to show relationships. The comma reflects the natural pause.

Among the authorities favoring the serial comma in all instances are these (in chronological order):

- **1851:** Goold Brown, *The Grammar of English Grammars* 783 (1851) ("When more than two words or terms are connected in the same construction, [illegible] understood, the comma should be inserted after every one of them [illegible] *wisdom, or folly* [illegible]").
- **1859:** Henry Beadnell, *Guide to Punctuation* 11 (1859) ("[illegible] or more subjects, predicates, or complements, with or without adjuncts [illegible] *temperance*").
- **1871:** John Wilson, *A Treatise on English Punctuation* [illegible] ed. 1871) ("Some punctuators omit the comma between the last two particulars when united by one of the conjunctions *and, or, nor*. But the propriety of using the comma will perhaps be obvious [illegible] the last two words of a series are not more closely connected in sense and construction with each other than is the preceding word."). [In the same text with slightly different wording: John Wilson, *The Elements of Punctuation* [illegible].]
- **1878:** W. [illegible], *Hand-Book of Punctuation* [illegible] ("When a conjunction is used with the last word in the series, a comma should be placed before the conjunction and between the other words").
- **1892:** Paul Allardyce, *Punctuation* 31 (1892) ("When *and* occurs only between the last words of the series, the comma is usually inserted before it: *Panegyric, drama, and* [illegible]. Many writers omit this comma, but it seems useful.").
- **1893:** [illegible], *Punctuation: [illegible] Hundred Lessons in Punctuation* [illegible] (1893) ("When the last two of the three or more are connected by *and* should be separated by a comma. This is of the greatest importance, and should be adhered to in all circumstances. [illegible] *the thick, thin, and loose*").
- **1901:** F. Horace Teall, *Punctuation* [illegible] (1901) ("In spite of the fact that many writers omit the comma before the last of such a series, though there is no reason to omit it [illegible] Nearly all authorities [illegible] with the weight of reason as well as common sense [illegible]").
- **1914:** [illegible], *[illegible] English Punctuation* [illegible] ("If in a series of three or more words, phrases, or clauses, only the last two members are joined by a conjunction, the comma is inserted before the conjunction as if there were no conjunction [illegible] to prevent the last two members from seeming to be a single unit in the series").
- **1926:** H.W. Fowler, *A Dictionary of Modern English Usage* [illegible] (1926) [illegible] "as a formula that will prevent [illegible]").
- **1937:** [illegible] & [illegible], *[illegible]* (1937) ("When more than two words or phrases occur together in a sequence a comma should precede the final one: e.g. *A good, wise, and* [illegible]").
- **1941:** [illegible], *A Handbook for Those Who Know about Punctuation and for Those Who Aren't Quite Sure* [illegible] ("Present usage [illegible] before *and* or *or* joining the last two members of a series.").
- **1966:** Theodore Bernstein, *The Careful Writer* [illegible] ("The meaningful [illegible] elements [illegible] since they occur [illegible] words, phrases, or clauses [illegible] By [illegible] separating all the elements of a series you keep [illegible] distinction lost long ago in the daily press").
- **1966:** Wilson Follett, *Modern American Usage: A Guide* 398, 401 (Jacques Barzun ed., 1966) (noting that journalists omit it only to save space "in the narrow width of a newspaper column"—and that this is the only argument for its omission).
- **1972:** Maxwell Nurnberg, *Questions You Always Wanted to Ask About English* 183 (1972) ("When we say 'The colors of our country are red, white, and blue,' there's a little [illegible] that seems to ask for a comma to make *blue* just as important as *red* and *white*.").
- **1974:** David W. Ewing, *Writing for Results in Business, Government, and the Professions* [illegible] (1974) ("While this rule is not observed by all publishers, it is valuable and helpful.").
- **1976:** *Words into Type* [illegible] (3d ed. 1974) ("[illegible] use of this comma is recommended").
- **1980:** Roy H. Copperud, *American Usage and Style: The Consensus* 78–79 (1980) ("Opinion is divided on whether the comma should be used before *and* in a series; the preponderance of newspapers is to omit it [illegible] general writing and editing practice [illegible] retain it").
- **1990:** Richard Dowis, *How to Make Your Writing Reader-Friendly* [illegible] (1990) ("My feeling is that the serial comma is simple [illegible] and I [illegible] recommend it").
- **1990:** Lawrence D. Dowsing & Fred R. Russo, *[illegible]* 57 ([illegible] ed. 1990) ("A comma separates the last two items in a series although those items are joined by a conjunction. [illegible] This comma was once considered optional, but

[illegible]

**complex preposition.** [illegible]

**complex sentence.** [illegible]

**complex tense.** [illegible]

**composition,** n. 1. [illegible] 2. [illegible] 3. [illegible] into a compound word.

**compound,** n. [illegible]

**compound adjective.** [illegible]

**compound–complex sentence.** [illegible]

**compound conjunction.** [illegible]

**compound indefinite pronoun.** [illegible]

**compound modifier.** [illegible] under ADJECTIVE.

**compound negation.** [illegible]

**compound noun.** [illegible]

**compound personal pronoun.** [illegible]

**compound predicate.** [illegible]

**compound preposition.** [illegible]

**compound relative pronoun.** [illegible]

**compound sentence.** [illegible]

**compound subject.** [illegible]

**compound word.** [illegible]

**conceit,** n. 1. [illegible] 2. [illegible]

**concessive,** adj. [illegible]

**conciseness,** n. [illegible]

**conclusion.** [illegible]

**concord,** n. [illegible]

**concrete noun.** [illegible]

**conditional clause.** [illegible]

**conditional conjunction.** [illegible]

**conditional sentence.** [illegible]

**conduplication** [illegible]

**conjugate.** [illegible]

**conjugate** [illegible] vb. [illegible] according to voice, mood, tense, number, and person. [illegible]

**conjugation,** n. 1. [illegible] 2. [illegible]

**conjunct,** n. [illegible]

**conjunction,** n. [illegible]

• **additive coordinating conjunction.** [illegible]

• **adverbial conjunction.** [illegible]

• **adversative conjunction** [illegible]

• **comparative conjunction.** [illegible]

• **compound conjunction.** [illegible]

• **conditional conjunction.** [illegible]

• **contrasting coordinating conjunction.** [illegible]

• **coordinate conjunction.** [illegible]

• **coordinating conjunction.** [illegible]

• **copulative conjunction** [illegible]

• **correlative conjunctions** [illegible]

• **digraphed conjunction.** [illegible]

• **disjunctive conjunction** [illegible]

• **expletive conjunction** [illegible]

• **final conjunction.** [illegible]

• **illative conjunction** [illegible]


McCarter & English LLP
3 0001 00061916 5
Reading Law:
The Interpretation of Legal Texts
ANTONIN SCALIA
BRYAN A. GARNER
Foreword by Frank H. Easterbrook

# Reading Law

## The Interpretation of Legal Texts

Antonin Scalia & Bryan A. Garner

The views expressed in this book are those of the authors as legal commentators. Nothing in this book prejudges any case that might come before the United States Supreme Court.

© 2012 Antonin Scalia & Bryan A. Garner

Published by Thomson/West
610 Opperman Drive
P.O. Box 64526
St. Paul, MN 55164-0527
1-800-328-9352

ISBN: 978-0-314-27555-4

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data
Antonin Scalia & Bryan A. Garner
Reading Law: the interpretation of legal texts — 1st ed.
p. cm.
Includes bibliographical references and index.
1. Law—interpretation and construction.
2. Judicial Process—United States.
3. Law—philosophy.
4. Statutes—United States.
5. Jurisprudence.
6. Law—methodology.
I. Scalia, Antonin, 1936–
I. Garner, Bryan A., 1958–
II. Title

*First printing*

## Prefatory Remarks

The legal instruments that are the subject of interpretation have not typically been slapped together thoughtlessly but are the considered expression of intelligent human beings. In whatever age or culture, human intelligence follows certain principles of expression that are as universal as principles of logic. For example, intelligent expression does not contradict itself or set forth two propositions that are entirely redundant. Lapses sometimes occur, but they are departures from what would normally be expected.

Most of the canons of interpretation set forth here are so venerable that many of them continue to bear their Latin names. Properly regarded, they are not "rules" of interpretation in any strict sense but presumptions about what an intelligently produced text conveys.

The canons fulfill another purpose—a self-fulfilling purpose, so to speak. They promote clearer drafting. When it is widely understood in the legal community that, for example, a word used repeatedly in a document will be taken to have the same meaning throughout, and that a change in terminology suggests a change in meaning, you can expect those who prepare legal documents competently to draft accordingly.

Sections 1–37 of this treatise deal with principles for interpreting all types of legal instruments, from constitutions to statutes to ordinances to regulations to contracts to wills. Sections 38–57 are specific to statutory interpretation.

## 17. Grammar Canon

**Words are to be given the meaning that proper grammar and usage would assign them.**

> "This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments."
>
> *Flora v. United States*, 362 U.S. 145, 150 (1960) (per Warren, C.J.).

Although drafters, like all other writers and speakers, sometimes perpetrate linguistic blunders,[1] they are presumed to be grammatical in their compositions. They are *not* presumed to be unlettered. Judges rightly presume, for example, that legislators understand subject–verb agreement, noun–pronoun concord, the difference between the nominative and accusative cases, and the principles of correct English word-choice. No matter how often the accuracy, indeed the plausibility, of this presumption is cast in doubt by legislators' oral pronouncements, when it comes to what legislators enact, the presumption is unshakable.

Courts sometimes say that rules of grammar govern unless they contradict legislative intent or purpose.[2] This statement is entirely correct (though it should go without saying) if it refers to legislative intent or purpose manifested in the only manner in which a legislature can authoritatively do so: in the text of the enactment. The presumption of legislative literacy is a rebuttable one; like all the other canons, this one can be overcome by other textual

1 *See, e.g.*, Jeremy Bentham, "Nomography," in 3 *The Works of Jeremy Bentham* 231, 242–43 (John Bowring ed., 1843) ("In the examination of one statute I have found a multitude of such gross palpable grammatical errors, as scarcely any schoolboy, who had made his way to the upper form of any school in which no language was taught besides English, would see himself convicted of without shame.").

2 *See, e.g.*, *Costello v. INS*, 376 U.S. 120, 125–26 (1964) (per Stewart, J.); *United States v. Shirey*, 359 U.S. 255, 260–61 (1959) (per Frankfurter, J.); *United States v. Whitridge*, 197 U.S. 135, 143 (1905) (per Holmes, J.).

indications of meaning. But if the statement suggests that grammatical usage is some category of indication separate from textual meaning, it is quite wrong. Grammatical usage is one of the means (though not the exclusive means) by which the sense of a statute is conveyed: "The words [a legislator] uses are the instruments by means of which he expects or hopes to effect . . . changes [in society]. What gives him this expectation or this hope is his belief that he can anticipate how others (e.g., judges and administrators) will understand these words."[3]

Often the issue centers on syntactic relationships. In a 1989 United States Supreme Court case, a Bankruptcy Code provision stated: "[T]here shall be allowed to the holder of [an oversecured] claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . ."[4] The question was whether "interest on such claim" was subject to the qualification "provided for under the agreement." The Court held that it was independent of the qualification, the conjunction *and* being essentially equivalent to *together with*.

> This reading is also mandated by the grammatical structure of the statute. The phrase "interest on such claim" is set aside by commas, and separated from the reference to fees, costs, and charges by the conjunctive words "and any." As a result, the phrase "interest on such claim" stands independent of the language that follows. "[I]nterest on such claim" is not part of the list made up of "fees, costs, or charges," nor is it joined to the following clause so that the final "provided for under the agreement" modifies it as well. The language and punctuation Congress used cannot be read in any other way. By the plain language of the statute, the two types of recovery are distinct.[5]

Many high-stakes cases turn on such narrow linguistic questions.

---

3 Gerald C. MacCallum Jr., *Legislative Intent*, 75 Yale L.J. 754, 758 (1966).

4 11 U.S.C. § 506(b).

5 *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42 (1989) (per Blackmun, J.) (citation and footnote omitted).

But some grammatical principles are weaker than others—such as the preference for *that* in a restrictive relative clause and a comma plus *which* in a nonrestrictive relative clause. A famous example arose in the drafting of the 1984 Republican platform:

> Republicans oppose new taxes that are unnecessary. (Restrictive meaning: only unnecessary new taxes are anathema.)

> Republicans oppose new taxes, which are unnecessary. (Nonrestrictive meaning: all new taxes are anathema.)[6]

An unfastidious wording that used *which* without a comma—one not seriously proposed at the Convention—could have gone either way:

> Republicans oppose new taxes which are unnecessary. (Ambiguous.)

This grammatical convention—preferring *that* for restrictive clauses and comma-*which* for nonrestrictive ones—is unfortunately a weak basis for deciding statutory meaning. For while grammarians have sought heroically to establish this as a firm rule,[7] they have been unsuccessful. Some usages of traditional English militate against it—the fact, for example, that *that* is not just a relative pronoun but also a stand-alone pronoun, a demonstrative adjective, and a conjunction. Good writers avoid too many *thats* in close proximity, and even a bad writer would never say (as the use of *that* as the defining relative pronoun would require) "that that I saw." What H.W. Fowler wrote in 1926 remains entirely true today:

---

6 For more on this example, see Bryan A. Garner, *How a "That–Which" Editorial Decision Changed U.S. History*, 37 Student Law. 10 (May 2009).

7 Theodore M. Bernstein, *The Careful Writer* 445 (1965) ("*That* is better used to introduce a limiting, or defining clause, *which* to introduce a nondefining or parenthetical clause."); John F. Genung, *Outlines of Rhetoric* 44–45 (1894) ("There are many cases where, for the sake of euphony or clearness, . . . *which* has to be used though the meaning is restrictive. Such cases ought to be watched; and wherever *that* will go smoothly use it. Do not be so careless in this respect as most writers are."); Richard Whately, *A Selection of English Synonyms* 81 (new ed. 1860) ("*Which* is used in speaking of a class generally, and *that* when we mean to designate any particular *individual* of that class.").

> [I]f writers would agree to regard *that* as the defining relative pronoun, and *which* as the non-defining, there would be much gain both in lucidity and in ease. Some there are who follow this principle now; but it would be idle to pretend that it is the practice either of most or of the best writers.[8]

Hence it is not unusual to encounter a text that disregards the supposed *that–which* dichotomy. Consider, for example, Connecticut's good-samaritan law. Designed to immunize healthcare providers who voluntarily render emergency aid, the law states that such providers

> shall not be liable to [a] person assisted for civil damages for any personal injuries which result from acts or omissions by such person in rendering the emergency care, which may constitute ordinary negligence.[9]

Does this mean that all emergency care is immunized, or only instances constituting ordinary negligence? If *which* is read nonrestrictively, the immunity is absolute; if it is read restrictively, only ordinary negligence is immunized. A strict *that–which* grammarian's reading (coupled with the punctuation canon [§ 23]) creates an absolute immunity. But only a reading that gives *which* a restrictive sense (in both its instances in the statute)—and overrides the punctuation—gives effect to every word (see § 26 [surplusage canon]). So a court would be textually justified in ignoring the grammarian's reading[10]—though legal drafters would be well-advised in the future to heed Fowler's recommendation for lucidity and ease.

---

8 H.W. Fowler, *A Dictionary of Modern English Usage* 635 (1926).
9 Conn. Gen. Stat. § 52-557b(a).
10 *See Gianetti v. Police Dep't of Burlington*, 836 A.2d 371 (Conn. App. Ct. 2003).

overcome by other textual indications of meaning. So in the case quoted at the beginning of this section, the Supreme Court, after noting that "[t]he unavoidable inference from familiar rules of punctuation" pointed in one direction, concluded that "all of the other evidence from the statute points the other way."[17]

> Against the overwhelming evidence from the structure, language, and subject matter of the 1916 Act there stands only the evidence from the Act's punctuation, too weak to trump the rest. . . . [W]e are convinced that the placement of the quotation marks in the 1916 Act was a simple scrivener's error, a mistake made by someone unfamiliar with the law's object and design. Courts, we have said, should "disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute."[18]

❧ ❧ ❧

One punctuation convention merits special mention: the serial comma—that is, the comma after the penultimate item in a series and just before the conjunction (a, b, and c). Authorities on English usage overwhelmingly recommend using the serial comma to prevent ambiguities.[19] Let us say that a testator bequeaths the residue of his enormous estate to "Bob, Sally, George and Jillian." Do the devisees take equal fourths, or do George and Jillian have to

---

17 *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 454, 455 (1993) (per Souter, J.).

18 *Id.* at 462 (quoting *Hammock v. Loan & Trust Co.*, 105 U.S. 77, 84–85 (1881)) (per Harlan, J.) (internal quotation marks and citation omitted).

19 *See, e.g.*, *Garner's Modern American Usage* 676 (3d ed. 2009) ("[O]mitting the final comma may cause ambiguity, whereas including it never will."); *The Chicago Manual of Style* § 6.18, at 312 (16th ed. 2010) ("Chicago strongly recommends this widely practiced usage, blessed by Fowler and other authorities, since it prevents ambiguity"); Kate L. Turabian, *A Manual for Writers of Term Papers, Theses, and Dissertations* §§ 5.68, 5.70, at 50–51 (5th ed. 1987) ("A series of three or more words, phrases, or clauses (like this) takes a comma between each of the elements and before a conjunction separating the last two."); Patricia T. O'Conner, *Woe Is I* 137 (1996) ("My advice is to stick with using the final comma."); Joseph Gibaldi, *MLA Style Manual* § 3.4.2b, at 69 (2d ed. 1998) ("Use a comma to separate words, phrases, and clauses in a series."); H.W. Fowler, *A Dictionary of Modern English Usage* 34 (1926) ("The only rule that will obviate . . . uncertainties is that [illegible] (or living the last without a comma) stop is needed for independent reasons, the comma should be used.").

Case: 25-1712 Document: 18 Page: 89 Filed: 05/14/2025



split a third? If Bob and Sally become avaricious, they might argue that they take thirds, not quarters, as shown by the punctuation.

Despite the well-known semantic hazards of omitting the serial comma, some legal drafters omit it anyway. And some legislative-drafting manuals, as a matter of style, actually adopt the newspaper convention of omitting it.[20]

So although the better practice is to use the serial comma, courts should not rely much if any on its omission. The Arizona Supreme Court made this mistake in interpreting the word *enterprise*,[21] which was statutorily defined as "any corporation, partnership, association, labor union or other legal entity."[22] The court erroneously latched onto the wording *labor union or other legal entity* as a single item in the enumeration because of the lack of a comma, reasoning that "[t]he absence of a comma after the phrase 'labor union' makes a difference,"[23] so that the *other legal entity* must be one similar to a labor union and could not include the state. While the outcome seems correct for other reasons, the absence of a comma assuredly did not "make a difference." Nor did the absence affect meaning earlier in the same statute in the phrases *neglect, abuse or exploitation*[24] (*abuse or exploitation* is not a single category) or in the relative clauses *that has been employed to provide care, that has assumed a legal duty to provide care or that has been appointed by a court to provide care*[25] (a better style would be to put a comma before the *or*). The court did not seem to notice that the serial comma was consistently omitted in the statute—as required by the state's drafting manual—and wrongly attributed meaning to this fact in a particular instance.

20 *See, e.g., Arizona Legislative Bill Drafting Manual* 83 (2011–2012).
21 *Estate of Braden v. Arizona*, 266 P.3d 349, 352 (Ariz. 2011) (en banc).
22 Ariz. Rev. Stat. § 46-455(Q).
23 266 P.3d at 352.
24 Ariz. Rev. Stat. § 46-455(B).
25 *Id.*


Webster's
Ninth New
Collegiate
Dictionary
A Merriam-Webster®
[redacted]

A B
C D
E F
G

# Ninth New Collegiate Dictionary

*A Merriam-Webster®*

MERRIAM-WEBSTER INC., *Publishers*
Springfield, Massachusetts, U.S.A.

**A GENUINE MERRIAM-WEBSTER**

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1986 by Merriam-Webster Inc.

Philippines Copyright 1986 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

Based on Webster's third new international dictionary.
Includes index.
1. English language—Dictionaries. I. Merriam-Webster Inc.
PE1628.W5638 1985 423 84-18979
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

1516171819RMcN86

tions 2 **a :** to appear in an impressively great or exaggerated form **b :** to take shape as an impending occurrence

[3]**loom** *n* (1836) **:** the indistinct and exaggerated appearance of something seen on the horizon or through fog or darkness; *also* **:** a looming shadow or reflection

[1]**loon** \ˈlün\ *n* [ME *loun*] (15c) **1 :** LOUT, IDLER **2** *chiefly Scot* **:** BOY **3 a :** a crazy person **b :** SIMPLETON

[2]**loon** *n* [of Scand origin; akin to ON *lōmr* loon — more at LAMENT] (1634) **:** any of several large fish-eating diving birds (genus *Gavia*) of the northern part of the northern hemisphere that have the legs placed far back under the body and as a result have a clumsy floundering gait on land

**loo•ny** *or* **loo•ney** \ˈlü-nē\ *adj* **loo•ni•er; -est** [by shortening & alter. fr. *lunatic*] (1872) **:** CRAZY, FOOLISH — **loo•ni•ness** *n* — **loony** *n*

**loony bin** *n* (ca. 1890) **:** an insane asylum **:** MADHOUSE

[1]**loop** \ˈlüp\ *n* [ME *loupe;* perh. akin to MD *lupen* to watch, peer] *archaic* (14c) **:** LOOPHOLE 1a

[2]**loop** *n* [ME *loupe,* of unknown origin] (14c) **1 a :** a curving or doubling of a line so as to form a closed or partly open curve within itself through which another line can be passed or into which a hook may be hooked **b :** such a fold of cord or ribbon serving as an ornament **2 a :** something shaped like a loop **b :** a maneuver in which an airplane starting from straight and level flight passes successively through a climb, inverted flight, a dive, and then returns to normal flight **3 :** a ring or curved piece used to form a fastening or a handle **4 a :** the portion of a vibrating body between two nodes **b :** the middle point of such a portion **5 :** a closed electric circuit **6 :** a piece of film or magnetic tape whose ends are spliced together so as to project or play back the same material continuously **7 :** a series of instructions (as for a computer) that is repeated until a terminating condition is reached **8 :** a sports league — **loopy** \ˈlü-pē\ *adj* — **for a loop :** into a state of amazement, confusion, or distress

[3]**loop** *vi* (1832) **1 :** to make or form a loop **2 :** to execute a loop in an airplane **3 :** to move in loops or in an arc ~ *vt* **1 a :** to make a loop in, on, or about **b :** to fasten with a loop **2 :** to join (two courses of loops) in knitting **3 :** to connect (electric conductors) so as to complete a loop **4 :** to cause to move in an arc

**loop•er** \ˈlü-pər\ *n* (1731) **1 :** any of the usu. rather small hairless caterpillars that are mostly larvae of moths (families Geometridae and Noctuidae) and move with a looping movement in which the anterior legs and the posterior prolegs are alternately made fast and released **2 :** one that loops

[1]**loop•hole** \ˈlüp-ˌhōl\ *n* [[1]*loop*] (1591) **1 a :** a small opening through which small arms may be fired **b :** a similar opening to admit light and air or to permit observation **2 :** a means of escape; *esp* **:** an ambiguity or omission in the text through which the intent of a statute, contract, or obligation may be evaded

[2]**loophole** *vt* (1664) **:** to make loopholes in

**loop of Hen•le** \-ˈhen-lē\ [F. G. J. *Henle* †1885 Ger. pathologist] (1867) **:** a part of the vertebrate nephron that lies between the proximal and distal convoluted tubules and plays a part in water resorption

[1]**loose** \ˈlüs\ *adj* **loos•er; loos•est** [ME *lous,* fr. ON *lauss;* akin to OHG *lōs* loose — more at -LESS] (13c) **1 a :** not rigidly fastened or securely attached **b** (1) **:** having worked partly free from attachments ⟨the masonry is ~ at the base of the wall⟩ (2) **:** having relative freedom of movement **c :** produced freely and accompanied by raising of mucus ⟨a ~ cough⟩ **d :** not tight-fitting **2 a :** free from a state of confinement, restraint, or obligation ⟨a lion ~ in the streets⟩ ⟨spend ~ funds wisely⟩ **b :** not brought together in a bundle, container, or binding **c** *archaic* **:** DISCONNECTED, DETACHED **3 :** not dense, close, or compact in structure or arrangement **4 a :** lacking in restraint or power of restraint ⟨a ~ tongue⟩ ⟨~ bowels⟩ **b :** lacking moral restraint **:** UNCHASTE **5 a :** not tightly drawn or stretched **:** SLACK **b :** having a flexible or relaxed character **6 a :** lacking in precision, exactness, or care **b :** permitting freedom of interpretation **7 :** expressed in or characterized by loose sentences ⟨~ style⟩ — **loose•ly** *adv* — **loose•ness** *n*

[2]**loose** *vb* **loosed; loos•ing** *vt* (13c) **1 a :** to let loose **:** RELEASE **b :** to free from restraint **2 :** to make loose **:** UNTIE ⟨~ a knot⟩ **3 :** to cast loose **:** DETACH **4 :** to let fly **:** DISCHARGE **5 :** to make less rigid, tight, or strict **:** RELAX ~ *vi* **:** to let fly a missile (as an arrow) **:** FIRE

[3]**loose** *adv* (15c) **:** in a loose manner **:** LOOSELY

**loose box** *n, Brit* (1849) **:** BOX STALL

**loose end** *n* (1546) **1 :** something left hanging loose **2 :** a fragment of unfinished business — usu. used in pl.

**loose–joint•ed** \ˈlüs-ˈjȯint-əd\ *adj* (1859) **1 :** having joints apparently not closely articulated **2 :** characterized by unusually free movements — **loose–joint•ed•ness** *n*

**loose–leaf** \ˈlü-ˈslēf\ *adj* (1902) **1 :** having leaves secured in book form in a cover whose backbone may be opened for the removal, rearrangement, or replacement of leaves ⟨~ notebook⟩ **2 :** of, relating to, or used with a loose-leaf binding ⟨~ paper⟩

**loos•en** \ˈlüs-ᵊn\ *vb* **loos•ened; loos•en•ing** \ˈlüs-niŋ, -ᵊn-iŋ\ *vt* (14c) **1 :** to release from restraint **2 :** to make looser **3 :** to relieve (the bowels) of constipation **4 :** to cause or permit to become less strict — often used with *up* ~ *vi* **:** to become loose or looser

**loosen up** *vi* (1906) **:** to become less tense **:** RELAX

**loose sentence** *n* (ca. 1891) **:** a sentence in which the principal clause comes first and the latter part contains subordinate modifiers or trailing elements

**loose smut** *n* (1890) **:** a smut disease of grains in which the entire head is transformed into a dusty mass of spores

**loose•strife** \ˈlü(s)-ˌstrīf\ *n* [intended as trans. of Gk *lysimacheios* loosestrife (as if fr. *lysis* act of loosing + *machesthai* to fight) — more at LYS-] (1548) **1 :** any of a genus (*Lysimachia*) of plants of the primrose family with leafy stems and yellow or white flowers **2 :** any of a genus (*Lythrum,* family Lythraceae, the loosestrife family) of herbs including some with showy spikes of purple flowers; *esp* **:** PURPLE LOOSESTRIFE

[1]**loot** \ˈlüt\ *n* [Hindi *lūṭ,* fr. Skt *luṇṭati* he robs] (ca. 1788) **1 :** goods usu. of considerable value taken in war **:** SPOILS **2 :** something held to resemble goods of value seized in war: as **a :** something appropriated illegally often by force or violence **b :** illicit gains by public officials **c :** MONEY **3 :** the action of looting ***syn*** see SPOIL

[2]**loot** *vt* (1845) **1 a :** to plunder or sack in war **b :** to rob esp. on a large scale and usu. by violence or corruption **2 :** to seize and carry away by force esp. in war ~ *vi* **:** to engage in robbing or plundering esp. in war — **loot•er** *n*

[1]**lop** \ˈläp\ *n* [ME *loppe*] (14c) **:** material cut away from a tree; *esp* **:** parts discarded in lumbering

[2]**lop** *vt* **lopped; lop•ping** (1519) **1 a** (1) **:** to cut off branches or twigs from (2) **:** to sever from a woody plant **b** (1) *archaic* **:** to cut off the head or limbs of (2) **:** to cut from a person **2 a :** to remove superfluous parts from **b :** to eliminate as unnecessary or undesirable — usu. used with *off* — **lop•per** *n*

[3]**lop** *vi* **lopped; lop•ping** [perh. imit.] (1578) **:** to hang downward **:** DROOP

[1]**lope** \ˈlōp\ *n* [ME *loup, lope* leap, fr. ON *hlaup;* akin to OE *hlēapan* to leap — more at LEAP] (1809) **1 :** an easy natural gait of a horse resembling a canter **2 :** an easy usu. bounding gait capable of being sustained for a long time

[2]**lope** *vi* **loped; lop•ing** (1825) **:** to go, move, or ride at a lope — **lop•er** *n*

**lop–eared** \ˈläp-ˈi(ə)rd\ *adj* (1687) **:** having ears that droop

**loph•o•phore** \ˈläf-ə-ˌfō(ə)r, -ˌfȯ(ə)r\ *n* [Gk *lophos* crest + E *-phore*] (1850) **:** a circular or horseshoe-shaped organ about the mouth esp. of a brachiopod or bryozoan that bears tentacles and functions esp. in food-getting

**lop•sid•ed** \ˈläp-ˈsīd-əd\ *adj* (1711) **1 :** leaning to one side **2 :** lacking in balance, symmetry, or proportion **:** disproportionately heavy on one side ⟨a ~ vote of 99-1⟩ — **lop•sid•ed•ly** *adv* — **lop•sid•ed•ness** *n*

**lo•qua•cious** \lō-ˈkwā-shəs\ *adj* [L *loquac-, loquax,* fr. *loqui* to speak] (1667) **a :** given to excessive talking **:** GARRULOUS **b :** full of excessive talk **:** WORDY ***syn*** see TALKATIVE — **lo•qua•cious•ly** *adv* — **lo•qua•cious•ness** *n*

**lo•quac•i•ty** \-ˈkwas-ət-ē\ *n* (13c) **:** the quality or state of being very talkative

**lo•quat** \ˈlō-ˌkwät\ *n* [Chin (Cant) *lō-kwat*] (1820) **:** an Asian evergreen tree (*Eriobotrya japonica*) of the rose family often cultivated for its fruit; *also* **:** its yellow edible fruit used esp. for preserves

**lo•ran** \ˈlō(ə)r-ˌan, ˈlȯ(ə)r-\ *n* [*lo*ng-*ra*nge *n*avigation] (ca. 1932) **:** a system of long-range navigation in which pulsed signals sent out by two pairs of radio stations are used by a navigator to determine the geographical position of a ship or an airplane

[1]**lord** \ˈlȯ(ə)rd\ *n* [ME *loverd, lord,* fr. OE *hlāford,* fr. *hlāf* loaf + *weard* keeper — more at LOAF, WARD] (bef. 12c) **1 :** one having power and authority over others: **a :** a ruler by hereditary right or preeminence to whom service and obedience are due **b :** one of whom a fee or estate is held in feudal tenure **c :** an owner of land or other real property **d** *obs* **:** the male head of a household **e :** HUSBAND **f :** one that has achieved mastery or that exercises leadership or great power in some area ⟨vice ~*s*⟩ **2** *cap* **a :** GOD 1 **b :** JESUS **3 :** a man of rank or high position: as **a :** a feudal tenant whose right or title comes directly from the king **b :** a British nobleman: as (1) **:** BARON 2a (2) **:** an hereditary peer of the rank of marquess, earl, or viscount (3) **:** the son of a duke or a marquess or the eldest son of an earl (4) **:** a bishop of the Church of England **c** *pl, cap* **:** HOUSE OF LORDS **4** — used as a British title: as **a** — used as part of an official title ⟨*Lord* Advocate⟩ **b** — used informally in place of the full title for a marquess, earl, or viscount **c** — used for a baron **d** — used by courtesy before the name and surname of a younger son of a duke or a marquess **5 :** a person chosen to preside over a festival

[2]**lord** *vi* (14c) **:** to act like a lord; *esp* **:** to put on airs — usu. used with *it* ⟨~*s* it over his friends⟩

**lord chancellor** *n, pl* **lords chancellor** (15c) **:** a British officer of state who presides over the House of Lords in both its legislative and judicial capacities, serves as the head of the British judiciary, and is usu. a leading member of the cabinet

**lord•ing** \ˈlȯrd-iŋ\ *n* (13c) **1** *archaic* **:** LORD **2** *obs* **:** LORDLING

**lord•ling** \ˈlȯ(ə)rd-liŋ\ *n* (13c) **:** a little or insignificant lord

**lord•ly** \-lē\ *adj* **lord•li•er; -est** (bef. 12c) **1 a :** of, relating to, or having the characteristics of a lord **:** DIGNIFIED **b :** GRAND, NOBLE **2 :** exhibiting such pride and assurance as could only be felt as appropriate to one of the highest birth or rank ***syn*** see PROUD — **lord•li•ness** *n* — **lordly** *adv*

**lord of misrule** (15c) **:** a master of Christmas revels in England esp. in the 15th and 16th centuries

**lor•do•sis** \lȯr-ˈdō-səs\ *n* [NL, fr. Gk *lordōsis,* fr. *lordos* curving forward; akin to OE be*lyrtan* to deceive] (1704) **:** abnormal curvature of the spine forward — **lor•dot•ic** \-ˈdät-ik\ *adj*

**Lord Protector of the Commonwealth** (ca. 1653) **:** PROTECTOR 2b

**Lord's day** *n, often cap D* [ME *Lordis day,* trans. of LL *dominica dies,* trans. of Gk *kyriakon hēmera* (Rev. 1:10)] (12c) **:** SUNDAY

**lord•ship** \ˈlȯ(ə)rd-ˌship\ *n* (bef. 12c) **1 a :** the rank or dignity of a lord — used as a title **b :** the authority or power of a lord **:** DOMINION **2 :** the territory under the jurisdiction of a lord **:** SEIGNIORY

**Lord's Prayer** *n* (1548) **:** the prayer with variant versions in Matthew and Luke that according to the Lucan account Christ taught his disciples

**Lord's Supper** *n* [ME *Lordis sopere,* trans. of LL *dominica cena,* trans. of Gk *kyriakon deipnon* (I Cor. 11:20)] (14c) **:** COMMUNION 2a

**Lord's table** *n, often cap T* [trans. of Gk *trapeza kyriou* (I Cor. 10:21)] (1535) **:** ALTAR 2

**Lordy** \ˈlȯrd-ē\ *interj* [[1]*lord* (God) + *-y*] (1853) — used to express surprise or strength of feeling

[1]**lore** \ˈlō(ə)r, ˈlȯ(ə)r\ *n* [ME, fr. OE *lār;* akin to OHG *lēra* doctrine, OE *leornian* to learn] (bef. 12c) **1** *archaic* **:** something that is taught **:** LESSON **2 :** something that is learned: **a :** knowledge gained through study or experience **b :** traditional knowledge or belief **3 :** a particular body of knowledge or tradition

[2]**lore** *n* [NL *lorum,* fr. L, thong, rein; akin to Gk *eulēra* reins] (1828) **:** the space between the eye and bill in a bird or the corresponding region in a reptile or fish — **lo•re•al** \ˈlōr-ē-əl, ˈlȯr-\ *adj*

---

\ə\ **abut** \ᵊ\ kitten, F table \ər\ **further** \a\ ash \ā\ ace \ä\ cot, cart
\au̇\ **out** \ch\ **chin** \e\ bet \ē\ **easy** \g\ go \i\ hit \ī\ ice \j\ job
\ŋ\ **sing** \ō\ **go** \ȯ\ **law** \ȯi\ **boy** \th\ **thin** \t͟h\ **the** \ü\ **loot** \u̇\ **foot**
\y\ yet \zh\ vision \ȧ, k̲, ⁿ, œ, œ̅, ue, ue̅, ʸ\ *see* Guide to Pronunciation

# The Random House College Dictionary

REVISED EDITION

Based on The Random House Dictionary of the English Language

THE UNABRIDGED EDITION

JESS STEIN • EDITOR IN CHIEF

# TABLE OF CONTENTS


| | |
|---|---|
| *Prefaces* | v |
| *Editorial Staff* | vi |
| *Consultant Staff* | vii |
| *Indo-European Language Chart* | x |
| *Historical Sketch of the English Language* | xi |
| *Etymology Key* | xv |
| *Pronunciation Key* | xvi |
| *Pronunciation of English* | xvii |
| *Usage, Dialects, and Functional Varieties* | xix |
| *Guide to the Dictionary* | xxii |
| *Table of English Sounds and Their Common Spellings* | xxxii |
| A DICTIONARY OF THE ENGLISH LANGUAGE | 1 |
| *Signs and Symbols* | 1535 |
| *United States Colleges and Universities* | 1539 |
| *Canadian Colleges and Universities* | 1551 |
| *English Given Names* | 1552 |
| *Basic Manual of Style* | 1559 |



REVISED EDITION

COPYRIGHT © 1984, 1982, 1980, 1979, 1975 BY RANDOM HOUSE, INC.

Previous edition copyright © 1973, 1972, 1969, 1968 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, without permission in writing from the publisher. All inquiries should be addressed to Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022.

Based on *The Random House Dictionary of the English Language–The Unabridged Edition* Copyright © 1983, 1981, 1979, 1973, 1971, 1970, 1969, 1967, 1966 by Random House, Inc.



PUBLISHED IN THE UNITED STATES OF AMERICA BY RANDOM HOUSE, INC., NEW YORK AND SIMULTANEOUSLY IN CANADA BY RANDOM HOUSE OF CANADA LIMITED, TORONTO


A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.


*Chart of Periodic Table of the Elements*, Copyright © 1964 by E. H. Sargent & Co.

*Table of Common Proofreader's Marks*, Copyright 1950, © 1956 by Alfred A. Knopf, Inc.



LIBRARY OF CONGRESS CATALOGING IN PUBLICATION DATA

Main entry under title:

The Random House college dictionary.

Based on the Random House dictionary of the English language, unabridged ed.

Published in 1968 under title: The Random House dictionary of the English language, college ed.

1. English language—Dictionaries.

PE1625.R34 1975 423 75-4858 ISBN 0-394-43500-1

ISBN 0-394-43600-8 thumb-indexed ed.

rs. e/ud

Manufactured in the United States of America

*Music.* progressing melodically by intervals of a second. [< L *conjunct(us)* joined, connected (ptp. of *conjungere*) = *con-* CON- + *junc-* (var. s. of *jungere* to JOIN) + *-tus* ptp. suffix] —**con·junct′ly,** *adv.*

**con·junc·tion** (kən jungk′shən), *n.* **1.** the act of conjoining; combination. **2.** the state of being conjoined; union; association. **3.** a combination of events or circumstances. **4.** *Gram.* any member of a small class of words functioning as connectors between words, phrases, clauses, or sentences, as *and, because, but, however.* Cf. **coordinating conjunction, subordinating conjunction.** **5.** *Astron.* **a.** the coincidence of two or more heavenly bodies at the same celestial longitude. **b.** the state of two or more such coinciding heavenly bodies. **6.** *Logic.* **a.** a propositional statement that is true if and only if both its components are true. **b.** a connective symbol, as ·, usually read as "and." [ME *conjunccio(u)n* < L *conjunctiōn-* (s. of *conjunctiō*)] —**con·junc′tion·al,** *adj.* —**con·junc′tion·al·ly,** *adv.*

**con·junc·ti·va** (kon′jungk tī′və), *n., pl.* **-vas, -vae** (-vē). *Anat.* the mucous membrane that lines the inner surface of the eyelids. [short for NL *membrāna conjunctīva* conjunctive membrane; see CONJUNCTIVE] —**con′junc·ti′val,** *adj.*

**con·junc·tive** (kən jungk′tiv), *adj.* **1.** connective. **2.** linked; joint: *a conjunctive action.* **3.** *Gram.* **a.** (of a mode) subjunctive. **b.** (of a pronoun) conjunct. **c.** of the nature of a conjunction. —*n.* **4.** *Gram.* conjunction. [< LL *conjunctīv(us)*] —**con·junc′tive·ly,** *adv.*

**con·junc·ti·vi·tis** (kən jungk′tə vī′tis), *n.* *Ophthalm.* inflammation of the conjunctiva.

**con·junc·ture** (kən jungk′chər), *n.* **1.** a combination of circumstances or a particular state of affairs. **2.** a critical state of affairs; crisis. **3.** conjunction; joining; meeting. —**con·junc′tur·al,** *adj.*

**con·jur·a·tion** (kon′jŏŏ rā′shən), *n.* **1.** the act of calling on or invoking by a sacred name. **2.** an incantation; magical spell or charm. **3.** the practice of legerdemain. **4.** *Archaic.* supplication; solemn entreaty. [ME *conjuracio(u)n* < L *conjūrātiōn-* (s. of *conjūrātiō*) = *conjūrāt(us),* ptp. of *conjūrāre* to swear together, (*con-* CON- + *jūr-* (s. of *jūs*) right, justice, duty + *-ātus* -ATE[1]) + *-iōn-* -ION]

**con·jure** (kon′jər *or, esp. Brit.,* kun′- *for 1–4, 7, 8;* kən jŏŏr′ *for 5, 6, 9*), *v.,* **-jured, -jur·ing.** —*v.t.* **1.** to call upon or command (a devil or spirit) by invocation or spell. **2.** to affect or influence by or as if by invocation or spell. **3.** to effect or produce by or as by magic: *to conjure a miracle.* **4.** to raise up, bring to mind, or recall by or as if by magic (usually fol. by *up*): *to conjure up the happy past.* **5.** to appeal to solemnly or earnestly: *I conjure you to hear my plea.* **6.** *Obs.* to charge solemnly. —*v.i.* **7.** to call upon or command a devil or spirit by invocation or spell. **8.** to practice magic or legerdemain. **9.** *Obs.* to conspire. [ME *conjure(n)* < OF *conjure(r)* < L *conjūrāre* = *con-* CON- + *jūrāre* to swear]

**con·jur·er** (kon′jər ər *or, esp. Brit.,* kun′- *for 1, 2;* kən jŏŏr′ər *for 3*), *n.* **1.** a person who conjures spirits or practices magic; sorcerer. **2.** a person who practices legerdemain; magician; juggler. **3.** a person who solemnly charges or entreats. Also, **con′ju·ror.** [ME]

**conk** (kongk, kôngk), *v.t.* *Slang.* to hit or strike on the head. [? alter. of CONCH]

**conk′ out′,** *Slang.* **1.** to break or fail, as a machine, engine, etc. **2.** to slow down or stop; lose energy. **3.** to lose consciousness; faint. **4.** to die. [*conk,* of imit. orig.]

**con′ man′,** *Informal.* See **confidence man.**

**conn** (kon), *v.t., n.* con[3].

**Conn.,** Connecticut.

**con·nate** (kon′āt), *adj.* **1.** existing in a person or thing from birth or origin; inborn; congenital. **2.** associated in birth or origin. **3.** allied or agreeing in nature; cognate. **4.** *Biol.* congenitally or firmly united into one body. [< LL *connāt(us)* (ptp. of *connāscī* to be born at the same time with) = L *con-* CON- + *nā-* (short s. of *nāscī*) + *-tus* ptp. suffix] —**con′nate·ly,** *adv.* —**con′nate·ness,** *n.* —**con·na·tion** (kə nā′shən), *n.*

**con·nat·u·ral** (kə nach′ər əl, -nach′rəl), *adj.* **1.** belonging to a person or thing by nature or from birth or origin; inborn. **2.** of the same or a similar nature. [< ML *connātūrāl(is)*] —**con·nat′u·ral·ly,** *adv.* —**con·nat′u·ral·ness,** *n.*

**Con·naught** (kon′ôt), *n.* a province in the NW Republic of Ireland. 419,465 (1961); 6611 sq. mi. Irish, **Con·nacht** (kon′əkнt, -ət).

**con·nect** (kə nekt′), *v.t.* **1.** to bind or fasten together; join or unite; link: *to connect the two cities by a bridge.* **2.** to establish communication between; put in communication (often fol. by *with*): *The telephone operator connected us.* **3.** to associate, attach, or place in relationship: *to connect oneself with a group.* **4.** to associate mentally or emotionally: *She connects all telegrams with bad news.* —*v.i.* **5.** to become connected; join or unite. **6.** (of trains, buses, etc.) to run so as to make connections (often fol. by *with*). **7.** *Slang.* to make direct contact for the illegal sale or purchase of narcotics. [< L *connect(ere)* = *con-* CON- + *nectere* to tie; see NEXUS] —**con·nect′ed·ly,** *adv.* —**con·nect′ed·ness,** *n.* —**con·nect′i·ble, con·nect′a·ble,** *adj.* —**con·nec′tor, con·nect′er,** *n.* —**Syn. 1.** See **join.** —**Ant. 1.** divide. **3.** dissociate

**Con·nect·i·cut** (kə net′ə kət), *n.* **1.** a state in the NE United States. 3,032,217 (1970); 5009 sq. mi. *Cap.:* Hartford. *Abbr.:* Conn., Ct., CT **2.** a river flowing S from N New Hampshire along the boundary between New Hampshire and Vermont and then through Massachusetts and Connecticut into Long Island Sound. 407 mi. long.

**connec′ting rod′,** *Mach.* a rod or link for transmitting motion and force between a rotating and a reciprocating part, as between a piston and a crankshaft.

**con·nec·tion** (kə nek′shən), *n.* **1.** the act of connecting. **2.** the state of being connected. **3.** anything that connects; link; bond. **4.** association; relationship: *the connection between crime and poverty.* **5.** a circle of friends or associates or a member of such a circle. **6.** association with something observed, imagined, discussed, etc. **7.** contextual relation; context, as of a word. **8.** Often, **connections.** the meeting of trains, planes, etc., for transfer of passengers. **9.** a relative, esp. by marriage or distant blood relationship. **10.** a group of persons connected as by political or religious ties. **11.** Usually, **connections.** associates, relations, or friends, esp. representing or having some influence or power. **12.** a channel of communication. **13.** sexual intercourse. Also, *Brit.,* **connexion.** [var. sp. of *connexion* < L *connexiōn-* (s. of *connexiō*) = *connex(us)* (ptp. of *connectere* to CONNECT) + *-iōn-* -ION] —**con·nec′tion·al,** *adj.* —**Syn. 1.** junction, conjunction, union. **3.** tie, coupling, yoke. **5.** affiliation, alliance, combination. **9.** relation, kinsman.

**con·nec·tive** (kə nek′tiv), *adj.* **1.** serving or tending to connect. —*n.* **2.** something that connects. **3.** *Gram.* a word used to connect words, phrases, clauses, and sentences, as a conjunction. **4.** *Bot.* the tissue joining the two cells of the anther. —**con·nec′tive·ly,** *adv.* —**con·nec·tiv·i·ty** (kon′ek tiv′i tē), *n.*

**connec′tive tis′sue,** *Anat.* a tissue, usually of mesoblastic origin, that connects, supports, or surrounds other tissues, organs, etc., and occurs in various forms throughout the body.

**con·nex·ion** (kə nek′shən), *n.* *Brit.* connection. —**con·nex′ion·al,** *adj.*

**conn′ing tow′er** (kon′ing), **1.** the low observation tower of a submarine, constituting the main entrance to the interior. **2.** the low, armored pilothouse of a warship.

**con·nip·tion** (kə nip′shən), *n.* Often, **conniptions.** *Informal.* a fit of hysteria, anger, or the like. [?]

**con·niv·ance** (kə nī′vəns), *n.* **1.** the act of conniving. **2.** *Law.* tacit encouragement or assent to wrongdoing by another. Also, **con·niv′ence.** [earlier *connivence* < L *connīventia*] —**con·niv′ant, con·niv′ent,** *adj.* —**con·niv′ant·ly, con·niv′ent·ly,** *adv.*

**con·nive** (kə nīv′), *v.i.,* **-nived, -niv·ing.** **1.** to avoid noticing something that one is expected to oppose or condemn; give aid to wrongdoing by forbearing to act or speak (usually fol. by *at*): *The policeman connived at traffic violations.* **2.** to be indulgent toward something others oppose or criticize (usually fol. by *at*): *to connive at childlike exaggerations.* **3.** to cooperate secretly; conspire (often fol. by *with*): *They connived with army chiefs to take over the government.* [< L *connīv(ēre)* (to) blink, wink at = *con-* CON- + *-nīvēre,* akin to *nictāre* to blink] —**con·niv′er,** *n.* —**con·niv′ing·ly** *adv.*

**con·niv·ent** (kə nī′vənt), *adj.* *Bot., Zool.* converging, as petals. [< L *connīvent-* (s. of *connīvēns,* prp. of *connīvēre*). See CONNIVE, -ENT]

**con·nois·seur** (kon′ə sûr′, -sŏŏr′), *n.* a person who is especially competent to pass critical judgments in an art, esp. one of the fine arts, or in matters of taste. [< F; OF *conoiseor* < L *cognōscitōr-* (s. of *cognōscitor*) knower. See COGNOSCIBLE, -OR[2]] —**con′nois·seur′ship,** *n.*

**con·no·ta·tion** (kon′ə tā′shən), *n.* **1.** an act or instance of connoting. **2.** the associated or secondary meaning of a word or expression; implication: *A possible connotation of "home" is "a place of warmth, comfort, and affection."* Cf. **denotation** (def. 1). **3.** *Logic.* the set of attributes constituting the meaning of a term; comprehension; intension. [< ML *connotātiōn-* (s. of *connotātiō*) = *connotāt(us)* (ptp. of *connotāre;* see CONNOTE, -ATE[1]) + *-iōn-* -ION] —**con·no·ta·tive** (kon′ə tā′tiv, kə nō′tə-), **con·no′tive,** *adj.* —**con′no·ta′tive·ly, con·no′tive·ly,** *adv.*

**con·note** (kə nōt′), *v.t.,* **-not·ed, -not·ing.** **1.** to signify or suggest (certain meanings, ideas, etc.) in addition to the explicit or primary meaning: *The word "fireplace" often connotes hospitality, warm comfort, etc.* **2.** to involve as a condition or accompaniment: *Injury connotes pain.* —*v.i.* **3.** to have significance only by association, as with another word: *Adjectives can only connote, nouns can denote.* [< ML *connot(āre)*]

**con·nu·bi·al** (kə nōō′bē əl, -nyōō′-), *adj.* of marriage; matrimonial; conjugal. [< L *cōnūbiāl(is)* = *cōnūbi(um)* (*cō-* CO- + *nūb(āre)* (to) marry + *-ium* n. suffix) + *-ālis* -AL[1]] —**con·nu′bi·al′i·ty,** *n.* —**con·nu′bi·al·ly,** *adv.*

**co·no·dont** (kō′nə dont′, kon′ə-), *n.* a small tooth-shaped fossil, the remains of an unidentified animal of the Paleozoic era. [< Gk *kôn(os)* CONE + *odont-,* s. of *odoús* or *odṓn* tooth]

**co·noid** (kō′noid), *adj.* **1.** Also, **co·noi′dal.** cone-shaped. —*n.* **2.** a geometrical solid formed by the revolution of a conic section about one of its axes. [< Gk *kōnoeid(ḗs).* See CONE, -OID] —**co·noi′dal·ly,** *adv.*

**Co·non** (kō′non), *n.* died A.D. 687, pope 686–687.

**co·no·scen·ti** (kō′nə shen′tē, kon′ə-; *It.* kô′nô shen′tē), *n.pl., sing.* **-te** (-tē; *It.* -te). cognoscenti.

**con·quer** (kong′kər), *v.t.* **1.** to acquire by force of arms; win in war: *to conquer a country.* **2.** to overcome by force: *to conquer an enemy.* **3.** to gain or obtain by effort. **4.** to overcome by mental or moral power; surmount. —*v.i.* **5.** to be victorious: *Despite their differences, their love will conquer.* [ME *conquer(en)* < OF *conquer(re)* < VL **conquērere* to acquire (alter. of L *conquīrere* to seek out). See CON-, QUERY] —**con′quer·a·ble,** *adj.* —**con′quer·a·ble·ness,** *n.* —**con′quer·ing·ly,** *adv.* —**Syn. 2.** vanquish, subjugate. See **defeat.**

**con·quer·or** (kong′kər ər), *n.* a person who conquers; victor. [ME *conquerour* < AF; OF *conquereor* = *conquer-* CONQUER + *-eor* -OR[2]]

**con·quest** (kon′kwest, kong′-), *n.* **1.** the act of conquering. **2.** the state of being conquered. **3.** the winning of favor or affection. **4.** a person whose favor or affection has been won: *He's another one of her conquests.* **5.** anything acquired by conquering, as a nation, a territory, spoils, etc. **6. the Conquest.** See **Norman Conquest.** [ME *conqueste* < MF < VL **conquēst(a)* (alter. of L *conquīsīta,* fem. ptp. of *conquīrere*)] —**Syn. 1.** subjugation, overthrow, defeat. See **victory.**

**con·quis·ta·dor** (kon kwis′tə dôr′; *Sp.* kông kēs′tä ᵺôr′), *n., pl.* **-dors,** *Sp.* **-do·res** (-ᵺô′res). one of the 16th-century Spanish conquerors in the Americas. [< Sp = *conquistad(o)* (ptp. of *conquistar* to conquer; see CONQUEST, -ADE[1]) + *-or* -OR[2]]

**Con·rad** (kon′rad), *n.* **Joseph** (*Teodor Jozef Konrad Korzeniowski*), 1857–1924, English novelist and short-story writer, born in Poland.

**Cons.,** **1.** Constable. **2.** Constitution. **3.** Consul.

**cons.,** **1.** consecrated. **2.** consolidated. **3.** consonant. **4.** constable. **5.** constitution. **6.** constitutional. **7.** consul.

...supple arms and

...undo, as a bond or relax: to loosen one's

**Lor·ca** (lôr′kə; *Sp.* lôʀ′kä), *n.* **1.** See **García Lorca.** **2.** a city in SE Spain. 71,757 (est. 1956).

**lo·ris** (lôr′is, lōr′-), *n., pl.* **-ris.** **1.** a small, slender, tailless, large-eyed, nocturnal lemur, *Loris gracilis*, of southern India and Ceylon. **2.** a similar but stockier lemur of the genus