# United States Court of Appeals for the Federal Circuit

SEOUL SEMICONDUCTOR CO., LTD., SEOUL VIOSYS CO., LTD.,
*Plaintiffs*

v.

FINELITE, INC.,
*Defendant/Third Party Plaintiff-Appellant*

v.

SAMSUNG SEMICONDUCTOR, INC.,
*Third-Party Defendant-Appellee*

*On Appeal from the United States District Court
for the Northern District of California, Hon. Trina L. Thompson
Case No. 3:22-cv-02869-TLT*

## APPELLANT FINELITE, INC.'S CORRECTED OPENING BRIEF AS FILED IN THE NINTH CIRCUIT

THOMAS J. RECHEN
MARK D. GIARRATANA
KEVIN REINER
MCCARTER & ENGLISH, LLP
CityPlace I, 185 Asylum Street
Hartford, Connecticut 06103
(860) 275-6700
trechen@mccarter.com
mgiarratana@mccarter.com
kreiner@mccarter.com

*Counsel for Defendant/Third-Party Plaintiff-Appellant*

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1, Defendant–Third-Party Plaintiff–Appellant, Finelite, Inc. ("Finelite"), hereby certifies as follows:

1. Finelite's parent corporations are Legrand Holding, Inc. and PB Finelectric, BV, Netherlands.

2. Legrand S.A. is the only publicly held corporation that owns 10% or more of the stock of PB Finelectric, BV, Netherlands.

3. Legrand S.A. has no parent corporation and only Massachusetts Financial Services Company owns 10% or more of Legrand S.A.'s stock.

4. Legrand Holding, Inc.'s parent corporation is PB Finelectric, BV, Netherlands.

Date: June 3, 2024                        MCCARTER & ENGLISH, LLP


                                          /s/ Thomas J. Rechen
                                          THOMAS J. RECHEN

                                          Attorney for Appellant
                                          Finelite, Inc.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

INTRODUCTION ................................................................................................2

JURISDICTIONAL STATEMENT .......................................................................6

ISSUES PRESENTED...........................................................................................9

STATEMENT OF THE CASE AND FACTS ......................................................11

I.      EXECUTION OF THE 2012 CREDIT AGREEMENT ................................11

II.     THE 2018-2021 LED PURCHASES ...........................................................14

III.    THE SEOUL PLAINTIFFS' PATENT INFRINGEMENT CLAIMS
AND FINELITE'S THIRD-PARTY CLAIMS FOR
INDEMNIFICATION AGAINST SAMSUNG ...........................................17

IV.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT ......18

V.     THE DISTRICT COURT'S ORDER REGARDING THE CROSS-
MOTIONS FOR SUMMARY JUDGMENT...............................................20

SUMMARY OF THE ARGUMENT ...................................................................21

STANDARD OF REVIEW .................................................................................25

ARGUMENT .......................................................................................................26

I.      APPLICABLE PRINCIPLES OF CONTRACT INTERPRETATION .......26

II.     THE DISTRICT COURT REVERSIBLY ERRED BY FINDING
THAT THE 2012 CREDIT AGREEMENT INCORPORATED BY
REFERENCE THE ENTIRETY OF THE CONTRACT OF SALE ............27

        A.     The last sentence of the Credit Agreement does not incorporate
the entirety of the Contract of Sale.....................................................27

        B.     The proper grammatical construction of the final sentence of the
Credit Agreement incorporates only the "'terms of sale … to pay
service charges assessed and to pay reasonable attorneys [sic]
fees in the event of default'" .............................................................27

        C.     The grammatical construction of the final sentence is reinforced
by other terms of the Credit Agreement and Contract of Sale............33

i

   1. The Credit Agreement consistently uses "including but not limited to" where intended to include other unstated terms, but notably does not use this phrase in the final sentence ........33

   2. The shipping terms in the Contract of Sale conflict with the corresponding terms in the Credit Agreement, further reinforcing an intent not to incorporate such unstated terms ........................................................................34

  D. The parties' subsequent conduct further confirms their intent expressed in the final sentence of the Credit Agreement ....................35

  E. Finelite's interpretation of the Credit Agreement is aligned with its object ............................................................................36

  F. Finelite's construction of the final sentence of the Credit Agreement renders no part of it superfluous .......................................37

III. TO THE EXTENT THE LAST SENTENCE OF THE CREDIT AGREEMENT IS CONSTRUED TO BE AMBIGUOUS, THAT AMBIGUITY MUST BE CONSTRUED AGAINST SAMSUNG..............39

IV. FINELITE'S THIRD-PARTY CLAIMS ARE GOVERNED BY THE § 2207 CONTRACTS CREATED THROUGH THE PARTIES' EXCHANGE OF WRITTEN FORMS .........................................................41

  A. Contract formation under Cal. Comm. Code § 2207 ..........................41

  B. The undisputed facts demonstrate that Samsung and Finelite formed contracts under Cal. Comm. Code § 2207(1) through their exchange of written forms in connection with each of the 2018-2020 Purchases...........................................................................44

  C. The additional and different terms in Samsung's 2018-2020 acceptances were not incorporated into the parties' § 2207(1) contracts pursuant to Cal. Comm. Code § 2207(2)............................48

   1. Each Finelite offer expressly limited Samsung's acceptance to the terms of the offer, Samsung's indemnification and warranty terms did not become part of the § 2207(1) contracts, and Finelite's indemnification and warranty provisions control ...............................................51

   2. Alternatively, Samsung's indemnification and warranty terms materially altered the terms in Finelite's offers under § 2207(2)(b) and therefore did not become part of the § 2207(1) contracts for this reason as well ..................................52

ii

D.    The parties' exchange of written forms in 2021 created a contract pursuant to Cal. Comm. Code § 2207(1) .............................................54

E.    Alternatively, the parties' conduct formed contracts pursuant to Cal. Comm. Code § 2207(3) ...............................................................55

CONCLUSION .......................................................................................................60

ME1 53115473v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*C9 Ventures v. SVC-W., L.P.*,
    202 Cal. App. 4th 1483 (2012) .................................................................53

*Channell Com. Corp. v. Wilmington Mach. Inc.*,
    No. EDCV142240DMGDTBX, 2016 WL 7638180 (C.D. Cal. June
    17, 2016) ...................................................................................................47

*In re Claremont Acquisition Corp., Inc.*,
    113 F.3d 1029 (9th Cir. 1997) ..................................................................32

*Coast Ctys. Real Est. & Inv. Co. v. Monterey Cnty. Water Works*,
    96 Cal. App. 269 (Cal. Ct. App. 1929) ....................................................35

*Congdon v. Uber Techs., Inc.*,
    291 F. Supp. 3d 1012 (N.D. Cal. 2018) ...................................................40

*Diamond Fruit Growers, Inc. v. Krack Corp.*,
    794 F.2d 1440 (9th Cir. 1986) .......................................................41, 42, 43

*Donell v. Kowell*,
    533 F.3d 762 (9th Cir. 2008) ....................................................................25

*Dorton v. Collins & Aikman Corp.*,
    453 F.2d 1161 (6th Cir. 1972) .............................................................46, 48

*Flores v. Barr*,
    934 F.3d 910 (9th Cir. 2019) ...............................................................37, 38

*Fontana v. Upp*,
    128 Cal. App. 2d 205 (Cal. Ct. App. 1954) .............................................35

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
    No. 1:11-CV-00030 AWI, 2011 WL 5838214 (E.D. Cal. Nov. 21,
    2011) .........................................................................................................57

*Frank M. Booth, Inc. v. Reynolds Metals Co.*,
    754 F. Supp. 1441 (E.D. Cal. 1991) ........................................................47

*Idaho Power Co. v. Westinghouse Electric Corp.*,
    596 F.2d 924 (9th Cir. 1979) ....................................................................*passim*

*Kandy Kiss of California Inc v. Tex-Ellent Inc*,
    No. CV 10-9215 GAF (CWX), 2012 WL 13006211 (C.D. Cal.
    June 26, 2012) .................................................................................................57

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ........................................................................25

*Lounge-A-Round v. GCM Mills, Inc.*,
    109 Cal. App. 3d 190 (Cal. Ct. App. 1980).......................................................51

*Miller v. Safeco Title Ins. Co.*,
    758 F.2d 364 (9th Cir. 1984) ..........................................................................26

*Niagara Bottling, LLC v. Rite-Hite Co., LLC*,
    No. EDCV182032PSGSHKX, 2019 WL 1768875 (C.D. Cal. Feb.
    11, 2019) ........................................................................................................48

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*,
    69 Cal. 2d 33 (1968) ......................................................................................35

*Pac. Sunwear of California, Inc. v. Olaes Enterprises, Inc.*,
    167 Cal. App. 4th 466 (2008) ....................................................................58, 59

*Phoenix Sols., Inc. v. Sony Elecs., Inc.*,
    637 F. Supp. 2d 683 (N.D. Cal. 2009)........................................................57, 58

*PlasPro GMBH v. Gens*,
    No. C 09-04302 PSG, 2011 WL 1000755 (N.D. Cal. Mar. 21,
    2011) ..............................................................................................................45

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*,
    55 Cal. 4th 1169 (2013) .................................................................................35

*Rost v. Bryson*,
    118 Cal. App. 2d 489 (1953) ..........................................................................34

*Royal Ins. Co. of Liverpool, Eng., v. Caledonian Ins. Co. of
    Edinburgh, Scotland*,
    20 Cal. App. 504 (Cal. Ct. App. 1912)............................................................35

v

*Sanchez v. State of California*,
179 Cal. App. 4th 467 (Cal. Ct. App. 2009)......................................................33

*Steiner v. Mobil Oil Corp.*,
20 Cal. 3d 90 (1977) .....................................................................................45, 50

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
939 F.2d 91 (3d Cir. 1991) ..................................................................................53

*Textile Unlimited, Inc. v. A. BMH & Co.*,
240 F.3d 781 (9th Cir. 2001) ...............................................................42, 43, 47

*Thomas v. Regents of Univ. of California*,
97 Cal. App. 5th 587 (2023), *reh'g denied* (Dec. 29, 2023), *review
denied* (Feb. 28, 2024) .........................................................................................33

*Trans–Aire International, Inc. v. Northern Adhesive Co.*
(7th Cir. 1989) 882 F.2d 1254 .............................................................................53

*Trans-Tec Asia v. M/V HARMONY CONTAINER*,
435 F. Supp. 2d 1015 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th
Cir. 2008) ..............................................................................................................52

*Transwestern Pipeline Co. v. Monsanto Co.*,
46 Cal. App. 4th 502 (1996) ................................................................................47

*United Pac. Ins. Co. v. McGuire Co.*,
229 Cal. App. 3d 1560 (Ct. App. 1991)..............................................................32

*Whiteman v. Leonard Realty Co.*,
189 Cal. App. 2d 373 (Cal. Ct. App. 1961).........................................................35

**Statutes**

28 U.S.C. § 1291 .....................................................................................................6

28 U.S.C. § 1367 .....................................................................................................6

Cal. Civ. Code § 1595 ...........................................................................................36

Cal. Civ. Code § 1636 .....................................................................................26, 36

Cal. Civ. Code § 1638 .....................................................................................26, 32

ME1 53115473v.1

Cal. Civ. Code § 1639 .................................................................26

Cal. Civ. Code § 1641 .................................................................26

Cal. Civ. Code § 1644 ............................................................26, 32

Cal. Civ. Code § 1647 .................................................................26

Cal. Civ. Code § 1648 .................................................................27

Cal. Civ. Code § 1649 .................................................................27

Cal. Civ. Code § 1653 .................................................................36

Cal. Civ. Code § 1654 ......................................................27, 28, 41

Cal. Civ. Code § 2778 ..............................................................8, 23

Cal. Comm. Code § 2104(1) .......................................................50

Cal. Comm. Code § 2207 ......................................................*passim*

Cal. Comm. Code § 2312 ......................................................*passim*

U.C.C. § 2–207 ...................................................................*passim*

## Other Authorities

72 A.L.R.3d 479 (Originally published in 1976)...........................52

Ninth Circuit Rule 26.1 ...............................................................1

Fed. R. Civ. P. 54(b) ..................................................................20

Fed. R. App. P. 26.1 .....................................................................1

*The Chicago Manual of Style*, The Univ. of Chicago Press, (17th ed.
    2017) ............................................................................28, 29, 31

*Elements of Style*, William Strunk, Jr. and E.B. White, (4th ed. 2000).............28, 29

*Garner's Modern English Usage: The Authority on Grammar, Usage,
    and Style*, Bryan A. Garner, (5th ed. 2022) ....................28, 29, 30, 31

*The Gregg Reference Manual: A Manual of Style, Grammar, Usage, and Formatting*, William A. Sabin, (11th ed. 2010) ....................................28, 29

*Infinitives*, The Writing Lab & The OWL at Purdue and Purdue Univ, available at https://owl.purdue.edu/owl/general_writing/mechanics/gerunds_participles_and_infinitives/infinitives.html (last visited June 3, 2024) .................31

*Parallel Structure*, The Writing Lab & The OWL at Purdue and Purdue Univ, available at https://owl.purdue.edu/owl/general_writing/mechanics/parallel_structure.html (last visited June 3, 2024)...............................................................30

ME1 53115473v.1

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument will materially assist the Court in understanding why the District Court reversibly erred by denying Finelite's Cross Motion for Summary Judgment, granting the Motion for Summary Judgment of Third-Party Defendant and Appellee Samsung Semiconductor, Inc. ("Samsung"), and dismissing each of Finelite's claims contained in its Third-Party Complaint. The parties' arguments rely heavily upon California's law of contract interpretation, including governing rules of English grammar construction. Further, this appeal will involve California's adoption of the Uniform Commercial Code ("UCC") and the case law applicable to contract formation arising from competing terms and conditions, *i.e.,* a "battle of the forms," as well as the UCC's so-called "gap-filler" provisions. There are a number of steps involved in a proper grammatical and UCC analysis of these complex issues, and oral argument will facilitate the Court's understanding of the various laws, rules and principles involved and how they relate to the facts of this case. Further, the UCC analysis differs with respect to at least one of the four purchases that are the subject of this dispute. As such, Finelite respectfully requests that this Court permit oral argument of this appeal.

ME1 53115473v.1

# INTRODUCTION

Finelite appeals from a final judgment dismissing its breach of contract, breach of warranty and declaratory judgment causes of action against Samsung. Finelite claims that Samsung breached the parties' contracts by failing to defend and indemnify Finelite against patent infringement claims brought by Plaintiffs Seoul Semiconductor Co., Ltd. and Seoul Viosys Co., Ltd. (the "Seoul Plaintiffs") in the underlying action. *See* ER-7, ER-188 and ECF No. 93.[1]

Finelite purchased light emitting diodes ("LEDs") from Samsung on four occasions in 2018-2021. Three of the four orders were initiated by Finelite through the submission of purchase orders containing a hyperlink to Finelite's Purchasing Terms and Conditions ("Finelite's Terms"). As to the fourth purchase order, the hyperlink was inactive, but Samsung was nonetheless aware of Finelite's Terms. Samsung responded to each purchase order with a sales order acknowledgement form containing Samsung's own Terms and Conditions of Sale ("Samsung's Terms"). Samsung's Terms differed from Finelite's Terms. The parties' exchange of written forms nonetheless created contracts under Cal. Comm. Code § 2207 on each of these four occasions.

---

[1] Unless otherwise stated, all "ECF No." citations are to the docket entries as they appear in Case No. 3:22-cv-02869-TLT (N.D. Cal.).

ME1 53115473v.1

Under the terms of each of these four contracts, Samsung owes Finelite a duty to defend and indemnify it against the Seoul Plaintiffs' infringement claims. By refusing its duty, Samsung breached the contracts.

Samsung claimed in the District Court below that the indemnity provision buried in "Terms and Conditions" attached to a Credit Agreement executed in 2012 governs the parties' transactions from 2018 through 2021, and that under the language of that indemnity provision, Samsung has no duty to indemnify. Samsung is wrong for several reasons.

The Credit Agreement was attached to a "Credit Application" along with a "Financial Authorization" to release Finelite's confidential financial information. Each of these three documents was signed by Finelite in 2012 to allow Samsung to contact Finelite's financial institutions and obtain information necessary for Finelite to purchase LEDs on credit. The object of the Credit Agreement was to determine whether Samsung would extend credit to Finelite. Attached to the three credit-related documents was a form titled "Samsung Semiconductor, Inc. Contract of Sale." This form, which had no signature line and was never signed by Finelite, included Samsung's terms and the indemnity provision relied upon by Samsung in the District Court. That indemnity provision was completely irrelevant to the Credit Agreement and to the 2018-2021 transactions at issue in this litigation.

ME1 53115473v.1

The plain language of the Credit Agreement does not actually include the indemnity provision cited by Samsung. The Credit Agreement makes clear that the only terms Samsung and Finelite agreed upon from the "Contract of Sale" were that Finelite would "'pay service charges assessed and . . . reasonable attorneys [sic] fees in the event of default.'" For Samsung's argument to prevail, the entirety of the Contract of Sale had to be incorporated into the Credit Agreement. But the rules of grammar and contract interpretation establish that the Credit Agreement's incorporation of the Contract of Sale is quite limited and does not include Samsung's preferred indemnity provision. Accordingly, the four purchases of LEDs at issue are not governed by the Credit Agreement but, rather, by the parties' exchange of written forms and the California Commercial Code.

The District Court erred in granting Samsung's Motion for Summary Judgment and in denying Finelite's Cross Motion for Summary Judgment on these issues. Because there are no genuine issues of material fact, this Court should reverse the District Court and enter judgment in favor of Finelite on Count One (Breach of Contract Against Samsung) of its Third-Party Complaint. ER-188. Alternatively, in the event this Court finds that the parties' conduct formed a contract pursuant to Cal. Comm. Code § 2207(3), it should enter judgment in favor of Finelite on Count Two (Breach of Warranty). *Id.* Finally, this Court should enter judgment declaring that

Samsung owes Finelite a duty of defense and indemnity on Count Three (Declaratory Judgment against Samsung). ER-195.

ME1 53115473v.1

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment entered on January 12, 2024, dismissing Finelite's claims in its Third-Party Complaint against Samsung following cross-motions for summary judgment. ER-7, ER-13, and ER-188. Finelite timely filed a notice of appeal on February 8, 2024. ER-267. The District Court has supplemental jurisdiction over this matter under 28 U.S.C. § 1367. ER-175 and ER-188. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

ME1 53115473v.1

# STATUTORY AUTHORITIES

Relevant provisions of the California Commercial Code:

§ 2207 states:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code.

§ 2312(3) states:

(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

ME1 53115473v.1

§ 2778 states:

> In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears:
>
> * * *
>
> 3. An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion;
>
> 4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so;
>
> 5. If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former;
>
> * * *

ME1 53115473v.1

# ISSUES PRESENTED

1. Whether the District Court erred by interpreting the 2012 Credit Agreement to incorporate the entirety of the "Samsung Semiconductor, Inc. Contract of Sale," as opposed to only the "'terms of sale . . . to pay service charges assessed and to pay reasonable attorneys [sic][2] fees in the event of default'"?

2. Alternatively, whether the District Court erred by failing to find, at a minimum, that the 2012 Credit Agreement was ambiguous as to whether the entirety of the "Samsung Semiconductor, Inc. Contract of Sale," as opposed to just the "'terms of sale . . . . to pay service charges assessed and to pay reasonable attorneys fees in the event of default,'" were intended by the parties to be included as part of the Credit Agreement and, if ambiguous, whether that ambiguity should be construed against Samsung as the drafter of the Credit Agreement?

3. If the 2012 Credit Agreement incorporated by reference only the "'terms of sale . . . to pay service charges assessed and to pay reasonable attorneys fees in the event of default,'" whether the parties' exchange of written forms created enforceable contracts pursuant to Cal. Comm. Code § 2207(1)?

---

[2] The sentence at the heart of this appeal does not make "attorneys fees" possessive, as it should. The proper grammatical presentation is either "attorney's fees" or "attorneys' fees," depending upon whether it is intended to be singular or plural possessive. Finelite will not hereafter include "[sic]" every time it quotes this sentence.

4. If the parties' exchanges of written forms created enforceable contracts pursuant to Cal. Comm. Code § 2207(1), whether Samsung breached its duty to defend and indemnify Finelite against the Seoul Plaintiffs' patent infringement claims pursuant to the terms of such contracts?

5. If the parties' exchange of written forms did not create enforceable contracts pursuant to Cal. Comm. Code § 2207(1), whether the parties' conduct nevertheless created enforceable contracts pursuant to Cal. Comm. Code § 2207(3)?

6. If the parties' conduct formed contracts with respect to any or all of the 2018-2021 transactions pursuant to Cal. Comm. Code § 2207(3), whether such contracts contained and Samsung breached the warranty of title and against infringement pursuant to Cal. Comm. Code § 2312?

ME1 53115473v.1

## STATEMENT OF THE CASE AND FACTS

I.    **EXECUTION OF THE 2012 CREDIT AGREEMENT**

Finelite is a California corporation that manufactures high-quality lighting products. ER-189 at ¶ 2. Certain of Finelite's products use light emitting diodes ("LEDs"). *Id*. Samsung manufactures and sells LEDs. ER-189 at ¶ 7.

In or around April 2012, Samsung provided Finelite with a compilation of four Samsung form documents numbered "Page 1 of 5" through "Page 5 of 5." ER-139–43.

The first document in the compilation was titled "Credit Application." ER-139. Its purpose was to assess Finelite's financial standing and determine whether Samsung would allow Finelite to purchase LEDs and other products in bulk on credit. The Credit Application requested certain financial information including, but not limited to: (1) the identity of Finelite's Treasurer and Controller; (2) the "credit line desired"; and (3) a list of "Bank References." *Id*.

The next three documents were (i) a "Credit Agreement" (referenced herein as the "2012 Credit Agreement" or "Credit Agreement"); (ii) a "Financial Authorization" form; and (iii) "Samsung Semiconductor, Inc.'s Contract of Sale." ER-140–43.

The Credit Agreement was a single-page document asking Finelite to agree to certain terms and conditions related to the purchase of goods from Samsung on

credit. ER-140. By executing the Credit Agreement, Finelite agreed to, *inter alia,* authorize Samsung to: (1) "contact the trade credit references" listed in Finelite's Credit Application, "and to exchange information with them concerning [Finelite's] business, including but not limited to credit limits, payment history, terms of payment and discounts"; (2) "respond to credit reference inquiries from any person or company who requests information concerning [Finelite's] business"; (3) pay all invoices within "30 days from the date of billing"; (4) "pay a monthly service charge equal to the maximum permitted by law" on "all accounts not paid within 30 days from the due date"; and (5) in its sole discretion "cease further extensions of credit." *Id*. Each of the terms and conditions outlined in the Credit Agreement related directly to the Credit Application and Samsung's decision whether or not to allow Finelite to purchase goods on credit.[3]

The final sentence of the Credit Agreement stated:

"Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached), to pay service charges assessed and to pay reasonable attorneys fees in the event of default."

---

[3] The fourth and fifth paragraphs of the Credit Agreement related to the object of the Credit Agreement as well. They made clear that Finelite would not be relieved of its credit obligations with respect to "material returned without [Samsung's] authorization," that Finelite would be charged upon delivery of product to the shipping point, and that, absent prompt notice from Finelite, delivery shortages, losses and damaged goods would not constitute grounds for relief from Finelite's credit obligations. *Id*.

12

*Id*. (quotations in original).[4] The Credit Agreement included a signature line immediately below the last sentence where it was signed by Finelite and dated April 17, 2012. ER-147.

The Financial Authorization form followed the Credit Agreement and was also a single-page document requesting Finelite to authorize its bank to release certain "information to [Samsung] for the purpose of extending credit," such as "Checking Account," "Savings Account," and "Loan" information. ER-141. The Financial Authorization form included a signature line and was signed by Finelite on the same date as the Credit Agreement. ER-146.

Samsung Semiconductor, Inc.'s Contract of Sale (the "Contract of Sale") followed Samsung's Financial Authorization form. ER-142. It was Samsung's boilerplate terms and conditions, section 7 of which set forth the service charges and attorneys' fees provisions specifically referred to in the last sentence of the Credit Agreement. *Id*. As set forth therein, payments made after thirty (30) days from the due date "are subject to a late charge at the lesser of 1.5% of [the] amount outstanding per month or the maximum rate permitted by law."[5] *Id*. Section 7 further

---

[4]  This last sentence of the Credit Agreement inexplicably appeared in quotes.

[5]  The third paragraph of the Credit Agreement described such interest charges on late payments as "service charge[s] … assessed." *Id*. ("a monthly *service charge* equal to the maximum permitted by law can be *assessed* to all accounts not paid within 30 days") (emphasis added).

13

stated that "[c]ustomer shall pay all reasonable collection costs (including attorneys' fees incurred in obtaining and enforcing any judgment)." *Id*. Thus, the phrase "'to pay reasonable attorneys fees in the event of default,'" specifically referred to in the last sentence of the Credit Agreement, embraced the late charges and attorneys' fee provision of the Contract of Sale. *Id*. But nothing more.

In or around April 2012, Finelite completed and executed only the Credit Application, Credit Agreement and Financial Authorization and returned them to Samsung. ER-145–47. The Contract of Sale was never signed by Finelite. *Id*. None of the foregoing compilation of documents was ever again referenced by either party during their business relationship until this litigation in January 2023—a period of over 10 years. ER-121 at ¶ 10.

## II. THE 2018-2021 LED PURCHASES

From 2018 through 2021, over the course of four separate transactions, Finelite purchased approximately 27 million LEDs from Samsung (the "2018-2021 Purchases"). ER-152, ER-154, ER-157, and ER-159. Each Purchase was initiated by Finelite's purchase order, specifically Nos. 094491-00 (dated August 27, 2018), 103778-00 (dated June 21, 2019), 113624-00 (dated May 27, 2020), and 122738-00 (dated July 8, 2021). ER-152–59; ER-120 at ¶ 6. Samsung responded to each purchase order with its own sales order acknowledgment form, specifically Nos. 1387721459, 1435234297, 1490721097, and 1565149063. ER-161–74; ER-121 at ¶

9. Samsung never mentioned the Contract of Sale and it never claimed that the parties had a preexisting purchase agreement in place, executed more than six years earlier. ER-121 at ¶ 10.

Each time Finelite submitted a purchase order it did so via a cover email. ER-120 at ¶¶ 6 and 7; ER-122–29. At the bottom of each email was a hyperlink that said "Click to view Purchasing Terms and Conditions." ER-122–29. Finelite's Terms were available to Samsung at the hyperlinked website at the bottom of each of the 2018-2020 emails.[6] ER-108 at ¶ 6.

Finelite's Terms requested that Samsung "acknowledge receipt of th[e] purchase order to [Finelite] within (5) five days after receipt or prior to shipment, whichever is first." ER-131. Further, Finelite's Terms made clear that "[a]ny terms and conditions proposed in Seller's acknowledgment, acceptance, invoice or other form that add to, vary from, or conflict with the terms herein are hereby rejected."

---

[6] Samsung claims through an attorney affidavit that at an irrelevant point in time (2023), the hyperlink accompanying Finelite's 2021 purchase order (as embedded in the 2021 cover email) did not direct to Finelite's Terms. ER-111 at ¶ 3. Finelite concedes that the hyperlink to Finelite's Terms was inadvertently inactive between October 2020 and July 2021. However, there is no dispute that Finelite sent and Samsung received Finelite's Terms with respect to the first three purchase orders, Nos. 094491-00 (dated August 27, 2018), 103778-00 (dated June 21, 2019), and 113624-00 (dated May 27, 2020). ER-108 at ¶ 6. Nor is there any dispute that Samsung received Finelite's July 2021 Purchase Order and cover email containing the language "Click here to view Purchasing Terms and Conditions," and there is no evidence that Samsung: (1) attempted to and was unable to access Finelite's Terms; or (2) notified Finelite of any inability to access Finelite's Terms.

*Id.* Two further pertinent provisions were included in Finelite's Terms: (i) an indemnity provision stating "Seller shall indemnify and hold harmless [Finelite] from and against any loss, damage or liability arising from or relating to the actual or alleged infringement of any patent or other intellectual property right"; and (ii) a warranty provision stating "Seller warrants to [Finelite] that all goods provided hereunder shall be and shall continue to be: (i) merchantable and fit for the ordinary purposes for which such goods are used; (ii) new; (iii) free from defects in material and workmanship; and (iv) free from liens or encumbrances on title." ER-132 at §§ 14 and 15.

Each of Samsung's responsive sales order acknowledgment forms set forth Samsung's Terms. ER-161–74; ER-121 at ¶ 9. Although the form containing Samsung's Terms changed somewhat between 2018 and 2019, in relevant part they remained the same for each of the 2018-2021 Purchases. *Compare* ER-162 and ER-165–66. Samsung's Terms specifically provided that "[t]hese terms and conditions exclusively govern and control, and entirely supersede, and are in lieu of the terms and conditions in, the Customer's purchase order or any other document offered or proposed by Customer." *See, e.g.*, ER-165 at § 1. They further stated that "[t]hese terms supersede all other terms submitted or proposed by Customer, as well as all prior terms in any quotation, purchase order, or otherwise." *Id.*

Samsung's Terms also contained the following provision:

> Samsung will at its expense defend or settle (at its option) any third party claim against Customer arising from the infringement of any patent, copyright, mask work right, trade secret, or other intellectual property right by Product in the jurisdiction where title passes from Samsung to Customer, and will pay any final judgment entered against Customer in such claim.

ER-166 at § 10. Thus, the indemnification provision included in Samsung's Terms differed from and/or added to the indemnification provision contained in Finelite's Terms. *See* ER-132. Similarly, Samsung's Terms included a warranty provision that differed from and/or added to the warranty provision in Finelite's Terms:

> Limited Warranty. Samsung warrants to Customer only, and not to Customer's affiliates or customers or any other third parties, that Products shall remain free from defects in Samsung's manufacturing workmanship and materials for a period of twelve (12) months from the date of shipment by Samsung. . . . SAMSUNG DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, COURSE OF DEALING, NON-INFRINGEMENT, OR USAGE OF TRADE."

ER-165 at § 3.

## III. THE SEOUL PLAINTIFFS' PATENT INFRINGEMENT CLAIMS AND FINELITE'S THIRD-PARTY CLAIMS FOR INDEMNIFICATION AGAINST SAMSUNG

In May 2022 the Seoul Plaintiffs filed a lawsuit against Finelite alleging that the Samsung LEDs in Finelite's light fixtures infringed the Seoul Plaintiffs' fourteen patents-in-suit. ECF Nos. 1 and 93. The accused LEDs were purchased by Finelite from Samsung through the 2018-2021 Purchases. ER-152–59. Accordingly, Finelite

sought Samsung's defense and indemnification under the contract created by the parties' exchange of written forms. Samsung refused.

In November 2022, Finelite filed its Third-Party Complaint. Finelite's claims against Samsung were for: (1) breach of contract; (2) breach of the California Uniform Commercial Code; and (3) a declaratory judgment. *See* ER-188–97. Samsung's response, notwithstanding its ten years of silence as to the Credit Agreement and its differing forms with differing terms at the time of each Finelite purchase, was that the indemnification provision of the Contract of Sale referred to as "attached" in the Credit Agreement negated any duties claimed by Finelite.

## IV.   THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

On May 19, 2023, Samsung filed its Motion for Summary Judgment arguing that the Contract of Sale attached to the Credit Agreement is dispositive of Finelite's claims because (i) section 10 of that document limited Samsung's obligations to defense of Finelite against "any third party claim . . . arising from the infringement of any patent . . . *in the jurisdiction where title passes from Samsung to Customer*"; (ii) section 8 of that document stated that "[t]itle and risk of loss pass to Customer at the C.I.P. point"; and (iii) Samsung's sales order acknowledgement forms issued in connection with the 2018-2021 Purchases stated that the CIP point was Hong Kong. ECF No. 105; ER-143 at § 10; ER-161; ER-164; ER-168; ER-172 (all designating Hong Kong as the CIP) (emphasis added). Samsung argued that because

title to the LEDs passed from Samsung to Finelite in Hong Kong, it had no obligation to indemnify Finelite against patent infringement claims brought by the Seoul Plaintiffs in California. ECF No. 105.

On June 23, 2023, Finelite filed its Cross Motion for Summary Judgment because the parties' repeated exchange of purchase orders and sales order acknowledgement forms created contracts under Cal. Comm. Code § 2207 and, pursuant to the indemnification provisions in those contracts, Samsung has an obligation to defend and indemnify Finelite against the Seoul Plaintiffs' infringement claims. ECF No. 112. Finelite argued that the indemnity provision in the Contract of Sale attached to the 2012 Credit Agreement is inapplicable because the Credit Agreement incorporated only the specifically identified "'terms of sale . . . to pay service charges assessed'" and "'to pay reasonable attorneys fees in the event of default'" found in section 7 of the Contract of Sale. ECF No. 111. Finelite's interpretation of the last sentence of the Credit Agreement is correct because it is: (1) dictated by a proper grammatical construction of the sentence and all the words in that sentence; (2) supported by Samsung's phrase choices in other parts of the Credit Agreement and Contract of Sale; and (3) ensures that no part of the Credit Agreement is rendered superfluous. Further, Finelite's interpretation is consistent with the parties' course of conduct.

## V. THE DISTRICT COURT'S ORDER REGARDING THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

On September 26, 2023, the District Court issued its order granting Samsung's Motion for Summary Judgment and denying Finelite's Cross Motion. ER-13–34. The District Court held that the Credit Agreement incorporated by reference the entirety of the Contract of Sale, including the indemnification provision therein, which, in turn, governed the 2018-2021 Purchases. *Id*. Because the District Court decided that the terms of the Contract of Sale governed the parties' ongoing business relationship and "applied to future sales between the parties," it did not perform a Cal. Comm. Code § 2207 analysis, reasoning that § 2207 "does not apply where there is already an existing contract between the parties." *See, e.g.*, ER-31. As a result, the Court failed to consider and address whether the parties' exchange of written forms formed contracts under Cal. Comm. Code § 2207 and failed to determine what Samsung's indemnification obligations would be thereunder.

The District Court's erroneous conclusion resulted from the faulty premise that Samsung's form Credit Agreement "provides the operative terms for this third-party dispute" because the final sentence of the Credit Agreement incorporates by reference the entirety of Samsung's Contract of Sale. ER-26. Finelite took exception to this premise and moved for a final judgment pursuant to Fed. R. Civ. P. 54(b).

ECF No. 148. The District Court granted Finelite's motion, and this appeal followed. ER-7 and ER-267.

## SUMMARY OF THE ARGUMENT

The last sentence of the 2012 Credit Agreement states:

> "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached), to pay service charges assessed and to pay reasonable attorneys fees in the event of default."

ER-147. Well-established rules of contract interpretation and grammatical construction dictate that the infinitive phrases "'to pay service charges assessed and to pay reasonable attorneys fees in the event of default'" modify and qualify the preceding main clause, "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached)." The purpose of the infinitive phrases is to specify which of the attached terms of sale will be enforced in the event Finelite fails to make payment or otherwise violates the terms of the 2012 Credit Agreement. Indeed, if the intent was for the entirety of the attached Contract of Sale to be incorporated, the sentence would have ended after the parenthetical "(attached)."

Moreover, Samsung's intentional use of the phrase "including but not limited to" on two prior occasions in the half-page Credit Agreement, and its omission of that phrase in the final sentence, reinforces Finelite's construction. Samsung, as drafter, used language incorporating only the explicitly referenced terms set forth in

section 7 and omitted language that would have made clear an intent to incorporate the entire Contract of Sale.

Further, Finelite's proposed interpretation of the Credit Agreement is aligned with the agreement's plain objective: to determine whether Samsung would sell on credit. Each of the terms listed in the half-page agreement are directly related to credit references, payment procedures and late fees—all common terms in a credit agreement. But if the entirety of the Contract of Sale were incorporated, the Credit Agreement would then include terms wholly unrelated to credit as well as terms that contradict or are duplicative of terms included elsewhere in the half-page Agreement.[7]

Finally, contrary to the District Court's decision, Finelite's interpretation of the final sentence of the Credit Agreement does not render as "surplusage" the attached Contract of Sale. ER-23. The issue here is not the language of the Contract of Sale, but whether all or only part of it was intended to be incorporated into the Credit Agreement by the language used in this latter document. Indeed, it is the District Court's interpretation of the final sentence of the Credit Agreement that

---

[7] For example, the Credit Agreement states that the goods "are sold *C.I.P. Samsung Semiconductor, Inc.'s designated shipping point* . . . ." ER-140 (emphasis added). The attached Contract of Sale, on the other hand, states that the goods are "sold, and prices quoted, C.I.P. *Samsung's warehouse in California.* . . . ." ER-143 at § 8 (emphasis added).

ME1 53115473v.1

renders the latter two phrases of that sentence superfluous, thereby violating the canon of construction that the District Court sought to honor.

This Court should find that the District Court erred. The 2012 Credit Agreement **does not** incorporate the entirety of the Contract of Sale and therefore **does not** provide the operative terms for this third-party dispute. Instead, the parties' subsequent exchange of forms prior to each of the 2018-2021 Purchases formed contracts under Cal. Comm. Code § 2207, and Samsung has an obligation thereunder to defend and indemnify Finelite.[8]

With respect to the 2018-2020 Purchases, the parties' exchange of written forms unquestionably formed contracts pursuant to Cal. Comm. Code § 2207(1). Samsung's sales order acknowledgments constituted "definite and seasonable expressions of acceptance" of Finelite's purchase orders, and these acceptances were not expressly conditioned on Finelite's assent to Samsung's Terms. The additional or differing terms attached to Samsung's sales order acknowledgment forms did not become part of the parties' § 2207(1) contracts either because: (1) Finelite's purchase orders clearly limited Samsung's acceptance to the terms of Finelite's

---

[8]   While Finelite's Terms require that Samsung "indemnify and hold harmless" Finelite against any "alleged infringement of any patent," ER-132 at § 15, Cal. Civ. Code § 2778 clearly imposes an obligation on Samsung to, "on request of the person indemnified [Finelite], to defend actions or proceedings brought against [Finelite] in respect to the matters embraced by the indemnity." Finelite has repeatedly requested that Samsung step in and defend Finelite against the Seoul Plaintiffs' claims, and Samsung has repeatedly refused Finelite's request. ER-194 at ¶ 22.

ME1 53115473v.1

offer; or (2) Samsung's additional or differing terms would have materially altered the parties' § 2207(1) contracts.

The 2021 Purchase presents a different factual situation, but the same result.

The fact that the hyperlink to Finelite's Terms was inactive in 2021 is immaterial. First, Samsung was fully aware of Finelite's Terms as a result of the three prior Purchases. Second, there is no evidence that Samsung attempted to access Finelite's Terms upon receipt of Finelite's 2021 purchase order and was unable to do so. Third, there is no evidence that, if Samsung had tried and was unable, it ever brought that fact to Finelite's attention or made inquiry concerning Finelite's 2021 Terms.[9] Nevertheless the § 2207 end result is the same.

In 2021, Finelite and Samsung still exchanged written forms—a purchase order and a sales order acknowledgment. Samsung's sales order acknowledgment was a "definite and seasonable expression of acceptance" that did not expressly condition acceptance on Finelite's assent to Samsung's Terms. The terms attached to Samsung's sales order acknowledgment were, therefore, additional or differing terms subject to a § 2207(2) analysis, and were excluded from the parties' contract under § 2207(2)(b). Thus, Samsung's disclaimer of warranties did not become a part

---

[9] On the contrary, Samsung merely accepted Finelite's purchase order stating "[t]hank you for the new order. It has been processed in our system." ER-128. Under Finelite's Terms, this acknowledgment "ensure[d] that [Samsung was] in receipt of [Finelite's] order, and terms and conditions." ER-131 at § 1.

of the parties' § 2207(1) contract and Samsung owed Finelite a warranty of title and against infringement pursuant to Cal. Comm. Code § 2312.

In the alternative, if the parties' exchange of written forms in 2018-2021 did not create contracts pursuant to Cal. Comm. Code § 2207(1), the parties' subsequent conduct surely did under Cal. Comm. Code § 2207(3). The terms of a § 2207(3) contract consist of the terms on which the parties' written forms agree, and is supplemented by the Uniform Commercial Code's gap-filler provisions. Here, the parties' § 2207(3) contracts would incorporate the warranty of title and against infringement provided by Cal. Comm. Code § 2312. To the extent any such warranty was included in the contracts formed by the parties in 2018-2021, Samsung breached that warranty by its refusal to defend and indemnify Finelite.

## STANDARD OF REVIEW

The Ninth Circuit reviews a district court's grant of summary judgment *de novo*. *See, e.g. Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) ("We review *de novo* a grant of summary judgment and must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law."). Further, "[t]he interpretation of a contract is a mixed question of law and fact," and when a district court's decision "is based on an analysis of the contractual language and an

ME1 53115473v.1

application of the principles of contract interpretation, that decision is a matter of law." *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1984); *see also* James Wm. Moore et. al., Moore's Federal Practice § 56.25 (3d ed. 2023) ("The interpretation of an unambiguous contract and the initial determination of whether the contract is or is not ambiguous, are considered pure questions of law.").

## ARGUMENT

## I. APPLICABLE PRINCIPLES OF CONTRACT INTERPRETATION

Under California law, the intention of the parties to a contract is "ascertained from the writing alone," Cal. Civ. Code § 1639, and "[t]he whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Generally, the plain language of the contract governs its interpretation if the language is "clear and explicit." Cal. Civ. Code § 1638. "The words of a contract are to be understood in their ordinary and popular sense." Cal. Civ. Code § 1644.

Every contract should be interpreted so as "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates," Cal. Civ. Code § 1647, and no matter how "broad" the terms of a contract may be, "it extends only to those things

concerning which it appears that the parties intended to contract." Cal. Civ. Code § 1648.

To the extent the terms of a contract are "ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649. Further, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

## II. THE DISTRICT COURT REVERSIBLY ERRED BY FINDING THAT THE 2012 CREDIT AGREEMENT INCORPORATED BY REFERENCE THE ENTIRETY OF THE CONTRACT OF SALE

### A. The last sentence of the Credit Agreement does not incorporate the entirety of the Contract of Sale

Under well-settled rules of grammar and contract interpretation, the final sentence of the Credit Agreement incorporates only the terms of the Contract of Sale addressing service charges and attorneys' fees in the event of default. This construction is consistent with the object of the Credit Agreement, other provisions of the Credit Agreement, and the course of conduct between the parties. And it ensures that no portion of the Credit Agreement is rendered superfluous.

### B. The proper grammatical construction of the final sentence of the Credit Agreement incorporates only the "'terms of sale … to pay service charges assessed and to pay reasonable attorneys [sic] fees in the event of default'"

The final sentence of the Credit Agreement, with its layered clauses, is categorized by grammarians as a "loose sentence," *i.e.,* one in which the first half of

the sentence—"'Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached)'"—is the "main clause," and the second half serves to modify, explain or qualify the main clause. In other words, a "loose sentence" is a "sentence that begins with a main idea and then attaches modifiers, qualifiers and additional details." William Strunk, Jr. and E.B. White, The Elements of Style at 92 (4th ed. 2000), Addendum-13.[10] In this context, the "main idea" or "main clause" is "[a]n independent clause, which can stand alone as a grammatically complete sentence." *Id.*, *see also* William A. Sabin, The Gregg Reference Manual: A Manual of Style, Grammar, Usage, and Formatting at 667 (11th ed. 2010), Addendum-27 ("an *independent clause* (also known as a *main clause* or *principle clause*) expresses a complete thought and can stand alone as a sentence"); Chicago Manual of Style, The Univ. of Chicago Press, § 5.225 (17th ed. 2017), Addendum-05 ("An *independent clause* can stand alone as a sentence") (italics in original); Bryan A. Garner, Garner's Modern English Usage: The Authority on Grammar, Usage, and Style at 1200 (5th Ed. 2022), Addendum-18 ("independent clause": "A clause that can stand alone as a complete sentence … also termed main clause; principle clause"). In the instant matter, the clause—"Applicant understands and agrees to

---

[10] Secondary sources are attached hereto in alphabetical order as the "Addendum of Sources" for this Court's ease of reference, and "Addendum-__" are citations thereto.

ME1 53115473v.1

Samsung Semiconductor, Inc.'s terms of sale (attached)"—could be a standalone sentence. It is grammatically complete. But Samsung added modifiers.

A "modifier" is "a word or phrase that makes specific the meaning of another word or phrase," or "[a] group of words (as a phrase or clause) used with another word or group of words to limit its meaning." *Modifier*, https://www.merriam-webster.com/dictionary/modifier (last visited May 29, 2024); *accord* Sabin at 669, Addendum-28. Here, the modifiers are "'to pay service charges assessed and to pay reasonable attorneys fees in the event of default.'" These phrases are not independent because they lack subjects. *See* Strunk and White at 93, Addendum-14 (defining "phrase" as "[a] group of related words that functions as a unit but lacks a subject, verb or both"); *see also* Sabin at 671, Addendum-29 ("Phrase. A group of two or more words without a subject and a predicate"); Garner at 1231, Addendum-21 ("phrase, n. A combination of words that … do not make a complete sentence"). The sole purpose of each phrase is to modify and explain the preceding main clause.

The modifiers at issue here are "infinitive phrases." An infinitive phrase "consists of an infinitive verb plus any complements or modifiers."[11] Sabin at 672, Addendum-30; *see also* Garner at 1231, Addendum-21. Here, each of the modifiers begins with the infinitive verb "'to pay,'" followed by complements, *i.e.*, "'service

---

[11] "An infinitive verb . . . is a verb . . . preceded by *to* {to dance} {to dive}. It is the basic form of the verb." Chicago Manual of Style, § 5.106, Addendum-04 (italics in original).

charges assessed'" and "'reasonable attorneys fees in the event of default.'" These phrases have no independent meaning apart from the main clause. Indeed, if separated from the main clause they are grammatically incomplete. *See* Garner at 1231, Addendum-21 (a phrase "do[es] not make a complete sentence").

The District Court may have been led astray by Samsung's erroneous argument that the last sentence of the Credit Agreement consists of "three parallel prepositional phrases" that "make the structure parallel," and its further argument that Finelite agreed to three distinct parallel terms: "(1) 'to Samsung Semiconductor, Inc.'s terms of sale (attached),' (2) 'to pay service charges assessed,' and (3) 'to pay reasonable attorneys fees in the event of default.'" ECF No. 122 at 7-8. Samsung's argument was wrong.

First, the modifier phrases beginning with "to pay" are infinitive phrases, **not** prepositional phrases. Samsung relies on a Purdue University website available at https://owl.purdue.edu/owl/general_writing/ mechanics/parallel_structure.html (last visited June 3, 2024), but its argument committed the very error warned against by that website. Purdue University cautions against mistaking infinitive phrases for prepositional phrases and making the same mistake urged by Samsung on the District Court: "[b]e sure not to confuse an infinitive—a verbal consisting of to plus a verb—with a prepositional phrase beginning with to." *Infinitives*, The Writing Lab & The OWL at Purdue and Purdue Univ, available at

30

https://owl.purdue.edu/owl/general_writing/mechanics/gerunds_participles_and_in finitives/infinitives.html (last visited June 3, 2024), Addendum-33; *see also* ER-230–34. The two modifier phrases in the last sentence of the Credit Agreement indisputably consist of "to plus a verb," *i.e.* , "to pay."

Further, in order for phrases to have parallel structure (also called "parallelism"), they must have "identical grammatical structure." *See* Garner at 1228, Addendum-19 (defining "parallelism"); Chicago Manual of Style, § 5.242, Addendum-08 ("Every element of a parallel series must be a functional match (word, phrase, clause, sentence) and serve the same grammatical function in the sentence (*e.g.,* noun, verb, adjective, adverb)."). The elements at issue in the last sentence of the Credit Agreement are (1) "'Samsung Semiconductor, Inc.'s terms of sale (attached)'"; (2) "'to pay service charges assessed'"; and (3) "'to pay reasonable attorneys fees in the event of default.'" But these three elements do **<u>not</u>** serve the same grammatical function. The first element—"'Samsung Semiconductor, Inc.'s terms of sale (attached)'"—is a noun. The second and third elements—beginning with "'to pay'"—are verbs. Thus, the sentence plainly does not have identical grammatical structure as the three elements of the sentence do not "serve the same grammatical function."[12] Samsung's argument was wrong.

---

[12] An example of a sentence with parallel structure would be: "Finelite understands and agrees to the terms of the Credit Application, the terms of the Credit Agreement,

Finelite's interpretation of the final sentence of the Credit Agreement conforms with both California's rules of contract interpretation and common grammar. *See* Cal. Civ. Code § 1638 (the plain language of the contract governs its interpretation if the language is "clear and explicit"); *see also* Cal. Civ. Code § 1644 (contracts are to be interpreted "in their ordinary and popular sense"). Contracts are presumed to be written in accordance with sound principles of grammatical construction. *See United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560, 1566 (Ct. App. 1991) (applying interpretation of contract language that "comports best with the grammatical structure"); *see also In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029, 1034 (9th Cir. 1997) (rejecting construction of a statute that was "both grammatically incorrect and nonsensical" and adopting the construction that is "grammatically correct"). The only grammatically correct interpretation of the last sentence of the Credit Agreement is that it incorporates **<u>only</u>** the specific provisions of the Contract of Sale pertaining to the payment of service charges assessed and reasonable attorneys' fees in the event of a default.

---

and Samsung Semiconductor, Inc.'s terms of sale (attached)." In this example, the three elements of the sentence are nouns, creating a parallel structure.

32

**C.** **The grammatical construction of the final sentence is reinforced by other terms of the Credit Agreement and Contract of Sale**

> **1.** **The Credit Agreement consistently uses "including but not limited to" where intended to include other unstated terms, but notably does not use this phrase in the final sentence**

In only a half-page, the Credit Agreement drafted by Samsung employs the oft-used phrase "including but not limited to" twice.

> Applicant hereby authorizes Samsung Semiconductor, Inc. to contact the trade Credit references and to exchange information with them concerning Applicant's business, ***including but not limited to*** credit limits, payment history, terms of payment and discounts.

> Applicant further agrees that Samsung Semiconductor, Inc. may respond to credit reference inquiries from any person or company who requests information concerning Applicant's business, ***including but not limited to*** credit limits, payment history, terms of payment and discounts.

ER-140 (emphasis added). The phrase "including but not limited to" makes clear that what expressly follows is not intended to be limiting; other unstated things are included without express mention. *See, e.g., Sanchez v. State of California*, 179 Cal. App. 4th 467, 483 (2009) (finding that "including, but not limited to" means the list "is not limited to the sources explicitly" listed and that "the list is not exclusive"); *see also Thomas v. Regents of Univ. of California*, 97 Cal. App. 5th 587, 606 (2023), *reh'g denied* (Dec. 29, 2023), *review denied* (Feb. 28, 2024) (acknowledging that the use of "including, but not limited to" creates a "non-exclusive list"). But that phrase is plainly omitted from the final sentence of the Credit Agreement at issue here.

ME1 53115473v.1

Had Samsung intended to include the entirety of the Contract of Sale, it would have written: "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached), **<u>including but not limited to the obligation</u>** to pay service charges assessed and to pay reasonable attorneys fees in the event of default." Samsung clearly expressed its intent to be more expansive in the first and second paragraphs, but not in the last paragraph, where the phrase "including but not limited to" was excluded. By this omission Samsung expressed the intent, agreed to by Finelite, not to include the entirety of the Contract of Sale. Only terms related to late fees and the consequences of a default were included.

> ## 2. The shipping terms in the Contract of Sale conflict with the corresponding terms in the Credit Agreement, further reinforcing an intent not to incorporate such unstated terms

The Contract of Sale includes a shipping provision stating in pertinent part as follows: "All Product is sold, and prices quoted, C.I.P. Samsung's warehouse in California …." ER-143 at § 8. On the other hand, the Credit Agreement states, in pertinent part, that "Goods are sold C.I.P. Samsung Semiconductor, Inc.'s shipping point …." ER-140. If the last sentence of the Credit Agreement incorporated the entire Contract of Sale, these provisions would be in direct conflict. This could not have been the intent of the Credit Agreement. *Rost v. Bryson*, 118 Cal. App. 2d 489, 493 (1953) ("Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the

general intent and purpose of the whole contract.") (*citing* Cal. Civ. Code § 1652);

*see also Coast Ctys. Real Est. & Inv. Co. v. Monterey Cnty. Water Works*, 96 Cal.

App. 269, 278 (Cal. Ct. App. 1929) ("[A]pparent conflicts should, if possible, be

harmonized."); *Royal Ins. Co. of Liverpool, Eng., v. Caledonian Ins. Co. of*

*Edinburgh, Scotland*, 20 Cal. App. 504, 506 (Cal. Ct. App. 1912) ("[E]very part of

a contract must be given some effect, if possible, and two apparently conflicting

provisions of the same contract must be reconciled if such may be done without

doing actual violence to the language of the contract.").

**D.    The parties' subsequent conduct further confirms their intent expressed in the final sentence of the Credit Agreement**

Although the intent of the parties is best determined by the language used (and

not used, but used elsewhere), here it is confirmed by their repeated, subsequent

conduct.[13]

---

[13]  The Parol Evidence Rule "provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 55 Cal. 4th 1169, 1174 (2013). However, the rule **does not** preclude evidence that confirms the plain meaning of the agreement. *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co*., 69 Cal. 2d 33, 38–39 (1968) ("the meaning of a writing can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words"); *see also Whiteman v. Leonard Realty Co.,* 189 Cal. App. 2d 373, 376 (Cal. Ct. App. 1961) (admission of parol evidence did not violate parol evidence rule where evidence was "not inconsistent" with the contract); *Fontana v. Upp*, 128 Cal. App. 2d 205, 207 (Cal. Ct. App. 1954) (parol evidence is admissible "where the contract does not include provisions inconsistent with the [parol evidence]").

ME1 53115473v.1

Following execution of the Credit Agreement, neither Samsung nor Finelite ever referred to the Credit Agreement again. Excepting only the 2021 Purchase, Finelite consistently included Finelite's Terms with each purchase order submitted, and Samsung responded by providing Finelite with a sales order acknowledgement containing Samsung's Terms. The parties' behavior was entirely consistent with Finelite's construction of the last sentence of the Credit Agreement.

It defies reason that Samsung would have provided Finelite with alternate— and at times differing—terms and conditions than those in its Contract of Sale if the parties (including Samsung as drafter) intended the entirety of the much earlier Contract of Sale to govern their transactions. The Credit Agreement was an unmentioned document for more than ten (10) years until it was raised from the grave in response to Finelite's Third-Party Complaint.

### E. Finelite's interpretation of the Credit Agreement is aligned with its object [14]

The Credit Application and accompanying Credit Agreement and Financial Authorization are commonplace between merchants. ER-120 at ¶ 5. Their purpose

---

[14] "The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." Cal. Civ. Code § 1595. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. Words that are "wholly inconsistent with" the nature of the contract or "the main intention of the parties, are to be rejected." Cal. Civ. Code § 1653.

is to facilitate the buyer's ability to purchase goods on credit by establishing the buyer's creditworthiness. That was the clear object of the Credit Agreement and accompanying Financial Authorization—to authorize Samsung to check Finelite's credit history by contacting Finelite's creditors and financial institutions.[15] Finelite's interpretation of the last sentence of the Credit Agreement perfectly aligns with its object.

### F. Finelite's construction of the final sentence of the Credit Agreement renders no part of it superfluous

The District Court mistakenly concluded that Finelite's proposed interpretation "would result in nearly half of the 2012 Agreement as surplusage." ER-23. This is wrong.

First, the District Court erred in its application of California law discouraging interpretations that would result in "surplusage." The law cited by the District Court states that "Courts interpreting the language of contracts 'should give effect to every provision,' and 'an interpretation which renders part of the instrument to be surplusage should be avoided." *Flores v. Barr*, 934 F.3d 910, 915 (9th Cir. 2019) (independent clauses *within the same Agreement* must be given equal weight and

---

[15] As referenced above, the Financial Authorization accompanied the Credit Application, which asked for information related to Finelite's financial standing, including the name of its primary financial institution, its Checking Account Number, and Savings Account Number. ER-141. Further, the Credit Application itself requested that Finelite specify the "credit line desired." ER-139.

equal enforcement, and cannot be interpreted to render other provisions of the same agreement "wholly superfluous").

The issue before the District Court was whether the Credit Agreement incorporated terms from an entirely separate document. *Flores*, on the other hand, involved a single document where the court found that independent clauses within that document should be given equal weight and equal enforcement. *Flores*, 934 F.3d at 912. Finelite's construction of the Credit Agreement renders no provision of that agreement superfluous. It construes an incorporation sentence referencing a separate document (the Contract of Sale) as limiting the scope of what is adopted from that document.

Ironically, the District Court's interpretation renders part of the Credit Agreement superfluous. If Samsung truly intended to incorporate the entirety of the Contract of Sale into the Credit Agreement, it would have put a period immediately after the parenthetical "(attached)" and ended the sentence. Had it done so, the main clause would have concluded with a grammatical sentence stating a complete thought. Once that main clause incorporated the "terms of sale (attached)," there was no reason to call out specific "terms of sale" from that document. They were already incorporated by inclusion of the language "terms of sale (attached)." But, as set forth above, Samsung included modifier phrases clarifying which terms of the "attached" it intended to adopt. The District Court's construction of the final sentence of the

38

Credit Agreement erroneously renders those modifier phrases redundant of the main clause.

The District Court violated the very principle of contract construction it sought to honor. The "'terms of sale … to pay service charges assessed and to pay reasonable attorneys fees in the event of default'" are set forth in section 7 of the Contract of Sale and do not relate to indemnification. ER-142. The indemnification terms, set forth in section 10 of the Contract of Sale, were not incorporated. ER-143 at § 10. Accordingly, the Credit Agreement does not provide "the operative terms for this third-party dispute," as the District Court erroneously concluded, ER-27, and the judgment must be reversed.

## III. TO THE EXTENT THE LAST SENTENCE OF THE CREDIT AGREEMENT IS CONSTRUED TO BE AMBIGUOUS, THAT AMBIGUITY MUST BE CONSTRUED AGAINST SAMSUNG

Finelite does not believe the last sentence of the Credit Agreement is ambiguous for the reasons set forth above. But if this Court disagrees with Finelite's construction, the sentence is at least ambiguous as to whether it incorporated the entirety of Samsung's Contract of Sale. In accordance with the principle of *contra proferentum,* any such ambiguity should be construed against Samsung because: (1) the extrinsic evidence weighs against a finding that the parties intended the entire Contract of Sale to be incorporated into the Credit Agreement; and (2) Samsung drafted the boilerplate Credit Agreement.

ME1 53115473v.1

First, Samsung never responded to a Finelite purchase order by referring Finelite back to the Credit Agreement or by stating that the terms and conditions contained in the Contract of Sale governed the parties' transaction. ER-121 at ¶¶ 8, 10. Instead, Samsung issued sales order acknowledgment forms containing a separate set of terms and conditions, which specifically stated "[t]hese terms and conditions exclusively govern and control" and "[t]hese terms supersede all other terms submitted or proposed by Customer, *as well as all prior terms in any quotation, purchase order, or otherwise*." *See, e.g.*, ER-165 (emphasis added). This evidence is not in dispute.

If Samsung sincerely believed that the terms and conditions in the "Contract of Sale" governed the 2018-2021 Purchases, it would have stated its belief at some point during the parties' decade-long business relationship after the 2012 Credit Agreement was inked. Instead, the extrinsic evidence shows that every time Finelite purchased LEDs from Samsung, Samsung sent Finelite a sales order acknowledgment form explicitly stating that Samsung's Terms "exclusively govern and control."[16]

Second, Samsung drafted the form Credit Agreement. If it is ambiguous, that ambiguity must be construed against the drafter. *See Congdon v. Uber Techs., Inc.*,

---

[16] Samsung failed to introduce any evidence into the record to contradict the statements of John Shue describing the parties' course of conduct throughout the 2018-2021 Purchases. ER-120–21.

291 F. Supp. 3d 1012, 1022 (N.D. Cal. 2018). Under California law, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

## IV. FINELITE'S THIRD-PARTY CLAIMS ARE GOVERNED BY THE § 2207 CONTRACTS CREATED THROUGH THE PARTIES' EXCHANGE OF WRITTEN FORMS

In its *de novo* review of the District Court's denial of Finelite's Motion for Summary Judgment, this Court must evaluate the parties' exchange of written forms at the time of each of the 2018-2021 Purchases to determine whether a contract was formed under Cal. Comm. Code § 2207.

### A. Contract formation under Cal. Comm. Code § 2207

California Commercial Code § 2207 governs commercial transactions in which the parties exchange purchase order and acknowledgment forms. *See* U.C.C. § 2–207 comment 1.4. The drafters of the UCC recognized that "[b]ecause the [purchase order and acknowledgment] forms are oriented to the thinking of the respective drafting parties, the terms contained in them often do not correspond." *Id.* Section 2207 provides rules of contract formation in such cases. *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442–43 (9th Cir. 1986).

At common law, an acceptance that varied the terms of the offer was considered a counteroffer, operating as a rejection of the original offer. *See Idaho Power Co. v. Westinghouse Electric Corp.*, 596 F.2d 924, 926 (9th Cir. 1979). If the

offeror proceeded with the contract after receiving the counteroffer, performance was treated as an acceptance of the terms of the counteroffer. *Diamond Fruit Growers, Inc.*, 794 F.2d at 1443.

U.C.C. § 2207(1) changed the common law landscape. It converted "a common law counteroffer into an acceptance even though it states additional or different terms." *Idaho Power*, 596 F. 2d at 926; *see* U.C.C. § 2–207(1). But it is subject to a proviso. If the responding form or acceptance expressly conditions acceptance on the offeror's assent to the additional or different terms, the parties do not have a contract under section 2207(1) unless the offeror provides "specific and unequivocal assent to the supplemental terms." *Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 787 (9th Cir. 2001); *see also* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 1–2 at 32–33 (2d ed. 1980). If the offeror assents, the additional or different terms become part of the parties' contract.

If the offeree's responding form does <u>not</u> condition its acceptance on the offeror's assent to the additional or different terms, then a contract is formed under § 2207(1), and the additional or different terms in the offeree's acceptance are subjected to a § 2207(2) analysis. To the extent the terms of a responding form contain different or additional terms they are nothing more than proposals for additions to the contract under § 2207(2). Between merchants the different or

additional terms become part of the contract <u>unless</u>: (1) the offer is specifically limited to its terms; (2) the offeror objects to the different or additional terms; or (3) the different or additional terms materially alter the terms of the offer. Cal. Comm. Code § 2207(2); *Diamond Fruit Growers, Inc*., 794 F.2d at 1443.

If the parties' exchange of written forms does not create a contract under § 2207(1), their conduct still creates a contract under § 2207(3) if they proceed with the transaction as if they have a contract. Pursuant to section 2207(3), "[c]onduct by both parties . . . recognizes the existence of a contract . . . [even though] the writings of the parties do not otherwise establish a contract." *Id*. "In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code," commonly referred to as UCC "gap-filler" provisions. *Id*.; *see e.g. Textile Unlimited, Inc. v. A. BMH and Co., Inc.*, 240 F.3d 781, 789 (9th Cir. 2001) ("The terms of an agreement formed pursuant to § 2207(3) are those terms upon which the parties expressly agreed, coupled with the standard 'gap-filler' provisions of Article Two."). One common "gap-filler" provision is Cal. Comm. Code § 2312, which states "there is in a contract for sale a warranty by the seller that . . . the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like."

ME1 53115473v.1

**B.** **The undisputed facts demonstrate that Samsung and Finelite formed contracts under Cal. Comm. Code § 2207(1) through their exchange of written forms in connection with each of the 2018-2020 Purchases**

The following undisputed facts demonstrate the formation of § 2207(1) contracts for each of the 2018-2020 Purchases:

1. Finelite emailed the 2018-2020 purchase orders to Samsung and Samsung received each such email, ER-123–29;

2. Each email included a hyperlink adjacent to the signature block stating "Click to view Purchasing Terms and Conditions," *Id.*;

3. Clicking on the hyperlink directed the recipient to Finelite's Terms, ER-108 at ¶ 6;

4. Samsung responded to each of Finelite's 2018-2020 purchase orders with a sales order acknowledgment containing Samsung's Terms, ER-121 at ¶ 9. While some of Samsung's Terms agreed with Finelite's Terms,[17] others differed or conflicted; and

5. Samsung's Terms and sales order acknowledgment forms did not "expressly make" Samsung's acceptance "conditional on [Finelite's] assent to the additional or different terms." ER-161–74.

---

[17] For example, the forms agreed on the material terms of product, price, quantity, and delivery location.

Each of Finelite's purchase orders, accompanied by Finelite's Terms, was an offer under § 2207(1). Likewise, each of Samsung's sales order acknowledgment forms was a "definite and seasonable expression of acceptance" under § 2207(1). Significantly, Samsung's acceptances were not "expressly made conditional on [Finelite's] assent to the additional or different terms" and, therefore, such terms did not become part of the parties' § 2207(1) contracts. S*ee Steiner v. Mobil Oil Corp.*, 20 Cal. 3d 90, 97 (1977) (even when an acknowledgment form contains language that conflicts with the terms of the offeror's form a contract is formed under § 2207(1)); *see also PlasPro GMBH v. Gens*, No. C 09-04302 PSG, 2011 WL 1000755, at *3 (N.D. Cal. Mar. 21, 2011) ("[E]ven if the PO included additional and different terms compared to those in the Invoice, what really happened is that the Invoice operated as a definite and seasonable expression of acceptance."). The proviso of § 2207(1)—that a contract is not formed when "acceptance is expressly made conditional on assent to the [offeree's] additional or different terms"—is inapplicable here.

In *Idaho Power Co. v. Westinghouse Elec. Corp.,* 596 F.2d 924 (9th Cir. 1979), this Court emphasized that the proviso of § 2207(1) should be "construed narrowly" because it was "intended to apply 'only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein." *Id*. at 926

(quoting *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972)). Similar to here, the written form at issue in *Idaho Power* stated "[a]cceptance of this order shall be deemed to constitute an agreement to the conditions named hereon and supersedes all previous agreements." *Id.* at 926-927. This Court held that such language "does not clearly reveal that Idaho Power was 'unwilling to proceed with the transaction unless . . . assured of (Westinghouse's) assent to the additional or different terms.' Consequently, the proviso in § 2207(1) does not apply." *Id.* at 927.

Likewise, in *Dorton* (relied upon by the Ninth Circuit in *Idaho Power*) the Sixth Circuit held that "[i]n order to fall within this proviso [of § 2207(1)], it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be *expressly* conditional on the offeror's *assent* to those terms." *Dorton*, 453 F.3d at 1168 (emphasis in original). The *Dorton* court reasoned:

> Viewing the Subsection (1) proviso within the context of the rest of that Subsection and within the polices of Section 2-207 itself, we believe that it was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein. [Citation omitted]. That the acceptance is predicated on the offeror's assent must be "directly and distinctly stated or expressed rather than implied or left to inference." Webster's Third International Dictionary (defining "express").

*Id.*

Here, Samsung's willingness to proceed with the 2018-2020 Purchases was never expressly conditioned on Finelite's assent to Samsung's additional or different

46

terms. Samsung said only that its terms "supersede all other terms submitted or proposed by Customer, as well as all prior terms in any quotation, purchase order, or otherwise." *See, e.g.*, ER-162. But that language has been found insufficient to satisfy the proviso of § 2207(1). *Channell Com. Corp. v. Wilmington Mach. Inc.*, No. EDCV142240DMGDTBX, 2016 WL 7638180, at *5 (C.D. Cal. June 17, 2016) (Party's acceptance was <u>not</u> "made expressly conditional on [] assent" where the sales order acknowledgment form stated that the "sale was made in accordance with [Seller's] Terms and Conditions," some of which "contradict[] the terms of [the offeror's] Purchase Order."); *Compare Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 788 (9th Cir. 2001) (Finding that the Seller's acceptance was conditioned on Buyer's assent only because the acceptance explicitly stated "Seller's willingness to sell yarn to you is conditioned on your acceptance of these Terms of Sale."); *see also Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 514 (1996) (seller's acceptance was conditioned on buyer's assent where Seller accepted buyer's purchase order "only on the express condition that you assent to the terms" contained in the invoice.); *Frank M. Booth, Inc. v. Reynolds Metals Co.*, 754 F. Supp. 1441, 1448 (E.D. Cal. 1991) ("There is no dispute that Reynolds' acknowledgement form expressly conditioned its acceptance of the contract on Valley's agreement to the terms and conditions of the acknowledgement" where the acceptance stated "Our acceptance is expressly conditioned on your agreement to the terms and conditions

47

on the front and reverse sides of this Sales Order."); *Niagara Bottling, LLC v. Rite-Hite Co., LLC*, No. EDCV182032PSGSHKX, 2019 WL 1768875, at *8 (C.D. Cal. Feb. 11, 2019) (same).

The teachings of *Idaho Power* and *Dorton* apply here. Samsung's terms do not state that Samsung was unwilling to proceed with the 2018-2020 Purchases unless assured of Finelite's "***assent*** to the additional or different terms." *Id.* (emphasis added). Thus, the proviso of § 2207(1) does not apply to any of those purchases and, under § 2207(1), the parties' exchange of written forms in 2018-2020 resulted in three § 2207(1) contracts.

**C.    The additional and different terms in Samsung's 2018-2020 acceptances were not incorporated into the parties' § 2207(1) contracts pursuant to Cal. Comm. Code § 2207(2)**

Because the parties' exchange of written forms created contracts under § 2207(1), the next step is to determine the terms of those contracts. The parties' forms relating to indemnification and warranties differed as follows:

|  | **Finelite's Terms** | **Samsung's Terms** |
|---|---|---|
| **Indemnity Provisions** | "Seller shall indemnify and hold harmless [Finelite] . . . from and against any loss, damage or liability arising from or relating to the actual or alleged infringement of any patent . . . by reason of the sale and/or use of the goods" ER-132 at § 15. | "Samsung will at its expense defend or settle (at its option) any third party claim against [Finelite] arising from the infringement of any patent . . . by Product in the jurisdiction where title passes from Samsung to [Finelite]." *See, e.g.*, ER-166 at § 10. |
| **Warranty Provisions** | "Seller warrants to [Finelite] that all goods provided hereunder shall be and shall continue to be: (i) merchantable and fit for the ordinary purposes for which such goods are used; (ii) new; (iii) free from defects in material and workmanship; and (iv) free from liens or encumbrances on title." ER-132 at § 14. | "Samsung warrants . . . that Products shall remain free from defects in Samsung's manufacturing workmanship and materials for a period of twelve (12) months from the date of shipment by Samsung. . . . SAMSUNG DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, COURSE OF DEALING, NON-INFRINGEMENT, OR USAGE OF TRADE." *See, e.g.*, ER-165 at § 3. |

Pursuant to Cal. Comm. Code § 2207(2), Samsung's additional or different

terms "become part of the contract unless: (a) [Finelite's] offer expressly limits

acceptance to the terms of the offer; [or] (b) [t]hey materially alter it."[18] Cal. Comm. Code § 2207(2).

Under California law, "additional" and "different" terms are treated identically under § 2207(2). *Steiner v. Mobil Oil Corp.*, 20 Cal. 3d 90, 102, n.5 (1977)("the applicability of section 2207, subdivision (2), should not turn upon a characterization of the varying terms of an acceptance as 'additional' or 'different'"). Here, Samsung's differing terms concerning indemnification and warranties did not become a part of the parties' § 2207(1) contracts because either: (i) each Finelite offer expressly limited Samsung's acceptance to the terms of the offer; or (ii) the differing indemnification and warranty provisions would materially alter the parties' contract if incorporated.[19]

---

[18] There is no dispute that Finelite and Samsung were "merchants" as that term is used in Cal. Comm. Code § 2104(1) and the 2018-2021 Purchases were "between merchants." ER-177 at ¶ 7 (Samsung admitting that "it is engaged in the business of selling LEDs known as LM561BPlus chips.") and ¶ 8 (Samsung admitting to selling approximately 27,000,000 LEDs to Finelite between 2018 and 2021).

[19] "In order to become part of the agreement," the additional term "must not fall within *any* of the categories defined" by UCC § 2-207. *Steiner*, 20 Cal.3d at 101 (emphasis in original).

ME1 53115473v.1

1. **Each Finelite offer expressly limited Samsung's acceptance to the terms of the offer, Samsung's indemnification and warranty terms did not become part of the § 2207(1) contracts, and Finelite's indemnification and warranty provisions control**

Pursuant to § 2207(2)(a), Samsung's additional or differing terms in its sales order acknowledgments did not become part of the parties' contracts because Finelite's Terms expressly provided that "[a]ny terms and conditions proposed in Seller's acknowledgment, acceptance, invoice or other form that add to, vary from, or conflict with the terms herein are hereby rejected." ER-131 at § 1. That language limits the acceptance to the terms of the offer. *See, e.g., Lounge-A-Round v. GCM Mills, Inc.*, 109 Cal. App. 3d 190, 195 (Cal. Ct. App. 1980) (finding acceptance was limited to the terms of the offer when offer stated "[n]o order is valid unless made upon this form and properly signed on the front hereof. ***This order may not be varied or changed, nor any of its provisions waived except in writing***, signed by an authorized representative of the Purchaser. . . . ***Terms of Seller's order, shipment or approval*** which are not identical with the terms of this order are not a part of the contract between Seller and Purchaser and ***are not binding upon purchase.***") (emphasis added). As a result, under § 2207(1) and (2)(a), the indemnification and warranty provisions in Finelite's Terms became part of the parties' contracts, and Samsung's terms did not.

### 2. Alternatively, Samsung's indemnification and warranty terms materially altered the terms in Finelite's offers under § 2207(2)(b) and therefore did not become part of the § 2207(1) contracts for this reason as well[20]

The Official Comments to § 2-207 offer both a basic standard of materiality for purposes of subsection (2)(b), and concrete examples of clauses which will normally meet or fail to meet this standard. 72 A.L.R.3d 479 (Originally published in 1976).

According to Official Comment 4, an additional term will fall within the purview of subsection (2)(b) if its inclusion in the contract would result in "surprise or hardship." U.C.C. § 2-207, Cmt. 4. "Examples of clauses which would normally materially alter a contract are: a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches." *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 435 F. Supp. 2d 1015, 1024 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008) (internal citations and quotations omitted). Consequently, the warranty provision contained in Samsung's Terms disclaiming all warranties related to "merchantability, fitness for any particular purpose, course of dealing, non-

---

[20] If this Court finds that Samsung's additional and different terms did not become part of the parties' § 2207(1) contracts pursuant to § 2207(2)(a), it need not address Finelite's § 2207(2)(b) argument. If any one of the exceptions of § 2207(2) apply, Samsung's additional and different terms are not incorporated into the § 2207(1) contracts.

ME1 53115473v.1

infringement or usage of trade" materially alters the parties' contracts, and therefore is excluded from the contracts under § 2207(2)(b).

In addition, "[a]n indemnification provision would constitute a material alteration, as a matter of law." *C9 Ventures v. SVC-W., L.P.*, 202 Cal. App. 4th 1483, 1506 (2012). An indemnity clause has the same effect as a provision disclaiming or excluding warranties, which is "regularly characterized as a material alteration as a matter of law." *Trans–Aire International, Inc. v. Northern Adhesive Co.* (7th Cir. 1989) 882 F.2d 1254, 1256, 1260("An indemnification clause, like a warranty disclaimer, relieves a party of otherwise well-established legal duties and obligations."); *see also Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 105 (3d Cir. 1991) (holding that "under UCC § 2–207(2)(b), the disclaimer of warranty and limitation of remedies terms of the box-top license did not become a part of the parties' agreement. . .").

Thus, it is clear that Samsung's differing indemnity and warranty provisions constitute material alterations of the parties' contracts and, absent acceptance, did not become part of their § 2207(1) contracts pursuant to § 2207(2)(b).

The parties' § 2207(1) contracts consisted of Finelite's indemnification and warranty provisions and, pursuant to those provisions, Samsung owed a duty to indemnify Finelite against the Seoul Plaintiffs' patent infringement claims. Because Samsung refused to indemnify Finelite, it breached its contractual obligations and

the District Court erred by granting Samsung's and denying Finelite's Motion for Summary Judgment.

### D. The parties' exchange of written forms in 2021 created a contract pursuant to Cal. Comm. Code § 2207(1)

Finelite's 2021 purchase order and Samsung's 2021 sales order acknowledgment also formed a § 2207(1) contract, although the terms of that contract were different from their 2018-2020 contracts.

As set forth above, Finelite's Terms were not available through the hyperlink embedded in the cover email accompanying Finelite's 2021 purchase order. As a result, Finelite's offer consisted of the terms set forth on the face of the purchase order, *i.e.*, the LED item number and description, the quantity thereof, the price and the delivery location.

In response to the 2021 purchase order, Samsung provided Finelite with a "definite and seasonable expression of acceptance" in the form of its sales order acknowledgment form, which, again, was not expressly conditioned on Finelite's assent to Samsung's Terms. *See* ER-161–74. Thus, a § 2207(1) contract was formed. While Samsung's sales order acknowledgment form confirmed the identity and quantity of LEDs, the purchase price and the delivery location, all other terms attached to the sales order acknowledgment form were additional terms subject to a § 2207(2) analysis.

For the same reasons stated above, *supra* § IV.C.2, Samsung's proposed additional terms—specifically those concerning indemnification and warranties—did not become a part of the parties' § 2207(1) contract. While Finelite's 2021 offer may not have limited acceptance to the terms of the offer (due to Finelite's inadvertent failure to make its terms and conditions available through an active hyperlink), Samsung's indemnification and warranty provisions still qualified as material alterations to the § 2207(1) contract under § 2207(2)(b). Accordingly, the parties' § 2207(1) contract consisted of the terms on which their forms agreed plus the indemnity and warranty provisions of Cal. Comm. Code § 2312. Here, § 2312 provides a warranty of title and against infringement. For the reasons set forth below, *infra* § IV.E, there is no genuine dispute of fact that Samsung owes and has breached its warranty obligation and owes Finelite a duty of indemnification as to the 2021 § 2207(1) contract as well.

### E. Alternatively, the parties' conduct formed contracts pursuant to Cal. Comm. Code § 2207(3)

The undisputed facts demonstrate that the parties' exchange of written forms created contracts under Cal. Comm. Code § 2207(1)-(2) for each of the 2018-2021 Purchases. However, if the Court finds that any such contracts were not formed, the undisputed record demonstrates that the parties' conduct nevertheless would have formed contracts pursuant to Cal. Comm. Code § 2207(3). And under that scenario, Samsung would owe Finelite a duty of indemnification.

Under § 2207(3) "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale [even though] the writings of the parties do not otherwise establish a contract." Cal. Comm. Code § 2207(3). "In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code." *Id*. Here, the parties' conduct in connection with each of the 2018-2021 Purchases, namely Finelite's decision to purchase LEDs from Samsung and Samsung's decision to sell and ship the LEDs to Finelite, created a contract. However, for each of the 2018-2021 Purchases, the writings of the parties did not agree with respect to indemnification or warranties, and therefore the UCC "gap-filler" provisions would govern Samsung's obligations with respect to warranting and indemnifying Finelite against the Seoul Plaintiffs' infringement claims. Indeed, the only terms on which the writings of the parties agreed were the goods sold (identified by product number), price, quantity, and delivery location. The writings did not agree on any other terms. Therefore, this Court must look to the UCC's gap-filler provisions to determine Samsung's indemnification and warranty obligations. Under Cal. Comm. Code § 2312, the parties' contracts would incorporate a warranty of title and against infringement.

Section 2312 of the California Commercial Code states "there is in a contract for sale a warranty by the seller that . . . the goods shall be delivered free of the

rightful claim of any third person by way of infringement or the like." *See also* Cal. Comm. Code § 2312 Cmt. 3 ("When the goods are part of the seller's normal stock and are sold in his normal course of business, it is his duty to see that no claim of infringement of a patent . . . by a third party will mar the buyer's title."). Under § 2207(3), this "gap-filler" would be incorporated into the parties' contracts. Under this provision, Samsung would warrant that the LEDs it sold to Finelite were "free of the rightful claim of any third person by way of infringement or the like." Cal. Comm. Code § 2312(3).

Consequently, whether pursuant to Cal. Comm. Code § 2207(1) or (3), Samsung owes a contractual duty to indemnify Finelite. *See Kandy Kiss of California Inc v. Tex-Ellent Inc*, No. CV 10-9215 GAF (CWX), 2012 WL 13006211, at *8 (C.D. Cal. June 26, 2012) ("Courts have interpreted section 2–312(3) to entitle the buyer of an infringing good to indemnification from the seller for any claims by a third party for infringement."); *Phoenix Sols., Inc. v. Sony Elecs., Inc.*, 637 F. Supp. 2d 683, 696 (N.D. Cal. 2009) (equating a claim for breach of warranty under § 2312 to a claim for indemnification); *see also Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, No. 1:11-CV-00030 AWI, 2011 WL 5838214, at *2 (E.D. Cal. Nov. 21, 2011) (entertaining request for "indemnification as well as damages on all three counts").

ME1 53115473v.1

To establish a § 2312 breach of warranty claim, Finelite must show that: (1) Samsung was a merchant regularly dealing in goods of the kind; (2) the goods were subject to a rightful infringement claim of any third party upon delivery; (3) the buyer did not furnish specifications to the seller; and (4) the parties did not form another agreement. *Phoenix Sols., Inc. v. Sony Elecs., Inc.*, 637 F. Supp. 2d 683, 693 (N.D. Cal. 2009).

As to element one, Finelite has alleged and Samsung has admitted that Samsung is a "merchant regularly dealing in goods of the kind." Finelite's Third-Party Complaint alleges that "Samsung is engaged in the business of, among other things, manufacturing and selling LEDs commonly known in the lighting industry as LM561BPlus chips," ECF No. 71, ¶ 7, and in response, Samsung admitted that "it is engaged in the business of selling LEDs known as LM561BPlus chips." ECF No. 81, ¶ 7. Thus, there is no dispute that Samsung is a merchant regularly dealing in "goods of the kind."

Finelite has also clearly established that the LEDs are subject to a rightful infringement claim of a third party. It bears emphasis that a rightful claim of infringement under Cal. Comm. Code § 2312 "is not synonymous with a claim that ultimately will prove successful in litigation." *Pac. Sunwear of California, Inc. v. Olaes Enterprises, Inc.*, 167 Cal. App. 4th 466, 470 (2008). It is simply "a nonfrivolous claim of infringement that has any significant and adverse effect on the

buyer's ability to make use of the purchased goods." *Id*. Here, the Seoul Plaintiffs brought a fourteen-count Complaint against Finelite alleging infringement of fourteen patents. This litigation is now more than three (3) years old and the Seoul Plaintiffs' claims have survived three separate motions to dismiss. ECF Nos. 24, 44 and 97. Samsung has not produced any evidence that the Seoul Plaintiffs' claims are frivolous or not "rightful claims" under § 2312. Thus, it is undisputed that Samsung's LEDs are subject to a rightful claim of infringement.

As to element three, there is no dispute that Finelite "did not furnish specifications" to Samsung when it ordered the LEDs. Each of Finelite's purchase orders and cover emails are before this Court. *See* R. 105-5, 105-6, 105-7, 105-8, and 112-1. They clearly show that Finelite's purchases were not requested or made subject to Finelite's specifications to Samsung, nor did they request that the LEDs be altered in any way. Further, although it should be unnecessary, the Declaration of John Shue explicitly states that "Finelite did not, for any of the 2018-2021 Purchases, furnish specifications to Samsung or request that any alterations be made to the LEDs." ER-109 at ¶ 11. There is no contrary evidence and this fact is not in dispute.

As to element four, there likewise is no dispute that Finelite and Samsung did not enter into any subsequent agreement governing the 2018-2021 Purchases. Samsung certainly has cited no fact or produced any document creating a genuine dispute. Further, and again although it should be unnecessary, Mr. Shue's Second

Declaration unequivocally establishes that "Finelite did not form any subsequent agreement(s) with Samsung … that are in any way relevant to the 2018-2021 Purchases." ER-109 at ¶ 11.

Thus, there is no genuine issue of material fact with respect to Finelite's breach of warranty and declaratory judgment claims. To the extent a contract was formed pursuant to Cal. Comm. Code § 2207(3) and the resulting contract included a warranty of non-infringement pursuant to Cal. Comm. Code § 2312, Finelite has sufficiently established that Samsung breached this warranty and, therefore, it was error for the District Court to deny Finelite's Motion for Summary Judgment.

## CONCLUSION

For all of the foregoing reasons, Finelite respectfully requests that this Court reverse the judgment of the District Court and remand with instructions to deny Samsung's Motion for Summary Judgment and grant Finelite's Cross Motion for Summary Judgment (Count One for breach of contract; Count Two for breach of warranty; and Count Three for declaratory judgment), holding that Samsung unequivocally owes a duty to defend and indemnify Finelite against the Seoul Plaintiffs' patent infringement claims, and that Samsung breached that duty.

Alternatively, to the extent that this Court concludes that the last sentence of the Credit Agreement is ambiguous as to whether the parties intended to incorporate the entirety of the "Samsung Semiconductor, Inc. Contract of Sale" into the Credit

Agreement and that such ambiguity is not resolved by the conduct of the parties or the doctrine of *contra proferentum,* Finelite respectfully requests that this Court reverse the judgment of the District Court and remand with instructions to deny the parties' respective motions for summary judgment and for further proceedings on the question of the parties' intent as set forth in the Credit Agreement.

Date: June 3, 2024                    Respectfully submitted,

*Defendant-Third-Party Plaintiff-Appellant*
FINELITE, INC.


/s/ *Thomas J. Rechen*_____
Thomas J. Rechen
trechen@mccarter.com
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone:  (860) 275-6700
Facsimile:   (860) 724-3397

ME1 53115473v.1

# CERTIFICATE OF COMPLIANCE

WE HEREBY CERTIFY that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains approximately 13,644 words and uses a Times New Roman 14-point font.

/s/ *Thomas J. Rechen*_____
Thomas J. Rechen
trechen@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

ME1 53115473v.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 3, 2024, which will send a notice of electronic filing to all counsel of record on the attached service list. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/  *Thomas J. Rechen*_____
Thomas J. Rechen
trechen@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone:  (860) 275-6700
Facsimile:   (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

ME1 53115473v.1

**ADDENDUM OF SOURCES**

# INDEX

| Source | Page |
|---|---|
| *The Chicago Manual of Style*, The Univ. of Chicago Press, (17th ed. 2017) | 1 |
| *Elements of Style*, William Strunk, Jr. and E.B. White, (4th ed. 2000) | 10 |
| *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style*, Bryan A. Garner, (5th ed. 2022) | 15 |
| *The Gregg Reference Manual: A Manual of Style, Grammar, Usage, and Formatting*, William A. Sabin, (11th ed. 2010) | 23 |
| *Infinitives,* The Writing Lab & The OWL at Purdue and Purdue Univ., available at https://owl.purdue.edu/owl/general_writing/mechanics/gerunds_participles_and_infinitives/infinitives.html (last visited June 3, 2024) | 32 |
| *Parallel Structure*, The Writing Lab & The OWL at Purdue and Purdue Univ., available at https://owl.purdue.edu/owl/general_writing/mechanics/parallel_structure.html (last visited June 3, 2024) | 37 |



# The Chicago Manual of Style

SEVENTEENTH EDITION

THE ESSENTIAL GUIDE
for Writers, Editors, and Publishers

# The Chicago Manual of Style

SEVENTEENTH EDITION

*The University of Chicago Press*
CHICAGO AND LONDON

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London
© 2017 by The University of Chicago
All rights reserved. No part of this book may be used or repro-
duced in any manner whatsoever without written permission,
except in the case of brief quotations in critical articles and re-
views. For more information, contact the University of Chicago
Press, 1427 E. 60th St., Chicago, IL 60637.
First edition published 1906. Seventeenth edition 2017.
Printed in the United States of America

26  25  24  23  22      4  5

ISBN-13: 978-0-226-28705-8 (cloth)
DOI: https://doi.org/10.7208/cmos17

Library of Congress Cataloging-in-Publication Data

Title: The Chicago manual of style.
Description: Seventeenth edition. | Chicago ; London : The
    University of Chicago Press, 2017. | Includes bibliographical
    references and indexes.
Identifiers: LCCN 2017020712 | ISBN 9780226287058 (cloth :
    alk. paper)
Subjects: LCSH: Printing—Style manuals. | Authorship—Style
    manuals. | Authorship—Handbooks, manuals, etc. |
    Publishers and publishing—United States—Handbooks,
    manuals, etc.
Classification: LCC Z253 .U69 2017 | DDC 808/.0270973—
    dc23
LC record available at https://lccn.loc.gov/2017020712

♾ This paper meets the requirements of ANSI/NISO
Z39.48-1992 (Permanence of Paper).

The Chicago Manual of Style is a registered trademark of
The University of Chicago.

natural {**don't you** want more?}. Most negative forms can be contracted {we do not–we don't} {I will not–I won't} {he has not–he hasn't} {she does not–she doesn't}, but *I am not* is contracted to *I'm not* (never *I amn't*). The corresponding interrogative form is *aren't I?* Sometimes the negative is emphasized if the auxiliary is contracted with the pronoun and the negative is left standing alone {he is not–he isn't–he's not} {we are not–we aren't–we're not} {they have not–they haven't–they've not}.

5.105   **Contractions.** Most types of writing benefit from the use of contractions. If used thoughtfully, contractions in prose sound natural and relaxed and make reading more enjoyable. *Be*-verbs and most of the auxiliary verbs are contracted when followed by *not*: *are not–aren't*, *was not–wasn't*, *cannot–can't*, *could not–couldn't*, *do not–don't*, and so on. A few, such as *ought not–oughtn't*, look or sound awkward and are best avoided. Pronouns can be contracted with auxiliaries, with forms of *have*, and with some *be*-verbs. Think before using one of the less common contractions, which often don't work well in prose, except perhaps in dialogue or quotations. Some examples are *I'd've* (I would have), *she'd've* (she would have), *it'd* (it would), *should've* (should have), *there're* (there are), *who're* (who are), and *would've* (would have). Also, some contracted forms can have more than one meaning. For instance, *there's* may be *there is* or *there has*, and *I'd* may be *I had* or *I would*. The particular meaning may not always be clear from the context.

INFINITIVES

5.106   **Infinitives defined.** An infinitive verb, also called the verb's *root* or *stem*, is a verb that in its principal uninflected form may be preceded by *to* {to dance} {to dive}. It is the basic form of the verb, the one listed in dictionary entries. The preposition *to* is sometimes called the *sign* of the infinitive {he tried **to open** the door}, and it is sometimes classed as an adverb. In the active voice, *to* is generally dropped when the infinitive follows an auxiliary verb {you must **flee**} and can be dropped after several verbs, such as *bid, dare, feel, hear, help, let, make, need,* and *see* {you dare **say** that to me?}. But when the infinitive follows one of these verbs in the passive voice, *to* should be retained {he cannot be heard **to deny** it} {they cannot be made **to listen**}. The *to* should also be retained after *ought* and *ought not* (see 5.149).

5.107   **Uses of the infinitive.** The infinitive has great versatility. It is sometimes called a *verbal noun* because it can function as part of a verb phrase {someone has **to tell** her} or a noun {**to walk** away now seems rash}. The

| How you think of yourself | affects | both | the way you approach |
|---|---|---|---|
| S | V | | O |

| the problems of everyday life | and | the degree to which you're |
|---|---|---|
| O | | O |

perceived as being well adjusted.
O

5.223   **All seven syntactic patterns.** Syntactic patterns other than the SVO pattern are available, but they are limited to specific types that include two to four of these elements: subject (S), verb (V), [direct] object (O), indirect object (IO), complement (C), adverbial (A). Here are all seven basic clause patterns:

S + V: Sandy smiled.
S + V + O: Sandy hit the ball.
S + V + C: Sandy is eager.
S + V + A: Sandy plays well.
S + V + IO + O: Sandy gave Jerry the ball.
S + V + O + C: Sandy got her bag wet.
S + V + O + A: Sandy wrote her score on the card.

5.224   **Variations on syntactic order.** When clause elements appear in a different order, the inversion may indicate either a question {is Sandy all right? [V–S–C]} or a special kind of emphasis:

| Yoda | my name | is! |
|---|---|---|
| C | S | V |

| Bully | you | say! |
|---|---|---|
| O | S | V |

Inversions of this type achieve a special emphasis precisely because they depart from the normal sequence of sentence elements.

### Clauses

5.225   **Clauses.** A *clause* is a grammatical unit that contains a subject, a finite verb, and any complements that the verb requires. An *independent clause* can stand alone as a sentence {José saw a squirrel}, while a *dependent clause* cannot stand alone because of the presence of a word by which

295

**Addendum - 05**

it would normally be linked to an independent clause {**because he was hungry**, he sat down for a meal}. A dependent clause is usually introduced either by a relative pronoun (making it a relative clause) or by a subordinating conjunction, which establishes the semantic relationship between the independent clause and the dependent one. Combining related ideas by linking one or more dependent clauses to an independent one is called *subordination*, and the result is a complex sentence. Because a dependent clause is always subordinate to an independent clause for contextual meaning, it is also called a *subordinate clause*. A dependent clause commonly serves one of several functions: the direct object of a verb {everyone believed **that the note was genuine** [the *that*-clause is the direct object of *believed*]}; an adjectival clause modifying a noun element {he **who hesitates** is lost [*who hesitates* adjectivally modifies *he*]}; an adverbial clause modifying a verb or verb phrase {I bought the car **despite my father's warning not to** [the *despite*-clause modifies the verb *bought*]}.

5.226   **Relative clauses.** A relative clause is a subordinate clause that is introduced by a relative pronoun and modifies the noun element (or sentence or clause) it follows {the car **that you own**} {those **who follow his progress**} {they were ten minutes late to the opera, **which meant they couldn't enter until the end of the first act**}. In some relative clauses, called *contact clauses*, the relative pronoun is merely implied {all the people **you mention** have already registered [the relative pronoun *who* is implied in *people* [*whom*] *you mention*]}. Because the necessary connective is omitted, contact clauses are a type of elliptical clause—one often involving what is known as a *whiz-deletion* (so called because it so often amounts to the omission of *who is*).

5.227   **Appositive clauses.** A clause used in apposition to a noun element in the sentence is called an *appositive clause*. Though these are often (but not always) introduced with the same words that introduce relative clauses (*that*, *which*, *who*), the two differ in that a relative clause functions only within the sentence, while an appositive clause is self-contained: with its introductory relative pronoun removed, it could stand on its own as a grammatical sentence {we all heard the report **that the beloved broadcaster had died** [without *that*, the remaining appositive clause is grammatically complete: *the beloved broadcaster had died*]}.

5.228   **Conditional clauses.** A conditional clause (also called a *protasis*) is an adverbial clause, typically introduced by *if* or *unless* (or *should*, *although*, *though*, *despite*, or another subordinating conjunction), establishing the condition in a conditional sentence. Usually this is a direct condition, indicating that the main clause (also called the *apodosis*) is dependent on

296

the condition being fulfilled. Sometimes, however, the clause may express an indirect condition {**if I recall correctly**, his assistant's name is Miljana}, alternative conditions {the party will be a success **whether or not it rains**}, or an open range of possibilities {**whatever you're doing**, it's working}. Most often, though, a conditional clause expresses a direct condition, which may be open (real or factual) or hypothetical (closed or unreal). An open condition leaves unanswered the question whether the condition will be fulfilled {**if you don't finish the work on time**, we'll have to reevaluate our arrangement}. A hypothetical condition, on the other hand, assumes that the condition has not been, is not, or is unlikely to be fulfilled {**if he had only remembered to wear a raincoat**, he wouldn't have ruined his new suit} {**if I had a hammer**, I could fix this creaky stair} {the transition would be much harder **if she left without giving notice**}.

## Ellipsis

5.229  **Ellipsis generally.** A grammatical ellipsis (sometimes called an omission) occurs when part of a clause is left understood and the reader or listener is able to supply the missing words. (For the use of three dots to indicate text omitted from a direct quotation or for faltering or interrupted speech, see 13.50–58.) This "recovery" of omitted words is possible because of shared idiomatic knowledge, context, and what's called the *principle of recoverability* {he preferred chocolate, she vanilla [*preferred* is understood in the second clause]}. A sentence containing such an ellipsis is called an *elliptical sentence*. In colloquial speech, an ellipsis is useful to avoid repetition, shorten the message, and make it easier to understand. It's particularly appropriate for commands and exclamations, and especially when asking or answering a question whose complete answer would essentially repeat the question. For example:

Thank you. (I thank you.)
One lump or two? (Would you like one lump of sugar or two?)
Glad you like it! (I'm glad that you like it!)
Which is better? And why? (Which choice is better, and why is it better?)
[Can you tell me who built this house?] The Tucker family. (Yes, I can tell you. The Tucker family built this house.)

## Negation

5.230  **Negation generally.** A statement may be expressed in positive or negative terms. Negation is the grammatical process of reversing the ex-

reader "what" it is foolish to ignore and emphasizes "facts." An expletive *it* may also take the position of a direct object, especially when the real object is a clause or noun phrase {some people don't like **it** that stores are open for business on Thanksgiving [some people don't like **stores being open for business** on Thanksgiving]}. Using an expletive in this way can tighten a verb phrase and emphasize the object. Compare *it was taken for granted that our team would win* with *we took for granted that our team would win.*

5.240   **Expletive "it."** Whereas the pronoun *it* adds meaning to a sentence because it has an antecedent or else is the formal subject of a *be*-verb in the sense of "a person" or "a thing," an expletive *it* adds no meaning and takes the subject's or object's place when the subject or object shifts to the predicate: *It is not known what happened* can be restated as *What happened is not known.* Usually readers have no difficulty intuitively understanding whether they're encountering a pronoun *it* or an expletive *it*. But when the expletive and the pronoun appear close together, they may cause the reader to stumble {The much-anticipated feast was a disappointment; **it** was poorly cooked and presented. **It** is hard to believe that such a famous chef thought **it** would be edible, let alone delight gourmands.}. Avoid having several *its* in a passage clash in this way. Some other names for the expletive *it* are *ambient it, anticipatory it, dummy it, empty it, introductory it, nonreferential it,* and *prop it.*

5.241   **Expletive "there."** The word *there* is also frequently used as an expletive with *be* or an intransitive verb (especially a linking verb) followed by the subject {there are many different viewpoints presented in the students' essays} {there were several hundred members present at the conference}. An expletive *there* shouldn't be confused with *there* as an adverb of place. Compare *There seemed to be someone* with *Someone seemed to be there.*

## Parallel Structure

5.242   **Parallel structure generally.** Parallel constructions—series of like sentence elements—are common in good writing. Compound structures may link words {win, lose, or draw}, phrases {government of the people, by the people, for the people}, dependent clauses {that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness}, or sentences {I came; I saw; I conquered}. Every element of a parallel series must be a functional match (word, phrase, clause, sentence) and

302

serve the same grammatical function in the sentence (e.g., noun, verb, adjective, adverb). This syntactic linking of matching elements is called *coordination*. When linked items do not match, the syntax of the uncoordinated sentence breaks down:

POOR: She did volunteer work in the community kitchen, the homeless shelter, and taught free ESL classes offered by her church.
BETTER: She did volunteer work in the community kitchen, the homeless shelter, and her church, where she taught free ESL classes.

POOR: The candidate is a former county judge, state senator, and served two terms as attorney general.
BETTER: The candidate is a former county judge, state senator, and two-term attorney general.

In the second example, for instance, the subject, verb, and modifier (*the candidate is a former*) fit with the noun phrases *county judge* and *state senator*, but the third item in the series renders nonsense: *The candidate is a former served two terms as attorney general.* The first two elements in the series are nouns, while the third is a separate predicate. The corrected version makes each item in the series a noun element.

5.243 **Prepositions and parallel structure.** In a parallel series of prepositional phrases, repeat the preposition with every element unless they all use the same preposition. A common error occurs when a writer lets two or more of the phrases share a single preposition but inserts a different one with another element:

POOR: I looked for my lost keys in the sock drawer, the laundry hamper, the bathroom, and under the bed.
BETTER: I looked for my lost keys in the sock drawer, in the laundry hamper, in the bathroom, and under the bed.

If the series had not included *under the bed*, the preposition could have been used once to apply to all the objects: *I looked for my lost keys in the sock drawer, the laundry hamper, and the bathroom.*

5.244 **Paired joining terms and parallel structure.** Correlative conjunctions such as *either–or*, *neither–nor*, *both–and*, and *not only–but also* and some adverb pairs such as *where–there*, *as–so*, and *if–then* must join grammatically parallel sentence elements. It is a common error to mismatch elements framed by correlatives.

303

NEW
EDITION

WILLIAM
# STRUNK JR.
**AND**
E.B. **WHITE**

*"...still a little book, small enough and important enough
to carry in your pocket, as I carry mine."*
**— Charles Osgood**



*The*
# ELEMENTS
*of*
# STYLE

**FOURTH EDITION**

FOREWORD BY ROGER ANGELL

# THE
# ELEMENTS
## OF
# *Style*

BY

## WILLIAM STRUNK Jr.

*With Revisions, an Introduction,*
*and a Chapter on Writing*

BY

## E. B. WHITE

FOURTH EDITION

ALLYN AND BACON
*Boston London Toronto Sydney Tokyo Singapore*

COPYRIGHT © 2000, 1979, ALLYN & BACON
A Pearson Education Company
Needham Heights, Massachusetts 02494

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photo-copying, recording, or any information storage and retrieval system, without permission in writing from the Publisher.

Earlier editions © 1959, 1972 by Macmillan Publishing Co., Inc.

The Introduction originally appeared, in slightly different form, in *The New Yorker*, and was copyrighted in 1957 by The New Yorker Magazine, Inc.

*The Elements of Style*, Revised Edition, by William Strunk Jr. and Edward A. Tenney, copyright 1935 by Oliver Strunk.

**Library of Congress Cataloging-in-Publication Data**

Strunk, William, 1869–1946.
    The elements of style / by William Strunk, Jr. ; with revisions,
an introduction, and a chapter on writing by E. B. White. — 4th ed.
        p.   cm.
    Includes index.
    ISBN 0-205-30902-X (paperback). — ISBN 0-205-31342-6 (casebound)
    1. English language—Rhetoric.   2. English language—Style.
3. Report writing.   I. White, E. B. (Elwyn Brooks), 1899–   .
II. Title.
PE1408.S772   1999
808'.042—dc21                                              99-16419
                                                              CIP

PRINTED IN THE UNITED STATES OF AMERICA

10   9   8   7   6   5   4   3          04   03   02   01   00

**linking verb**   A verb that joins the subject of a sentence to its complement. Professor Chapman *is* a philosophy teacher. They *were* ecstatic.

**loose sentence**   A sentence that begins with the main idea and then attaches modifiers, qualifiers, and additional details: He was determined to succeed, with or without the promotion he was hoping for and in spite of the difficulties he was confronting at every turn.

**main clause**   An independent clause, which can stand alone as a grammatically complete sentence. Grammarians quibble.

**modal auxiliaries**   Any of the verbs that combine with the main verb to express necessity (*must*), obligation (*should*), permission (*may*), probability (*might*), possibility (*could*), ability (*can*), or tentativeness (*would*). Mary *might* wash the car.

**modifier**   A word or phrase that qualifies, describes, or limits the meaning of a word, phrase, or clause. *Frayed* ribbon, *dancing* flowers, *worldly* wisdom.

**nominative pronoun**   A pronoun that functions as a subject or a subject complement: *I, we, you, he, she, it, they, who.*

**nonrestrictive modifier**   A phrase or clause that does not limit or restrict the essential meaning of the element it modifies. My youngest niece, *who lives in Ann Arbor,* is a magazine editor.

**noun**   A word that names a person, place, thing, or idea. Most nouns have a plural form and a possessive form. *Carol;* the *park;* the *cup; democracy.*

**number**   A feature of nouns, pronouns, and a few verbs, referring to singular or plural. A subject and its corresponding verb must be consistent in number; a pronoun should agree in number with its antecedent. A solo *flute plays;* two *oboes join* in.

Addendum - 13

**object**  The noun or pronoun that completes a prepositional phrase or the meaning of a transitive verb. (See also *direct object, indirect object,* and *preposition.*) Frost offered *his audience a poetic performance* they would likely never forget.

**participial phrase**  A present or past participle with accompanying modifiers, objects, or complements. The buzzards, *circling with sinister determination,* squawked loudly.

**participle**  A verbal that functions as an adjective. Present participles end in *-ing* (*brimming*); past participles typically end in *-d* or *-ed* (*injured*) or *-en* (*broken*) but may appear in other forms (*brought, been, gone*).

**periodic sentence**  A sentence that expresses the main idea at the end. With or without their parents' consent, and whether or not they receive the assignment relocation they requested, *they are determined to get married.*

**phrase**  A group of related words that functions as a unit but lacks a subject, a verb, or both. *Without the resources to continue.*

**possessive**  The case of nouns and pronouns that indicates ownership or possession (*Harold's, ours, mine*).

**predicate**  The verb and its related words in a clause or sentence. The predicate expresses what the subject does, experiences, or is. Birds *fly.* The partygoers *celebrated wildly for a long time.*

**preposition**  A word that relates its object (a noun, pronoun, or *-ing* verb form) to another word in the sentence. She is the leader *of* our group. We opened the door *by* picking the lock. She went *out* the window.

**prepositional phrase**  A group of words consisting of a preposition, its object, and any of the object's modifiers. Georgia *on my mind.*

BRYAN A. GARNER

# Garner's Modern English Usage

*The Authority on Grammar,
Usage, and Style*

Fifth Edition

# GARNER'S MODERN ENGLISH USAGE

FIFTH EDITION

Bryan A. Garner

OXFORD
UNIVERSITY PRESS

OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trademark of
Oxford University Press in the U.K. and certain other countries.

Published in the United States of America by Oxford University Press,
198 Madison Avenue, New York, NY 10016.

© Bryan A. Garner 2022

First Edition published in 1998
Second Edition published in 2003
Third Edition published in 2009
(The first three editions bore the title *Garner's Modern American Usage*.)
Fourth Edition published in 2016
Fifth Edition published in 2022

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior written permission of Oxford University Press,
or as expressly permitted by law, by license, or under terms agreed with
the appropriate reproduction-rights organization. Inquiries concerning
reproduction outside the scope of the above should be sent to the
Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form,
and you must impose this same condition on any acquirer.

Cataloguing-in-Publication data is on file at Library of Congress.

Library of Congress Control Number: 2022945705

ISBN 978-0-19-759902-0

1 3 5 7 9 8 6 4 2
Sheridan Books, Inc., United States of America

*I left after the mail arrived,* the clause following *after* is dependent. And in *I learned to drive when I was 16,* the clause beginning with *when* is subordinate. Dependent clauses may function as nouns <*that I am interested* should be obvious>, adjectives <Caroline, *who had never before been deep-sea fishing,* caught a shark>, or adverbs <*because Alexandra scored two points,* the family celebrated>. — Also termed *subordinate clause; subclause.* See *subordinating conjunction* under CONJUNCTION. Cf. *independent clause.*

▸**elliptical clause.** A clause in which some of the words have been omitted as being understood <when [you are] hitting a golf ball, focus on just one "swing thought">.

▸**embedded clause.** A sentence that changes into a relative clause when combined with another sentence. ● For example, the sentences *The boy is defending the goal well* and *The boy is my son* can be combined into *The boy who is defending the goal so well is my son.* The relative clause *who is defending the goal so well* was derived from the first sentence.

▸**independent clause.** A clause that can stand alone as a complete sentence. ● For example, in the sentence *I was present when the teacher walked in,* the clause *I was present* could stand alone. — Also termed *main clause; principal clause; matrix clause; superordinate clause.* Cf. *dependent clause.*

▸**main clause.** See *independent clause.*

▸**matrix clause.** See *independent clause.*

▸**nominal clause.** A dependent clause that functions as a noun element. ● Nominal clauses may begin with an interrogative (such as *who, when, how*) or a conjunction (such as *that, if, which*). For example, in the sentence *I couldn't imagine who would send an invitation,* the nominal clause *who would send an invitation* functions as the direct object. And in *The fact that he confessed is in his favor,* the nominal clause *that he confessed* is an appositive of *the fact.* Nominal clauses aren't as syntactically malleable as nouns because they have no plural form and can't take all the determiners and complements that a noun can. — Also termed *noun clause.*

▸**nondefining relative clause.** See *nonrestrictive relative clause.*

▸**nonrestrictive relative clause.** A clause beginning with *which, who,* or *whose* and adding nonessential information about the noun it modifies; a relative clause that narrows

and identifies the head phrase. ● The clause is always set off by commas <my aunt, who published a book recently, will be lecturing tonight>, and could be omitted without affecting the sentence's meaning (in the preceding example, *My aunt* is the subject of the complete sentence and the *who*-clause adds nonessential information). — Also termed *nondefining relative clause; appositive relative clause.*

▸**noun clause.** See *nominal clause.*

▸**principal clause.** See *independent clause.*

▸**reduced relative clause.** A relative clause that has lost either a relative pronoun plus a *be*-verb or an object relative pronoun (e.g., *the officer who was on duty* becomes *the officer on duty*). See WHIZ DELETION.

▸**relative clause.** A dependent clause that modifies an antecedent and is most often expressly introduced by a relative pronoun such as *which, who, whose,* or *that.* See ANTECEDENT.

▸**restrictive relative clause.** A clause beginning with *that, who,* or *whose* that contains essential information about the noun element it modifies; a relative clause that gives additional information about a noun element that has already been identified. ● This type of clause is never set off with commas. If the clause were deleted, the meaning of the sentence would be affected. Compare *The room that I slept in was tastefully decorated* with *The room was tastefully decorated.* The restrictive relative clause *that I slept in* identifies a particular room. — Also termed *defining relative clause.*

▸**subordinate clause.** See *dependent clause.*

▸**superordinate clause.** See *independent clause.*

**cledonism** /klee-də-niz-əm/, n. The practice of using euphemisms; the avoidance of seemingly ominous words.

**cleft construction.** See *cleft sentence* under SENTENCE.

**cleft sentence.** See SENTENCE.

**cliché,** n. A trite or hackneyed phrase, esp. a metaphorical one, that has been repeated so often as to have lost some or all of its meaning—and to have acquired a displeasing overfamiliarity. ● Clichés can also be irritating. Consider this passage: *We chased a red herring and got the wool pulled over our eyes.* Few writers can turn one to effective use, although it can be done <let him who has never used a cliché cast the first stone> <football is a game of inches>. Avoid them. See

FIGURE OF SPEECH; SET PHRASE. Cf. IDIOM. See also pp. 212–13.

**climax,** n. *Rhetoric.* The presentation of ideas or propositions so that each successive one is more forceful than the one preceding it—as in Caesar's *I came; I saw; I conquered.* — Also termed *auxesis.*

**clipping,** n. The process by which a word is shortened to produce a new word with the same meaning. ● Clippings are abundant in English. For instance, *auto* comes from *automobile, binocs* from *binoculars, celeb* from *celebrity, fax* from *facsimile transmission,* and *fridge* from *refrigerator.* Cf. APOCOPE; DERIVATION.

**clitic** /klit-ik/, n. An unstressed word that is pronounced and sometimes written as part of a larger word, often in contracted form (e.g., *sanserif* when so spelled, instead of *sans serif*). ● Although it is an independent word, it forms a phonological unit with the words that follow or precede it. There are two types of clitics: enclitics and proclitics. See ENCLITIC; PROCLITIC.

**closed syllable.** See SYLLABLE.

**code-switching,** n. The act of alternating between two or more languages, dialects, or linguistic registers, esp. as the context requires. See DIGLOSSIA; REGISTER.

**code word.** 1. A word assigned, under some agreed-upon system, to bear a special meaning unrelated to its literal sense. 2. An expression that represents some other word, phrase, or idea as a matter of employing a euphemism, signaling others, spreading propaganda, etc.

**cognate** /kog-nayt/, adj. 1. (Of two or more languages) descended from the same ancestral language; belonging to the same linguistic family. 2. (Of two or more words) deriving from the same root; representing the same original word, though having differences because of separate development in usage or phonetics <*provenance* is cognate with *provenience*>.

**cognate** /kog-nayt/, n. 1. A word related to another by common origin, such as *provenance* (from French) and *provenience* (from Latin). 2. A related word in a different language, as French *père* and Spanish *padre.* ● The English word *mother,* the German *Mutter,* and the Latin *mater* all have the same meaning, similar forms, and a common origin. It is possible to trace commonality of origin back much further than Classical Latin or Classical Greek and to say that *brotherly* and *fatherly* are cognates because they derive from the same Indo-European root. 3. *Phonetics.* A sound that

the suggestiveness of the thing omitted <I'll mention only a few of the outrages committed by the Spanish Inquisition>. — Also spelled *paraleipsis; paralepsis* /pa-rə-**lep**-sis/. — Also termed *preterition; pretermission; occupatio.* Cf. APOPHASIS.

**parallelism,** n. **1.** Structural correspondence of adjacent phrases, clauses, or sentences; esp., the presentation of ideas bearing equivalent weight by putting them into identical grammatical structures. **2.** A passage that contains syntactically complementary structures. See pp. 801–02.

**paramoion** /pa-rə-**moy**-ən/, n. Alliteration of the initial sounds of two or more words in a sentence.

**paraph** /pə-**raf**/, n. A penned flourish at the end of or under a signature, often used to protect against forgery.

**paraphrase,** n. **1.** The restatement of a thought, passage, or text in words different from the original statement, and often with greater clarity and either more or less detail; an alternative wording that is faithful to the sense of another, earlier expression. **2.** Another wording of a grammatical structure to reveal its ambiguity. — **paraphrastic,** adj.

**paraphrase,** vb. To use one's own words to express the substance of what another writer or speaker has said <*To paraphrase Shakespeare, no matter what you call a rose, it still smells nice*>.

**parapraxia.** See FREUDIAN SLIP; PARAPRAXIS.

**parapraxis** /pa-rə-**prak**-sis/, n. A moment of faulty memory, esp. as evidenced by a slip of the tongue. — Also termed *parapraxia.* Pl. **parapraxes.**

**paraprosdokian** /pa-rə-pros-**dohk**-ee-ən/, n. An unexpected linguistic shift at the end of a sentence, phrase, or passage, esp. one that suddenly changes the reader's interpretation of the first part. ● The device is frequently used for comedic or dramatic effect. Examples:

- "I don't belong to an organized political party. I'm a Democrat." (Will Rogers [1879–1935])
- "Time flies like an arrow; fruit flies like a banana." (Groucho Marx [1890–1977])
- "War doesn't determine who is right—only who is left." (Anon.)

**parasitic vowel.** See SVARABHAKTI VOWEL.

**parasynesis** /pa-rə-**sin**-ə-sis/, n. The misconception of a word that results in a faulty form (as when *home in* [originally based on what homing pigeons do] becomes, through error, *hone in*; or *chaise longue* is corrupted into *chaise lounge*). Cf. OTOSIS. Pl. **parasyneses.**

**parasyntheton** /pa-rə-**sin**-thə-ton/, n. A derivative word that consists of a root compounded with a particle <bylaws> <downtrodden> <uplifting>.

**parataxis** /pa-rə-**tak**-səs/, n. *Rhetoric.* The combination of successive, equal clauses without expressly showing their syntactic relationship, so that the reader must infer how they are related <I'm ready; let's go>. Cf. HYPOTAXIS. — **paratactic,** adj.

**parathesis** /pə-**rath**-ə-sis/, n. Apposition; the placement of a word or phrase beside another with which it is syntactically parallel <my brother the flutist>. — **parathetic** /pa-rə-**thet**-ik/, adj. See APPOSITION.

**paregmenon** /pə-**reg**-mə-non/, n. *Rhetoric.* The use of a word in the same construction as another to which the first is cognate <die a death> <the victor's victory>.

**parembole** /pa-**rem**-bə-lee/, n. *Rhetoric.* An inserted phrase that modifies or explains the thought expressed in a sentence. ● A parembole differs from a parenthesis by having a more integral connection with the context. — Also termed *paremptosis.*

**paremiology** /pa-ree-mee-**ol**-ə-jee/, n. The study of proverbs and their lore. — Also spelled *paroemiology.* — **paremiological,** adj. — **paremiologist,** n.

**parenthesis,** n. **1.** A word, phrase, clause, or sentence inserted as an explanation or afterthought; an aside inserted into a sentence or paragraph. ● In writing, it is usually set off by commas, em-dashes, or the curved brackets known as "parentheses" (see sense 2). **2.** A punctuation mark that sets off such a word, phrase, clause, or sentence—[(] as the opening mark and [)] as the closing one. Pl. **parentheses.**

**paresis** /pə-**ree**-səs/ or /**pa**-rə-səs/. See ELISION.

**parisology** /pa-ri-**sol**-ə-jee/, n. Ambiguous or equivocal language. — **parisologist,** n.

**parison** /**pa**-rə-sən/, n. **1.** An even balance of clauses, words, syllables, or other elements in a sentence. **2.** A clause that balances another, as in an antithesis.

**parlance,** n. A manner of speaking or of using words, esp. within a particular social or professional group. ● *Parlance* is usually combined with an adjective such as *common, film, legal, medical, military,* or *vulgar.* Cf. JARGON; LINGO.

**parody** /**pa**-rə-dee/, n. **1.** A literary imitation intended for comic effect or ridicule; specif., a piece of writing that mimics certain aspects of a particular author's characteristic style, exaggerating them for satirical purposes. **2.** The genre of such satirical imitations. **3.** By extension, any feeble imitation; a travesty. — **parodic,** adj. — **parody,** vb. — **parodist,** n.

**paroemiology.** See PAREMIOLOGY.

**parole,** n. *Linguistics.* The actual use of language by speakers; written or spoken utterance. ● Parole depends on the existence of a language and its systematic principles, but is not a system itself. Cf. LANGUE.

**paromology** /pa-rə-**mol**-ə-jee/, n. *Rhetoric.* The concession of minor points in a debate as a way of enhancing one's credibility and strengthening one's position. — Also termed *paromologia.*

**paronomasia** /pa-rə-noh-**may**-zhə/, n. *Rhetoric.* The deliberate and humorous use of the double meanings of words and phrases; esp., wordplay in which the similarity of sound is a prominent characteristic; a pun <the best of all acids is assiduity>. — Also termed *adnomination; agnomination; paronymy.* See PUN. — **paronomastic,** adj.

**paronym** /**pa**-rə-nim/, n. **1.** A derived word having but a slight change in form from one in another language; esp., a word formed by adapting a foreign word (e.g., *civil* from Latin *civilis,* or *egality* from French *égalité*). **2.** A word derived from another in the same language (e.g., *analytical* from *analysis,* or *parasitic* from *parasite*). **3.** HOMOPHONE. — **paronymous,** adj.

**paronymy** /pə-**ron**-ə-mee/, n. **1.** The introduction of a word into a language by borrowing from another language and slightly changing it. **2.** The relationship between cognate words with related meanings. **3.** PARONOMASIA.

**parrhesia** /pə-**ree**-zhə/, n. **1.** Candor and frankness; bold outspokenness. **2.** The practice or an instance of seeking permission to be boldly outspoken.

**parrotry** /**pa**-rə-tree/, n. The mindless repetition of others' words or sayings; PSITTACISM.

**parse,** vb. **1.** v.t. To determine the parts of speech of and the relationship between (the individual parts of a sentence). **2.** v.t. To describe (a word or phrase) by classifying its part of speech, its composition, its inflection, and its relation to other words in the sentence. **3.** v.i. (Of a sentence) to meet the standards of good grammar.

**parsing,** n. **1.** The act or process of separating out the elements of a

trivial. **2.** An instance of pedantic behavior or a pedantic form of expression. — Also termed *pedanticism*.

**pejoration** /pee-jə-**ray**-shən/, n. A change in the meaning of a word from one that is positive or neutral to one that is negative or borders on the negative. • For example, *notorious* once meant "widely known" and implied nothing about reputation, but now it means "infamous." Cf. MELIORATION.

**pejorative,** n. A linguistic form, such as a word or morpheme, that expresses disparagement. — **pejorative,** adj.

**pensée** /pon-**say**/ or (BrE) /**pon**-say/, n. A thought or reflection set down in literary form. • The classical appearance of the term was in Blaise Pascal's *Les Pensées* (1657–1658), a collection of nearly a thousand notes and fragments expressing his religious beliefs, including the idea now known as "Pascal's Wager," which posits that rational people will wager that God does indeed exist because if they erroneously wager otherwise, they stand to endure eternity in Hell.

**pentasyllable** /**pen**-tə-sil-ə-bəl/, n. A word of five syllables. — **pentasyllabic** /pen-tə-si-**lab**-ik/, adj.

**penult** /**pen**-əlt/, n. A word's next-to-last syllable.

**perfective aspect.** See ASPECT.

**perfect tense.** See *present-perfect tense* under TENSE.

**pericope** /pə-**rik**-ə-pee/, n. An extract or selection from a book, esp. a passage from the Bible. — **pericopal** /per-i-**koh**-pəl/, adj.

**periergia** /per-i-**ər**-jee-ə/, n. The use of ornate, embellished language to discuss a commonplace thing; pompous, bombastic language. Cf. EUPHUISM; GONGORISM.

**period,** n. **1.** The full stop that marks the end of a sentence. **2.** A grammatically complete sentence. **3.** A paragraph; a series of sentences that make up a unit of thought.

**period-dots.** See ELLIPSIS (2).

**periodic sentence.** *Rhetoric.* A sentence in which a complete thought is not expressed until the main clause and other rhetorical balancing devices are all read. • By using the opening clauses to give context and delay, the speaker slowly builds to a climax.

**periphrasis** /pə-**rif**-rə-sis/, n. **1.** *Rhetoric.* The use of a roundabout expression in place of a direct one; circumlocution <an elongated yellow fruit = banana>. **2.** *Grammar.* A phrase used to express what might otherwise be expressed in one inflected word (e.g., *did go* = went; *more tight* = tighter). Pl. **periphrases.**

— **periphrastic** /per-ə-**fras**-tik/, adj. See p. 817.

**periphrastic comparative.** See COMPARATIVE.

**perissology** /per-i-**sol**-i-jee/, n. The use of more words than necessary; superfluity of expression; PLEONASM.

**perlocution** /pər-loh-**kyoo**-shən/, n. Speech or writing intended to persuade or convince; language designed to bring about an action not itself constituting that action. Cf. ILLOCUTION.

**perlocutionary,** adj. *Linguistics.* Of or designating an act of speech or writing intended to produce an effect on the audience, such as persuading, convincing, inspiring, scaring, insulting, or motivating. • This word appears most frequently in the term *perlocutionary act.*

**permissive,** adj. (Of a modal auxiliary) expressing permission or exhortation (as with *may* or *should*). Cf. OBLIGATIVE.

**perorate** /**par**-ə-rayt/, vb. **1.** To sum up; to conclude. **2.** To make a long, elaborate speech in a formal and dignified manner; to harangue grandiloquently. — **peroration,** n.

**persiflage** /**pər**-si-flahzh/, n. Banter that is a mixture of frivolity and mockery, sometimes sardonic or contemptuous in tone. Cf. BADINAGE.

**person,** n. A characteristic of a noun or pronoun that identifies it as the speaker (first person), the thing spoken to (second person), or the thing spoken of (third person). • In English, *I* (singular) and *we* (plural) are the first-person pronouns; *you* (singular and plural) is the second-person pronoun; and *he, she,* and *it* (singular) and *they* (plural) are the third-person pronouns. See CONCORD.

**personal pronoun.** See PRONOUN.

**personification,** n. *Rhetoric.* The representation of an object, esp. an inanimate one, or an idea as having a personality or human attributes. • Examples:

- Sir Walter Raleigh (1552–1618) referred to flowers as "you pretty daughters of the earth and sun."
- The Pyramids, doting with age, have forgotten the names of their founders. (Thomas Fuller [1608–1661])
- England expects every man to do his duty. (Lord Horatio Nelson [1758–1805])

— Also termed *prosopopoeia.*

**perspicuity** /pər-spi-**kyoo**-i-tee/, n. Clarity of expression or style; freedom from obscurity, ambiguity, and undue complexity; lucidity. — **perspicuous** /pər-**spik**-yoo-wəs/, adj.

*petitio principii* /pə-**tish**-ee-oh prin-**sip**-i-ee or -**sip**-ee-i/, n. An argument in which a basic premise presupposes the conclusion at issue; a circular argument. — Also termed *diallelus; diallelon.* See **beg the question** (pp. 128–29).

**phatic** /**fat**-ik/, adj. Of, relating to, or involving communication used for polite social interaction rather than to elicit or convey information; characterized by small talk.

**phatic exchange.** A rudimentary, superficial conversation made only for general purposes of social interaction and not for literal meaning (e.g., *Hey. How's it going? Great. And you? Fine, thanks. Nice weather. Yeah. Have a great day.*).

**philippic** /fi-**lip**-ik/, n. A speech or discourse abounding in bitter denunciations and vituperative acrimony; a prolonged scathing attack. • The original philippics, from which the term derives, were Demosthenes's speeches against Philip II of Macedon in 351–350 BCE. — **philippic,** adj. — **philippize,** vb.

**philologaster** /fi-**lol**-ə-gas-tər/, n. An inept or blundering philologist. Cf. GRAMMATICASTER; LOGICASTER; POETASTER.

**philology** /fi-**lol**-ə-jee/, n. **1.** The study of literature from many points of view, including metaphor, criticism, grammar, etymology, and the like. **2.** The study of language apart from its literature. **3.** The love of learning and literature.

**phonaestheme.** See PHONESTHEME.

**phoneme** /**foh**-neem/, n. The smallest unit of sound in a language. • Phonemes are represented in writing by single letters for many consonants, such as *p* in *pot* and *rip*. See ALLOPHONE; CONSONANT; MORPHOPHONEMICS. — **phonemic,** adj.

**phonemics** /foh-**nee**-miks/, n. *Linguistics.* The study of a language's sound system, focusing on analyzing and classifying the language's phonemes.

**phonestheme** /**foh**-nəs-theem/, n. A phoneme that carries a vague semantic content or identifiable associations because it appears in many words having loosely allied meanings. • Examples: /gr/ in *gripe, gritty, grudge, gruff, grumble,* and *grumpy;* /sl/ in *sleazy, slime, slob, sloppy, slur,* and *slurp;* /sn/ in *snarl, sneak, snicker, snide, snivel,* and *snoop.* Although counterexamples can always be found, they are considered not to invalidate the concept. For a discussion illustrating the concept, see **snuck** (fourth from the last paragraph, pp. 1013–14). — Also

spelled *phonaestheme*. — **phonesthemic**, adj. — **phonesthesia**, n.

**phonetic**, adj. Representing speech sounds.

**phoneticism** /foh-**net**-i-siz-əm/, n. **1.** A phonetic quality within either a word, a system of writing, or a person's speech. **2.** A phonetic spelling.

**phonetics**, n. *Linguistics.* The study of the properties of speech sounds, how they are made by the human voice, how they are combined with one another, and the acoustic effect that they produce. — **phonetician**, n.

**phonocentrism** /foh-nə-**sen**-triz-əm/, n. A bias in favor of speech over writing in linguistic analysis; the view that the spoken language is paramount over the written language. ● This view had its most prominent origins in the work of Ferdinand de Saussure (1857–1913). — **phonocentric**, adj.

**phonology** /fə-**nol**-ə-jee/, n. *Linguistics.* The study of the sound structure of a language; specif., the study of the sounds found in any one language or group of related languages. — **phonological**, adj.

**phonotactics**, n. **1.** The branch of linguistics that studies the rules for phoneme sequences in a language or in languages generally. **2.** The rules themselves.

**phrasal** /**fray**-zəl/, adj. Of, relating to, or consisting of a phrase. ● The word dates from the mid-19th century. Cf. CLAUSAL.

**phrasal adjective.** See ADJECTIVE.

**phrasal preposition.** See PREPOSITION.

**phrasal verb.** See VERB.

**phrase**, n. A combination of words that make sense but do not form a complete sentence; in modern linguistics, a constituent that consists of a single word (the "head") plus all its modifiers. Cf. CLAUSE; WORD.

▸**adjective phrase. 1.** A prepositional phrase that functions as an adjective, qualifying a noun <the ambassador from Brazil>. **2.** A phrase with an adjective as its head <my teddy bear is afraid of the dark> (the adjective phrase being *afraid of the dark*). **3.** Loosely, a phrasal adjective. — Also termed *adjectival phrase.* See *phrasal adjective* under ADJECTIVE.

▸**adverbial phrase.** Two or more words in a sentence jointly having the force of an adverb <they do that work *every day*> <*by the way*, he was not found guilty>.

▸**gerundive phrase.** See *gerund phrase.*

▸**gerund phrase.** A noun phrase with a gerund as its head. — Also termed *gerundive phrase.*

▸**infinitive phrase.** A noun phrase with an infinitive as its head. ● An infinitive phrase may be either (1) an infinitive and its accompanying complements or adverbs <to strike a bargain> <to think deeply> or (2) a sequence such as *to be tapped, to be tapping, to have been tapped*, or *to have been tapping.*

▸**participial phrase.** A phrase consisting of a participle and a modifier or complement and functioning as an adjective. ● The phrase may appear before or after the subject. In *The monarch butterflies migrating from Mexico look fragile but are quite hardy*, the participial phrase *migrating from Mexico* modifies the subject, *monarch butterflies.* Likewise, *hiding behind the curtains* modifies the subject *burglar* in *Hiding behind the curtains, the burglar planned his next move.* A participial phrase may also be appositive: *The lecture, delivered as a favor to the president, drew an enthusiastic audience.*

▸**prepositional phrase.** A constituent that consists of a preposition followed by a noun phrase.

▸**verb phrase.** A phrase composed of the main verb plus the complement, objects, and adverbs. ● In *I bought her a new necklace, I* is the subject and the other words make up the verb phrase.

**phrasebook.** A book used by non-native speakers of a language, esp. travelers, to explain idioms and other characteristic expressions. — Also written *phrase book; phrase-book.*

**phrasemaker**, n. **1.** Someone who creates striking verbal formulations; a coiner of well-turned expressions. **2.** Someone who invents catchy but often meaningless or empty statements. Cf. NEOLOGIST.

**phrasemonger**, n. **1.** A person who seeks to impress others by coining or using grandiose phrases, usu. to excess. **2.** Someone who engages in underhanded sloganeering in a way calculated to mislead. Cf. WORD-MONGER.

**phraseology** /fray-zee-**ol**-ə-jee/, n. **1.** The selection and arrangement of words in expressing an idea; manner or style of expression. **2.** The terminology, syntax, and style that characterize either the work of a particular writer or the language of a particular subject, specialty, or place. — **phraseological**, adj. — **phraseologist**, n.

**phrase structure. 1.** The hierarchical structure of words and phrases as the constituents of a sentence; specif., the elements of a sentence analyzed into its constituent parts. — Also termed

*constituent structure.* **2.** A group of words constituting a phrase.

**pictogram**, n. A character that represents an idea or object independently of words, as with ancient cave paintings. — Also termed *pictograph.* Cf. LOGOGRAM; IDEOGRAM.

**pictograph.** See PICTOGRAM.

**pidgin** /**pij**-ən/, n. A language developed from elements of dissimilar languages (e.g., English and Tagalog) and using a simplified grammatical form so that people without a common language may communicate. ● The vocabulary is usually limited. A pidgin language may be local (in the sense that it has elements of the local language), but it is not a native language; it is a product of contact between speakers of different languages. (Cf. CREOLE.) The word *pidgin* is a Cantonese corruption of the English word *business.* One of the first recorded pidgins was an amalgam of English and Chinese words arranged according to Chinese syntax and used to conduct trade.

**pied-piping**, n. The habit or convention of avoiding a terminal preposition by putting it right before the relative or interrogative pronoun that it relates to (or, to illustrate the habit itself, *the relative or interrogative pronoun to which it relates*). ● The term was first used in J.R. Ross's 1967 Ph.D. dissertation at MIT and since has appeared in many other linguistic contexts. The allusion, of course, is to the way charmed rats follow the piper in the fairy tale.

**pilcrow** /**pil**-kroh/, n. A paragraph marker (¶).

**pitch**, n. The high or low tone of a spoken sound produced by the vibrational frequency of the vocal cords; spoken stress. See INTONATION.

**pithy**, adj. Stylistically concentrated in force and energy.

**pivot-pun**, n. A pun that implies one meaning with the words preceding it, another with the words following it. ● The term originated to denote a device in classical Japanese poetry.

**pivot. 1.** A word central to the meaning or syntax of a sentence or paragraph. **2.** The word on which a pivot-pun turns. See PIVOT-PUN. **3.** One of the core words that a child acquires at an early stage of linguistic development.

**placeholder**, n. A word or phrase that is required by syntax but that carries little or no semantic information; esp., the impersonal pronoun in a sentence in which the subject clause occurs after the verb <do you believe it?>.

<we'll set up camp at the foot of the mountain> <that shoe is too tight for my foot>. Cf. MONOSEMY. — **polysemous,** adj.

**polysyllable** /**pol**-i-sil-ə-bal/, n. A line or word of many syllables, usu. three or more. — **polysyllabic** /po-lee-si-**lab**-ik/, adj.

**polysyndeton** /pol-ee-**sin**-də-ton/, n. *Rhetoric.* The repetitive use of conjunctions between elements in a sentence, such as words, phrases, or clauses. ● This device can make a speaker or writer sound breathless. Example:

> ● I said, "Who killed him?" and he said, "I don't know who killed him but he's dead all right," and it was dark and there was water running in the street and no lights and windows broke and boats all up in the town and trees blown down and everything all blown and I got a skiff and went out and found my boat where I had her inside Mango Bay and she was all right only she was full of water. (Ernest Hemingway [1899–1961])

Cf. ASYNDETON.

**polysynthesis** /pol-ee-sin-thə-sis/, n. The combination of several words that often go together into one word <insofar> <inasmuch>. Pl. **polysyntheses.**

**poncif** /pon-**seef**/, n. Hackneyed or conventional ideas in expression, literature, or art.

**popularized technicality.** A technical term that has come into widespread use outside the field where it originated, usu. having acquired an extended meaning. ● When H.W. Fowler (1858–1933) first coined this term in his 1926 book *A Dictionary of Modern English Usage*, the phrase *acid test* was the leading example. In its original scientific context, it referred to using nitric acid to test for gold. It was popularized by President Woodrow Wilson (1856–1924), who used it figuratively to mean "a severe or conclusive test" when he stated, "The treatment accorded Russia by her sister nations in the months to come will be the acid test of their good will." Many specialized subjects have contributed popularized technicalities to English, among them law <leading question>, medicine <cancerous>, logic <dilemma>, chess <gambit>, physics <quantum leap>, and sailing <underway>. ● Often purists object to a popularized technicality when it is new, but they tend to have little say in its linguistic fate.

**portmanteau word** /port-**man**-toh/. See BLEND.

**positive,** adj. & n. The ordinary condition of a gradable adjective or adverb; the lowest degree of comparison. ● The positive degree does not express a comparison to any other thing <*strong*—not *stronger* (comparative) or *strongest* (superlative)>. — Also termed *positive degree; absolute degree.* See ADJECTIVE; ADVERB; DEGREE. Cf. COMPARATIVE; SUPERLATIVE.

**possessive** /pə-**zes**-iv/, n. The case to show possession, ownership, or close relationship. ● In English, most nouns form the possessive by adding *-'s* to the singular and irregular plural forms, and an apostrophe alone to regular plural forms. See pp. 854–57.

▸**second possessive.** A personal pronoun commonly used in a nominal position (*mine, yours, his, hers, its, ours,* and *theirs*).

**possessive adjective.** See ADJECTIVE.

**possessive case.** See CASE.

**possessive pronoun.** See PRONOUN.

**postclitic** /pohst-**klit**-ik/, n. An unemphatic word that is accented as if it were part of the preceding word (as *one* in *good one* or *it* in *Post-it note*). Cf. PROCLITIC.

**postmodification,** n. The placement of a modifier after the word it modifies (such as *a man with blue eyes* instead of *a blue-eyed man*).

**postmodifier,** n. A word that qualifies or limits the sense of a preceding word; a postpositive qualifier. See POSTPOSITIVE. — **postmodification,** n.

**postpositive,** n. A modifying particle or word that is placed after the word it modifies. ● In *he was the man chosen for the job, chosen* is a postpositive because it modifies *man,* clarifies which man is referred to, and comes after the word modified. — Also termed *postmodifier.* Cf. PREPOSITIVE. See p. 858.

**postverbal,** adj. Following the verb. — **postverbal,** n.

**praeteritio** /pree-tə-**rit**-ee-oh/. See PARALIPSIS.

**pragmatics** /prag-**mat**-iks/, n. *Linguistics.* The study of how language is used in the context of certain communications, such as the beliefs of the speaker and his or her relationship to the audience.

**prate,** vb. To engage in trivial, empty, or foolish—and often lengthy—talk.

**prattle,** vb. **1.** To talk in a foolish, childish, or inconsequential way; to babble or chatter at length to little or no purpose. **2.** To say (things) as if to fill up space, often through nervous energy, in a way that drains the energy of listeners.

**precatory** /**prek**-ə-tor-ee/, adj. Expressing a desire that something be done,

but in a nonmandatory way <precatory words in a will>.

**precisian** /pri-**sizh**-ən/, n. A person who rigidly and precisely observes established rules, forms, or standards. — Also termed *precisionist.*

**predicate,** n. A syntactic unit consisting of a finite verb and all the words modifying it or governed by it, such as *are ready to go* in the sentence *We are ready to go.* — Also termed *complete predicate.*

▸**compound predicate.** A predicate consisting of two or more verbs connected by *and.*

▸**simple predicate.** The verb or verb phrase in a sentence without its objects, modifiers, etc.

**predicate adjective.** See ADJECTIVE.

**predicate nominative.** A predicate noun in the nominative case, such as *he* <this is he> and *I* <it was I who called their attention to that fact>. — Also termed *predicate noun.*

**predicative,** adj. Of, relating to, or involving a noun or adjective that follows a linking verb to form a predicate. ● In the sentence *His mentor called him a failure, yet he became a well-respected businessman,* the noun phrase *a failure* is the predicative object of the linking verb *called,* and the noun phrase *a well-respected businessman* is the predicative complement of the linking verb *became.* Cf. ATTRIBUTIVE.

**predicative adjective.** See *predicate adjective* under ADJECTIVE.

**prefix,** n. An affix attached to the beginning of a word to modify its meaning. ● Prefixes serve many functions. Some, such as *im-, in-,* and *un-,* change a word's meaning to its direct opposition <possible–impossible> <comfortable–uncomfortable>. See AFFIX. Cf. SUFFIX; INFIX.

**prelect** /pri-**lekt**/, vb. To lecture or discourse publicly. — **prelection** /pri-**lek**-shən/, n.

**prelinguistics,** n. The study of biological and physiological aspects of speech. Cf. MICROLINGUISTICS; MACROLINGUISTICS.

**premodifier.** See PREPOSITIVE.

**preoccupation.** See PROLEPSIS (2).

**preposition,** n. An uninflected word or a phrase that indicates relationships of location, direction, means, agency, etc. between a noun and other words in the sentence. ● The preposition's object is usually a noun or pronoun, which is always in the objective case (e.g., in *that sounds good to me,* the pronoun *me* is the object of the preposition *to,* so it is in the objective case). Although the preposition



# The Gregg Reference Manual

## William A. Sabin

*tribute edition*



# The Gregg Reference Manual

## A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING

# The Gregg Reference Manual

A MANUAL OF STYLE, GRAMMAR,
USAGE, AND FORMATTING

William A. Sabin



Connect
Learn
Succeed™



THE GREGG REFERENCE MANUAL: A MANUAL OF STYLE, GRAMMAR, USAGE, AND FORMATTING: TRIBUTE EDITION, ELEVENTH EDITION

Published by McGraw-Hill, a business unit of The McGraw-Hill Companies, Inc., 1221 Avenue of the Americas, New York, NY, 10020. Copyright © 2011 by The McGraw-Hill Companies, Inc. All rights reserved. Previous editions © 1951, 1956, 1961, 1970, 1977, 1985, 1992, 1996, 2001, and 2005. No part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written consent of The McGraw-Hill Companies, Inc., including, but not limited to, in any network or other electronic storage or transmission, or broadcast for distance learning.

Some ancillaries, including electronic and print components, may not be available to customers outside the United States.

This book is printed on acid-free paper.

1 2 3 4 5 6 7 8 9 0 DOC/DOC 1 0 9 8 7 6 5 4 3 2 1 0

ISBN 978-0-07-339710-8

MHID 0-07-339710-5

Vice President/Editor in Chief: *Elizabeth Haefele*
Vice President/Director of Marketing: *John E. Biernat*
Publisher: *Kenneth S. Kasee Jr.*
Sponsoring editor: *Natalie J. Ruffatto*
Director of Development: *Sarah Wood*
Senior developmental editor: *Michelle L. Flomenhoft*
Editorial coordinator: *Parissa DJangi*
Marketing manager: *Kelly Curran*
Lead digital product manager: *Damian Moshak*
Digital developmental editor: *Kevin White*
Director, Editing/Design/Production: *Jess Ann Kosic*
Lead project manager: *Rick Hecker*
Senior production supervisor: *Janean A. Utley*
Senior designer: *Srdjan Savanovic*
Senior photo research coordinator: *Lori Kramer*
Media project manager: *Cathy L. Tepper*
Cover design: *Srdjan Savanovic*
Interior design: *Karen LaFond*
Typeface: *10/12 Cushing Book*
Compositor: *MPS Limited, A Macmillan Company*
Printer: *R. R. Donnelley*
Cover credit: *Jody Series #7, 2008, courtesy of Nancy Freeman*

### Library of Congress Cataloging-in-Publication Data

Sabin, William A.
    The Gregg reference manual : a manual of style, grammar, usage, and formatting / William A. Sabin.—Tribute ed., 11th ed.
        p. cm.
    Includes index.
    ISBN-13: 978-0-07-339710-8 (alk. paper)
    ISBN-10: 0-07-339710-5 (alk. paper)
    1. English language—Business English—Handbooks, manuals, etc. 2. English language—Grammar—Handbooks, manuals, etc. 3. English language—Transcription—Handbooks, manuals, etc. 4. Business writing—Handbooks, manuals, etc. I. Title.
PE1479.B87S23 2011
808'.042—dc22

                                                                                2009052625

**Nominative case.** Used for the subject or the complement of a verb.

> *She* publishes a newsletter. (Subject.)
> The person who called you was *I*. (Complement.)

**Possessive case.** Used to show ownership and other relationships. (See ¶¶627–653, especially the examples in ¶627.)

> *My* statistical analysis is in this report. The suggestions in the appendix are also *mine*.

**Objective case.** Used for (1) the object of a verb, (2) the object of a preposition, (3) the subject of an infinitive, (4) the object of an infinitive, and (5) the complement of the infinitive *to be*.

> Can you help *us* this weekend? (Object of the verb *help*.)
> Brenda has not written to *me*. (Object of the preposition *to*.)
> I encouraged *her* to enter the biathlon. (Subject of the infinitive *to enter*.)
> William promised to call *me* but he didn't. (Object of the infinitive *to call*.)
> They believed me to be *her*. (Complement of the infinitive *to be*.)

**Clause.** A group of related words containing a subject and a predicate. An *independent clause* (also known as a *main clause* or *principal clause*) expresses a complete thought and can stand alone as a sentence. A *dependent clause* (also known as a *subordinate clause*) does not express a complete thought and cannot stand alone as a sentence.

> I will go *[independent clause]* if I am invited *[dependent clause]*.

**Adjective clause.** A dependent clause that modifies a noun or a pronoun in the main clause. Adjective clauses are joined to the main clause by relative pronouns *(which, that, who, whose, whom)*.

> Their bill, *which includes servicing,* seems reasonable. (Modifies *bill*.)

**Adverbial clause.** A dependent clause that functions as an adverb in its relation to the main clause. Adverbial clauses indicate time, place, manner, cause, purpose, condition, result, reason, or contrast.

> These orders can be filled *as soon as stock is received.* (Time.)
> I was advised to live *where the climate is dry.* (Place.)
> She worked *as though her life depended on it.* (Manner.)
> Please write me at once *if you have any suggestions.* (Condition.)
> *Because our plant is closed in August,* we cannot fill your order now. (Reason.)

**Coordinate clauses.** Clauses of the same rank—independent or dependent.

> *Carl will oversee the day-to-day operations, and Sheila will be responsible for the finances.* (Coordinate independent clauses.)
> *When you have read the user's manual and you have mastered all the basic operations,* try to deal with these special applications. (Coordinate dependent clauses.)

**Elliptical clause.** A clause from which key words have been omitted. (See ¶¶101b–c, 111, 119a, 130b, and 1082d.)

> *Now, for the next topic.*     *Really?*     *If possible,* arrive at one.

**Essential (restrictive) clause.** A dependent clause that cannot be omitted without changing the meaning of the main (independent) clause. Essential clauses are *not* set off by commas.

> The magazine *that came yesterday* contains an evaluation of new software.

Glossary of Grammatical Terms

A

**Conjunctive adverb.** See *Adverbial conjunctive*.

**Connective.** A word that joins words, phrases, or clauses. The chief types of connectives are conjunctions, adverbial conjunctives, prepositions, and relative pronouns.

**Consonants.** The letters *b, c, d, f, g, h, j, k, l, m, n, p, q, r, s, t, v, w, x, y, z*. The letters *w* and *y* sometimes serve as vowels (as in *saw* and *rhyme*). (See also *Vowels*.)

**Contraction.** A shortened form of a word or phrase in which an apostrophe indicates the omitted letters or words; for example, *don't* for *do not*. (See ¶505b–e.)

**Dangling modifier.** A modifier that is attached either to no word in a sentence or to the wrong word. (See *Modifier* and ¶¶1082–1087.)

**Direct address.** A construction in which a speaker or a writer addresses another person directly; for example, "What do you think, Sylvia?"

**Elliptical expressions.** Condensed expressions from which key words have been omitted; for example, *if necessary* (for *if it is necessary*). (See ¶¶101b–c, 111, 119a; see also *Clause; Sentence*.)

**Essential elements.** Words, phrases, or clauses needed to complete the structure or meaning of a sentence. (See also *Clause; Phrase*.)

**Gender.** The characteristic of nouns and pronouns that indicates whether the thing named is *masculine (man, boy, he), feminine (woman, girl, she),* or *neuter (book, concept, it).* Nouns that refer to either males or females have *common* gender *(person, child).*

**Gerund.** A verb form ending in *ing* and used as a *noun*.

> *Selling* requires special skills. (Subject.)
> I enjoy *selling*. (Direct object of *enjoy*.)
> She is experienced in *selling*. (Object of preposition *in*.)

**Dangling gerund.** A prepositional-gerund phrase that is attached either to no word in a sentence or to the wrong word. (See ¶1082c.)

**Imperative.** See *Mood*.

**Indicative.** See *Mood*.

**Infinitive.** The form of the verb usually introduced by *to* (see ¶¶1044–1046). An infinitive may be used as a noun, an adjective, or an adverb. (See *Phrase*.)

| | |
|---|---|
| NOUN: | *To find affordable housing these days* is not easy. (Subject.) |
| | She is trying *to do a hatchet job on my proposal.* (Object.) |
| ADJECTIVE: | I still have two more contracts *to draft.* (Modifies *contracts.*) |
| ADVERB: | He resigned *to take another position.* (Modifies *resigned.*) |

**Interjection.** A word that shows emotion; usually without grammatical connection to other parts of a sentence.

> *Wow!* What a weekend!     *Oh,* so that's what he meant.

**Modifier.** A word, phrase, or clause that qualifies, limits, or restricts the meaning of a word. (See *Adjective; Adverb; Compound adjective; Dangling modifier; Squinting modifier.*)

**Participle.** A word that may stand alone as an adjective or may be combined with helping (auxiliary) verbs to form different tenses (see ¶¶1033–1034). There are three forms: present, past, and perfect.

Present participle. Ends in *ing;* for example, *making, advertising.*

Past participle. Regularly ends in *ed* (as in *asked* or *filed*) but may be irregularly formed (as in *lost, seen,* and *written*). (See ¶1030a–b.)

Perfect participle. Consists of *having* plus the past participle; for example, *having asked, having lost.*

When a participle functions as an *adjective*, it modifies a noun or a pronoun.

The *coming* year poses some new challenges. (Modifies *year*.)
*Having retired* last year, I now do volunteer work. (Modifies *I*.)

Because a participle has many of the characteristics of a verb, it may take an object and be modified by an adverb. The participle and its object and modifiers make up a *participial phrase.*

*Seizing the opportunity,* Orzo offered to buy the business. *(Opportunity is the object of seizing.)*
*Moving aggressively,* we can control the market. *(Aggressively modifies moving.)*

Dangling participle. A participial phrase attached either to no word in a sentence or to the wrong word. (See *Phrase* and ¶1082a.)

**Parts of speech.** The eight classes into which words are grouped according to their uses in a sentence: verb, noun, pronoun, adjective, adverb, conjunction, preposition, and interjection.

*Time flies like* an arrow. (In this case, *time* is a noun, *flies* is a verb, and *like* is a preposition.)
*Fruit flies like* a banana. (In this case, *flies* is part of a compound noun, *fruit flies; like* is a verb.)

**Passive verb.** See *Voice, passive.*

**Person.** The characteristic of a word that indicates whether a person is speaking *(first person)*, is spoken to *(second person)*, or is spoken about *(third person)*. Only personal pronouns and verbs change their forms to show person. All nouns are considered third person.

|  | **Singular** | **Plural** |
|---|---|---|
| FIRST PERSON: | *I* like this book. | *We* like this book. |
| SECOND PERSON: | *You* like this book. | *You* like this book. |
| THIRD PERSON: | *She* likes this book. | *They* like this book. |

**Phrase.** A group of two or more words without a subject and a predicate; used as a noun, an adjective, or an adverb. (See *Predicate.*)

Noun phrase. A phrase that functions as a noun (such as a gerund phrase, an infinitive phrase, or a prepositional phrase).

I like *running my own business.* (Gerund phrase as object.)
*To provide the best possible service* is our goal. (Infinitive phrase as subject.)
*Before 9 a.m.* is the best time to call me. (Prepositional phrase as subject.)

Adjective phrase. A phrase that functions as an adjective (such as an infinitive phrase, a participial phrase, or a prepositional phrase).

The time *to act* is now! (Infinitive phrase indicating what kind of time.)

Adverbial phrase. A phrase that functions as an adverb (such as an infinitive phrase or a prepositional phrase).

Let's plan to meet *after lunch.* (Prepositional phrase indicating when to meet.)

**Gerund phrase.** A gerund plus its object and modifiers; used as a noun.

*Delaying payments to your suppliers* will prove costly. (Gerund phrase as subject.)

**Infinitive phrase.** An infinitive plus its object and modifiers; may be used as a noun, an adjective, or an adverb. An infinitive phrase that is attached either to no word in a sentence or to the wrong word is called a *dangling infinitive.* (See ¶1082b.)

*To get TF's okay on this purchase order* took some doing. (As a noun; serves as subject of the verb *took.*)

The decision *to close the Morrisville plant* was not made easily. (As an adjective; tells what kind of decision.)

Janice resigned *to open her own business.* (As an adverb; tells why Janice resigned.)

**NOTE:** An infinitive phrase, unlike other phrases, may sometimes have a subject. This subject precedes the infinitive and is in the objective case.

I want *her to review this draft for accuracy. (Her* is the subject of *to review.)*

**Participial phrase.** A participle and its object and modifiers; used as an adjective.

The committee *considering your proposal* should come to a decision this week.

I prefer the cover sample *printed in blue and yellow.*

**Prepositional phrase.** A preposition and its object and modifiers; may be used as a noun, an adjective, or an adverb.

*From Boston to Tulsa* is about 1550 miles. (As a noun; serves as subject of *is.)*

Profits *in the automobile industry* are up sharply this quarter. (As an adjective; indicates which type of profits.)

You handled Dr. Waterman's objections *with great skill.* (As an adverb; indicates the manner in which the objections were handled.)

**Prepositional-gerund phrase.** A phrase that begins with a preposition and has a gerund as the object. (See *Gerund* and ¶1082c.)

*By rechecking these figures before you release them,* you deal with any questions raised by higher management. *(By* is the preposition; *rechecking,* a gerund, is the object of *by.)*

**Essential (restrictive) phrase.** A phrase that limits, defines, or identifies; cannot be omitted without changing the meaning of the sentence.

The study *analyzing our competitors' promotion activities* will be finished within the next two weeks.

**Nonessential (nonrestrictive) phrase.** A phrase that can be omitted without changing the meaning of the sentence.

The Stanforth-Palmer Company, *one of the country's largest financial services organizations,* is expanding into satellite communications.

**Verb phrase.** The individual words that make up the verb in a sentence. Sometimes a verb phrase includes an adverb. A verb phrase can function only as a verb.

You *should work together* with Nora on the report. (The verb phrase consists of the verb form *should work* plus the adverb *together.)*

**Positive degree.** See *Comparison, positive.*

**Possessive case.** See *Case, possessive.*

**Predicate.** That part of a sentence which tells what the subject does or what is done to the subject or what state of being the subject is in. (See also *Verb.*)



Glossary of
Grammatical Terms

A

**Gerund phrase.** A gerund plus its object and modifiers; used as a noun.

> *Delaying payments to your suppliers* will prove costly. (Gerund phrase as subject.)

**Infinitive phrase.** An infinitive plus its object and modifiers; may be used as a noun, an adjective, or an adverb. An infinitive phrase that is attached either to no word in a sentence or to the wrong word is called a *dangling infinitive.* (See ¶1082b.)

> *To get TF's okay on this purchase order* took some doing. (As a noun; serves as subject of the verb *took.*)
>
> The decision *to close the Morrisville plant* was not made easily. (As an adjective; tells what kind of decision.)
>
> Janice resigned *to open her own business.* (As an adverb; tells why Janice resigned.)

**NOTE:** An infinitive phrase, unlike other phrases, may sometimes have a subject. This subject precedes the infinitive and is in the objective case.

> I want *her to review this draft for accuracy. (Her* is the subject of *to review.)*

**Participial phrase.** A participle and its object and modifiers; used as an adjective.

> The committee *considering your proposal* should come to a decision this week.
>
> I prefer the cover sample *printed in blue and yellow.*

**Prepositional phrase.** A preposition and its object and modifiers; may be used as a noun, an adjective, or an adverb.

> *From Boston to Tulsa* is about 1550 miles. (As a noun; serves as subject of *is.*)
>
> Profits *in the automobile industry* are up sharply this quarter. (As an adjective; indicates which type of profits.)
>
> You handled Dr. Waterman's objections *with great skill.* (As an adverb; indicates the manner in which the objections were handled.)

**Prepositional-gerund phrase.** A phrase that begins with a preposition and has a gerund as the object. (See *Gerund* and ¶1082c.)

> *By rechecking these figures before you release them,* you deal with any questions raised by higher management. *(By* is the preposition; *rechecking,* a gerund, is the object of *by.)*

**Essential (restrictive) phrase.** A phrase that limits, defines, or identifies; cannot be omitted without changing the meaning of the sentence.

> The study *analyzing our competitors' promotion activities* will be finished within the next two weeks.

**Nonessential (nonrestrictive) phrase.** A phrase that can be omitted without changing the meaning of the sentence.

> The Stanforth-Palmer Company, *one of the country's largest financial services organizations,* is expanding into satellite communications.

**Verb phrase.** The individual words that make up the verb in a sentence. Sometimes a verb phrase includes an adverb. A verb phrase can function only as a verb.

> You *should work together* with Nora on the report. (The verb phrase consists of the verb form *should work* plus the adverb *together.)*

**Positive degree.** See *Comparison, positive.*

**Possessive case.** See *Case, possessive.*

**Predicate.** That part of a sentence which tells what the subject does or what is done to the subject or what state of being the subject is in. (See also *Verb.*)

Purdue OWL > General Writing > Mechanics > Gerunds, Participles, and Infinitives > **Infinitives**

# Infinitives



# Welcome to the Purdue OWL

https://owl.purdue.edu/owl/general_writing/mechanics/gerunds_participles_and_infinitives/infinitives.html

This page is brought to you by the OWL at Purdue University. When printing this page, you must include the entire legal notice.

---

Copyright ©1995-2018 by The Writing Lab & The OWL at Purdue and Purdue University. All rights reserved. This material may not be published, reproduced, broadcast, rewritten, or redistributed without permission. Use of this site constitutes acceptance of our terms and conditions of fair use.

---

An infinitive is a verbal consisting of the word to plus a verb (in its simplest "stem" form) and functioning as a noun, adjective, or adverb. The term *verbal* indicates that an infinitive, like the other two kinds of verbals, is based on a verb and therefore expresses action or a state of being. However, the infinitive may function as a subject, direct object, subject complement, adjective, or adverb in a sentence. Although an infinitive is easy to locate because of the *to* + verb form, deciding what function it has in a sentence can sometimes be confusing.

- *To wait* seemed foolish when decisive action was required. (subject)

- Everyone wanted *to go*. (direct object)

- His ambition is *to fly*. (subject complement)

- He lacked the strength *to resist*. (adjective)

- We must study *to learn*. (adverb)

Addendum - 32

Be sure not to confuse an infinitive—a verbal consisting of to plus a verb—with a prepositional phrase beginning with to, which consists of to plus a noun or pronoun and any modifiers.

- **Infinitives:** to fly, to draw, to become, to enter, to stand, to catch, to belong
- **Prepositional Phrases:** to him, to the committee, to my house, to the mountains, to us, to this address

**An Infinitive Phrase** is a group of words consisting of an infinitive and the modifier(s) and/or (pro)noun(s) or noun phrase(s) that function as the actor(s), direct object(s), or complement(s) of the action or state expressed in the infinitive, such as:

We intended **to leave early**.

**The infinitive phrase functions as the direct object of the verb *intended*.**
**to leave** (infinitive)
**early** (adverb)

I have a paper **to write before class**.

**The infinitive phrase functions as an adjective modifying *paper*.**
**to write** (infinitive)
**before class** (prepositional phrase as adverb)

Phil agreed **to give me a ride**.

**The infinitive phrase functions as the direct object of the verb *agreed*.**
**to give** (infinitive)
**me** (indirect object of action expressed in infinitive)
**a ride** (direct object of action expressed in infinitive)

They asked **me to bring some food**.

**The infinitive phrase functions as the direct object of the verb *asked*.**
**me** (actor or "subject" of infinitive phrase)
**to bring** (infinitive)
**some food** (direct object of action expressed in infinitive)

Addendum - 33

Everyone wanted Carol to be the captain of the team.

**The infinitive phrase functions as the direct object of the verb *wanted*.**

<span style="color:blue">**Carol**</span> (actor or "subject" of infinitive phrase)

<span style="color:red">**to be**</span> (infinitive)

<span style="color:green">**the captain**</span> (subject complement for Carol, via state of being expressed in infinitive)

<span style="color:olive">**of the team**</span> (prepositional phrase as adjective)

**Actors:** In these last two examples the actor of the infinitive phrase could be roughly characterized as the "subject" of the action or state expressed in the infinitive. It is somewhat misleading to use the word *subject*, however, since an infinitive phrase is not a full clause with a subject and a finite verb. Also notice that when it is a pronoun, the actor appears in the objective case (*me*, not *I*, in the fourth example). Certain verbs, when they take an infinitive direct object, require an actor for the infinitive phrase; others can't have an actor. Still other verbs can go either way, as the charts below illustrate.

## VERBS THAT TAKE INFINITIVE OBJECTS WITHOUT ACTORS:

| agree | begin | continue | decide |
|---|---|---|---|
| fail | hesitate | hope | intend |
| learn | neglect | offer | plan |
| prefer | pretend | promise | refuse |
| remember | start | try | |

**Examples:**

- Most students *plan* to study.

- We *began* to learn.

- They *offered* to pay.

- They *neglected* to pay.

- She *promised* to return.

In all of these examples no actor can come between the italicized main (finite) verb and the infinitive direct-object phrase.

Addendum - 34

## VERBS THAT TAKE INFINITIVE OBJECTS WITH ACTORS:

| advise | allow | convince | remind |
|--------|-------|----------|--------|
| encourage | force | hire | teach |
| instruct | invite | permit | tell |
| implore | incite | appoint | order |

**Examples:**

- He *reminded* me to buy milk.

- Their fathers *advise* them to study.

- She *forced* the defendant to admit the truth.

- You've *convinced* the director of the program to change her position.

- I *invite* you to consider the evidence.

In all of these examples an actor is required after the italicized main (finite) verb and before the infinitive direct-object phrase.

## VERBS THAT USE EITHER PATTERN:

| ask | expect | (would) like | want | need |
|-----|--------|--------------|------|------|

**Examples:**

- I *asked* to see the records.

- I *asked* him to show me the records.

- Trent *expected* his group to win.

- Trent *expected* to win.

- Brenda *likes* to drive fast.

- Brenda *likes* her friend to drive fast.

Addendum - 35

In all of these examples the italicized main verb can take an infinitive object with or without an actor.

**Punctuation:** If the infinitive is used as an adverb and is the beginning phrase in a sentence, it should be set off with a comma; otherwise, no punctuation is needed for an infinitive phrase.

- *To buy a basket of flowers,* John had to spend his last dollar.

- *To improve your writing,* you must consider your purpose and audience.

## POINTS TO REMEMBER

1. An infinitive is a verbal consisting of the word to plus a verb; it may be used as a noun, adjective, or adverb.

2. An infinitive phrase consists of an infinitive plus modifier(s), object(s), complement(s), and/or actor(s).

3. An infinitive phrase requires a comma only if it is used as an adverb at the beginning of a sentence.

## SPLIT INFINITIVES

Split infinitives occur when additional words are included between to and the verb in an infinitive. Many readers find a single adverb splitting the infinitive to be acceptable, but this practice should be avoided in formal writing.

**Examples:**

- I like *to* on a nice day *walk* in the woods. * (unacceptable)
  On a nice day, I like *to walk* in the woods. (revised)

- I needed *to* quickly *gather* my personal possessions. (acceptable in informal contexts)
  I needed *to gather* my personal possessions quickly. (revised for formal contexts)

Addendum - 36

Purdue OWL > General Writing > Mechanics > **Parallel Structure**

# Parallel Structure



# Welcome to the Purdue OWL

https://owl.purdue.edu/owl/general_writing/mechanics/parallel_structure.html

This page is brought to you by the OWL at Purdue University. When printing this page, you must include the entire legal notice.

Copyright ©1995-2018 by The Writing Lab & The OWL at Purdue and Purdue University. All rights reserved. This material may not be published, reproduced, broadcast, rewritten, or redistributed without permission. Use of this site constitutes acceptance of our terms and conditions of fair use.

Parallel structure means using the same pattern of words to show that two or more ideas have the same level of importance. This can happen at the word, phrase, or clause level. The usual way to join parallel structures is with the use of coordinating **conjunctions** such as "and" or "or."

## WORDS AND PHRASES

**With the -ing form (gerund) of words:**

Addendum - 37

**Parallel:**

Mary likes hik**ing**, swimm**ing**, and bicycl**ing**.

**With infinitive phrases:**

**Parallel:**

Mary likes **to hike**, **to swim**, and **to ride** a bicycle.
OR
Mary likes to **hike**, **swim**, and **ride** a bicycle.

(Note: You can use "to" before all the verbs in a sentence or only before the first one.)

## DO NOT MIX FORMS.

## Example 1

**Not Parallel:**
Mary likes hik**ing**, swimm**ing**, and **to ride** a bicycle.

**Parallel:**
Mary likes hik**ing**, swimm**ing**, and rid**ing** a bicycle.

## Example 2

**Not Parallel:**
The production manager was asked to write his report quick**ly**, accurate**ly**, and **in a detailed manner**.

Addendum - 38

**Parallel:**

The production manager was asked to write his report quick**ly**, accurate**ly**, and thorough**ly**.

## Example 3

**Not Parallel:**

The teacher said that he was a poor student because he wait**ed** until the last minute to study for the exam, complet**ed** his lab problems in a careless manner, and **his motivation was** low.

**Parallel:**

The teacher said that he was a poor student because he wait**ed** until the last minute to study for the exam, complet**ed** his lab problems in a careless manner, and lack**ed** motivation.

## CLAUSES

A parallel structure that begins with clauses must keep on with clauses. Changing to another pattern or changing the voice of the verb (from active to passive or vice versa) will break the parallelism.

## Example 1

**Not Parallel:**

The coach told the players **that they should get** a lot of sleep, **that they should not eat** too much, and **to do** some warm-up exercises before the game.

**Parallel:**

The coach told the players **that they should get** a lot of sleep, **that they should not eat** too much, and **that they should do** some warm-up exercises before the game.

Addendum - 39

— or —

**Parallel:**

The coach told the players that they should **get** a lot of sleep, not **eat** too much, and **do** some warm-up exercises before the game.

## Example 2

**Not Parallel:**

The salesman expected **that he would present** his product at the meeting, **that he would have time** to show his slide presentation, and **that questions would be asked** by prospective buyers. **(passive)**

**Parallel:**

The salesman expected **that he would present** his product at the meeting, **that he would have time** to show his slide presentation, and **that prospective buyers would ask** him questions.

## LISTS AFTER A COLON

**Be sure to keep all the elements in a list in the same form.**

## Example 1

**Not Parallel:**

The dictionary can be used to find these: **word meanings**, **pronunciations**, **correct spellings**, and **looking up irregular verbs**.

**Parallel:**

The dictionary can be used to find these: **word meanings**, **pronunciations**, **correct spellings**, and **irregular verbs**.

## PROOFREADING STRATEGIES TO TRY:

Addendum - 40

- Skim your paper, pausing at the words "and" and "or." Check on each side of these words to see whether the items joined are parallel. If not, make them parallel.

- If you have several items in a list, put them in a column to see if they are parallel.

- Listen to the sound of the items in a list or the items being compared. Do you hear the same kinds of sounds? For example, is there a series of "-ing" words beginning each item? Or do you hear a rhythm being repeated? If something is breaking that rhythm or repetition of sound, check to see if it needs to be made parallel.

Addendum - 41