**Case No. 2025-1712**

# United States Court of Appeals for the Federal Circuit

SEOUL SEMICONDUCTOR CO., LTD., SEOUL VIOSYS CO., LTD.,
*Plaintiffs*

v.

FINELITE, INC.,
*Defendant/Third Party Plaintiff-Appellant*

v.

SAMSUNG SEMICONDUCTOR, INC.,
*Third-Party Defendant-Appellee*

*On Appeal from the United States District Court*
*for the Northern District of California, Hon. Trina L. Thompson*
*Case No. 3:22-cv-02869-TLT*

## APPELLANT'S SECOND CORRECTED REPLY BRIEF AS FILED IN THE NINTH CIRCUIT

THOMAS J. RECHEN
MARK D. GIARRATANA
KEVIN REINER
MCCARTER & ENGLISH, LLP
CityPlace I, 185 Asylum Street
Hartford, Connecticut 06103
(860) 275-6700
trechen@mccarter.com
mgiarratana@mccarter.com
kreiner@mccarter.com

*Counsel for Defendant/Third-Party Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT .....1

ARGUMENT .....2

I. The only terms of sale that became part of the Credit Agreement were "to pay service charges assessed and to pay reasonable attorneys [sic] fees in the event of default" .....2

A. The infinitive phrases in the final sentence of the Credit Agreement limit and identify the "terms of sale (attached)" in the main clause .....2

1. The final sentence is a loose sentence. .....2

2. The comma and the conjunction do not transform the sentence into a list .....5

3. Lacking parallelism, the final sentence cannot be a list .....6

B. Samsung's argument that the infinitive phrases in the final sentence do not refer to the "terms of sale (attached)" is meritless .....10

C. Samsung's interpretation of the final sentence violates California's doctrine of incorporation by reference .....11

D. Evidence of the parties' course of conduct is proper to confirm the plain meaning of the Credit Agreement .....13

E. The conflicting terms in the Contract of Sale and Credit Agreement further evidence the intent to limit incorporation .....14

F. If the Court finds an ambiguity, then such ambiguity must be resolved in Finelite's favor .....15

G. Finelite neither waived its grammatical arguments nor invited the District Court's error .....15

II. Absent incorporation of the entirety of Samsung's Contract of Sale, the Credit Agreement cannot govern the 2018-2021 Purchases .....17

III. Finelite's third-party claims are governed by the § 2207 contracts created through the parties' exchange of written forms ................................18

A. Because Samsung failed to expressly require Finelite's assent to the terms and conditions of the 2018 sales acknowledgment form, the § 2207(1) proviso is inapplicable and a contract was formed by the parties' exchange of written forms ..........................................19

B. Steiner resolved that "different" terms are treated the same as "additional" terms under Cal. Comm. Code § 2207 ...........................20

C. Even if Steiner does not control, the parties' competing indemnification provisions drop out and are replaced by Cal. Comm. Code § 2312 ...........................................................................22

D. There is no disputed issue of material fact precluding summary judgment for Finelite on the 2018-2021 Purchases ............................22

1. There is no genuine dispute that Finelite's Purchasing Terms and Conditions were incorporated by reference into each of the parties' 2207 contracts...........................................23

2. There is no dispute of material fact precluding summary judgment for Finelite on the 2021 Purchase .............................25

3. There is no dispute of material fact precluding summary judgment for Finelite on its Cal. Comm. Code § 2312 breach of warranty claim ..........................................................27

CONCLUSION ..........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anhui Powerguard Tech. Co. Ltd. v. DRE Health Corp.*,
95 F.4th 1146 (8th Cir. 2024) ........................................................ 9

*Doe v. Uber Techs., Inc.*,
90 F.4th 946 (9th Cir. 2024) ........................................................ 21

*Germantown Trust and Sav. Bank v U.S. Bank*,
No. 19-CV-352-JPG, 2020 WL 8082408 (S.D. Ill. June 9, 2020) ........................ 5

*Hippler v. Allied Prop. and Cas. Ins. Co.*,
No. 2:12-CV-1039-PMW, 2013 WL 5448245 (D. Utah Sept. 30, 2013) ........................................................ 5

*Katana Silicon Techs. LLC v. Micron Tech., Inc.*,
671 F.Supp.3d 1138 (D. Idaho 2023) ........................................................ 29

*Killgore v. SpecPro Pro. Servs., LLC*,
51 F.4th 973 (9th Cir. 2022) ........................................................ 21

*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) ........................................................ 29

*Phoenix Sols., Inc. v. Sony Elecs., Inc.*,
637 F. Supp. 2d 683 (N.D. Cal. 2009) ........................................................ 29

*Plastoform Indus. Ltd. v. Monster LLC*,
No. 18-CV-02805, 2018 WL 10562845 (N.D. Cal. Sept. 6, 2018) ........................ 17

*Semiconductor Co. v. Finelite, Inc.*,
No. 22-CV-02869-TLT, 2023 WL 7106480 (N.D. Cal. Jan. 27, 2023) ........................................................ 27

*Textile Unlimited, Inc. v. A. BMH and Co., Inc.*,
240 F.3d 781 (9th Cir. 2001) ........................................................ 22

*U.S. v. Bass*,
404 U.S. 336 (1971) ........................................................ 4



ME1 51584618v.1

*U.S. v. Nader*,
542 F.3d 713 (9th Cir. 2008) ....................................................................4

*Universal Title Inc. Co. v. United States*,
942 F.2d 1311 (8th Cir. 1991)....................................................................16

*Whittaker Corp. v. Execuair Corp.*,
953 F.2d 510 (9th Cir. 1992) ....................................................................15

**State Cases**

*Burke v. Award, Inc.*,
No. G042606, 2011 WL 2556029 (Cal. Ct. App. June 28, 2011)......................12

*Chan v. Drexel Burnham Lambert, Inc.*,
178 Cal.App.3d 632 (1986) ....................................................................11, 12, 23

*C9 Ventures v. SVC-W., L.P.*,
202 Cal.App.4th 1483 (2012) ....................................................................25, 26

*In re Cipro Cases I & II*,
134 Cal.Rptr.3d 165 (Cal. App. 2011), *review granted and opinion superseded*, 269 P.3d 653 (Cal. 2012) *and rev'd on other grounds*, 61 Cal.4th 116 (2015) ....................................................................29

*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*,
176 Cal.App.4th 697 (2009) ....................................................................23

*Hayter Trucking, Inc. v. Shell W. E&P, Inc.*,
18 Cal.App.4th 1 (1993) ....................................................................13

*Irving v. Divito*,
807 S.E.2d 741 (Va. 2017) ....................................................................8

*Long v. Provide Com., Inc.*,
245 Cal.App.4th 855 (2016) ....................................................................23, 24

*Pac. Sunwear of Cal., Inc. v. Olaes Enters.*,
167 Cal.App.4th 466 (2008) ....................................................................27, 28

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*,
55 Cal.4th 1169 (2013) ....................................................................13

*State v. Woodrum*,
845 S.E.2d 278 (W. Va. 2020)....................................................................8

*Steiner v. Mobil Oil Corp.*,
20 Cal.3d 90 (1977) ....................................................................20, 21

*Tomlinson v. Qualcomm, Inc.*,
97 Cal.App.4th 934 (2002) ....................................................................18

*Whitman v. Transtate Title Co.*,
165 Cal.App.3d 312 (1985) ....................................................................5

*Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*,
14 Cal.5th 58 (2022) ....................................................................4

**Federal Statutes**

35 U.S.C. § 271(a) ....................................................................28

**State Statutes**

Cal. Civ. Code § 1638....................................................................9

Cal. Civ. Code § 1639....................................................................9

Cal. Civ. Proc. Code § 1856 ....................................................................13

Cal. Comm. Code § 2207....................................................................*passim*

Cal. Comm. Code § 2312....................................................................*passim*

**Other Authorities**

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)....................................................................9, 10

Bryan A. Garner, *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style* 801 (5th Ed. 2022) ..........................................4, 6, 9

*Chicago Manual of Style*, The Univ. of Chicago Press (17th ed. 2017) ..........*passim*

*Loose Sentence,* THE RANDOM HOUSE COLLEGE DICTIONARY (Rev. Ed. 1984)....................................................................3

*Loose Sentence*, WEBSTER'S NINTH COLLEGIATE DICTIONARY (1st Ed. 1983) .....3

UCC § 2-207 .....19, 20

William Strunk, Jr. and E.B. White, *The Elements of Style* 92 (4th ed. 2000) .....*passim*

## JURISDICTIONAL STATEMENT

Appellant Finelite, Inc. ("Finelite") refers this Court to the jurisdictional statement in Finelite's Opening Brief ("FOB"), ECF No. 10.1 at 6.[1]

If this Court determines that Samsung has sufficiently preserved its request to transfer by referencing its prior moving papers, Samsung's Answering Brief ("SAB"), ECF No. 35.1 at 2, Finelite similarly refers this Court to its opposition to Samsung's motion to transfer and sur-reply. ECF Nos. 16 and 27.

[1]Unless otherwise stated, "ECF No." citations are to the docket entries in this appeal, No. 24-711.

## ARGUMENT

### I. The only terms of sale that became part of the Credit Agreement were "to pay service charges assessed and to pay reasonable attorneys [sic] fees in the event of default"

Like the District Court's decision below, ER-13–34, Samsung's Answering Brief ignores long-standing and undisputed rules of contract interpretation and grammar.

#### A. The infinitive phrases in the final sentence of the Credit Agreement limit and identify the "terms of sale (attached)" in the main clause

##### 1. The final sentence is a loose sentence.

It is uncontroverted that the final sentence[2] begins with a grammatically-complete main clause punctuated with a comma, followed by two grammatically-incomplete infinitive phrases—"to pay service charges assessed" and "to pay reasonable attorneys [sic] fees in the event of default"—each beginning with the infinitive verb "to pay." FOB at 27-32. The main clause, "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached)," can stand alone as a sentence. *See* FOB at 28-29. The infinitive phrases cannot. Accordingly, they modify, qualify and explain the main clause. *See* FOB at 28 (*citing* William Strunk, Jr. and E.B. White, *The Elements of Style* 92 (4th ed. 2000) (hereinafter "Strunk &

[2] "Applicant understands and agrees to Samsung Semiconductor, Inc.'s terms of sale (attached), to pay service charges assessed and to pay reasonable attorneys fees in the event of default." ER-147.

White")). Under well-established grammar rules, the infinitive phrases identify the only terms in Samsung's "terms of sale" that were made part of the Credit Agreement.

On appeal, Samsung abandons its argument before the District Court that "to pay service charges assessed" and "to pay reasonable attorneys fees in the event of default" are prepositional phrases.[3] SAB at 32-33. It also admits that "Samsung Semiconductor, Inc.'s terms of sale (attached)" in the main clause is a noun. *Id.* Samsung's admissions, and the sentence's undisputed grammatical components, establish that the infinitive phrases modify the main clause and limit incorporation from Samsung's Contract of Sale to "service charges" and "reasonable attorneys fees."

Samsung argues that "loose sentence" is "an obscure term little discussed by grammarians." *Id*. at 29. The term's popularity, though irrelevant, is far from obscure. Indeed, multiple dictionaries define the term consistent with Strunk & White. *See, e.g.*, *Loose Sentence*, THE RANDOM HOUSE COLLEGE DICTIONARY (Rev. Ed. 1984), Reply Add.-56;[4] *Loose Sentence,* WEBSTER'S NINTH COLLEGIATE DICTIONARY (1st

[3] *See* Samsung's Reply in Support of Motion for Summary Judgment, SER-67–69; *see also* Transcript of Hearing on Cross-Motions for Summary Judgment, ER-231–33.

[4] Secondary sources not already included in the addenda to Finelite's Opening Brief or Samsung's Answering Brief are attached as an "Addendum of Sources" and cited as "Reply Add.-__."

Ed. 1983), Reply Add.-52. And, of course, Strunk & White itself is an authoritative reference. *See, e.g.*, *U.S. v. Bass*, 404 U.S. 336, 340 n. 6 (1971) (relying thereon); *U.S. v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) (same); *Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*, 14 Cal.5th 58, 68 (2022) (same).

Samsung argues that Strunk & White's exemplary loose sentence[5] involves "the addition of details," whereas the final sentence of the Credit Agreement does not. SAB at 30-31. But structurally, both sentences begin with a grammatically-complete main clause punctuated by a comma, followed by two grammatically-incomplete phrases joined by the conjunction "and." In both sentences the post-comma phrases modify the main clause.[6] In Strunk & White, the phrases specify the conditions under which "[h]e was determined to succeed"—"with or without the promotion …" and "in spite of the difficulties …." FOB at Add.-13. In the Credit Agreement, the phrases specify the "terms of sale (attached)" that Finelite agreed to, and provide additional details. ER-147; *see infra* § I.C. Both are loose sentences.

---

[5]"He was determined to succeed, with or without the promotion he was hoping for and in spite of the difficulties he was confronting at every turn." FOB at Add.-13.

[6]The phrases in Strunk & White's example are not "clauses" as Samsung contends. They lack a subject and a verb and thus are phrases like the disputed infinitive phrases here. *See* Bryan A. Garner, *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style* 1199 (5th Ed. 2022) (hereinafter "Garner"), Reply Add.-35.

### 2. The comma and the conjunction do not transform the sentence into a list

Samsung's only grammatical argument that the sentence is a list is that it contains a comma and a conjunction. SAB at 17-18. But that does not make the sentence a list.

"And" is merely "[a] word that joins words, phrases, clauses or sentences." Strunk & White 91, Reply Add.-31 (defining "conjunction"). A comma generally "denotes a slight pause," *e.g.*, "to set off phrases at the end of the sentence that refer to the beginning [] of the sentence." *Chicago Manual of Style*, The Univ. of Chicago Press, § 6.16 (17th ed. 2017) (hereinafter "Chicago Manual"), Reply Add.-7; SAB at Add.-035 ¶ 8. The comma at issue here does just that, setting off the infinitive phrases from the main/independent clause.

None of Samsung's cases support its position. SAB at 18. The presence of a list was undisputed in each case. *See Hippler v. Allied Prop. and Cas. Ins. Co.*, No. 2:12-CV-1039-PMW, 2013 WL 5448245 at *1, 3 (D. Utah Sept. 30, 2013); *Whitman v. Transtate Title Co.*, 165 Cal.App.3d 312, 318-19 (1985); *Germantown Trust and Sav. Bank v U.S. Bank*, No. 19-CV-352-JPG, 2020 WL 8082408, at *1-4 (S.D. Ill. June 9, 2020). Thus, those cases are irrelevant.

Samsung also contends that the Purdue University website supports its position. SAB at 18. But that website merely states the well-known rule that, ***if*** a



ME1 51584618v.1

sentence contains a list, commas should be used between the listed items. SAB at Add.-033.[7]

### 3. Lacking parallelism, the final sentence cannot be a list[8]

"Items in a list should consist of parallel elements." Chicago Manual § 6.127, Reply Add.-27. "[W]ith lists (even short ones), noun should be matched with noun, adjective with adjective, adverb with adverb, etc." Garner 801, Reply Add.-34. Lists employ parallel structure "to show that two or more ideas have the same level of importance." FOB at Add.-33; *accord* Garner 1228, FOB at Add.-19 (*Parallelism*: "the presentation of ideas bearing equivalent weight by putting them into identical grammatical form").

The phrases in the final sentence are not parallel. First, the phrases lack "identical grammatical structure." *See* FOB at 31; Garner 1228, FOB at Add.-19. Samsung does not dispute that the second and third phrases, "to pay service charges assessed" and "to pay reasonable attorneys fees in the event of default" are infinitive verb phrases, while the first phrase, "to Samsung Semiconductor, Inc.'s terms of sale (attached)," is not. *See supra* Section I.A.1; SAB at 33.

[7]Samsung admits that an "Oxford" or "serial" comma is irrelevant to whether a sentence constitutes a list. SAB at 19-20. It fails to explain why another type of comma is determinative of a list when an Oxford comma is not.

[8]SAB at 32.

Moreover, as Samsung acknowledges, to be parallel, all three phrases "***must*** … serve the same grammatical function in the sentence." Chicago Manual § 5.242 (emphasis added), FOB at Add.-8–9; *see* SAB at 32 (quoting rule). Here, they do not. The infinitive phrases function as verbs but, as the parties agree, the prepositional phrase in the main clause does not. This is confirmed by the Chicago Manual: "As a verb, it [the infinitive] can take … an object {try to throw **the javelin** higher}." Chicago Manual § 5.107 (emphasis in original), Reply Add.-3–4. The infinitive verb "to throw" takes the object "the javelin." *See id.* Similarly, in the Credit Agreement, "to pay" in the first infinitive phrase takes the object "service charges," and "to pay" in the second phrase takes the object "attorneys fees." Thus, just like the Chicago Manual example, both infinitive phrases function as verbs. *See id.*

Samsung makes a new argument on appeal that the infinitive phrases "function as nouns" because they are purportedly "the direct objects of 'agrees'" in the main clause. SAB at 32-34. But Samsung never disputes that the sentence's three phrases lack identical structure and never explains why the infinitive phrases are direct objects of "agrees." They are not. "Agrees" already has a direct object. "Samsung Semiconductor, Inc.'s terms of sale (attached)" is the "noun … that receives the action" of the verb "agrees." *See* Strunk & White 91, Reply Add.-31

(defining "direct object"). Accordingly, the infinitive phrases do not serve as direct objects.

Samsung's cited authorities on this topic are inapposite. The infinitive phrases in *State v. Woodrum* functioned as adjectives, not nouns. 845 S.E.2d 278, 285 (W. Va. 2020) (the phrases were "adjectival, infinitive phrases … that must describe a noun"). That case teaches nothing regarding infinitive phrases functioning as nouns or direct objects.[9]

Samsung's remaining examples—*Irving*, the Purdue University website, and the Chicago Manual—fare no better. In each, the direct object is (1) adjacent to a verb; (2) in the main clause of the sentence; and (3) the only phrase in the sentence that can function as the direct object of the verb to make the sentence grammatical. *See Irving v. Divito*, 807 S.E.2d 741, 743 (Va. 2017); SAB at Add.-40; SAB at 32 (*citing* the Chicago Manual). In contrast, the infinitive phrases in the sentence at issue here lack those characteristics and thus have a significantly different structure. They are not adjacent to the verb, are not even in the main clause, and are not required to function as the direct object of "agrees" or otherwise as a noun to make the sentence grammatically correct. ER-147.

---

[9]Samsung implies that, per *Woodrum*, infinitive phrases cannot function as verbs. SAB at 32. This is directly contradicted by the Chicago Manual § 5.107. *See* SAB at 33 (citing same).

Samsung's reliance on *Anhui Powerguard Tech. Co. Ltd. v. DRE Health Corp.*, 95 F.4th 1146 (8th Cir. 2024) is also misplaced. SAB at 34. As Samsung acknowledges, that court expressly stated that the disputed sentence had "a parallel construction" because "the verbs 'agrees' or 'agree' precede ***all three***" phrases at issue. *Anhui* 95 F.4th at 1150 (emphasis added). In sharp contrast, the sentence before this Court does not contain three repetitions of the verb "agrees." "Agrees" appears once in the main clause and the infinitive phrases do not contain that word at all. Thus, in stark contrast to *Anhui Powerguard*, the three phrases here do not have "identical syntactical elements." *See id*. at 1150 ("parallel" structure requires "identical syntactical elements").

Samsung also improperly relies on the court's comment in *Anhui* that the phrases "pertain[ed] to common subject matter: the business relationship between the parties." SAB at 34. Perhaps true, but it does not follow that every such sentence is a series, particularly where, as here, it lacks the grammatical markers of such.

Citing Garner, Samsung says that "even experienced writers fall short." *Id*. at 32. Indeed. But Garner stresses the importance of parallelism and expressly instructs that mixing nouns and verb phrases as Samsung does in the Credit Agreement is not parallelism. Garner 801, Reply Add.-34. Further, the parties' intention is determined from what they wrote, not from what one of them claims it intended but failed to write. Cal. Civ. Code §§ 1638 and 1639. Drafters of legal documents "are presumed

to be grammatical in their compositions," and to understand "the principles of correct English word choice." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012), Reply Add.-43; *see also id.* 51, Reply Add.-42 (legal documents are not typically "slapped together thoughtlessly"). These presumptions apply to the sentence Samsung drafted.

### B. Samsung's argument that the infinitive phrases in the final sentence do not refer to the "terms of sale (attached)" is meritless[10]

Samsung argues that the phrase "service charges assessed" refers only to the "monthly service charge" or "late charge" for "accounts not paid within 30 days" appearing earlier in the Credit Agreement. ER-147; SAB at 21. However, the Credit Agreement does not define the service charge that Finelite agreed to pay. Rather, it states only that such charges "can be assessed" and that Finelite will pay any "charges assessed." ER-147. Section 7 of the "terms of sale" provides the missing details. It defines the service charges that Finelite agreed to pay, *i.e.*, "the lesser of 1.5% … per month or the maximum rate permitted by law." ER-142. Accordingly, the phrase "to pay service charges assessed" necessarily refers to this sentence in the Contract of Sale.

Samsung next argues that "to pay reasonable attorneys fees in the event of default" does not refer to the "terms of sale" because attorney's fees "are not the

[10] SAB at 20-22.

same as 'collection costs.'" SAB at 21-22. But Samsung's Contract of Sale specifically states that collection costs include "attorneys' fees incurred in obtaining and enforcing any judgement." ER-142. There is no question that such attorneys' fees may be incurred in the event of default, and therefore the second infinitive phrase necessarily refers to this sentence in the Contract of Sale.

### C. Samsung's interpretation of the final sentence violates California's doctrine of incorporation by reference

Samsung claims that Finelite executed a single, five-page document called "the 2012 Agreement" and that "Finelite's interpretation nullifies 40%" of that "Agreement." SAB at 2-3, 22-23. This is a fiction. Samsung sent Finelite four, separately-titled documents—a "Credit Application," a "Credit Agreement," a "Financial Authorization," and a "Samsung Semiconductor, Inc. Contract of Sale" tacked onto the very end. ER-139–143. Finelite signed only the "Credit Agreement" and "Financial Authorization," and omitted Samsung's "Contract of Sale" when returning the signed documents to Samsung. ER-139–147.

Under California law, the intent to incorporate must be "clear and unequivocal." *See Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal.App.3d 632, 641 (1986) ("*For the terms of another document to be incorporated … the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent …*") (emphasis in original). California courts interpret

this doctrine "strictly." *Burke v. Award, Inc.*, No. G042606, 2011 WL 2556029, at *3 (Cal. Ct. App. June 28, 2011).

Neither the Credit Agreement nor the Financial Authorization unequivocally express an intent to incorporate the entire Contract of Sale. To the contrary, the clear expression of intent limits incorporation to "service charges assessed" and "reasonable attorneys fees in the event of default." *Supra,* Sections I.A.1-4.

Samsung's argument regarding the sequential pagination of the four documents fares no better. SAB at 3, 11, 16, 22-23. There is no record evidence concerning the purpose of the page numbers. Further, although the Credit Agreement (Page 2 of 5) refers to "terms of sale," the document purportedly referenced is entitled "Contract of Sale" (Page 4 of 5), which comes after the Financial Authorization (Page 3 of 5) and is not referenced in any of the other documents. That this somewhat haphazard collection of four documents has sequential page numbering proves nothing, and neither constitutes a clear and unequivocal reference, nor establishes Finelite's consent. *See Chan*, 178 Cal.App.3d at 642-43.

In addition, Finelite's interpretation neither "nullifies" nor renders as "surplusage" any part of the Credit Agreement. A provision can't be nullified if it was never part of the parties' agreement in the first place.

### D. Evidence of the parties' course of conduct is proper to confirm the plain meaning of the Credit Agreement

The parties' conduct related to the 2018-2021 LED Purchases is relevant because it supports the plain, grammatical interpretation of the final sentence. FOB at 35-36. While parol evidence "may not be relied upon to alter or add to the terms" of an integrated contract, *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 55 Cal.4th 1169, 1174 (2013), it may be used to confirm a contract's plain meaning. Cal. Civ. Proc. Code § 1856 ("The terms set forth in a writing … may be explained or supplemented by course of dealing … or by course of performance."); *see also* FOB at 35; *Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 18 Cal.App.4th 1 (1993) ("extrinsic evidence of custom and practice" is "admissible[] to explain terms of parties' integrated agreement").

The evidence offered by Finelite establishes that the parties' post-Credit Agreement conduct is consistent with Finelite's interpretation of that Agreement. Samsung argues that Finelite's interpretation would negate almost the entire "Contract of Sale." SAB at 23-24. But that could only be so if the entire Contract of Sale was made part of the Credit Agreement. Here, the parties' subsequent conduct reinforces what a proper grammatical construction establishes—that the entire Contract of Sale was never part of the bargain. Indeed, Samsung took no issue with either party's post-contract behavior until there was litigation. The parties' conduct simply confirms the limited scope of their incorporation.

### E. The conflicting terms in the Contract of Sale and Credit Agreement further evidence the parties' intent to limit incorporation

Samsung does not dispute that the Credit Agreement and Contract of Sale contain competing shipping terms. The Credit Agreement states in pertinent part that the LEDs are sold "C.I.P. Samsung Semiconductor, Inc.'s designated shipping point" (ER-147), whereas the Contract of Sale states in pertinent part that the LEDs are sold "C.I.P. Samsung's warehouse in California" (ER-143). These contradictions can only be reconciled by limiting incorporation of the "terms of sale" to "service charges assessed" and "reasonable attorneys fees in the event of default."

Samsung shrugs off this contradiction by arguing that the conflicting terms allowed the parties to agree to a different C.I.P. location, and the parties separately agreed years later in their purchasing forms to the same location. ER-152–174. But that does not change the fact that the competing terms in the Credit Agreement and Contract of Sale conflict. A reasonable drafter would not allow such a conflict to creep into the parties' contract, and such conflict reinforces the parties' intent to limit incorporation to those terms specifically identified in the infinitive phrases of the last sentence of the Credit Agreement.[11]

[11]Samsung argues that the "designated shipping point" in the Credit Agreement is the same location as "Samsung's warehouse in California" and therefore there is no conflict. SAB at 37. However, none of Samsung's record citations establish such shipping point and therefore Samsung's argument must be disregarded.

### F. If the Court finds an ambiguity, then such ambiguity must be resolved in Finelite's favor

Applicable rules of construction establish that Finelite's interpretation of the last sentence of the Credit Agreement is correct. But if this Court finds that Samsung has proposed an equally reasonable interpretation, then it must construe the ambiguity against Samsung. Cal. Civ. Code. § 1654.

### G. Finelite neither waived its grammatical arguments nor invited the District Court's error[12]

An argument "raised sufficiently for the trial court to rule on it" is not waived. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992). Finelite argued in the District Court, as it does here, that the language "to pay service charges assessed and to pay reasonable attorneys fees in the event of default" limits the scope of what is incorporated from the Contract of Sale.[13] SER-92–93; ER-225–234; *see supra* Section I.A.1; FOB at 27-30. Thus, Finelite not only expressly raised its argument sufficiently for the District Court to rule on it, the District Court in fact ruled on it. ER-22–23; *see Whittaker Corp.*, 953 F.2d at 515.[14]

[12]SAB at 28, 31, 35.

[13]The fact that Finelite's argument below did not include the words "loose sentence" did not waive the point.

[14]Preserving an argument for appeal does not require a trial court to rule on the argument. *See id.*

Samsung's further contention that Finelite waived its argument that the final sentence did not contain "three parallel prepositional phrases" is belied by Samsung's contention just two sentences later that it was Finelite who "introduced the concept." SAB at 31. Regardless, Finelite vigorously opposed Samsung's contention that the sentence "has three parallel prepositional phrases." *See, e.g.*, SER-67–69; ER-231–233. Thus, Finelite's argument was raised "sufficiently for the trial court to rule on it." *See Whittaker Corp.*, 953 F.2d at 515.

In fact, Finelite's appeal raises no new issues. The issues raised in Finelite's summary judgment motion before the District Court are the same issues before this Court, including whether the Credit Agreement incorporated by reference the entirety of the "terms of sale (attached)," or only those terms identified in the final sentence. While Finelite's Opening Brief might now focus or expand the arguments in order to expose the District Court's error, there is nothing improper about that. "[O]ne of the primary purposes of appellate review" would be undermined if appellate courts "refuse[d] to consider each nuance or shift in approach urged by a party simply because it was not similarly urged below." *Universal Title Inc. Co. v. United States*, 942 F.2d 1311, 1314 (8th Cir. 1991). Put differently, if parties were limited to verbatim recitals of the arguments made below, appellate briefing would be unnecessary and reference to their summary judgment briefing would suffice.

## II. Absent incorporation of the entirety of Samsung's Contract of Sale, the Credit Agreement cannot govern the 2018-2021 Purchases

Samsung argues that even if the Contract of Sale was not incorporated in its entirety, a § 2207 battle of the forms analysis can "not apply where there is already an existing contract between the parties." SAB at 39.

Samsung's entire argument hinges on the first sentence of the Contract of Sale: "[t]he following Terms and Conditions apply to any purchase of products ('Products') that you ('Customer') make from Samsung Semiconductor, Inc." But as set forth *supra* at Sections I.A-C, this language was not incorporated into the Credit Agreement. Moreover, the Credit Agreement did not address any of the material terms—identification of product, quantity, price—of potential future purchases. *Id*. Thus, the Credit Agreement could not possibly govern the 2018-2021 transactions.

Second, under the correct construction of the Credit Agreement, it has <u>no</u> merger or modification provision. Reliance on these provisions by the District Court assumed away the issue (*i.e.*, what, exactly, was incorporated?) and was fundamental to its error. ER-26. The District Court specifically stated that "California courts have held that subsequent terms, such as purchase orders, do not *modify* or supersede an existing *integrated* contract." *Id*. (emphasis added). And the case law relied upon by the District Court involved integrated contracts with "restrictive" modification provisions. *See Plastoform Indus. Ltd. v. Monster LLC*, No. 18-CV-02805, 2018 WL

10562845, at *3-4 (N.D. Cal. Sept. 6, 2018) (involving an integrated agreement with a restrictive modification clause) and *Tomlinson v. Qualcomm, Inc.*, 97 Cal.App.4th 934, 946 (2002) (same). The District Court wrongly interpreted the Credit Agreement to include the entirety of Samsung's Contract of Sale, and then interpreted the wrongly incorporated integration and modification clauses to shut down any application of Cal. Comm. Code § 2207. Once the provisions wrongly relied upon by the District Court are stripped away, a § 2207 "battle of the forms" analysis must follow.

## III. Finelite's third-party claims are governed by the § 2207 contracts created through the parties' exchange of written forms

Because the 2012 Credit Agreement does not govern, this Court must proceed to a Cal. Comm. Code § 2207 analysis to determine the terms of the parties' 2018-2021 Purchases. When that analysis is complete, Samsung's motion for summary judgment necessarily fails and should have been denied by the District Court. Samsung recognizes this. SAB at 38-66. In its Answering Brief, Samsung's argument is that Finelite's cross-motion for summary judgment similarly should have been denied. *Id.* Yet Samsung's arguments for why Finelite's cross-motion was properly denied are actually quite limited: (1) the 2018 sales acknowledgment form expressly conditioned Samsung's acceptance on Finelite's assent to its terms (it did not), (2) the 2019-2020 sales acknowledgment forms proposed "differing," as opposed to "additional" terms (it doesn't matter); and (3) the hyperlink associated

with the 2021 Purchase was malfunctioning in 2023 (it's irrelevant). Each of Samsung's arguments fails for different reasons that follow. But even if they succeeded Finelite would still be entitled to summary judgment because the "gap-filler" provisions of the UCC, namely Cal. Comm. Code § 2312, require that result.

### A. Because Samsung failed to expressly require Finelite's assent to the terms and conditions of the 2018 sales acknowledgment form, the § 2207(1) proviso is inapplicable and a contract was formed by the parties' exchange of written forms

Samsung argues that no contract was created by the parties' exchange of written forms in 2018 because Samsung's 2018 sales acknowledgment form was "expressly conditioned on assent to Samsung's different terms." SAB at 51. Samsung's argument fails because the 2018 sales acknowledgment form was not so conditioned. That form states only that Samsung's acceptance is "expressly conditioned upon and subject to the terms and conditions of sale in this order acknowledgment." FOB at 44-48; ER-162. It does not expressly request Finelite's assent.

The proviso of Cal. Comm. Code § 2207(1) should be "construed narrowly" because it was "intended to apply 'only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured *of the offeror's assent to the additional or different terms therein*." FOB at 45 quoting *Idaho Power Co. v. Westinghouse Elec. Corp.*, 598 F.2d 924 (9th Cir. 1979) (emphasis added).

### B. *Steiner* resolved that "different" terms are treated the same as "additional" terms under Cal. Comm. Code § 2207

Samsung's reliance on the jurisdictional split concerning the treatment of "different" terms under UCC § 2-207 is misplaced, and ignores controlling California Supreme Court law. SAB at 54-57.

In *Steiner v. Mobil Oil Corp*., 20 Cal.3d 90, 102 n.5 (1977), the California Supreme Court analyzed the relevance of the distinction between "additional" and "different" terms in a UCC 2-207 context and held that "the applicability of section 2207, subdivision (2), should not turn upon a characterization of the varying terms of acceptance as 'additional' or 'different.'" *Id*. The court came to this conclusion after a detailed, three-paragraph analysis, wherein it specifically referenced the jurisdictional split as a result of official comment 6 to UCC § 2-207. *See id.* (discussing how "several courts and commentators have concluded that section 2207, subdivision (2), applies if an acceptance adds terms to an offer, but does not apply if an acceptance alters the terms of an offer," while others "suggest that section 2207, subdivision (2) applies without regard to whether the varying terms of an acceptance differ from or add to an offer"). The court did exactly what Samsung argues it had to do for the court's decision to be binding: it analyzed "the competing lines of national authority" and "decide[d] whether California would adopt the majority or minority position," opting for the latter. SAB at 55.

This was not a passing, standalone comment buried deep in an obscure opinion, as Samsung implies. *Id*. Further, Cal. Comm. Code § 2207 adopted UCC § 2-207 verbatim in 1965 (including official comment 6) and the California adoption remains unchanged to this day. *Id.* at 55. By the time of the *Steiner* opinion in 1977, the jurisdictional split had been evolving for approximately twelve years and a majority view had developed. The *Steiner* court called out the dichotomy, analyzed the issue, and decided that there was no reason to treat "additional" and "different" terms differently under California's adoption of the code. *Steiner*, 20 Cal.3d at 102 n.5. Thus, *Steiner* is controlling and is the best indicator of how the same court would decide the same question today.[15] Under *Steiner*, Finelite's Purchasing Terms and Conditions apply to the 2018-2020 Purchases.

Nor, in light of *Steiner*, is there any reason to certify this question to the California Supreme Court. A federal court sitting in diversity is tasked with predicting, based upon existing precedent, how a question of law would be decided by the forum state's highest court. *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 982 (9th Cir. 2022). Doing so is a simple matter in light of what the California Supreme Court said in *Steiner*. Accordingly, Samsung's request that this Court certify the question should be rejected. *Id.*

[15] At minimum, it is reasoned dicta, which is binding as to California law. *Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024).

### C. Even if *Steiner* does not control, the parties' competing indemnification provisions drop out and are replaced by Cal. Comm. Code § 2312

To the extent this Court finds that *Steiner* is not binding and that the California Supreme Court would hold that the differing indemnification terms in the parties' forms would cancel each other out, summary judgment in Finelite's favor is nevertheless required. In that scenario, the parties' indemnification provisions are replaced by Cal. Comm. Code § 2312. *See Textile Unlimited, Inc. v. A. BMH and Co., Inc.*, 240 F.3d 781, 789 (9th Cir. 2001) (A contract formed pursuant to § 2207 consists of "those terms upon which the parties expressly agreed, coupled with the standard 'gap-filler' provisions of Article Two.").

### D. There is no disputed issue of material fact precluding summary judgment for Finelite on the 2018-2021 Purchases

Samsung does not dispute that if a § 2207 analysis applies, the District Court erred by granting Samsung's motion for summary judgment. SAB at 38-66. If this Court agrees that § 2207 applies, then the District Court's order granting Samsung's motion for summary judgment, ER-13–34, must be reversed. But it must go further because, for the reasons set forth below, there is no issue of material fact that precludes summary judgment in favor of Finelite.

### 1. There is no genuine dispute that Finelite's Purchasing Terms and Conditions were incorporated by reference into each of the parties' 2207 contracts

Samsung argues that there is a factual dispute as to whether Finelite's Purchasing Terms and Conditions ("Finelite's Terms") were properly incorporated into the parties' Cal. Comm. Code § 2207 contracts.[16] SAB at 48-50. However, there is no such factual dispute and the issue can be decided as a matter of law. *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*, 176 Cal.App.4th 697, 713 (2009) ("interpretation of a contract generally presents a question of law," including whether an exhibit to a contract was properly incorporated by reference). While it is true that hyperlinked terms are incorporated only if the reference is "clear and unequivocal," Finelite's hyperlink satisfies this requirement. *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 641 (1986).

Under California law, hyperlinks are an accepted method by which parties may exchange binding terms and conditions. Hyperlinks are disfavored only when they are "located on a submerged page, requiring the [user] to scroll below layers of order summary details, advertisement banners, hyperlinks . . . logos . . . and customer service contact information." *See, e.g., Long v. Provide Com., Inc.*, 245 Cal.App.4th

[16]The parties' Cal. Comm. Code § 2207 contracts consist of all of the forms that were exchanged between the parties, including Finelite's cover emails, Finelite's Terms and Conditions, Finelite's purchase orders, and Samsung's sales acknowledgment forms.

855, 866 (2016). Finelite's hyperlinks, by contrast, state "Click to view Purchasing Terms and Conditions." Each hyperlink is underlined in a contrasting blue font for emphasis, and located immediately adjacent to the signature block in each email transmitting a purchase order. *See* ER-123–128. Each signature block immediately follows a one-to-three sentence message stating an unequivocal invitation to "view" or "see" the purchase order.[17] *Id*. Far from being buried, or difficult to find, Finelite's hyperlinks are plainly apparent when viewing each email.

But even if this Court found that Finelite's Purchasing Terms and Conditions were not incorporated into the parties' § 2207 contracts, there still would be no disputed issue of fact precluding summary judgment for Finelite because the Court would then proceed to determine, as a matter of law, that Samsung owes Finelite a duty of indemnification under Cal. Comm. Code § 2312. The undisputed facts dictating summary judgment for Finelite are as follows:

- Finelite sent purchase orders, *i.e.*, initial written forms, to Samsung, constituting offers under Cal. Comm. Code § 2207, ER-123–34; *id*. at 151–59; and

- Samsung responded with its own written forms—the sales acknowledgment forms—thereby accepting Finelite's offers and proposing additional or different terms concerning, *inter alia*, indemnification and warranty

[17] *See* ER-123 ("Please view attached file and provide order confirmation when available"); ER124 ("Po updated"); ER-125 ("Please view attached July PO."); ER-127 ("Please view attached file and provide order confirmation when available."); ER-128 ("Please see the attached PO, please kindly provide confirmation when available.").

obligations, ER-160–74, which would not become part of the parties' contracts under Cal. Comm. Code § 2207(2)(b). *See* FOB at 52-54.

As a matter of law, the parties' exchange of written purchase orders and sales order acknowledgments created § 2207 contracts. But Samsung's proposed additional or different terms would not be incorporated into such contracts because, pursuant to § 2207(2)(b), they constituted material changes. *See C9 Ventures v. SVC-W., L.P.*, 202 Cal.App.4th 1483, 1506 (2012) ("[a]n indemnification provision would constitute a material alteration, as a matter of law."). Accordingly, the Court would then turn to the "gap-filler" provisions of the California Commercial Code, which impose an obligation to indemnify against any "rightful claim of any third person by way of infringement." Cal. Comm. Code § 2312(3).

**2. There is no dispute of material fact precluding summary judgment for Finelite on the 2021 Purchase**

Samsung cites no evidence or authority to support its argument that there exists a factual dispute regarding the 2021 Purchase, except for its reference to the District Court's decision.[18] SAB at 46; ER-31.

There is no factual dispute that Samsung had access to Finelite's Purchasing Terms and Conditions for the 2018-2020 Purchases. FOB at 44. The only issue raised by Samsung (via an inadmissible attorney affidavit) concerns the hyperlink in

[18] Samsung argues that Finelite has "waived its right to challenge" the District Court's finding that there is a factual dispute by failing to address it in Finelite's Opening Brief. SAB at 46. This is not true. *See, e.g.*, FOB at 44.

Finelite's 2021 cover email. Samsung claims that it was inoperative when tested by Samsung's counsel **in 2023**. SAB at 47. But this does not prevent summary judgment in favor of Finelite.

Whether the hyperlink was operative in 2023 is irrelevant. Samsung offered no other temporal evidence concerning the hyperlink. Finelite, however, conceded that the 2021 hyperlink to Finelite's Terms and Conditions was unintentionally inactive at the time of the 2021 Purchase Order. As explained in the Declaration of Chia Liau, ER-35, and the Second Declaration of John Shue, ER-106, this resulted from a clerical error on the part of a Finelite employee who failed to correctly update his signature block in or around October 2020. Thus, this relevant fact is not in dispute. The only dispute concerns the legal effect of Finelite's concession. The Court must apply the applicable law to the undisputed facts to determine: (1) whether a § 2207 contract was created; and (2) the resulting terms of any such contract. Once again, the parties' exchange of written purchase orders and sales order acknowledgments created § 2207 contracts, and Samsung's proposed additional or different terms would not be incorporated into such contracts because, pursuant to § 2207(2)(b), they constituted material changes. *See C9 Ventures*, 202 Cal.App.4th at 1506. So, once again, as to the 2021 Purchase, this Court turns to the gap-filler provisions of California Commercial Code § 2312(3).

**3. There is no dispute of material fact precluding summary judgment for Finelite on its Cal. Comm. Code § 2312 breach of warranty claim**

Samsung argues that "Finelite points to no record evidence whatsoever" to "establish[] that the LEDs are subject to a rightful infringement claim." SAB at 62 (internal quotations omitted). Not true. Finelite established that (i) the Seoul plaintiffs brought a 14-count complaint alleging that Samsung's LEDs infringe 14 patents, and (ii) Finelite filed three separate motions to dismiss the complaint over a 10-month period vigorously attacking the merits of every count of the complaint. FOB at 59 (*citing Seoul Semiconductor, Co., Ltd. et al. v. Finelite, Inc. v. Samsung Semiconductor, Inc.*, No. 3:22-cv-02869-TLT, ECF Nos. 24, 44 and 97). Finelite's motions attacked 13 counts for failure to plausibly state claims for infringement and all counts for failure to plausibly plead pre-suit damages. *Id*. The District Court carefully examined the infringement allegations and found that some counts plausibly pled claims for infringement, while others did not. *Semiconductor Co. v. Finelite, Inc.*, No. 22-CV-02869-TLT, 2023 WL 7106480, at *6 (N.D. Cal. Jan. 27, 2023). Ultimately, the Seoul plaintiffs amended their complaint to address the deficiencies and overcame Finelite's motions. *Id.*; *see also Seoul Semiconductor, Co., Ltd.*, *supra*, ECF Nos. 40 and 93.

A "rightful claim … broadly encompasses any nonfrivolous claim of infringement." *Pac. Sunwear of Cal., Inc. v. Olaes Enters.*, 167 Cal.App.4th 466,

475 (2008). A frivolous claim is "totally and completely without merit," or "indisputably ha[s] no merit." *Id*. at 482 (internal quotations omitted). After surviving Finelite's three motions to dismiss attacking every count on the merits, the infringement claims indisputably meet the "rightful claim" standard because they are nonfrivolous.

Samsung next argues that a factual dispute exists because "4 of the 14 asserted patents issued after at least one of the purchase orders." SAB at 63. The dates of all purchase orders and patents are undisputed. Ten of the patents issued prior to every purchase order and delivery, and all fourteen patents issued before the 2021 purchase order and delivery. *See* SER-15 and SER-36. Accordingly, all LEDs were delivered subject to rightful claims of infringement of ten patents, and the LEDs of the 2021 Purchase Order were subject to rightful claims regarding all 14 patents.

Nor is there a disputed fact because the LEDs were delivered to Hong Kong for preassembly prior to shipment into the United States. SAB at 64. Samsung's argument that Finelite failed to "present evidence of activity within the United States to establish direct infringement under 35 U.S.C. § 271(a)" is ludicrous. SAB at 64 (internal quotations omitted). "[W]hoever without authority makes, uses, ***offers to sell, or sells*** any patented invention, within the United States … infringes the patent." 35 U.S.C. § 271(a) (emphasis added). Samsung and Finelite are both located in California, the offer for sale and sale of every LED occurred in the U.S., and

therefore every LED was the subject of a rightful claim of infringement in the U.S. at the time of delivery.[19]

Finally, Samsung argues that Finelite is not entitled to summary judgment because it failed to present evidence of damages.

First, damages are not a required element for a Cal. Comm. Code § 2312 claim. *See Phoenix Sols., Inc. v. Sony Elecs., Inc.*, 637 F. Supp. 2d 683 (N.D. Cal. 2009).

Second, the District Court docket shows that the patent infringement claims have been heavily litigated. *See Seoul Semiconductor, Co., Ltd. et al. v. Finelite, Inc. v. Samsung Semiconductor, Inc.,* No. 3:22-cv-02869-TLT. Patent litigation is hideously expensive. *See, e.g., In re Cipro Cases I & II*, 134 Cal.Rptr.3d 165, 182 (Cal. App. 2011) ("Patent litigation breeds a litany of direct and indirect costs, ranging from attorney and expert fees to the expenses associated with discovery compliance."), *review granted and opinion superseded*, 269 P.3d 653 (Cal. 2012), *and rev'd on other grounds*, 61 Cal.4th 116 (2015); *see also Katana Silicon Techs. LLC v. Micron Tech., Inc.*, 671 F.Supp.3d 1138, 1160 (D. Idaho 2023) ("patent litigation … become[s] more expensive the more patents are at issue"). There is no need for an affidavit of attorneys' fees to establish the obvious harm to Finelite.

---

[19] Contrary to Samsung's assertion (SAB at 64), location of title passage is irrelevant to the location of infringement. *See Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1370 (Fed. Cir. 2008).

Third, Finelite's motion for summary judgment is for liability on its breach of contract, breach of warranty and declaratory judgment claims. SER-43–56. A summary judgment of liability in Finelite's favor is sufficient. The parties can then proceed to a hearing to precisely establish Finelite's damages.

## CONCLUSION

For all of the foregoing reasons, and those set forth in Finelite's Opening Brief, the relief requested by Finelite in the Conclusion of its Opening Brief is warranted. FOB at 60-61.

Dated: December 27, 2024

/s/ *Thomas J. Rechen*
Thomas J. Rechen
trechen@mccarter.com
Mark D. Giarratana
mgiarratana@mccarter.com
Joseph Boccia
jboccia@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

## CERTIFICATE OF COMPLIANCE

WE HEREBY CERTIFY that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains approximately 6,802 words and uses a Times New Roman 14-point font.

/s/ *Thomas J. Rechen*____________
Thomas J. Rechen
trechen@mccarter.com
Mark D. Giarratana
mgiarratana@mccarter.com
Joseph Boccia
jboccia@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 27, 2024, which will send a notice of electronic filing to all counsel of record on the attached service list. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Thomas J. Rechen*
Thomas J. Rechen
trechen@mccarter.com
Mark D. Giarratana
mgiarratana@mccarter.com
Joseph Boccia
jboccia@mccarter.com
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700
Facsimile: (860) 724-3397

*Attorneys for Appellant*
FINELITE, INC.

# ADDENDUM OF SOURCES

**INDEX**

| Source | Page |
|---|---|
| *The Chicago Manual of Style*, The Univ. of Chicago Press, (17th ed. 2017) | 1 |
| *Elements of Style*, William Strunk, Jr. and E.B. White, (4th ed. 2000) | 28 |
| *Garner's Modern English Usage: The Authority on Grammar, Usage, and Style,* Bryan A. Garner, (5th ed. 2022) | 32 |
| *Reading Law: The Interpretation of Legal Texts*, Antonin Scalia and Bryan A. Garner, (2012) | 39 |
| *Webster's Ninth New Collegiate Dictionary*, (1986) | 49 |
| *The Random House College Dictionary, Revised Edition,* (1984) | 53 |

# The Chicago Manual of Style

SEVENTEENTH EDITION

*The University of Chicago Press*
CHICAGO AND LONDON

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London
© 2017 by The University of Chicago
All rights reserved. No part of this book may be used or reproduced in any manner whatsoever without written permission, except in the case of brief quotations in critical articles and reviews. For more information, contact the University of Chicago Press, 1427 E. 60th St., Chicago, IL 60637.
First edition published 1906. Seventeenth edition 2017.
Printed in the United States of America

26 25 24 23 22 4 5

ISBN-13: 978-0-226-28705-8 (cloth)
DOI: https://doi.org/10.7208/cmos17

Library of Congress Cataloging-in-Publication Data

Title: The Chicago manual of style.
Description: Seventeenth edition. | Chicago ; London : The University of Chicago Press, 2017. | Includes bibliographical references and indexes.
Identifiers: LCCN 2017020712 | ISBN 9780226287058 (cloth : alk. paper)
Subjects: LCSH: Printing—Style manuals. | Authorship—Style manuals. | Authorship—Handbooks, manuals, etc. | Publishers and publishing—United States—Handbooks, manuals, etc.
Classification: LCC Z253 .U69 2017 | DDC 808/.0270973—dc23
LC record available at https://lccn.loc.gov/2017020712

♾ This paper meets the requirements of ANSI/NISO Z39.48-1992 (Permanence of Paper).

The Chicago Manual of Style is a registered trademark of The University of Chicago.

natural {**don't you** want more?}. Most negative forms can be contracted {we do not–we don't} {I will not–I won't} {he has not–he hasn't} {she does not–she doesn't}, but *I am not* is contracted to *I'm not* (never *I amn't*). The corresponding interrogative form is *aren't I?* Sometimes the negative is emphasized if the auxiliary is contracted with the pronoun and the negative is left standing alone {he is not–he isn't–he's not} {we are not–we aren't–we're not} {they have not–they haven't–they've not}.

5.105 **Contractions.** Most types of writing benefit from the use of contractions. If used thoughtfully, contractions in prose sound natural and relaxed and make reading more enjoyable. *Be*-verbs and most of the auxiliary verbs are contracted when followed by *not*: *are not–aren't*, *was not–wasn't*, *cannot–can't*, *could not–couldn't*, *do not–don't*, and so on. A few, such as *ought not–oughtn't*, look or sound awkward and are best avoided. Pronouns can be contracted with auxiliaries, with forms of *have*, and with some *be*-verbs. Think before using one of the less common contractions, which often don't work well in prose, except perhaps in dialogue or quotations. Some examples are *I'd've* (I would have), *she'd've* (she would have), *it'd* (it would), *should've* (should have), *there're* (there are), *who're* (who are), and *would've* (would have). Also, some contracted forms can have more than one meaning. For instance, *there's* may be *there is* or *there has*, and *I'd* may be *I had* or *I would*. The particular meaning may not always be clear from the context.

## INFINITIVES

5.106 **Infinitives defined.** An infinitive verb, also called the verb's *root* or *stem*, is a verb that in its principal uninflected form may be preceded by *to* {to dance} {to dive}. It is the basic form of the verb, the one listed in dictionary entries. The preposition *to* is sometimes called the *sign* of the infinitive {he tried **to open** the door}, and it is sometimes classed as an adverb. In the active voice, *to* is generally dropped when the infinitive follows an auxiliary verb {you must **flee**} and can be dropped after several verbs, such as *bid*, *dare*, *feel*, *hear*, *help*, *let*, *make*, *need*, and *see* {you dare **say** that to me?}. But when the infinitive follows one of these verbs in the passive voice, *to* should be retained {he cannot be heard **to deny** it} {they cannot be made **to listen**}. The *to* should also be retained after *ought* and *ought not* (see 5.149).

5.107 **Uses of the infinitive.** The infinitive has great versatility. It is sometimes called a *verbal noun* because it can function as part of a verb phrase {someone has **to tell** her} or a noun {**to walk** away now seems rash}. The

infinitive also has limited uses as an adjective or an adverb. As a verb, it can take (1) a subject {we wanted **the lesson** to end}, (2) an object {try to throw **the javelin** higher}, (3) a predicate complement {want to race **home**?}, or (4) an adverbial modifier {you need to think **quickly** in chess}. As a noun, the infinitive can perform as (1) the subject of a finite verb {**to fly** is a lofty goal} or (2) the object of a transitive verb or participle {I want **to hire** a new assistant}. An infinitive may be governed by a verb {**cease to do** evil}, a noun {we all have **talents to be improved**}, an adjective {she is **eager to learn**}, a participle {they are **preparing to go**}, or a pronoun {let **him do** it}.

5.108 **Split infinitive.** Although from about 1850 to 1925 many grammarians stated otherwise, it is now widely acknowledged that adverbs sometimes justifiably separate the *to* from the principal verb {they expect **to more than double** their income next year}. See also 5.171.

5.109 **Dangling infinitive.** An infinitive phrase can be used, often loosely, to modify a verb—in which case the sentence must have a grammatical subject (or an unexpressed subject of an imperative) that could logically perform the action of the infinitive. If there is none, then the sentence may be confusing. For example, in *To repair your car properly, it must be sent to a mechanic*, the infinitive *repair* does not have a logical subject; the infinitive phrase *to repair your car* is left dangling. But if the sentence is rewritten as *To repair your car properly, you must take it to a mechanic*, the logical subject is *you*.

### PARTICIPLES AND GERUNDS

5.110 **Participles generally.** A participle is a nonfinite verb that is not limited by person, number, or mood but does have tense. Two participles are formed from the verb stem: the present participle invariably ends in *-ing*, and the past participle usually ends in *-ed*. The present participle denotes the verb's action as being in progress or incomplete at the time expressed by the sentence's principal verb {**watching** intently for a mouse, the cat settled in to wait} {**hearing** his name, Jon turned to answer}. The past participle denotes the verb's action as being completed {**planted** in the spring} {**written** last year}.

5.111 **Participial phrases.** A participial phrase is made up of a participle plus any closely associated word or words, such as modifiers or complements. It can be used (1) as an adjective to modify a noun or pronoun {**nailed to the roof**, the slate stopped the leaks} {she pointed to the clerk **drooping**

**unequal** (*adj.*): to [a challenge]; in [attributes]
**used** (*adj.*): to ("accustomed"); for ("applied to")
**vexed** (*adj.*): with [someone]; about, at [something]

## *Conjunctions*

5.196 **Conjunctions defined.** A conjunction is a function word that connects sentences, clauses, or words within a clause {my daughter graduated from college in December, **and** my son will graduate from high school in May [*and* connects two sentences]} {I said hello, **but** no one answered [*but* connects two clauses]} {we're making progress slowly **but** surely [*but* joins two adverbs within a clause]}. In Standard English, conjunctions connect pronouns in the same case {he **and** she are colleagues} {the teacher encouraged her **and** me}. A pronoun following the conjunction *than* or *as* is normally in the nominative case even when the clause that follows is understood {you are wiser **than I** [am]} {you seem as pleased **as she** [does]}—except in informal or colloquial English {you are wiser than me}. In the latter instance, *than* can be read as a preposition (see 5.183).

5.197 **Simple versus compound conjunctions.** A conjunction may be simple, a single word such as *and*, *but*, *if*, *or*, or *though*. Most are derived from prepositions. Compound conjunctions are single words formed by combining two or more words. Most are relatively modern formations; they include words such as *although*, *because*, *nevertheless*, *notwithstanding*, and *unless*. Phrasal conjunctions are connectives made up of two or more separate words. Examples are *as though*, *inasmuch as*, *in case*, *provided that*, *so that*, and *supposing that*. The two main classes of conjunctions are coordinating and subordinating.

5.198 **Coordinating conjunctions.** Coordinating conjunctions join words or groups of words of equal grammatical rank, such as two nouns, two verbs, two phrases, or two clauses {are you speaking to him **or** to me?} {the results are disappointing **but** not discouraging}. Coordinating conjunctions are further broken down into copulative, adversative, disjunctive, and final. A coordinating conjunction may be either a single word or a correlative conjunction.

5.199 **Correlative conjunctions.** Correlative conjunctions are conjunctions used in pairs, often to join successive clauses that depend on each other to form a complete thought. Some examples of correlative conjunctions are *as–as*, *if–then*, *either–or*, *neither–nor*, *both–and*, *where–there*, *so–as*, and

*not only–but also*. Correlative conjunctions must frame structurally identical or matching sentence parts {she wanted **both** to win the gold medal **and** to set a new record}; in other words, each member of the pair should immediately precede the same part of speech {they **not only read** the book **but also saw** the movie} {**if** the first **claim** is true, **then** the second **claim** must be false}.

5.200 **Subordinating conjunctions.** A subordinating conjunction connects clauses of unequal grammatical rank. The conjunction introduces a clause that is dependent on the independent clause {follow this road **until** you reach the highway} {that squirrel is friendly **because** people feed it} {Marcus promised **that** he would help}. A pure subordinating conjunction has no antecedent and is not a pronoun or an adverb {take a message **if** someone calls}.

5.201 **Special uses of subordinating conjunctions.** Subordinating conjunctions or conjunctive phrases often denote the following relationships: (1) *Comparison or degree*—e.g., *than* (if it follows comparative adverbs or adjectives, or if it follows *else*, *rather*, *other*, or *otherwise*), *as*, *else*, *otherwise*, *rather*, *as much as*, *as far as*, and *as well as* {is a raven less clever **than** a magpie?} {these amateur musicians play **as well as** professionals} {it's not true **as far as** I can discover}. (2) *Time*—e.g., *since*, *until*, *as long as*, *as soon as*, *before*, *after*, *when*, *as*, and *while* {**while** we waited, it began to snow} {the tire went flat **as** we were turning the corner} {we'll start the game **as soon as** everyone understands the rules} {the audience returned to the auditorium **after** the concert's resumption was announced}. (3) *Condition or assumption*—e.g., *if*, *though*, *unless*, *except*, *without*, and *once* {**once** you sign the agreement, we can begin remodeling the house} {your thesis must be presented next week **unless** you have a good reason to postpone it} {I'll go on this business trip **if** I can fly first class}. (4) *Reason or concession*—e.g., *as*, *inasmuch as*, *why*, *because*, *for*, *since*, *though*, *although*, and *albeit* {**since** you won't share the information, I can't help you} {Sir John decided to purchase the painting **although** it was very expensive} {she deserves credit **because** it was her idea}. (5) *Purpose or result*—e.g., *that*, *so that*, *in order that*, and *such that* {we dug up the yard **so that** a new water garden could be laid out} {he sang **so loudly that** he became hoarse}. (6) *Place*—e.g., *where* {I found a great restaurant **where** I didn't expect one to be}. (7) *Manner*—e.g., *as if* and *as though* {he swaggers around the office **as if** he were an executive}. (8) *Appositions*—e.g., *and*, *or*, *what*, and *that* {the buffalo, **or** American bison, was once nearly extinct}. (9) *Indirect questions*—e.g., *whether*, *why*, and *when* {he could not say **whether** we were going the right way}.

period (e.g., an abbreviation) falls at the end of a sentence, no additional period follows (see 6.123; but see 6.13). For use or omission of the period in lists and outline style, see 6.127–32. For punctuation with URLs and email addresses, see 6.8.

6.15 **Periods in ellipses.** An ellipsis—a series of three periods, or dots (sometimes referred to as suspension points)—may be used to indicate an omission in quoted material; for a full discussion of this use, see 13.50–58. An ellipsis may also be used to indicate faltering speech or an incomplete sentence or thought (see 13.41, 13.55). For the use of ellipses in languages other than English, see 11.19, 11.32, 11.49, 11.65, 11.102. For the use of the em dash to indicate a sudden break or interruption, see 6.87.

## Commas

6.16 **Use of the comma.** The comma, aside from its technical uses in scientific, bibliographical, and other contexts, indicates the smallest break in sentence structure. It usually denotes a slight pause. In formal prose, however, logical considerations come first. Effective use of the comma involves good judgment, with the goal being ease of reading.

6.17 **Commas in pairs.** Whenever a comma is placed before an element to set it off from the surrounding text (such as "1920" or "Minnesota" in the first two examples below), a second comma is required if the phrase or sentence continues beyond the element being set off. This principle applies to many of the uses for commas described in this section. An exception is made for commas within the title of a work (third example); such commas are considered to be independent of the surrounding sentence.

August 18, 1920, was a good day for American women.
Sledding in Duluth, Minnesota, is facilitated by that city's hills and frigid winters.
*but*
*Look Homeward, Angel* was not the working title of Wolfe's manuscript.

6.18 **Commas relative to parentheses and brackets.** When the context calls for a comma at the end of material in parentheses or brackets, the comma should follow the closing parenthesis or bracket. A comma never precedes a closing parenthesis. (For its rare appearance before an opening parenthesis, see the examples in 6.129.) Rarely, a comma may appear inside and immediately before a closing bracket as part of an editorial interpolation (as in the last example; see also 13.59).

After several drummers had tried out for the part (the last having destroyed the kit), the band decided that a drum machine was their steadiest option.
Her delivery, especially when she would turn to address the audience (almost as if to spot a long-lost friend), was universally praised.
"Conrad told his assistant [Martin], who was clearly exhausted, to rest."
"The contents of the vault included fennel seeds, tweezers, [straight-edged razors,] and empty Coca-Cola cans."

## *Series and the Serial Comma*

6.19 **Serial commas.** Items in a series are normally separated by commas (but see 6.60). When a conjunction joins the last two elements in a series of three or more, a comma—known as the serial or series comma or the Oxford comma—should appear before the conjunction. Chicago strongly recommends this widely practiced usage, blessed by Fowler and other authorities (see bibliog. 1.2), since it prevents ambiguity. If the last element consists of a pair joined by *and*, the pair should still be preceded by a serial comma and the first *and* (as in the last two examples below).

She posted pictures of her parents, the president, and the vice president.
Before heading out the door, he took note of the typical outlines of sweet gum, ginkgo, and elm leaves.
I want no ifs, ands, or buts.
Paul put the kettle on, Don fetched the teapot, and I made tea.
Their wartime rations included cabbage, turnips, and bread and butter.
Ahmed was configuring updates, Jean was installing new hardware, and Alan was running errands and furnishing food.

If the sentence continues beyond the series, add a comma only if one is required by the syntax of the surrounding sentence.

Apples, plums, and grapes can all be used to make wine.
*but*
Apples, plums, and grapes, available at most large grocery stores, can all be used to make wine.

In the rare case where the serial comma does not prevent ambiguity, it may be necessary to reword. In the following example, the repetition of *and* makes it clear that Lady Gaga is not the writer's mother (and see the examples at the end of this paragraph). In the second example, "Lady Gaga" might be read as an appositive (see 6.28).

I thanked my mother and Lady Gaga and Madonna.
*not*
I thanked my mother, Lady Gaga, and Madonna.

Note that the phrase *as well as* cannot substitute for *and* in a series of items.

The team fielded one Mazda, two Corvettes, and three Bugattis, as well as a battered Plymouth Belvedere.
*not*
The team fielded one Mazda, two Corvettes, three Bugattis, as well as a battered Plymouth Belvedere.

In a series whose elements are all joined by conjunctions, no commas are needed unless the elements are long and delimiters would be helpful.

Would you prefer Mendelssohn or Schumann or Liszt?
You can turn left at the second fountain and right when you reach the temple, or left at the third fountain and left again at the statue of Venus, or in whatever direction Google sends you.

6.20 **Commas with "etc." and "et al."** The abbreviation *etc.* (*et cetera*, literally "and others of the same kind") and such equivalents as *and so forth* and *and the like* are preceded by a comma; they are followed by a comma only if required by the surrounding text. This small departure from the recommendation in previous editions treats such terms as equivalent to the final element in a series (see 6.19). (According to a more traditional usage, such terms were often set off by two commas.) In formal prose, Chicago prefers to limit the abbreviation *etc.* to parentheses, notes, and tabular matter. See also 5.250 under *etc.*

The map was far from complete (lacking many of the streets, alleys, etc. seen in earlier iterations).
The philosopher's population studies, classic textbooks, stray notes, and so forth were found in the attic.
*but*
For a discussion of periods, commas, and the like, see chapter 6.

The abbreviation *et al.* (*et alia* [neut.], *et alii* [masc.], or *et aliae* [fem.], literally "and others"), whether used in regular text or (more often) in bibliographical references, should be treated like *etc.* If *et al.* follows a single item, however (e.g., "Jones et al."), it requires no preceding comma. (Nor

is a preceding comma required in the rare case that *etc.* follows a single item.) Note that neither *etc.* nor *et al.* is italicized in normal prose (see the first example above).

6.21 **Omitting serial commas before ampersands.** When an ampersand is used instead of the word *and* (as in company names), the serial comma is omitted.

Winken, Blinken & Nod is a purveyor of nightwear.

See also 14.88, 14.135.

## *Commas with Independent Clauses*

6.22 **Commas with independent clauses joined by coordinating conjunctions.** When independent clauses are joined by *and*, *but*, *or*, *so*, *yet*, or any other coordinating conjunction, a comma usually precedes the conjunction. If the clauses are very short and closely connected, the comma may be omitted (as in the last two examples) unless the clauses are part of a series. These recommendations apply equally to imperative sentences, in which the subject (*you*) is omitted but understood (as in the fifth and last examples). (For the use of a semicolon between independent clauses, see 6.56.)

We activated the alarm, but the intruder was already inside.
All watches display the time, and some of them do so accurately.
Do we want to foster creativity, or are we interested only in our intellectual property?
The bus never came, so we took a taxi.
Wait for me at the bottom of the hill on Buffalo Street, or walk up to Eddy Street and meet me next to the Yield sign.
Donald cooked, Sally poured the wine, and Maddie and Cammie offered hors d'oeuvres.
*but*
Electra played the guitar and Tambora sang.
Raise your right hand and repeat after me.

6.23 **Commas with compound predicates.** A comma is not normally used to separate a two-part compound predicate joined by a coordinating conjunction (cf. 6.22). (A compound predicate occurs when a subject that is shared by two or more clauses is not repeated after the first clause.) A

comma may occasionally be needed, however, to prevent a misreading (as in the fourth example).

He printed out a week's worth of crossword puzzles and arranged them on his clipboard.
Kelleher tried to contact the mayor but was informed that she had stopped accepting unsolicited calls.
He stood up and opened his mouth but failed to remember his question.
*but*
She recognized the man who entered the room, and gasped.

When *then* is used as a shorthand for *and then*, a comma usually precedes the adverb. (See also 6.57.)

She filled in the last square in Sunday's puzzle, then yawned.
*but*
She filled in the last square in Sunday's puzzle and then yawned.

Compound predicates of three or more parts treated as a series are punctuated accordingly (see 6.19).

She scrubbed the floors, washed the dishes, and finished her essay on twenty-first-century labor-saving technologies.

### *Commas with Dependent Clauses*

6.24 **Commas with introductory dependent clauses.** When a dependent clause precedes the main, independent clause, it should be followed by a comma. A dependent clause is generally introduced by a subordinating conjunction such as *if*, *because*, or *when* (see 5.200, 5.201).

If you accept our conditions, we shall agree to the proposal.
Until we have seen the light, we cannot guarantee a safe exit from the tunnel.
Whether you agree with her or not, she has a point.

Compare 6.25.

6.25 **Commas with dependent clauses following the main clause.** A dependent clause that follows a main, independent clause should *not* be preceded by a comma if it is restrictive—that is, essential to fully understanding the meaning of the main clause (see also 6.27). For instance, in

the first example below, it is not necessarily true that "we will agree to the proposal"; the dependent *if* clause adds essential information.

We will agree to the proposal if you accept our conditions.
Paul sighed when he heard the news.
He wasn't running because he was afraid; he was running because he was late.

If the dependent clause is merely supplementary or parenthetical (i.e., nonrestrictive, or not essential to the meaning of the main clause), it should be preceded by a comma. Such distinctions are occasionally tenuous. In the fourth example below, the meaning—and whether the subject is running or not—depends almost entirely on the presence of the comma (compare with the third example above). If in doubt, rephrase.

I'd like the *tom yum*, if you don't mind.
At last she arrived, when the food was cold.
She has a point, whether you agree with her or not.
He wasn't running, because he was afraid of the dark.
*or*
Because he was afraid of the dark, he wasn't running.

Compare 6.24.

6.26 **Commas with intervening dependent clauses (two consecutive conjunctions).** When a dependent clause intervenes between two other clauses joined by a coordinating conjunction, causing the coordinating and subordinating conjunctions to appear next to each other (e.g., *and if*, *but if*), the conjunctions need not be separated by a comma. See also 6.22, 6.24.

Burton examined the documents for over an hour, and if Smedley had not intervened, the forgery would have been revealed.
She claimed to have seen the whole film, but when we pressed her for details, she failed to recall the name of Rhett and Scarlett's only child.

By a similar logic, when a dependent clause intervenes between an independent clause and a dependent clause introduced by a subordinating conjunction, no comma is needed between the two subordinating conjunctions (e.g., *that if*).

They decided that if it rained, they would reschedule the game.

Strictly speaking, it would not be wrong to add a comma between the conjunctions in any of the examples above. Such usage, which would extend the logic of commas in pairs (see 6.17), may be preferred in certain cases for emphasis or clarity. See also 6.32.

## *Commas with Relative Clauses, Appositives, and Descriptive Phrases*

6.27 **Commas with relative clauses—"that" versus "which."** A clause is said to be restrictive (or defining) if it provides information that is essential to understanding the intended meaning of the rest of the sentence. Restrictive relative clauses are usually introduced by *that* (or by *who/whom/whose*) and are never set off by commas from the rest of the sentence. The pronouns *that* and *who* or *whom* may occasionally be omitted (but need not be) if the sentence is just as clear without them, as in the second and fourth examples (before "I" [*that*] and "we" [*whom*], respectively).

The manuscript that the editors submitted to the publisher was well formatted.
The book I have just finished is due back tomorrow; the others can wait.
I prefer to share the road with drivers who focus on the road rather than on what they happen to be reading.
The drivers we hire to make deliveries must have good driving records.
The author whose work I admire the most is generally the one whose books I have most recently read.

A clause is said to be nonrestrictive (or nondefining or parenthetical) if it could be omitted without obscuring the identity of the noun to which it refers or otherwise changing the intended meaning of the rest of the sentence. Nonrestrictive relative clauses are usually introduced by *which* (or *who/whom/whose*) and are set off from the rest of the sentence by commas.

The final manuscript, which was well formatted, was submitted to the publisher on time.
*Ulysses*, which I finished early this morning, is due back on June 16.
I prefer to share the road with illiterate drivers, who are unlikely to read books while driving.
Boris Pasternak, whose most famous creation was a doctor, wrote what is probably the best novel about the Russian Revolution.

Although *which* can be substituted for *that* in a restrictive clause (a common practice in British English), many writers preserve the distinction

between restrictive *that* (with no commas) and nonrestrictive *which* (with commas). See also 5.250 under *that; which.*

6.28 **Commas with appositives.** A word, abbreviation, phrase, or clause that is placed in apposition to a noun (i.e., providing an explanatory equivalent) is normally set off by commas if it is nonrestrictive—that is, if it can be omitted without obscuring the identity of the noun to which it refers.

K. Lester's only collection of poems, *An Apocryphal Miscellany*, first appeared as a series of mimeographs. (The collection has been identified as his only one; the title provides additional rather than essential information.)

This year's poet laureate, K. Lester, spoke first. (There is only one laureate this year.)

Ursula's husband, Jan, is also a writer. (Ursula has only one husband.)

Ursula's son, Clifford, had been a student of Norman Maclean's. (Ursula has only one son.)

If, however, the word or phrase is restrictive—that is, it provides (or may provide) essential information about the noun (or nouns) to which it refers—no commas should appear.

O'Neill's play *The Hairy Ape* was being revived. (O'Neill wrote a number of plays; the title identifies the one being revived.)

The renowned poet and historian K. Lester scheduled a six-city tour for April. (K. Lester is not the world's only renowned poet and historian.)

Caligula's sister Drusilla has been the subject of much speculation. (Caligula had three sisters.)

The playwright's son Julio was there. (Whether the playwright has sons in addition to Julio is not known.)

Though the possessive may be used with a restrictive appositive (e.g., Caligula's sister Drusilla's son), avoid such a construction with a nonrestrictive appositive. Instead, reword as needed.

The motorcycle belonging to Ursula's mother, Hulga, was a Harley.
*not*
Ursula's mother's, Hulga's, motorcycle was a Harley.

See also 5.23, 6.27.

6.29 **Commas with descriptive phrases.** A descriptive phrase that is restrictive—that is, essential to the meaning (and often the identity) of the noun it belongs to—should not be set off by commas. A nonrestrictive phrase, however, should be enclosed in commas (or, if at the end of a sentence,

preceded by a comma). In the first example, the descriptive phrase ("with the guitar over her shoulder") is essential information that identifies which woman is the mother. In the second example, the identity of the person who turned to the drummer ("My mother") is clear; the fact that she has a guitar over her shoulder is not essential information. See also 6.27.

The woman with the guitar over her shoulder is my mother.
My mother, with her guitar over her shoulder, turned to the drummer and gave the signal to begin.

## *Commas with Participial and Adverbial Phrases*

6.30 **Commas with participial phrases.** An introductory participial phrase is normally set off from the rest of the sentence by a comma.

Exhilarated by her morning workout, she headed for the ocean.
Having forgotten his lines, the actor was forced to ad-lib.

When such a phrase occurs in the middle of a sentence, it should be set off by commas unless it is used restrictively, providing essential information about the main clause (see also 6.29).

The actor, having forgotten his lines, was forced to ad-lib.
*but*
Actors forgetting their lines may be forced to ad-lib. (The phrase "forgetting their lines" specifies which actors may be forced to ad-lib.)

Likewise, a comma sets off such a phrase at the end of a sentence unless the phrase is used restrictively.

She headed for the ocean, exhilarated by her morning workout.
The actor was forced to ad-lib, having forgotten his lines.
*but*
She always headed for the ocean exhilarated by her morning workout. (It is *not* true that she always headed for the ocean; it *is* true that she always headed for the ocean in a state of exhilaration from her morning workout.)

A comma should *not* be used if the participial phrase modifies the subject of a sentence by means of a linking verb (see 5.101), even if the sentence is inverted.

Running along behind the wagon was the archduke himself!

6.31 **Commas with adverbial phrases.** Although an introductory adverbial phrase can usually be followed by a comma, it need not be unless misreading is likely. Shorter adverbial phrases are less likely to merit a comma than longer ones.

On the other hand, his vices could be considered virtues.
With three consecutive swings, Jackson made history.
In 1931 Henrietta turned fifty.
*but*
Before eating, the members of the committee met in the assembly room.
To Anthony, Blake remained an enigma.

When such a phrase occurs in the middle of a sentence, it is normally set off by commas (cf. 6.29).

Jackson, with three consecutive swings, made history.
His vices, on the other hand, could be considered virtues.

At the end of a sentence, a comma is necessary only when the phrase is used in a nonrestrictive sense, providing information that is not essential to the meaning of the rest of the sentence.

Jackson made history with three consecutive swings.
Henrietta turned fifty in 1931.
*but*
Henrietta turned fifty a decade later, in 1931.

A comma should *not* be used to set off an adverbial phrase that introduces an inverted sentence.

Before the footlights stood one of the most notorious rakes of the twenty-first century.

6.32 **Commas with a participial or adverbial phrase plus a conjunction.** When a participial or adverbial phrase immediately follows a coordinating conjunction, the use of commas depends on whether the conjunction joins two independent sentences. If the conjunction is simply a part of the predicate or joins a compound predicate, the first comma follows the conjunction (see also 6.23).

We were extremely tired and, in light of our binge the night before, anxious to go home.

The Packers trailed at halftime but, buoyed by Rodgers's arm, stormed back to win.

If the conjunction joins two independent clauses, however, the comma precedes the conjunction (see also 6.22).

We were elated, but realizing that the day was almost over, we decided to go to bed.

Strictly speaking, it would not be wrong to add a second comma after *but* in the last example. Such usage, which would extend the logic of commas in pairs (see 6.17), may be preferred in certain cases for emphasis or clarity. See also 6.26.

## *Commas with Introductory Words and Phrases*

6.33 **Commas with introductory phrases.** Whether to use a comma to set off an introductory phrase can depend on the type of phrase, its relationship to the rest of the sentence, and its length. For participial phrases, see 6.30. For adverbial phrases, see 6.31. Some cases involving specific words are discussed below (6.34 and 6.35). For dependent clauses, see 6.24.

6.34 **Commas with an introductory "yes," "no," or the like.** A comma should follow an introductory *yes*, *no*, *OK*, *well*, and the like, except in certain instances more likely to be encountered in informal prose or dialogue.

Yes, it is true that 78 percent of the subjects ate 50 percent more than they reported.
No, neither scenario improved the subjects' accuracy.
OK, I'll try the quinoa.
Well then, we shall have to take a vote.
*but*
No you will not!

6.35 **Commas with an introductory "oh" or "ah."** A comma usually follows an exclamatory *oh* or *ah* unless it is followed by an exclamation mark (or a dash) or forms part of a phrase (e.g., "oh boy," "ah yes"). No comma follows a vocative *oh* or (mainly poetic and largely archaic) *O*. See also 7.31.

| | |
|---|---|
| Oh, you're right! | My oh my! |
| Ah, here we are at last! | Oh mighty king! |
| Oh no! Ah yes! Oh yeah? | "O wild West Wind . . ." |

### *Commas with Two or More Adjectives Preceding a Noun*

6.36 **Commas with coordinate adjectives.** As a general rule, when a noun is preceded by two or more adjectives that could, without affecting the meaning, be joined by *and*, the adjectives are separated by commas. Such adjectives, which are called coordinate adjectives, can also usually be reversed in order and still make sense. If, on the other hand, the adjectives are not coordinate—that is, if one or more of the adjectives are essential to (i.e., form a unit with) the noun being modified—no commas are used. See also 5.91.

Shelly had proved a faithful, sincere friend. (Shelly's friendship has proved faithful *and* sincere.)
It is going to be a long, hot, exhausting summer. (The summer is going to be long *and* hot *and* exhausting.)
*but*
She has many faithful friends.
He has rejected traditional religious affiliations.
She opted for an inexpensive quartz watch.

6.37 **Commas with repeated adjectives.** When an adjective is repeated before a noun, a comma normally appears between the pair.

Many, many people have enjoyed the book.

### *Commas with Dates and Addresses*

6.38 **Commas with dates.** In the month-day-year style of dates, commas must be used to set off the year—a traditional usage that not only applies the logic of commas in pairs (see 6.17) but also serves to separate the numerals for day and year. By a similar logic, when the day of the week is given, it is separated from the month and day by a comma. Commas are usually unnecessary, however, between the name for the day and the ordinal in references where the month is not expressed (see also 9.31). Commas are also unnecessary where month and year only are given, or where a named day (such as a holiday) is given with a year. For dates used adjectivally, see 5.83. See also 9.29–36.

The performance took place on February 2, 2006, at the State Theatre in Ithaca.
The hearing was scheduled for Friday, August 11, 2017.
Monday, May 5, was a holiday; Tuesday the sixth was not.

Her license expires sometime in April 2021.
On Thanksgiving Day 1998 they celebrated their seventy-fifth anniversary.

In the day-month-year system—useful in material that requires many full dates (and standard in British English)—no commas are needed to set off the year. For the year-month-day (ISO) date style, see 9.36.

The accused gradually came to accept the verdict. (See his journal entries of 6 October 2015 and 4 January 2017.)

6.39 **Commas with addresses.** Commas are used to set off the individual elements in addresses or place-names that are run in to the text (see also 6.17). In a mailing address, commas should be used sparingly, mainly to set off the separate lines of the address, but also to separate city and state or province (but not the postal code), apartment numbers, and the like. If in doubt about the accuracy of an address, consult the applicable postal service. (Preferred postal usage will be tailored for use on address labels and may consist of all capital letters and spare punctuation, a style that need not be emulated in regular text and related contexts.) For place-names used adjectivally, see 5.69.

A printout was sent to the author at 743 Olga Drive NE, Ashtabula, OH 44044, on May 2.
Queries can be sent to the author at 123 Main St., Apt. 10, Montreal, QC H3Z 2Y7.
Waukegan, Illinois, is not far from the Wisconsin border.
The plane landed in Kampala, Uganda, that evening.

Some institutional names include place-names set off by commas. When such a name appears in the middle of a clause, a second comma is required to set off the place-name. See also 6.81.

California State University, Northridge, has an enrollment of . . .
*but*
The University of Wisconsin–Madison has an enrollment of . . .

## *Commas with Quotations and Questions*

6.40 **Commas with quotations.** An independent clause quoted in the form of dialogue or from text and introduced with *said*, *replied*, *asked*, *wrote*, and the like (including variations of such terms) is usually introduced with a comma (but see 6.65, 13.16). This traditional usage considers the grammar and syntax of the quoted material to be separate from the text that introduces it.

It was Thoreau who wrote, "One generation abandons the enterprises of another like stranded vessels."
She replied, "I hope you aren't referring to us."

Commas are required regardless of the position of the explanatory text relative to the quotation (but see 6.125).

"I hope," she replied, "you aren't referring to us."
"I hope you aren't referring to us," she replied.

If, however, such a quotation is introduced by *that*, *whether*, *if*, or a similar conjunction (see 5.200), no comma is normally needed.

Was it Stevenson who said that "the cruelest lies are often told in silence"?
He wondered whether "to think is to live."

For the location of a comma in relation to closing quotation marks, see 6.9. For quoted titles and expressions, see 6.41; for questions, see 6.42. For words such as *yes* and *no*, see 13.40. For a more detailed discussion and illustration of the use or omission of commas before and after quoted material, including dialogue, see 13.13–17, 13.50–58, and the examples throughout chapter 13.

6.41 **Commas with quoted or italicized titles and expressions.** Titles or expressions set off from the surrounding text with quotation marks or italics are usually treated like noun forms; commas are used or omitted as they would be with any other noun.

His favorite story in Joyce's *Dubliners* is "Counterparts."
She recites the poem "One Art" every night before bed.
Of her many favorites, "One Art" is the one she knows best.

A common mistake is to use a comma before a title or expression whenever it follows a noun that describes it (e.g., *story*, *novel*, or *poem*). In fact, the rule for appositives applies: the title or expression is set off by commas only if it is nonrestrictive—that is, if it can be omitted without obscuring the identity of the noun (i.e., *story*, *novel*, etc.) to which it refers (see 6.28). In the first example below, the quoted or italicized titles identify *which* poem by Bishop (she wrote many) and *which* novel by Weiner (she has published more than one); in the third example, the quoted words tell us *which* motto appears over the door. In the second and fourth examples, *which* story (the last one in the collection) and *which* proverb (Tom's favorite) have already been identified.

Elizabeth Bishop's poem "One Art" was featured in Jennifer Weiner's novel *In Her Shoes* and read by Cameron Diaz in the movie adaptation of the book.
In the collection's last story, "Negocios," Junot Díaz gives us a portrait of Papi.
The motto "All for one and one for all" appears over the door.
Tom's favorite proverb, "A rolling stone gathers no moss," proved wrong.

For quotation marks versus italics for the titles of works, see 8.163. See also 7.62.

6.42 **Commas with questions.** A direct question is sometimes included within a sentence but not enclosed in quotation marks. Such a question is usually introduced by a comma (unless it comes at the beginning of a sentence) and begins with a capital letter. This slight departure from earlier editions of the manual recognizes that such a question is analogous to (and can be treated like) a direct quotation (see 6.40; see also 6.65).

She wondered, What am I doing?
Legislators had to be asking themselves, Can the fund be used for the current emergency, or must it remain dedicated to its original purpose?

If the question ends before the end of the sentence, no comma is required after the question mark (see also 6.125).

What am I doing? she wondered.

If the result seems awkward, rephrase as an indirect question. An indirect question does not require a question mark, nor does it need to be set off with a comma. Indirect questions are never capitalized (except at the beginning of a sentence). See also 6.69.

She wondered what she was doing.
The question of how to tell her was on everyone's mind.
Ursula wondered why her watch had stopped ticking.
Where to find a reliable clock is the question of the hour.

### *Commas in Personal and Corporate Names*

6.43 **Commas with "Jr.," "Sr.," and the like.** Commas are not required with *Jr.* and *Sr.*, and they are never used to set off *II*, *III*, and the like when these are used as part of a name. In an inverted name, however (as in an index; see 16.41), a comma is required before such an element, which comes last.

John Doe Sr. continues to cast a shadow over his son.
Jason Deer III has turned over stewardship of the family business to his cousin.
*but*
Doe, John, Sr.
Deer, Jason, III

If a comma is used to set off *Jr.* or *Sr.*, a second comma is normally required in the middle of a sentence (see 6.17); rephrase as needed to avoid the possessive.

the speech made by John Doe, Sr. (*not* John Doe, Sr.'s, speech)

6.44 **Commas with "Inc.," "Ltd.," and the like.** Commas are not required with *Inc.*, *Ltd.*, and such as part of a company's name. A particular company may use such commas in its corporate documentation; articles and books about such companies, however, should generally opt for a consistent style rather than make exceptions for particular cases.

QuartzMove Inc. was just one such company named in the suit.

If a comma is used to set off the abbreviation, a second comma is normally required in the middle of a sentence (see 6.17); rephrase as needed to avoid the possessive. See also 6.43.

## *Commas with Antithetical Elements*

6.45 **Commas with "not" phrases.** When a phrase beginning with *not* is interjected in order to clarify a particular noun, commas should be used to set off the phrase. See also 6.46.

We hoped the mayor herself, not her assistant, would attend the meeting.
They want you, not him.

6.46 **Commas with "not . . . but," "not only . . . but also," and the like.** With an interjected phrase of the type *not . . . but* or *not only . . . but also*, commas are usually unnecessary.

Works of art are created not by inspiration but by persistence.
Being almost perfectly ambidextrous, she wore not one watch but two.
They marched to Washington not only armed with petitions and determined to get their senators' attention but also hoping to demonstrate their solidarity with one another.

If, however, such a phrase seems to require special emphasis or clarification (usually a matter of editorial judgment), commas may be used to set off the *not* phrase. Alternatively, a dash may be used in place of the first comma, in which case a second comma usually becomes unnecessary.

She was in the habit of placing her orders months ahead of the competition—not only as a matter of personal pride but also to bolster her credibility as an early adopter.

6.47 **Commas with "the more," "the less," and so on.** A comma is customarily used between clauses of *the more . . . the more* type. Shorter phrases of that type, however, rarely merit commas.

The more I discover about the workings of mechanical movements, the less I seem to care about the holy grail of perfectly accurate timekeeping.
*but*
The more the merrier.

## *Other Uses of the Comma*

6.48 **Commas with parenthetical elements.** If only a slight break is intended, commas may be used to set off a parenthetical element inserted into a sentence as an explanation or comment. Such elements are occasionally awkward, especially if they are inserted between an adjective and the noun it modifies; in such cases, rewording may help.

All the test participants, in spite of our initial fears, recovered.
The Hooligan Report was, to say the least, a bombshell.
Most children fail to consider the history behind new technologies, if they think of it at all.
She was the fastest, not to mention the strongest, runner on her team.
*or, better,*
She was the fastest runner on her team, not to mention the strongest.

If a stronger break is needed or if there are commas within the parenthetical element, em dashes (6.85) or parentheses (6.95) should be used instead of commas.

6.49 **Commas with "however," "therefore," "indeed," and the like.** Commas—sometimes paired with semicolons (see 6.57)—are traditionally used to set off conjunctive adverbs such as *however*, *therefore*, and *indeed*. When

the adverb is essential to the meaning of the clause, or if the emphasis is on the adverb itself, commas are usually unnecessary (as in the last two examples).

A truly efficient gasoline-powered engine remains, however, a pipe dream.
Indeed, not one test subject accurately predicted the amount of soup in the bowl.
*but*
If you cheat and are therefore disqualified, you may also risk losing your scholarship.
That was indeed the outcome of the study.

6.50 **Commas with "such as" and "including."** The principles delineated in 6.29 apply also to phrases introduced by *such as* or *including*. Nonrestrictive phrases introduced by these terms are set off by commas (because they are not essential to the meaning or identity of the noun they modify). When such phrases are restrictive (i.e., essential to the meaning or identity of the noun), commas are not used.

The entire band, including the matutinal lead singer, overslept the noon rehearsal.
Some words, such as *matutinal* and *onomatopoetic*, are best avoided in everyday speech.
*but*
Words such as *matutinal* and *onomatopoetic* are best avoided in everyday speech.

6.51 **Commas with "that is," "namely," "for example," and the like.** Expressions of the type *that is* are traditionally followed by a comma. They are best preceded by an em dash or a semicolon rather than a comma, or the entire phrase they introduce may be enclosed in parentheses or em dashes.

There are simple alternatives to the stigmatized plastic shopping bag—namely, reusable cloth bags and foldable carts.
The committee (that is, its more influential members) wanted to drop the matter.
Keesler managed to change the subject; that is, he introduced a tangential issue.
Bones from various small animals—for example, a squirrel, a cat, a pigeon, and a muskrat—were found in the doctor's cabinet.

When *or* is used in a sense analogous to *that is* (to mean "in other words"), the phrase it introduces is usually set off by commas.

The compass stand, or binnacle, must be situated within the helmsman's field of vision.

Note that in formal writing, Chicago prefers to confine the abbreviations *i.e.* ("that is") and *e.g.* ("for example") to parentheses or notes, where they are followed by a comma.

The most noticeable difference between male and female ginkgo trees (i.e., the presence of berries in the latter) is also the species' most controversial feature.

6.52 **Commas with "too" and "either."** The adverbs *too* and *either* used in the sense of "also" generally need not be preceded by a comma.

I had my cake and ate it too.
Anders likes Beethoven; his sister does too.
The airport lacked charging stations; there were no comfortable chairs either.

When *too* comes in the middle of the sentence or clause, however, a comma aids comprehension.

She, too, decided against the early showing.

See also 6.31.

6.53 **Commas with direct address.** A comma is used to set off names or words used in direct address.

Ms. Jones, please come in.
James, your order is ready.
Hello, Ms. Philips.
Hi, Pratchi. Please sit down.
Take that, you devil.
Kiss me, you fool!
Are you listening, class?
It's time to go, Marta.
I am not here, my friends, to discuss personalities.

In correspondence, a comma typically follows the greeting, though a colon may be used instead (especially in formal correspondence; see 6.66).

Dear Lucien, . . .

If the greeting itself consists of a direct address, two marks of punctuation are needed (i.e., the comma in the direct address and the colon or comma following the greeting). (The first mark is often left out in casual correspondence.)

Greetings, Board Members: . . .
Hi, Karel, . . .

6.54 **Commas to indicate elision.** A comma is often used to indicate the omission of a word or words readily understood from the context.

In Illinois there are seventeen such schools; in Ohio, twenty; in Indiana, thirteen.
Thousands rushed to serve him in victory; in defeat, none.

The comma may be omitted if the elliptical construction is clear without it.

One student excels at composition, another at mathematics, and the third at sports.
Jasper missed her and she him.

6.55 **Commas between homonyms.** For ease of reading and subject to editorial discretion, two words that are spelled alike but have different functions may be separated by a comma if such clarification seems desirable.

Let us march in, in twos.
Whatever is, is good.
*but*
"It depends on what *means* means."

## Semicolons

6.56 **Use of the semicolon.** In regular prose, a semicolon is most commonly used between two independent clauses not joined by a conjunction to signal a closer connection between them than a period would. (For the similar use of a colon, see 6.61.)

She spent much of her free time immersed in the ocean; no mere water-*resistant* watch would do.
Though a gifted writer, Miqueas has never bothered to master the semicolon; he insists that half a colon is no colon at all.

For the use of the semicolon in index entries, see 16.96, 16.17. For its use in parenthetical text citations, see 15.30. For its use with a second subtitle of a work, see 14.90.

6.57 **Semicolons with "however," "therefore," "indeed," and the like.** Certain adverbs, when they are used to join two independent clauses, should

All the band's soundtrack albums—*A Hard Day's Night*, *Help!*, *Yellow Submarine*, and *Magical Mystery Tour*—were popular.

6.126 **Question mark with exclamation point.** In the rare case of a question or exclamation ending with a title or quotation that ends in a question mark or exclamation point, include both marks only if they are different and the sentence punctuation seems essential.

Have you seen *Help!*?
Who shouted, "Long live the king!"?
I just love *Who's Afraid of Virginia Woolf?*!
*but*
Who starred opposite Richard Burton in *Who's Afraid of Virginia Woolf?*
Who wrote "Are You a Doctor?"
Where were you when you asked, "Why so blue?"

The question mark is sometimes used in combination with the exclamation point to express excitement or disbelief, a practice that is best avoided in formal prose; see also 6.72.

## Lists and Outline Style

6.127 **Lists and outlines—general principles.** Items in a list should consist of parallel elements. Unless introductory numerals or letters serve a purpose—to indicate the order in which tasks should be done, to suggest chronology or relative importance among the items, to facilitate text references, or, in a run-in list, to clearly separate the items—they may be omitted. Where similar lists are fairly close together, consistent treatment is essential. Note that the advice in this section applies primarily to lists that occur in the text. For lists of illustrations and tables, see 1.39; for lists of abbreviations, see 1.44; for glossaries, see 1.61; for indexes, see chapter 16.

6.128 **Run-in versus vertical lists.** Lists may be either run in to the text or set vertically. Short, simple lists are usually better run in, especially if the introductory text and the items in the list together form a sentence (see 6.129). Lists that require typographic prominence, that are relatively long, or that contain multiple levels (see 6.132) should be set vertically.

6.129 **Run-in lists.** If numerals or letters are used to mark the divisions in a run-in list, enclose them in parentheses. If letters are used, they are


NEW EDITION
WILLIAM
STRUNK JR.
AND
E.B. WHITE
"...still a little book, small enough and important enough to carry in your pocket, as I carry mine."
— Charles Osgood
The ELEMENTS of STYLE
FOURTH EDITION
FOREWORD BY ROGER ANGELL

# THE ELEMENTS OF *Style*

BY

WILLIAM STRUNK Jr.

*With Revisions, an Introduction, and a Chapter on Writing*

BY

E. B. WHITE

FOURTH EDITION

ALLYN AND BACON
*Boston London Toronto Sydney Tokyo Singapore*

COPYRIGHT © 2000, 1979, ALLYN & BACON
A Pearson Education Company
Needham Heights, Massachusetts 02494

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the Publisher.

Earlier editions © 1959, 1972 by Macmillan Publishing Co., Inc.

The Introduction originally appeared, in slightly different form, in *The New Yorker*, and was copyrighted in 1957 by The New Yorker Magazine, Inc.

*The Elements of Style*, Revised Edition, by William Strunk Jr. and Edward A. Tenney, copyright 1935 by Oliver Strunk.

**Library of Congress Cataloging-in-Publication Data**

Strunk, William, 1869–1946.
The elements of style / by William Strunk, Jr. ; with revisions, an introduction, and a chapter on writing by E. B. White. — 4th ed.
p. cm.
Includes index.
ISBN 0-205-30902-X (paperback). — ISBN 0-205-31342-6 (casebound)
1. English language—Rhetoric. 2. English language—Style.
3. Report writing. I. White, E. B. (Elwyn Brooks), 1899– .
II. Title.
PE1408.S772 1999
808'.042—dc21 99-16419
CIP

PRINTED IN THE UNITED STATES OF AMERICA

10 9 8 7 6 5 4 3 04 03 02 01 00

**conjunction** A word that joins words, phrases, clauses, or sentences. The coordinating conjunctions, *and, but, or, nor, yet, so, for,* join grammatically equivalent elements. Correlative conjunctions (*both, and; either, or; neither, nor*) join the same kinds of elements.

**contraction** A shortened form of a word or group of words: *can't* for cannot; *they're* for they are.

**correlative expression** See *conjunction.*

**dependent clause** A group of words that includes a subject and verb but is subordinate to an independent clause in a sentence. Dependent clauses begin with either a subordinating conjunction, such as *if, because, since,* or a relative pronoun, such as *who, which, that. When it gets dark,* we'll find a restaurant *that has music.*

**direct object** A noun or pronoun that receives the action of a transitive verb. Pearson publishes *books.*

**gerund** The *-ing* form of a verb that functions as a noun: *Hiking* is good exercise. She was praised for her *playing.*

**indefinite pronoun** A pronoun that refers to an unspecified person (*anybody*) or thing (*something*).

**independent clause** A group of words with a subject and verb that can stand alone as a sentence. *Raccoons steal food.*

**indirect object** A noun or pronoun that indicates to whom or for whom, to what or for what the action of a transitive verb is performed. I asked *her* a question. Ed gave *the door* a kick.

**infinitive/split infinitive** In the present tense, a verb phrase consisting of *to* followed by the base form of the verb (*to write*). A split infinitive occurs when one or more words separate *to* and the verb (*to boldly go*).

**intransitive verb** A verb that does not take a direct object. His nerve *failed.*

# GARNER'S MODERN ENGLISH USAGE

FIFTH EDITION

Bryan A. Garner

OXFORD
UNIVERSITY PRESS

OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide. Oxford is a registered trademark of Oxford University Press in the U.K. and certain other countries.

Published in the United States of America by Oxford University Press, 198 Madison Avenue, New York, NY 10016.

© Bryan A. Garner 2022

First Edition published in 1998
Second Edition published in 2003
Third Edition published in 2009
(The first three editions bore the title *Garner's Modern American Usage.*)
Fourth Edition published in 2016
Fifth Edition published in 2022

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, without the prior written permission of Oxford University Press, or as expressly permitted by law, by license, or under terms agreed with the appropriate reproduction-rights organization. Inquiries concerning reproduction outside the scope of the above should be sent to the Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form, and you must impose this same condition on any acquirer.

Cataloguing-in-Publication data is on file at Library of Congress.

Library of Congress Control Number: 2022945705

ISBN 978-0-19-759902-0

1 3 5 7 9 8 6 4 2
Sheridan Books, Inc., United States of America

**paralipsis; *paralepsis; *paraleipsis.** Although the more classical spelling **paraleipsis* predominated until about 1960, *paralipsis* has become standard among rhetoricians since that time. **Paralepsis* is the second most common spelling. Let's not fully discuss the degree to which **paraleipsis* has fallen into disfavor. For the meaning of this rare term, see p. 1019.

Current ratio in print (*paralipsis* vs. **paralepsis* vs. **paraleipsis*): 5:2.2:1

**parallel,** vb., makes *paralleled* and *paralleling* in AmE and BrE alike—not **parallelled* and **parallelling*. See SPELLING (C).

**PARALLELISM. A. Generally.** *Parallelism*—the matching of sentence parts for logical balance, especially by using grammatically coordinate structures—helps satisfy every reader's innate craving for order and rhythm. In a list, for example, you might have noun + noun + noun, or verb + verb + verb, or adjective + adjective + adjective. By phrasing parallel ideas in parallel grammatical constructions, you show the reader how one idea relates to another. You supply correspondences. Stylists have long emphasized the importance of matching phrase to like phrase:

- **1926:** "One of the first requisites for the writing of good clean sentences is to have acquired the art of enumeration, that is, of stringing together three or four words or phrases of identical grammatical value without going wrong." H.W. Fowler, *FMEU1* at 142.
- **1966:** "Everyone who tries to write—at least, everyone not afflicted with what is sometimes called a tin ear—has a degree of natural instinct for putting like thoughts into like constructions. Some have the instinct *in excelsis*. . . . [But] most of us possess the instinct for matching parts in no more than a variable and inferior degree and must strengthen it by self-discipline and taking thought." Wilson Follett, *MAU* at 211.
- **1993:** "How do you make ideas parallel? In a series, all the items should be alike, whether all nouns, all gerunds, all infinitives, all phrases or all clauses. If a series of verbs is used, they should all be in the same tense, voice and mood. Subjects of parallel clauses should be in the same person and number. When two phrasal prepositions or conjunctions are used together, both need to be present in their entirety." Brian S. Brooks & James L. Pinson, *Working with Words* 73 (2d ed. 1993).
- **1998:** "No long complex sentence will hold up without parallel construction. Paralleling can be very simple. Any word will seek its own kind, noun to noun, adjective to adjective, infinitive to infinitive." Sheridan Baker, *The Practical Stylist* 101 (8th ed. 1998).
- **2005:** "The use of parallel structures helps produce cohesion and coherence in a text. Aim for parallelism in sentences and in longer passages. The structures can be clauses or phrases." Ann Raimes, *Keys for Writers* 325 (4th ed. 2005).

**B. Parts of Speech.** With CORRELATIVE CONJUNCTIONS and with lists (even short ones), noun should be matched with noun, adjective with adjective, adverb with adverb, etc. Avoid mixtures—e.g.:

- "The poem is derivative, ceremonial, and *an elegy* [read *elegiacal*]." D.S. Brewer, *Chaucer* 44 (2d ed. 1960). (Another possible revision: *The poem is a derivative and ceremonial elegy.* The original list consisted of adjective + adjective + noun.)
- "John Baker is conservative and *a traditionalist*." Murray Teigh Bloom, *The Trouble with Lawyers* 223 (1970). (A possible revision: *John Baker is conservative and traditional.* Or: *John Baker is a conservative traditionalist.* The original list consisted of adjective + noun.)
- "Webb, who batted .104 last season, had two doubles, three walks *and scored three times* [read *and three runs*]." Rick Cantu, "Freshman Sits in Driver's Seat as Longhorns Cruise," *Austin Am.-Statesman*, 5 Feb. 1995, at E1, E8. (The original list consisted of noun + noun + verb phrase.)
- "Her French-Canadian husband, Jean Marc, 50, was *gentle, generous and a millionaire* [read *a gentle, generous millionaire*]." Adam Fresco & Ian Cobain, "Weetabix Wife Lived a Life of Novel Charm," *Times* (London), 23 Mar. 2001, at 5. (The original list consisted of adjective + adjective + noun.)

A clear thinker presents lists logically so that grammatical and commonsense relationships are clear.

**C. Phrases and Clauses.** One of the most common mistakes in falling into a nonparallel construction involves mixing phrases and clauses by introducing a verb late in the game. "Orthopedic surgeons study for four years in a college or university, four years in an orthopedic residency program and may have one optional year of specialized education." "Podiatry vs. Orthopedics," *USA Today*, 14 Apr. 2003, at D7. The writer follows two *four years* phrases with the clause *may have one optional year of specialized education.* Worse, the first two elements are objects of the shared preposition *for*, a job that the *may have* clause can't serve. A suggested revision: *Orthopedic surgeons study for four years in a college or university and four years in an orthopedic residency program; they may also have one optional year of specialized education.*

**D. Content.** To the true stylist, mere grammatical parallelism isn't enough: the grammar should match the ideas. That is, you should strive for notional parallelism. It seems obvious that you shouldn't say that someone is *hungry, tall, and Italian*. But subtler problems arise: "The poetic opening stiffens, dreamily relaxes, then mightily reclenches: an instability of mood and texture both *symptomatic* of the mature Schubert and *disorienting* to generations of frustrated admirers, beginning with Robert Schumann." Joseph Horowitz, "A Symphony Is Where You Find It," *N.Y. Times*, 24 May 1992, § 2, at 1. Although both *symptomatic* and *disorienting* begin adjective phrases, the ideas expressed aren't coordinate. A possible revision: *The poetic opening stiffens, dreamily relaxes, and then mightily reclenches. The instability of mood and texture—symptomatic of the mature Schubert—has*

whether the first word should be capitalized. The first three bulleted examples in the preceding paragraph follow the prevalent journalistic practice: the first word is capitalized. But the other view—urging for a lowercase word following the colon—is probably sounder: the lowercase (as in this very sentence) more closely ties the two clauses together. That's the style used throughout this book. It's also the house style for *The New Yorker*—e.g.:

- "Though active, El Misti isn't doing anything at the moment, but Arequipa is: it has spread up the volcano's flanks along the gullies where lava and ash will someday begin to flow." Tad Friend, "Disaster!," *New Yorker*, 16 Dec. 2002, at 36, 38.
- "Party lines are not to be confused with chat lines, party planners, or escort services: they are a prehistoric phone technology of copper-loop circuits." Susan Orlean, "Party Line," *New Yorker*, 16 Dec. 2002, at 52.

Although the uppercase convention is a signpost to the reader that a complete sentence is ahead, that signpost generally isn't needed.

Those who follow the lowercase convention typically recognize an exception and capitalize what follows the colon when the colon introduces a series of sentences: "He made three points: He wanted some water. He needed to sleep. And he wanted to go home."

Second, the colon can introduce a list of items, often after expressions such as *the following* and *as follows*—e.g.: "The meetings are as follows: Central, Dec. 11 at the Municipal Auditorium, 5:30 p.m.–7:30 p.m.; South, Dec. 15 at the Mexican Cultural Institute, 5:30 p.m.–7:30 p.m." Megan Kamerick, "Main Plaza Considered as Site of Museum on Mexico's History," *San Antonio Bus. J.*, 12 Dec. 1997, at 6.

Third, the colon formally introduces a wholly self-contained quotation, whether short or long. If the quotation is in block form, the colon is mandatory, but if it's run in with the text, a comma is also permissible. E.g.: "By 1776 it seemed clear to numerous inhabitants of the western areas of the Connecticut River valley that the fight against tyranny had assumed a two-fold character: 'We are contending against the same enemy within, that is also without.'" Gordon S. Wood, *Creation of the American Republic* 186 (1972).

Fourth, the colon often appears after the salutation in formal correspondence <Dear Ms. Johnsonius:>.

Finally, the colon separates elements such as a book's title and subtitle <*Will Rogers: A Biography*>, chapter and verse in a biblical citation <John 3:16>, hour and minute in time <9:05 p.m.>, and similar uses.

Avoid four common misuses of the colon. (1) Don't put one between a verb and its object or complement <she enjoys watching plays, films, and TV shows> (no colon after *watching*). (2) Don't put a colon between a preposition and its object <they are enamored of rare books, bone china, and etched glass> (no colon after *of*). (3) Don't put a colon after the conjunction *that* <he declared that all the plants on board must be quarantined>. (4) Don't put a colon after an introductory word or phrase such as *for example*, *including*, *such as*, or *that is* <several dignitaries were present, including Vice President Kamala Harris, Senator John Cornyn, and Justice Elena Kagan> (no colon after *including*). Even so, as noted above, a colon is often appropriate after a phrase that more formally announces a list (e.g., *as follows*, *the following*, *including these*).

**D. Comma [,].** This punctuation mark, the least emphatic of them all, is the one used in the greatest variety of circumstances. Two styles result in different treatments. The "close" style of punctuation results in fairly heavy uses of commas; the "open" style results in fairly light uses of commas. In the 20th century, the movement was very much toward the open style. The byword was, "When in doubt, leave it out." Indeed, some writers and editors went too far in omitting commas that would aid clarity. What follows is an explanation tending slightly toward the open style, but with a steady view toward enhancing clarity.

Essentially, the comma has ten uses.

First, the comma separates items (including the last from the next-to-last) in a list of more than two—e.g.: "The Joneses, the Smiths, and the Nelsons." In this position, it's called, variously, the serial comma, the Oxford comma, or the Harvard comma. Whether to include the serial comma has sparked many arguments. Although newspaper journalists typically omit the serial comma as a "space-saving" device, most writing authorities outside that field recommend keeping it. Why? For a full discussion, see SERIAL COMMA.

A variation of this comma essentially functions as a shorter equivalent of *and*, especially in headlines and often with only two items: "Nuns, lay friends to raise funds." In that example, the inclusion of the comma is particularly important. When a church newsletter omitted it, embarrassment ensued.

Second, the comma separates coordinated main clauses—e.g.: "Cars will turn here[,] and coaches will go straight." There are two exceptions: (1) when the main clauses are closely linked <do as I tell you [no comma] and you won't regret it>; and (2) when the subject of the second independent clause, being the same as in the first, is not repeated <policies that help prevent crime are often better for the public [no comma] and are closer to the ideal of effective public administration>. (Another way of referring to the construction in that sentence is that it contains a "compound predicate.") Omitting the comma before

Because people learn one convention or the other at a fairly impressionable age, they become indoctrinated. They hold their convictions almost as tenaciously as they might their religious beliefs. It's difficult to change such a deeply held tenet.

What follows might strike you as overdone. But the authorities on the question, to my knowledge, have never been thoroughly canvassed. And the issue is one of the most recurrent in prose composition—as well as one of the most controversial among amateurs. So read closely, if you like, or just browse through the authorities quoted. The examples are worth pondering.

What are the merits on each side of the argument?

**A. Favoring the Serial Comma.** Proponents say that the comma is both logical and helpful. They point out that including it *never* creates an ambiguity, whereas omitting it fairly often does. It's a preventive measure that requires no real thought. The serial comma precludes ambiguities and annoyances at a negligible cost.

Problems arise more and more when the items in the series become longer and more complex. Let's say it's as simple as a list of couples: "We'll invite Herb and Myra, Gary and Mariellen, John and Robert, and Bill and Les." Delete the comma after *Robert*, and you have uncertainty about the relationships. And those items in the series aren't even especially complex. Also, of course, there's a pause after *Robert*—and the couples are paired in a normal oral delivery to show relationships. The comma reflects the natural pause.

Among the authorities favoring the serial comma in all instances are these (in chronological order):

- **1851:** Goold Brown, *The Grammar of English Grammars* 775 (1851) ("When more than two words or terms are connected in the same construction, or in a joint dependence on some other term, by conjunctions expressed or understood, the comma should be inserted after every one of them but the last . . . : *envy, scorn, remorse, or pride* . . . ; *head, hands, wings, or feet*.").
- **1859:** Henry Beadnell, *Guide to Typography* 119 (1859) ("Three or more subjects, predicates, or complements, with or without adjuncts, . . . are separated by a comma . . . *industry, honesty, and temperance*.").
- **1871:** John Wilson, *A Treatise on English Punctuation* 37 (21st ed. 1871) ("Some punctuators omit the comma between the last two particulars, when united by either of the conjunctions *and, or, nor*. But the propriety of using the comma will perhaps be obvious to any one who examines the nature of such sentences; for the last two words of a series are not more closely connected in sense and construction with each other than with the preceding words."). [To the same effect with slightly different words: John Wilson, *The Elements of Punctuation* 16 (1856).]
- **1878:** W.J. Cocker, *Hand-book of Punctuation* 18 (1878) ("When a conjunction is used with the last word in the series, a comma should be placed before the conjunction and between the other words.").
- **1892:** Paul Allardyce, *Punctuation* 34 (1892) ("When *and* occurs only between the last words of the series, the comma is usually inserted before it. *Trumpets, drums, and kettle-drums contended in noise with the shouts of a numerous rabble.* Many writers omit this comma. But it seems useful.").
- **1893:** Edmund Shaftesbury, *One Hundred Lessons in Punctuation* 22 (1893) ("Where three or more similar elements are connected *all* should be separated by commas. This is of the greatest importance, and should be adhered to in all circumstances. . . . *We think, feel, and know*.").
- **1901:** F. Horace Teall, *Punctuation* 4 (1901) ("It is a singular fact that many printers omit the comma before the last of such a series, though there is no plainer occasion for its use. Nearly all authorities prescribe such use of the comma, and the weight of custom, as well as common sense, favors it.").
- **1914:** Lyle Spencer, *Practical English Punctuation* 36 (1914) ("If in a series of three or more words, phrases, or clauses only the last two members are joined by a conjunction, the comma is inserted before the conjunction just as if there were no connective. This is done to prevent the last two members from seeming to be a single unit in the series.").
- **1926:** H.W. Fowler, *A Dictionary of Modern English Usage* 24 (1926)—elsewhere referred to in this book as *FMEU1* (calling its consistent use "the only rule that will obviate . . . uncertainties").
- **1937:** H.A. Treble & G.H. Vallins, *An A.B.C. of English Usage* 56 (Am. ed. 1937) ("Where more than two words or phrases occur together in a sequence a comma should precede the final *and*; e.g. *A great, wise, and beneficent measure*.").
- **1941:** Robert M. Gay, *Stops: A Handbook for Those Who Know Their Punctuation and for Those Who Aren't Quite Sure* 13 (1941) ("Present usage calls for a comma before *and* or *or* joining the last two members of a series.").
- **1966:** Sheridan Baker, *The Complete Stylist* 124 (1966) ("The meaningful pause demands a comma. Items in a series are equal, and they silently wait for equal treatment: *words, phrases, or clauses in a series*; *to hunt, to fish, and to hike* . . . . By carefully separating all the elements in a series, you keep alive a fine distinction lost long ago in the daily press.").
- **1966:** Wilson Follett, *Modern American Usage: A Guide* 398, 401 (Jacques Barzun ed., 1966) (noting that journalists omit it only to save space "in the narrow width of a newspaper column"—and that this is the only cogent argument for its omission).
- **1972:** Maxwell Nurnburg, *Questions You Always Wanted to Ask About English* 181 (1972) ("When we say 'The colors of our country are red, white, and blue,' there's a little pause after *white* that seems to ask for a comma to make *blue* just as important as *red* and *white*.").
- **1974:** David W. Ewing, *Writing for Results in Business, Government, and the Professions* 358 (1974) ("While this rule is not observed by all publishers, it is valid and helpful.").
- **1974:** *Words into Type* 187 (3d ed. 1974) ("The consistent use of this comma is recommended.").
- **1980:** Roy H. Copperud, *American Usage and Style: The Consensus* 78–79 (1980) ("Opinion is divided on whether the comma should be used before *and* in a series; the parade, led by newspapers, is turning away from it. Meticulous writing and editing preserves this comma.").
- **1990:** Richard Dowis, *How to Make Your Writing Reader-Friendly* 144 (1990) ("My feeling about the serial comma is simple: It can't do any harm, and it might do some good. I recommend it.").
- **1990:** Lawrence H. Freeman & Terry R. Bacon, *Style Guide* 52 (2d ed. 1990) ("A comma separates the last two items in a series although these items are linked by a conjunction . . . . This comma was once considered optional, but

**3.** Any forced use of a word. **4.** The use of a word falsely formed through folk etymology (see p. 415). — **catachrestic,** adj.

**cataphora** /kə-**taf**-ə-rə/, n. *Rhetoric.* The use of a substitute to refer to or stand for a later word or phrase <although it might be a good investment, the stock is too expensive> (the pronoun *it* having no antecedent but instead referring to *stock*, which occurs later in the sentence). Cf. ANAPHORA. For a discussion of confusing instances of cataphora, see ANTICIPATORY REFERENCE (p. 69).

**cataphoric** /kat-ə-**for**-ik/, adj. Of, relating to, or denoting reference to a word or group of words occurring later in the sentence. Cf. ANAPHORIC.

**catastasis** /kə-**tas**-tə-sis/, n. The part of a speech, toward the beginning, in which the speaker sets forth the subject of discussion. Pl. **catastases.**

**catchphrase,** n. **1.** A memorable or striking phrase. **2.** A stock phrase or other expression often repeated by and therefore associated with a particular person, organization, political group, cult, etc. **3.** An advertising slogan. See SLOGAN.

**catchword,** n. **1.** In an old book, a word that ends one page and begins the next, placed emphatically at the bottom of the earlier page to orient the reader as he or she progresses to the next. **2.** GUIDEWORD. **3.** CATCHPHRASE.

**catenative verb.** See VERB.

**causerie** /kohz-**ree**/ or /**koh**-zə-ree/, n. An informal article, essay, or talk, usu. one of a series on a literary subject.

**cedilla** /sə-**dil**-ə/, n. In some Romance languages (e.g., French and Portuguese), a diacritical mark that appears under the letter *c* to indicate that the letter is pronounced softly as an *s* rather than hard as a *k*. • Many loanwords used in English lose their cedillas <*soupçon*–soupcon> <*garçon*–garcon> <*façade*–facade>. See DIACRITICAL MARK.

**cheville** /shə-**veel**/, n. A repeated or meaningless word or phrase used to fill out the end of a sentence when euphony or balance with other sentences is desired. • The device is often used in poetry, as in Lewis Carroll's *Jabberwocky*: "O frabjous day! Callooh! Callay!" (in *Through the Looking Glass* 24 [1871; repr. 1993]).

**chiasmus** /kī-**az**-məs/, n. *Rhetoric.* The arrangement of adjoining parallel clauses or phrases with inverted word-order <I do not live that I may eat, but I eat that I may live>. • Normally, parallel clauses have an "a-b-a-b" arrangement. In a chiasmus, the order becomes "a-b-b-a." Examples:

- The children ought not to lay up for the parents, but the parents for the children. (2 Corinthians 12:14)
- To Adam paradise was a home; to the good among his descendants, home is a paradise. (Julius Hare [1795–1855])
- Those gallant men will remain often in my thoughts and in my prayers always. (General Douglas MacArthur [1951])

— **chiastic,** adj.

**choplogic,** n. **1.** Contentious, complicated, and often illogical or false argument based on trivial points. **2.** Someone who makes such an argument. • Shakespeare used the word effectively in both senses in *Romeo and Juliet* (Act 3, scene 5). When Juliet's father announces he has chosen a husband for Juliet and she argues with him, her father dismisses her and her arguments as "choplogic."

**chrestomathy** /kres-**tom**-ə-thee/, n. **1.** A collection of choice passages or short works from an author or authors. **2.** A collection of passages intended for use in learning a foreign language. — **chrestomathic** /kres-tə-**math**-ik/, adj.

**chunk,** n. *Linguistics.* **1.** A phrase or group of words, usu. learned as a unit when acquiring a language. **2.** A grouping of words customarily used together in a fixed expression, such as *It's a shame that*, *It's up to you*, or *To make a long story short*.

**circumambage** /sər-kəm-**am**-bəj/, n. **1.** (Usu. pl.) The use of roundabout or indirect speech or writing, often to avoid a particular subject; an instance of such indirectness. **2.** CIRCUMLOCUTION. See AMBAGES. — **circumambagious** /sər-kəm-am-**bay**-jəs/, adj.

**circumflect,** vb. To mark with the diacritical mark known as a circumflex. See CIRCUMFLEX.

**circumflex,** n. **1.** A diacritical mark (ˆ) used over a vowel in a French word to show that a following *s* was elided <*hospital*–*hôpital*>. • Although French loanwords with circumflexes (such as *hôtel*) were used in the 1800s, the mark is uncommon today because so many loanwords have become naturalized. An exception is *fête*. It retains the circumflex in British English, but in American English it is a variant spelling of *fete*. See DIACRITICAL MARK. **2.** An accent or tone of voice in which a higher or acute tone is followed by a lower or grave tone within a single syllable.

**circumlocution** /sər-kəm-loh-**kyoo**-shən/, n. Roundabout speech or language, or the use of many words where one or two would suffice. See CIRCUMAMBAGE. — **circumlocutory** /sər-kəm-**lok**-yə-tohr-ee/, adj.

**circumstance.** See ADJUNCT.

**clausal** /**klaw**-zəl/, adj. Of, relating to, or consisting of a clause. • The word dates from the early 20th century. Cf. PHRASAL.

**clause,** n. A sentence part that contains a subject and verb. • While a clause has two essential elements (subject and predicate), a phrase consists of a group of two or more words not containing both of those elements. See PHRASE; WORD.

▸**adjectival clause.** A dependent clause that is used to expand a noun element <she was delighted with the letter *that informed her of her admission to college*> <the evening *when we arrived* was eerily foggy> <I went to see the spot *where we met*>. — Also termed *adjective clause*. Cf. *relative clause*.

▸**adverbial clause.** A clause that indicates time, place, manner, degree, cause, or the like. • An adverbial clause can modify an adjective, an adverb, or a verb in the independent clause <you're better *than I ever was*> <I came *as soon as I knew you'd arrived*> <*because you were still sleeping*, I waited *before I started practicing my flute*>. In the category of adverbial clauses some grammarians include (1) tag questions <he didn't go to the movie, *did he*?>, (2) interjected clauses <the dog, *he has declared*, must be fed promptly at 3:00 p.m.>, and (3) dependent clauses introduced by such words as *whoever* and *whichever* <*whenever the play begins*, the children will settle down>.

▸**appositive relative clause.** See *nonrestrictive relative clause*.

▸**comparative clause.** A clause containing (and usu. introduced by) a comparative conjunction. See *comparative conjunction* under CONJUNCTION.

▸**conditional clause.** See PROTASIS.

▸**consequence clause.** See APODOSIS.

▸**coordinate clauses.** The individual clauses of a compound sentence, or the independent clauses of a compound–complex sentence; specif., clauses of the same rank.

▸**defining relative clause.** See *restrictive relative clause*.

▸**dependent clause.** A clause that, because it does not express a complete idea, must be joined with an independent clause to make sense, typically by a subordinating conjunction such as *before*, *though*, or *when*. • For example, in the sentence

**complex preposition.** See *phrasal preposition* under PREPOSITION.

**complex sentence.** See SENTENCE.

**complex tense.** See TENSE.

**composition,** n. **1.** The art of arranging words into sentences, of sentences into paragraphs, and of paragraphs into various types of discourse. **2.** The production of written work. **3.** The combination of two or more words into a compound word.

**compound,** n. A grammatical unit composed of several independent elements. See *compound word* under WORD.

**compound adjective.** See *phrasal adjective* under ADJECTIVE.

**compound–complex sentence.** See SENTENCE.

**compound conjunction.** See CONJUNCTION.

**compound indefinite pronoun.** See PRONOUN.

**compound modifier.** See *phrasal adjective* under ADJECTIVE.

**compound negation.** See NEGATION (1).

**compound noun.** See NOUN.

**compound personal pronoun.** See PRONOUN.

**compound predicate.** See PREDICATE.

**compound preposition.** See PREPOSITION.

**compound relative pronoun.** See PRONOUN.

**compound sentence.** See SENTENCE.

**compound subject.** See SUBJECT.

**compound word.** See WORD.

**conceit,** n. **1.** An elaborate or strained metaphor; a fanciful idea. **2.** An organizing theme or concept for a written work.

**concessive,** adj. (Of a preposition or conjunction) denoting a word, phrase, or clause that signals a reversal of an idea, opinion, viewpoint, or stance (e.g., introduced by *although*, *even though*, *in spite of*).

**conciseness,** n. The quality of expressing much in brief form; compact comprehensiveness.

**conclusion.** See APODOSIS.

**concord,** n. A grammatical relationship in which related parts of speech correspond in features such as number, gender, and person <I was> <you were> <they were>. • In English, a subject and its verb must agree in person and number; a pronoun and its antecedent must agree in number, person, gender, and (sometimes, with linking verbs) case. — Also termed *agreement*. See also GENDER; SINGULAR; PERSON.

**concrete noun.** See NOUN.

**conditional clause.** See CLAUSE.

**conditional conjunction.** See CONJUNCTION.

**conditional sentence.** See SENTENCE.

**conduplication** /kon-d[y]oo-pli-**kay**-shən/, n. *Rhetoric.* The emphatic repetition of a word, with other words intervening between repetitions. — Also termed *conduplicatio*. Cf. EPIZEUXIS.

**congruence.** See AGREEMENT.

**conjugate** /**kon**-jə-gayt/, vb. To inflect (a verb) according to voice, mood, tense, number, and person. — **conjugate** /**kon**-jə-gət/, adj.

**conjugation,** n. **1.** The changing of a verb's forms to show voice, mood, tense, number, and person. **2.** A list of a verb's inflectional forms. • In some traditional grammars, the term *conjugation* applies not just to inflection but also to various sets of verb phrases—hence not just *rings* and *rang* but also *will ring*, *has rung*, *had rung*, and *will have rung*. This broader interpretation of conjugation is a remnant of Latin grammars. **3.** A class of verbs similarly conjugated <Latin verbs of the second conjugation>.

**conjunct,** n. In some grammatical systems, an adverb that connects one sentence or clause with another by expressing addition (e.g., *and* as a sentence-starter), contrast (e.g., *but* as a sentence-starter), or the like. • Although traditional grammarians use the term *conjunction* to cover both midsentence *and*s and sentence-starting *and*s, some modern grammarians call the former *conjunctions* and the latter *conjuncts*. Cf. ADJUNCT; DISJUNCT; SUBJUNCT.

**conjunction,** n. A particle (such as *and*, *or*, or *since*) that joins words, phrases, clauses, or sentences, and that indicates their relationship to one another.

▸**additive coordinating conjunction.** See *copulative conjunction*.

▸**adverbial conjunction.** See *conjunctive adverb* under ADVERB.

▸**adversative conjunction** /ad-**vər**-sə-tiv/. A conjunction that introduces a contrast or comparison to a preceding phrase or clause, e.g., *but*, *still*, and *yet* <the roof and the walls are finished, yet there is a lot of inside work to do>. — Also termed *contrasting coordinating conjunction*.

▸**comparative conjunction.** A conjunction that expresses equality or difference of degree <as . . . as> <as if> <just as . . . , so . . .> <than>. See *comparative clause* under CLAUSE.

▸**compound conjunction.** A conjunction formed from the combination of two or more words, such as *nevertheless* and *notwithstanding*.

▸**conditional conjunction.** A conjunction that expresses contingency or some other condition <if> <unless>.

▸**contrasting coordinating conjunction.** See *adversative conjunction*.

▸**coordinate conjunction.** See *coordinating conjunction*.

▸**coordinating conjunction.** A conjunction that joins two elements of identical construction and of equal grammatical rank, such as *and* <Tom and I are going> or *or* <she is deciding whether to fly or drive>. — Also termed *coordinate conjunction*; *coordinator*.

▸**copulative conjunction** /**kop**-yə-lə-tiv/ or /**kop**-yə-lay-tiv/. A conjunction that joins two coordinate phrases or clauses <and> <also>; esp., one that states an additional fact related to the first clause, e.g., *and*, *also*, and *moreover* <she is an excellent swimmer; moreover, she knows CPR>. — Also termed *additive coordinating conjunction*.

▸**correlative conjunctions** /kə-**rel**-ə-tiv/. Conjunctions that function as separable compound forms, occur in pairs, and have corresponding meanings <both . . . and> <either . . . or> <neither . . . nor>. See pp. 270–71.

▸**disguised conjunction.** A conjunction that has the form of a participle but is used to introduce clauses (e.g., *considering*, *regarding*, and *supposing*).

▸**disjunctive conjunction** /dis-**jənk**-tiv/. A conjunction that expresses opposed or contrasting ideas; esp., one that denotes separation from or an alternative to the first phrase or clause. • Examples are *but*, *either*, *or*, and *nor*. — Also termed *separative coordinating conjunction*.

▸**expletive conjunction** /**eks**-plə-tiv/. A conjunction connecting two thoughts that are not expressed in the same sentence. • The conjunction refers back to a preceding thought or sentence (e.g., *So* in *So they say* and *thus* in *May it always be thus*).

▸**final conjunction.** A coordinating conjunction that denotes an inference or consequence. • It introduces a clause that gives a reason or shows what has been or ought to be done in view of the first clause (e.g., *consequently*, *hence*, *so*, and *therefore* <I misread the map, hence my wrong turn>). — Also termed *illative conjunction*.

▸**illative conjunction** /**il**-ə-tiv/ or /i-**lay**-tiv/. **1.** See *final conjunction*. **2.** See *conjunctive adverb* under ADVERB.


McCarter & English LLP
3 0001 00061916 5
Reading Law:
The Interpretation of Legal Texts
ANTONIN SCALIA
BRYAN A. GARNER
Foreword by Frank H. Easterbrook

# Reading Law

## The Interpretation of Legal Texts

Antonin Scalia & Bryan A. Garner

The views expressed in this book are those of the authors as legal commentators. Nothing in this book prejudges any case that might come before the United States Supreme Court.

©2012 Antonin Scalia & Bryan A. Garner

Published by Thomson/West
610 Opperman Drive
P.O. Box 64526
St. Paul, MN 55164-0527
1-800-328-9352

ISBN: 978-0-314-27555-4

Printed in the United States of America

Library of Congress Cataloguing-in-Publication Data
Antonin Scalia & Bryan A. Garner
Reading Law: the interpretation of legal texts — 1st ed.
p. cm.
Includes bibliographical references and index.
1. Law—interpretation and construction.
2. Judicial Process—United States.
3. Law—philosophy.
4. Statutes—United States.
5. Jurisprudence.
6. Law—methodology.
I. Scalia, Antonin, 1936–
I. Garner, Bryan A., 1958–
II. Title

*First printing*

## Prefatory Remarks

The legal instruments that are the subject of interpretation have not typically been slapped together thoughtlessly but are the considered expression of intelligent human beings. In whatever age or culture, human intelligence follows certain principles of expression that are as universal as principles of logic. For example, intelligent expression does not contradict itself or set forth two propositions that are entirely redundant. Lapses sometimes occur, but they are departures from what would normally be expected.

Most of the canons of interpretation set forth here are so venerable that many of them continue to bear their Latin names. Properly regarded, they are not "rules" of interpretation in any strict sense but presumptions about what an intelligently produced text conveys.

The canons fulfill another purpose—a self-fulfilling purpose, so to speak: They promote clearer drafting. When it is widely understood in the legal community that, for example, a word used repeatedly in a document will be taken to have the same meaning throughout, and that a change in terminology suggests a change in meaning, you can expect those who prepare legal documents competently to draft accordingly.

Sections 1–37 of this treatise deal with principles for interpreting all types of legal instruments, from constitutions to statutes to ordinances to regulations to contracts to wills. Sections 38–57 are specific to statutory interpretation.

## Syntactic Canons

### 17. Grammar Canon

**Words are to be given the meaning that proper grammar and usage would assign them.**

> "This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments."
>
> *Flora v. United States*, 362 U.S. 145, 150 (1960) (per Warren, C.J.).

Although drafters, like all other writers and speakers, sometimes perpetrate linguistic blunders,[1] they are presumed to be grammatical in their compositions. They are *not* presumed to be unlettered. Judges rightly presume, for example, that legislators understand subject–verb agreement, noun–pronoun concord, the difference between the nominative and accusative cases, and the principles of correct English word-choice. No matter how often the accuracy, indeed the plausibility, of this presumption is cast in doubt by legislators' oral pronouncements, when it comes to what legislators enact, the presumption is unshakable.

Courts sometimes say that rules of grammar govern unless they contradict legislative intent or purpose.[2] This statement is entirely correct (though it should go without saying) if it refers to legislative intent or purpose manifested in the only manner in which a legislature can authoritatively do so: in the text of the enactment. The presumption of legislative literacy is a rebuttable one; like all the other canons, this one can be overcome by other textual

1 *See, e.g.*, Jeremy Bentham, "Nomography," in 3 *The Works of Jeremy Bentham* 231, 242–43 (John Bowring ed., 1843) ("In the examination of one statute, I have found a multitude of such gross palpable grammatical errors, as scarcely any schoolboy, who had made his way to the upper form of any school in which no language was taught besides English, would see himself convicted of without shame.").

2 *See, e.g.*, *Costello v. INS*, 376 U.S. 120, 122–26 (1964) (per Stewart, J.); *United States v. Shirey*, 359 U.S. 255, 260–61 (1959) (per Frankfurter, J.); *United States v. Whitridge*, 197 U.S. 135, 143 (1905) (per Holmes, J.).

indications of meaning. But if the statement suggests that grammatical usage is some category of indication separate from textual meaning, it is quite wrong. Grammatical usage is one of the means (though not the exclusive means) by which the sense of a statute is conveyed: "The words [a legislator] uses are the instruments by means of which he expects or hopes to effect . . . changes [in society]. What gives him this expectation or this hope is his belief that he can anticipate how others (e.g., judges and administrators) will understand these words."[3]

Often the issue centers on syntactic relationships. In a 1989 United States Supreme Court case, a Bankruptcy Code provision stated: "[T]here shall be allowed to the holder of [an oversecured] claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . ."[4] The question was whether "interest on such claim" was subject to the qualification "provided for under the agreement." The Court held that it was independent of the qualification, the conjunction *and* being essentially equivalent to *together with*:

> This reading is also mandated by the grammatical structure of the statute. The phrase "interest on such claim" is set aside by commas, and separated from the reference to fees, costs, and charges by the conjunctive words "and any." As a result, the phrase "interest on such claim" stands independent of the language that follows. "[I]nterest on such claim" is not part of the list made up of "fees, costs, or charges," nor is it joined to the following clause so that the final "provided for under the agreement" modifies it as well. The language and punctuation Congress used cannot be read in any other way. By the plain language of the statute, the two types of recovery are distinct.[5]

Many high-stakes cases turn on such narrow linguistic questions.

---

3 Gerald C. MacCallum Jr., *Legislative Intent*, 75 Yale L.J. 754, 758 (1966).

4 11 U.S.C. § 506(b).

5 *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42 (1989) (per Blackmun, J.) (citation and footnote omitted).

But some grammatical principles are weaker than others—such as the preference for *that* in a restrictive relative clause and a comma plus *which* in a nonrestrictive relative clause. A famous example arose in the drafting of the 1984 Republican platform:

> Republicans oppose new taxes that are unnecessary. (Restrictive meaning: only unnecessary new taxes are anathema.)
>
> Republicans oppose new taxes, which are unnecessary. (Nonrestrictive meaning: all new taxes are anathema.)[6]

An unfastidious wording that used *which* without a comma—one not seriously proposed at the Convention—could have gone either way:

> Republicans oppose new taxes which are unnecessary. (Ambiguous.)

This grammatical convention—preferring *that* for restrictive clauses and comma-*which* for nonrestrictive ones—is unfortunately a weak basis for deciding statutory meaning. For while grammarians have sought heroically to establish this as a firm rule,[7] they have been unsuccessful. Some usages of traditional English militate against it—the fact, for example, that *that* is not just a relative pronoun but also a stand-alone pronoun, a demonstrative adjective, and a conjunction. Good writers avoid too many *that*s in close proximity, and even a bad writer would never say (as the use of *that* as the defining relative pronoun would require) "that that I saw." What H.W. Fowler wrote in 1926 remains entirely true today:

---

6 For more on this example, see Bryan A. Garner, *How a "That–Which" Editorial Decision Changed U.S. History*, 37 Student Law. 10 (May 2009).

7 Theodore M. Bernstein, *The Careful Writer* 444 (1965) ("*That* is better used to introduce a limiting or defining clause, *which* to introduce a nondefining or parenthetical clause."); John F. Genung, *Outlines of Rhetoric* 94–95 (1894) ("There are many cases where, for the sake of euphony or clearness, . . . *which* has to be used though the meaning is restrictive. Such cases ought to be studied; and wherever *that* will go smoothly, use it. Do not be so careless in this respect as some writers are."); Richard Dublin, *A Selection of English Synonyms* 21 (rev. ed. 1860) ("*Which* is used in speaking of a class generally, and *that* when we mean to designate any particular *individual* of that class.").

> [I]f writers would agree to regard *that* as the defining relative pronoun, and *which* as the non-defining, there would be much gain both in lucidity and in ease. Some there are who follow this principle now; but it would be idle to pretend that it is the practice either of most or of the best writers.[8]

Hence it is not unusual to encounter a text that disregards the supposed *that–which* dichotomy. Consider, for example, Connecticut's good-samaritan law. Designed to immunize healthcare providers who voluntarily render emergency aid, the law states that such providers

> shall not be liable to [a] person assisted for civil damages for any personal injuries which result from acts or omissions by such person in rendering the emergency care, which may constitute ordinary negligence.[9]

Does this mean that all emergency care is immunized, or only instances constituting ordinary negligence? If *which* is read nonrestrictively, the immunity is absolute; if it is read restrictively, only ordinary negligence is immunized. A strict *that–which* grammarian's reading (coupled with the punctuation canon [§ 23]) creates an absolute immunity. But only a reading that gives *which* a restrictive sense (in both its instances in the statute)—and overrides the punctuation—gives effect to every word (see § 26 [surplusage canon]). So a court would be textually justified in ignoring the grammarian's reading[10]—though legal drafters would be well-advised in the future to heed Fowler's recommendation for lucidity and ease.

---

8 H.W. Fowler, *A Dictionary of Modern English Usage* 635 (1926).

9 Conn. Gen. Stat. § 52-557b(a).

10 *See Glorioso v. Police Dep't of Burlington*, 826 A.2d 271 (Conn. Super. Ct. 2003).

overcome by other textual indications of meaning. So in the case quoted at the beginning of this section, the Supreme Court, after noting that "[t]he unavoidable inference from familiar rules of punctuation" pointed in one direction, concluded that "all of the other evidence from the statute points the other way."[17]

> Against the overwhelming evidence from the structure, language, and subject matter of the 1916 Act there stands only the evidence from the Act's punctuation, too weak to trump the rest. . . . [W]e are convinced that the placement of the quotation marks in the 1916 Act was a simple scrivener's error, a mistake made by someone unfamiliar with the law's object and design. Courts, we have said, should "disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute."[18]

❧ ❧ ❧

One punctuation convention merits special mention: the serial comma—that is, the comma after the penultimate item in a series and just before the conjunction (a, b, and c). Authorities on English usage overwhelmingly recommend using the serial comma to prevent ambiguities.[19] Let us say that a testator bequeaths the residue of his enormous estate to "Bob, Sally, George and Jillian." Do the devisees take equal fourths, or do George and Jillian have to

17 *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 454, 455 (1993) (per Souter, J.).

18 *Id.* at 462 (quoting *Hammock v. Loan & Trust Co.*, 105 U.S. 77, 84–85 (1881) (per Harlan, J.) (internal quotation marks and citation omitted)).

19 *See, e.g., Garner's Modern American Usage* 676 (3d ed. 2009) ("[O]mitting the final comma may cause ambiguities, whereas including it never will."); *The Chicago Manual of Style* § 6.18, at 312 (16th ed. 2010) ("Chicago strongly recommends this widely practiced usage, blessed by Fowler and other authorities, since it prevents ambiguity"); Kate L. Turabian, *A Manual for Writers of Term Papers, Theses, and Dissertations* §§ 3.68, 3.70, at 50–51 (5th ed. 1987) ("A series of three or more words, phrases, or clauses (like this) takes a comma between each of the elements, and before a conjunction separating the last two."); Patricia T. O'Conner, *Woe Is I* 137 (1996) ("[M]y advice is to stick with using the final comma."); Joseph Gibaldi, *MLA Style Manual* § 3.42b, at 67 (2d ed. 1998) ("Use a comma to separate words, phrases, and clauses in a series."); H.W. Fowler, *A Dictionary of Modern English Usage* 24 (1926) ("The only rule that will obviate . . . uncertainties is that after every item, including the last unless a heavier stop is needed for independent reasons, the comma should be used.").

split a third? If Bob and Sally become avaricious, they might argue that they take thirds, not quarters, as shown by the punctuation.

Despite the well-known semantic hazards of omitting the serial comma, some legal drafters omit it anyway. And some legislative-drafting manuals, as a matter of style, actually adopt the newspaper convention of omitting it.[20]

So although the better practice is to use the serial comma, courts should not rely much if any on its omission. The Arizona Supreme Court made this mistake in interpreting the word *enterprise*,[21] which was statutorily defined as "any corporation, partnership, association, labor union or other legal entity."[22] The court erroneously latched onto the wording *labor union or other legal entity* as a single item in the enumeration because of the lack of a comma, reasoning that "[t]he absence of a comma after the phrase 'labor union' makes a difference,"[23] so that the *other legal entity* must be one similar to a labor union and could not include the state. While the outcome seems correct for other reasons, the absence of a comma assuredly did not "make a difference." Nor did the absence affect meaning earlier in the same statute in the phrases *neglect, abuse or exploitation*[24] (*abuse or exploitation* is not a single category) or in the relative clauses *that has been employed to provide care, that has assumed a legal duty to provide care or that has been appointed by a court to provide care*[25] (a better style would be to put a comma before the *or*). The court did not seem to notice that the serial comma was consistently omitted in the statute—as required by the state's drafting manual—and wrongly attributed meaning to this fact in a particular instance.

20 *See, e.g., Arizona Legislative Bill Drafting Manual* 83 (2011–2012).

21 *Estate of Braden v. Arizona*, 266 P.3d 349, 352 (Ariz. 2011) (en banc).

22 Ariz. Rev. Stat. § 46–455(Q).

23 266 P.3d at 352.

24 Ariz. Rev. Stat. § 46–455(B).

25 *Id.*


Webster's
Ninth New
Collegiate
Dictionary
A Merriam-Webster®
[redacted]

# Ninth New Collegiate Dictionary

*A Merriam-Webster®*

MERRIAM-WEBSTER INC., *Publishers*
Springfield, Massachusetts, U.S.A.

**A GENUINE MERRIAM-WEBSTER**

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1986 by Merriam-Webster Inc.

Philippines Copyright 1986 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

Based on Webster's third new international dictionary.
Includes index.
1. English language—Dictionaries. I. Merriam-Webster Inc.
PE1628.W5638 1985 423 84-18979
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

1516171819RMcN86

tions **2 a :** to appear in an impressively great or exaggerated form **b :** to take shape as an impending occurrence

[3]**loom** *n* (1836) **:** the indistinct and exaggerated appearance of something seen on the horizon or through fog or darkness; *also* **:** a looming shadow or reflection

[1]**loon** \ˈlün\ *n* [ME *loun*] (15c) **1 :** LOUT, IDLER **2** *chiefly Scot* **:** BOY **3 a :** a crazy person **b :** SIMPLETON

[2]**loon** *n* [of Scand origin; akin to ON *lōmr* loon — more at LAMENT] (1634) **:** any of several large fish-eating diving birds (genus *Gavia*) of the northern part of the northern hemisphere that have the legs placed far back under the body and as a result have a clumsy floundering gait on land

**loo·ny** *or* **loo·ney** \ˈlü-nē\ *adj* **loo·ni·er; -est** [by shortening & alter. fr. *lunatic*] (1872) **:** CRAZY, FOOLISH — **loo·ni·ness** *n* — **loony** *n*

**loony bin** *n* (ca. 1890) **:** an insane asylum **:** MADHOUSE

[1]**loop** \ˈlüp\ *n* [ME *loupe;* perh. akin to MD *lupen* to watch, peer] *archaic* (14c) **:** LOOPHOLE 1a

[2]**loop** *n* [ME *loupe,* of unknown origin] (14c) **1 a :** a curving or doubling of a line so as to form a closed or partly open curve within itself through which another line can be passed or into which a hook may be hooked **b :** such a fold of cord or ribbon serving as an ornament **2 a :** something shaped like a loop **b :** a maneuver in which an airplane starting from straight and level flight passes successively through a climb, inverted flight, a dive, and then returns to normal flight **3 :** a ring or curved piece used to form a fastening or a handle **4 a :** the portion of a vibrating body between two nodes **b :** the middle point of such a portion **5 :** a closed electric circuit **6 :** a piece of film or magnetic tape whose ends are spliced together so as to project or play back the same material continuously **7 :** a series of instructions (as for a computer) that is repeated until a terminating condition is reached **8 :** a sports league — **loopy** \ˈlü-pē\ *adj* — **for a loop :** into a state of amazement, confusion, or distress

[3]**loop** *vi* (1832) **1 :** to make or form a loop **2 :** to execute a loop in an airplane **3 :** to move in loops or in an arc ~ *vt* **1 a :** to make a loop in, on, or about **b :** to fasten with a loop **2 :** to join (two courses of loops) in knitting **3 :** to connect (electric conductors) so as to complete a loop **4 :** to cause to move in an arc

**loop·er** \ˈlü-pər\ *n* (1731) **1 :** any of the usu. rather small hairless caterpillars that are mostly larvae of moths (families Geometridae and Noctuidae) and move with a looping movement in which the anterior legs and the posterior prolegs are alternately made fast and released **2 :** one that loops

[1]**loop·hole** \ˈlüp-ˌhōl\ *n* [[1]*loop*] (1591) **1 a :** a small opening through which small arms may be fired **b :** a similar opening to admit light and air or to permit observation **2 :** a means of escape; *esp* **:** an ambiguity or omission in the text through which the intent of a statute, contract, or obligation may be evaded

[2]**loophole** *vt* (1664) **:** to make loopholes in

**loop of Hen·le** \-ˈhen-lē\ [F. G. J. *Henle* †1885 Ger. pathologist] (1867) **:** a part of the vertebrate nephron that lies between the proximal and distal convoluted tubules and plays a part in water resorption

[1]**loose** \ˈlüs\ *adj* **loos·er; loos·est** [ME *lous,* fr. ON *lauss;* akin to OHG *lōs* loose — more at -LESS] (13c) **1 a :** not rigidly fastened or securely attached **b (1) :** having worked partly free from attachments ⟨the masonry is ~ at the base of the wall⟩ **(2) :** having relative freedom of movement **c :** produced freely and accompanied by raising of mucus ⟨a ~ cough⟩ **d :** not tight-fitting **2 a :** free from a state of confinement, restraint, or obligation ⟨a lion ~ in the streets⟩ ⟨spend ~ funds wisely⟩ **b :** not brought together in a bundle, container, or binding **c** *archaic* **:** DISCONNECTED, DETACHED **3 :** not dense, close, or compact in structure or arrangement **4 a :** lacking in restraint or power of restraint ⟨a ~ tongue⟩ ⟨~ bowels⟩ **b :** lacking moral restraint **:** UNCHASTE **5 a :** not tightly drawn or stretched **:** SLACK **b :** having a flexible or relaxed character **6 a :** lacking in precision, exactness, or care **b :** permitting freedom of interpretation **7 :** expressed in or characterized by loose sentences ⟨~ style⟩ — **loose·ly** *adv* — **loose·ness** *n*

[2]**loose** *vb* **loosed; loos·ing** *vt* (13c) **1 a :** to let loose **:** RELEASE **b :** to free from restraint **2 :** to make loose **:** UNTIE ⟨~ a knot⟩ **3 :** to cast loose **:** DETACH **4 :** to let fly **:** DISCHARGE **5 :** to make less rigid, tight, or strict **:** RELAX ~ *vi* **:** to let fly a missile (as an arrow) **:** FIRE

[3]**loose** *adv* (15c) **:** in a loose manner **:** LOOSELY

**loose box** *n, Brit* (1849) **:** BOX STALL

**loose end** *n* (1546) **1 :** something left hanging loose **2 :** a fragment of unfinished business — usu. used in pl.

**loose–joint·ed** \ˈlüs-ˈjȯint-əd\ *adj* (1859) **1 :** having joints apparently not closely articulated **2 :** characterized by unusually free movements — **loose–joint·ed·ness** *n*

**loose–leaf** \ˈlü-ˈslēf\ *adj* (1902) **1 :** having leaves secured in book form in a cover whose backbone may be opened for the removal, rearrangement, or replacement of leaves ⟨~ notebook⟩ **2 :** of, relating to, or used with a loose-leaf binding ⟨~ paper⟩

**loos·en** \ˈlüs-ᵊn\ *vb* **loos·ened; loos·en·ing** \ˈlüs-niŋ, -ᵊn-iŋ\ *vt* (14c) **1 :** to release from restraint **2 :** to make looser **3 :** to relieve (the bowels) of constipation **4 :** to cause or permit to become less strict — often used with *up* ~ *vi* **:** to become loose or looser

**loosen up** *vi* (1906) **:** to become less tense **:** RELAX

**loose sentence** *n* (ca. 1891) **:** a sentence in which the principal clause comes first and the latter part contains subordinate modifiers or trailing elements

**loose smut** *n* (1890) **:** a smut disease of grains in which the entire head is transformed into a dusty mass of spores

**loose·strife** \ˈlü(s)-ˌstrīf\ *n* [intended as trans. of Gk *lysimacheios* loosestrife (as if fr. *lysis* act of loosing + *machesthai* to fight) — more at LYS-] (1548) **1 :** any of a genus (*Lysimachia*) of plants of the primrose family with leafy stems and yellow or white flowers **2 :** any of a genus (*Lythrum,* family Lythraceae, the loosestrife family) of herbs including some with showy spikes of purple flowers; *esp* **:** PURPLE LOOSESTRIFE

[1]**loot** \ˈlüt\ *n* [Hindi *lūṭ,* fr. Skt *luṇṭati* he robs] (ca. 1788) **1 :** goods usu. of considerable value taken in war **:** SPOILS **2 :** something held to resemble goods of value seized in war: as **a :** something appropriated illegally often by force or violence **b :** illicit gains by public officials **c :** MONEY **3 :** the action of looting ***syn*** see SPOIL

[2]**loot** *vt* (1845) **1 a :** to plunder or sack in war **b :** to rob esp. on a large scale and usu. by violence or corruption **2 :** to seize and carry away by force esp. in war ~ *vi* **:** to engage in robbing or plundering esp. in war — **loot·er** *n*

[1]**lop** \ˈläp\ *n* [ME *loppe*] (14c) **:** material cut away from a tree; *esp* **:** parts discarded in lumbering

[2]**lop** *vt* **lopped; lop·ping** (1519) **1 a (1) :** to cut off branches or twigs from **(2) :** to sever from a woody plant **b (1)** *archaic* **:** to cut off the head or limbs of **(2) :** to cut from a person **2 a :** to remove superfluous parts from **b :** to eliminate as unnecessary or undesirable — usu. used with *off* — **lop·per** *n*

[3]**lop** *vi* **lopped; lop·ping** [perh. imit.] (1578) **:** to hang downward **:** DROOP

[1]**lope** \ˈlōp\ *n* [ME *loup, lope* leap, fr. ON *hlaup;* akin to OE *hlēapan* to leap — more at LEAP] (1809) **1 :** an easy natural gait of a horse resembling a canter **2 :** an easy usu. bounding gait capable of being sustained for a long time

[2]**lope** *vi* **loped; lop·ing** (1825) **:** to go, move, or ride at a lope — **lop·er** *n*

**lop–eared** \ˈläp-ˈi(ə)rd\ *adj* (1687) **:** having ears that droop

**loph·o·phore** \ˈläf-ə-ˌfō(ə)r, -ˌfȯ(ə)r\ *n* [Gk *lophos* crest + E *-phore*] (1850) **:** a circular or horseshoe-shaped organ about the mouth esp. of a brachiopod or bryozoan that bears tentacles and functions esp. in food-getting

**lop·sid·ed** \ˈläp-ˈsīd-əd\ *adj* (1711) **1 :** leaning to one side **2 :** lacking in balance, symmetry, or proportion **:** disproportionately heavy on one side ⟨a ~ vote of 99-1⟩ — **lop·sid·ed·ly** *adv* — **lop·sid·ed·ness** *n*

**lo·qua·cious** \lō-ˈkwā-shəs\ *adj* [L *loquac-, loquax,* fr. *loqui* to speak] (1667) **a :** given to excessive talking **:** GARRULOUS **b :** full of excessive talk **:** WORDY ***syn*** see TALKATIVE — **lo·qua·cious·ly** *adv* — **lo·qua·cious·ness** *n*

**lo·quac·i·ty** \-ˈkwas-ət-ē\ *n* (13c) **:** the quality or state of being very talkative

**lo·quat** \ˈlō-ˌkwät\ *n* [Chin (Cant) *lō-kwat*] (1820) **:** an Asian evergreen tree (*Eriobotrya japonica*) of the rose family often cultivated for its fruit; *also* **:** its yellow edible fruit used esp. for preserves

**lo·ran** \ˈlō(ə)r-ˌan, ˈlȯ(ə)r-\ *n* [*lo*ng-*ra*nge *n*avigation] (ca. 1932) **:** a system of long-range navigation in which pulsed signals sent out by two pairs of radio stations are used by a navigator to determine the geographical position of a ship or an airplane

[1]**lord** \ˈlȯ(ə)rd\ *n* [ME *loverd, lord,* fr. OE *hlāford,* fr. *hlāf* loaf + *weard* keeper — more at LOAF, WARD] (bef. 12c) **1 :** one having power and authority over others: **a :** a ruler by hereditary right or preeminence to whom service and obedience are due **b :** one of whom a fee or estate is held in feudal tenure **c :** an owner of land or other real property **d** *obs* **:** the male head of a household **e :** HUSBAND **f :** one that has achieved mastery or that exercises leadership or great power in some area ⟨vice ~*s*⟩ **2** *cap* **a :** GOD 1 **b :** JESUS **3 :** a man of rank or high position: as **a :** a feudal tenant whose right or title comes directly from the king **b :** a British nobleman: as **(1) :** BARON 2a **(2) :** an hereditary peer of the rank of marquess, earl, or viscount **(3) :** the son of a duke or a marquess or the eldest son of an earl **(4) :** a bishop of the Church of England **c** *pl, cap* **:** HOUSE OF LORDS **4** — used as a British title: as **a** — used as part of an official title ⟨*Lord* Advocate⟩ **b** — used informally in place of the full title for a marquess, earl, or viscount **c** — used for a baron **d** — used by courtesy before the name and surname of a younger son of a duke or a marquess **5 :** a person chosen to preside over a festival

[2]**lord** *vi* (14c) **:** to act like a lord; *esp* **:** to put on airs — usu. used with *it* ⟨~*s* it over his friends⟩

**lord chancellor** *n, pl* **lords chancellor** (15c) **:** a British officer of state who presides over the House of Lords in both its legislative and judicial capacities, serves as the head of the British judiciary, and is usu. a leading member of the cabinet

**lord·ing** \ˈlȯrd-iŋ\ *n* (13c) **1** *archaic* **:** LORD **2** *obs* **:** LORDLING

**lord·ling** \ˈlȯ(ə)rd-liŋ\ *n* (13c) **:** a little or insignificant lord

**lord·ly** \-lē\ *adj* **lord·li·er; -est** (bef. 12c) **1 a :** of, relating to, or having the characteristics of a lord **:** DIGNIFIED **b :** GRAND, NOBLE **2 :** exhibiting such pride and assurance as could only be felt as appropriate to one of the highest birth or rank ***syn*** see PROUD — **lord·li·ness** *n* — **lordly** *adv*

**lord of misrule** (15c) **:** a master of Christmas revels in England esp. in the 15th and 16th centuries

**lor·do·sis** \lȯr-ˈdō-səs\ *n* [NL, fr. Gk *lordōsis,* fr. *lordos* curving forward; akin to OE *belyrtan* to deceive] (1704) **:** abnormal curvature of the spine forward — **lor·dot·ic** \-ˈdät-ik\ *adj*

**Lord Protector of the Commonwealth** (ca. 1653) **:** PROTECTOR 2b

**Lord's day** *n, often cap D* [ME *Lordis day,* trans. of LL *dominica dies,* trans. of Gk *kyriakon hēmera* (Rev. 1:10)] (12c) **:** SUNDAY

**lord·ship** \ˈlȯ(ə)rd-ˌship\ *n* (bef. 12c) **1 a :** the rank or dignity of a lord — used as a title **b :** the authority or power of a lord **:** DOMINION **2 :** the territory under the jurisdiction of a lord **:** SEIGNIORY

**Lord's Prayer** *n* (1548) **:** the prayer with variant versions in Matthew and Luke that according to the Lucan account Christ taught his disciples

**Lord's Supper** *n* [ME *Lordis sopere,* trans. of LL *dominica cena,* trans. of Gk *kyriakon deipnon* (I Cor. 11:20)] (14c) **:** COMMUNION 2a

**Lord's table** *n, often cap T* [trans. of Gk *trapeza kyriou* (I Cor. 10:21)] (1535) **:** ALTAR 2

**Lordy** \ˈlȯrd-ē\ *interj* [[1]*lord* (God) + *-y*] (1853) — used to express surprise or strength of feeling

[1]**lore** \ˈlō(ə)r, ˈlȯ(ə)r\ *n* [ME, fr. OE *lār;* akin to OHG *lēra* doctrine, OE *leornian* to learn] (bef. 12c) **1** *archaic* **:** something that is taught **:** LESSON **2 :** something that is learned: **a :** knowledge gained through study or experience **b :** traditional knowledge or belief **3 :** a particular body of knowledge or tradition

[2]**lore** *n* [NL *lorum,* fr. L, thong, rein; akin to Gk *eulēra* reins] (1828) **:** the space between the eye and bill in a bird or the corresponding region in a reptile or fish — **lo·re·al** \ˈlōr-ē-əl, ˈlȯr-\ *adj*

# The Random House College Dictionary

## REVISED EDITION

Based on The Random House Dictionary of the English Language

THE UNABRIDGED EDITION

JESS STEIN • EDITOR IN CHIEF

# TABLE OF CONTENTS

| | |
|---|---|
| *Prefaces* | v |
| *Editorial Staff* | vi |
| *Consultant Staff* | vii |
| *Indo-European Language Chart* | x |
| *Historical Sketch of the English Language* | xi |
| *Etymology Key* | xv |
| *Pronunciation Key* | xvi |
| *Pronunciation of English* | xvii |
| *Usage, Dialects, and Functional Varieties* | xix |
| *Guide to the Dictionary* | xxii |
| *Table of English Sounds and Their Common Spellings* | xxxii |
| A DICTIONARY OF THE ENGLISH LANGUAGE | 1 |
| *Signs and Symbols* | 1535 |
| *United States Colleges and Universities* | 1539 |
| *Canadian Colleges and Universities* | 1551 |
| *English Given Names* | 1552 |
| *Basic Manual of Style* | 1559 |

REVISED EDITION

COPYRIGHT © 1984, 1982, 1980, 1979, 1975 BY RANDOM HOUSE, INC.

Previous edition copyright © 1973, 1972, 1969, 1968 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, without permission in writing from the publisher. All inquiries should be addressed to Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022.

Based on *The Random House Dictionary of the English Language–The Unabridged Edition* Copyright © 1983, 1981, 1979, 1973, 1971, 1970, 1969, 1967, 1966 by Random House, Inc.

PUBLISHED IN THE UNITED STATES OF AMERICA BY RANDOM HOUSE, INC., NEW YORK AND SIMULTANEOUSLY IN CANADA BY RANDOM HOUSE OF CANADA LIMITED, TORONTO

A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.

*Chart of Periodic Table of the Elements*, Copyright © 1964 by E. H. Sargent & Co.

*Table of Common Proofreader's Marks*, Copyright 1950, © 1956 by Alfred A. Knopf, Inc.

LIBRARY OF CONGRESS CATALOGING IN PUBLICATION DATA
Main entry under title:
The Random House college dictionary.
Based on the Random House dictionary of the English language, unabridged ed.
Published in 1968 under title: The Random House dictionary of the English language, college ed.
1. English language—Dictionaries.
PE1625.R34 1975 423 75-4858 ISBN 0-394-43500-1
ISBN 0-394-43600-8 thumb-indexed ed.

rs. e/ud

Manufactured in the United States of America

*Music.* progressing melodically by intervals of a second. [< L *conjunct(us)* joined, connected (ptp. of *conjungere*) = *con-* CON- + *junc-* (var. s. of *jungere* to JOIN) + *-tus* ptp. suffix] —**con·junct′ly,** *adv.*

**con·junc·tion** (kən jungk′shən), *n.* **1.** the act of conjoining; combination. **2.** the state of being conjoined; union; association. **3.** a combination of events or circumstances. **4.** *Gram.* any member of a small class of words functioning as connectors between words, phrases, clauses, or sentences, as *and, because, but, however.* Cf. **coordinating conjunction, subordinating conjunction.** **5.** *Astron.* **a.** the coincidence of two or more heavenly bodies at the same celestial longitude. **b.** the state of two or more such coinciding heavenly bodies. **6.** *Logic.* **a.** a propositional statement that is true if and only if both its components are true. **b.** a connective symbol, as ·, usually read as "and." [ME *conjunccio(u)n* < L *conjunctiōn-* (s. of *conjunctiō*)] —**con·junc′tion·al,** *adj.* —**con·junc′tion·al·ly,** *adv.*

**con·junc·ti·va** (kon′jungk tī′və), *n., pl.* **-vas, -vae** (-vē). *Anat.* the mucous membrane that lines the inner surface of the eyelids. [short for NL *membrāna conjunctīva* conjunctive membrane; see CONJUNCTIVE] —**con′junc·ti′val,** *adj.*

**con·junc·tive** (kən jungk′tiv), *adj.* **1.** connective. **2.** linked; joint: *a conjunctive action.* **3.** *Gram.* **a.** (of a mode) subjunctive. **b.** (of a pronoun) conjunct. **c.** of the nature of a conjunction. —*n.* **4.** *Gram.* conjunction. [< LL *conjunctīv(us)*] —**con·junc′tive·ly,** *adv.*

**con·junc·ti·vi·tis** (kən jungk′tə vī′tis), *n.* *Ophthalm.* inflammation of the conjunctiva.

**con·junc·ture** (kən jungk′chər), *n.* **1.** a combination of circumstances or a particular state of affairs. **2.** a critical state of affairs; crisis. **3.** conjunction; joining; meeting. —**con·junc′tur·al,** *adj.*

**con·jur·a·tion** (kon′jŏŏ rā′shən), *n.* **1.** the act of calling on or invoking by a sacred name. **2.** an incantation; magical spell or charm. **3.** the practice of legerdemain. **4.** *Archaic.* supplication; solemn entreaty. [ME *conjuracio(u)n* < L *conjūrātiōn-* (s. of *conjūrātiō*) = *conjūrāt(us),* ptp. of *conjūrāre* to swear together, (*con-* CON- + *jūr-* (s. of *jūs*) right, justice, duty + *-ātus* -ATE[1]) + *-iōn-* -ION]

**con·jure** (kon′jər or, *esp. Brit.,* kun′- *for 1–4, 7, 8;* kən jŏŏr′ *for 5, 6, 9*), *v.,* **-jured, -jur·ing.** —*v.t.* **1.** to call upon or command (a devil or spirit) by invocation or spell. **2.** to affect or influence by or as if by invocation or spell. **3.** to effect or produce by or as by magic: *to conjure a miracle.* **4.** to raise up, bring to mind, or recall by or as if by magic (usually fol. by *up*): *to conjure up the happy past.* **5.** to appeal to solemnly or earnestly: *I conjure you to hear my plea.* **6.** *Obs.* to charge solemnly. —*v.i.* **7.** to call upon or command a devil or spirit by invocation or spell. **8.** to practice magic or legerdemain. **9.** *Obs.* to conspire. [ME *conjure(n)* < OF *conjure(r)* < L *conjūrāre* = *con-* CON- + *jūrāre* to swear]

**con·jur·er** (kon′jər ər or, *esp. Brit.,* kun′- *for 1, 2;* kən jŏŏr′ər *for 3*), *n.* **1.** a person who conjures spirits or practices magic; sorcerer. **2.** a person who practices legerdemain; magician; juggler. **3.** a person who solemnly charges or entreats. Also, **con′ju·ror.** [ME]

**conk** (kongk, kôngk), *v.t.* *Slang.* to hit or strike on the head. [? alter. of CONCH]

**conk′ out′,** *Slang.* **1.** to break or fail, as a machine, engine, etc. **2.** to slow down or stop; lose energy. **3.** to lose consciousness; faint. **4.** to die. [*conk,* of imit. orig.]

**con′ man′,** *Informal.* See **confidence man.**

**conn** (kon), *v.t., n.* con[3].

**Conn.,** Connecticut.

**con·nate** (kon′āt), *adj.* **1.** existing in a person or thing from birth or origin; inborn; congenital. **2.** associated in birth or origin. **3.** allied or agreeing in nature; cognate. **4.** *Biol.* congenitally or firmly united into one body. [< LL *connāt(us)* (ptp. of *connāscī* to be born at the same time with) = L *con-* CON- + *nā-* (short s. of *nāscī*) + *-tus* ptp. suffix] —**con′nate·ly,** *adv.* —**con′nate·ness,** *n.* —**con·na·tion** (kə nā′shən), *n.*

**con·nat·u·ral** (kə nach′ər əl, -nach′rəl), *adj.* **1.** belonging to a person or thing by nature or from birth or origin; inborn. **2.** of the same or a similar nature. [< ML *connātūrāl(is)*] —**con·nat′u·ral·ly,** *adv.* —**con·nat′u·ral·ness,** *n.*

**Con·naught** (kon′ôt), *n.* a province in the NW Republic of Ireland. 419,465 (1961); 6611 sq. mi. Irish, **Con·nacht** (kon′əKHt, -ət).

**con·nect** (kə nekt′), *v.t.* **1.** to bind or fasten together; join or unite; link: *to connect the two cities by a bridge.* **2.** to establish communication between; put in communication (often fol. by *with*): *The telephone operator connected us.* **3.** to associate, attach, or place in relationship: *to connect oneself with a group.* **4.** to associate mentally or emotionally: *She connects all telegrams with bad news.* —*v.i.* **5.** to become connected; join or unite. **6.** (of trains, buses, etc.) to run so as to make connections (often fol. by *with*). **7.** *Slang.* to make direct contact for the illegal sale or purchase of narcotics. [< L *connect(ere)* = *con-* CON- + *nectere* to tie; see NEXUS] —**con·nect′ed·ly,** *adv.* —**con·nect′ed·ness,** *n.* —**con·nect′i·ble, con·nect′a·ble,** *adj.* —**con·nec′tor, con·nect′er,** *n.* —**Syn. 1.** See **join.** —**Ant. 1.** divide. **3.** dissociate

**Con·nect·i·cut** (kə net′ə kət), *n.* **1.** a state in the NE United States. 3,032,217 (1970); 5009 sq. mi. *Cap.:* Hartford. *Abbr.:* Conn., Ct., CT **2.** a river flowing S from N New Hampshire along the boundary between New Hampshire and Vermont and then through Massachusetts and Connecticut into Long Island Sound. 407 mi. long.

**connec′ting rod′,** *Mach.* a rod or link for transmitting motion and force between a rotating and a reciprocating part, as between a piston and a crankshaft.

**con·nec·tion** (kə nek′shən), *n.* **1.** the act of connecting. **2.** the state of being connected. **3.** anything that connects; link; bond. **4.** association; relationship: *the connection between crime and poverty.* **5.** a circle of friends or associates or a member of such a circle. **6.** association with something observed, imagined, discussed, etc. **7.** contextual relation; context, as of a word. **8.** Often, **connections.** the meeting of trains, planes, etc., for transfer of passengers. **9.** a relative, esp. by marriage or distant blood relationship. **10.** a group of persons connected as by political or religious ties. **11.** Usually, **connections.** associates, relations, or friends, esp. representing or having some influence or power. **12.** a channel of communication. **13.** sexual intercourse. Also, *Brit.,* **connexion.** [var. sp. of *connexion* < L *connexiōn-* (s. of *connexiō*) = *connex(us)* (ptp. of *connectere* to CONNECT) + *-iōn-* -ION] —**con·nec′tion·al,** *adj.* —**Syn. 1.** junction, conjunction, union. **3.** tie, coupling, yoke. **5.** affiliation, alliance, combination. **9.** relation, kinsman.

**con·nec·tive** (kə nek′tiv), *adj.* **1.** serving or tending to connect. —*n.* **2.** something that connects. **3.** *Gram.* a word used to connect words, phrases, clauses, and sentences, as a conjunction. **4.** *Bot.* the tissue joining the two cells of the anther. —**con·nec′tive·ly,** *adv.* —**con·nec·tiv·i·ty** (kon′ek tiv′i tē), *n.*

**connec′tive tis′sue,** *Anat.* a tissue, usually of mesoblastic origin, that connects, supports, or surrounds other tissues, organs, etc., and occurs in various forms throughout the body.

**con·nex·ion** (kə nek′shən), *n.* *Brit.* connection. —**con·nex′ion·al,** *adj.*

**conn′ing tow′er** (kon′ing), **1.** the low observation tower of a submarine, constituting the main entrance to the interior. **2.** the low, armored pilothouse of a warship.

**con·nip·tion** (kə nip′shən), *n.* Often, **conniptions.** *Informal.* a fit of hysteria, anger, or the like. [?]

**con·niv·ance** (kə nī′vəns), *n.* **1.** the act of conniving. **2.** *Law.* tacit encouragement or assent to wrongdoing by another. Also, **con·niv′ence.** [earlier *connivence* < L *conniventia*] —**con·niv′ant, con·niv′ent,** *adj.* —**con·niv′ant·ly, con·niv′ent·ly,** *adv.*

**con·nive** (kə nīv′), *v.i.,* **-nived, -niv·ing.** **1.** to avoid noticing something that one is expected to oppose or condemn; give aid to wrongdoing by forbearing to act or speak (usually fol. by *at*): *The policeman connived at traffic violations.* **2.** to be indulgent toward something others oppose or criticize (usually fol. by *at*): *to connive at childlike exaggerations.* **3.** to cooperate secretly; conspire (often fol. by *with*): *They connived with army chiefs to take over the government.* [< L *connīv(ēre)* (to) blink, wink at = *con-* CON- + *-nīvēre,* akin to *nictāre* to blink] —**con·niv′er,** *n.* —**con·niv′ing·ly** *adv.*

**con·niv·ent** (kə nī′vənt), *adj.* *Bot., Zool.* converging, as petals. [< L *connivent-* (s. of *connivēns,* prp. of *connivēre*). See CONNIVE, -ENT]

**con·nois·seur** (kon′ə sûr′, -sŏŏr′), *n.* a person who is especially competent to pass critical judgments in an art, esp. one of the fine arts, or in matters of taste. [< F; OF *conoiseor* < L *cognōscitōr-* (s. of *cognōscitor*) knower. See COGNOSCIBLE, -OR[2]] —**con′nois·seur′ship,** *n.*

**con·no·ta·tion** (kon′ə tā′shən), *n.* **1.** an act or instance of connoting. **2.** the associated or secondary meaning of a word or expression; implication: *A possible connotation of "home" is "a place of warmth, comfort, and affection."* Cf. **denotation** (def. 1). **3.** *Logic.* the set of attributes constituting the meaning of a term; comprehension; intension. [< ML *connotātiōn-* (s. of *connotātiō*) = *connotāt(us)* (ptp. of *connotāre;* see CONNOTE, -ATE[1]) + *-iōn-* -ION] —**con·no·ta·tive** (kon′ə tā′tiv, kə nō′tə-), **con·no′tive,** *adj.* —**con′no·ta′tive·ly, con·no′tive·ly,** *adv.*

**con·note** (kə nōt′), *v.t.,* **-not·ed, -not·ing.** **1.** to signify or suggest (certain meanings, ideas, etc.) in addition to the explicit or primary meaning: *The word "fireplace" often connotes hospitality, warm comfort, etc.* **2.** to involve as a condition or accompaniment: *Injury connotes pain.* —*v.i.* **3.** to have significance only by association, as with another word: *Adjectives can only connote, nouns can denote.* [< ML *connot(āre)*]

**con·nu·bi·al** (kə nōō′bē əl, -nyōō′-), *adj.* of marriage; matrimonial; conjugal. [< L *cōnūbiāl(is)* = *cōnūbi(um)* (*cō-* co- + *nūb(ere)* (to) marry + *-ium* n. suffix) + *-ālis* -AL[1]] —**con·nu′bi·al′i·ty,** *n.* —**con·nu′bi·al·ly,** *adv.*

**co·no·dont** (kō′nə dont′, kon′ə-), *n.* a small tooth-shaped fossil, the remains of an unidentified animal of the Paleozoic era. [< Gk *kôn(os)* CONE + *odont-,* s. of *odoús* or *odṓn* tooth]

**co·noid** (kō′noid), *adj.* **1.** Also, **co·noi′dal.** cone-shaped. —*n.* **2.** a geometrical solid formed by the revolution of a conic section about one of its axes. [< Gk *kōnoeid(ḗs).* See CONE, -OID] —**co·noi′dal·ly,** *adv.*

**Co·non** (kō′non), *n.* died A.D. 687, pope 686–687.

**co·no·scen·ti** (kō′nə shen′tē, kon′ə-; *It.* kō′nō shen′tē), *n.pl., sing.* **-te** (-tē; *It.* -te). cognoscenti.

**con·quer** (kong′kər), *v.t.* **1.** to acquire by force of arms; win in war: *to conquer a country.* **2.** to overcome by force: *to conquer an enemy.* **3.** to gain or obtain by effort. **4.** to overcome by mental or moral power; surmount. —*v.i.* **5.** to be victorious: *Despite their differences, their love will conquer.* [ME *conquer(en)* < OF *conquer(re)* < VL **conquǣrere* to acquire (alter. of L *conquīrere* to seek out). See CON-, QUERY] —**con′quer·a·ble,** *adj.* —**con′quer·a·ble·ness,** *n.* —**con′quer·ing·ly,** *adv.* —**Syn. 2.** vanquish, subjugate. See **defeat.**

**con·quer·or** (kong′kər ər), *n.* a person who conquers; victor. [ME *conquerour* < AF; OF *conquereor* = *conquer* CONQUER + *-eor* -OR[2]]

**con·quest** (kon′kwest, kong′-), *n.* **1.** the act of conquering. **2.** the state of being conquered. **3.** the winning of favor or affection. **4.** a person whose favor or affection has been won: *He's another one of her conquests.* **5.** anything acquired by conquering, as a nation, a territory, spoils, etc. **6. the Conquest.** See **Norman Conquest.** [ME *conqueste* < MF < VL **conquǣst(a)* (alter. of L *conquīsīta,* fem. ptp. of *conquīrere*)] —**Syn. 1.** subjugation, overthrow, defeat. See **victory.**

**con·quis·ta·dor** (kon kwis′tə dôr′; *Sp.* kông kēs′tä thôr′), *n., pl.* **-dors,** *Sp.* **-do·res** (-thō′res). one of the 16th-century Spanish conquerors in the Americas. [< Sp = *conquistad(o)* (ptp. of *conquistar* to conquer; see CONQUEST, -ADE[1]) + *-or* -OR[2]]

**Con·rad** (kon′rad), *n.* **Joseph** (*Teodor Józef Konrad Korzeniowski*), 1857–1924, English novelist and short-story writer, born in Poland.

**Cons.,** **1.** Constable. **2.** Constitution. **3.** Consul.

**cons.,** **1.** consecrated. **2.** consolidated. **3.** consonant. **4.** constable. **5.** constitution. **6.** constitutional. **7.** consul.

act, āble, dâre, ärt; ebb, ēqual; if, īce; hot, ōver, ôrder; oil; bŏŏk; ōōze; out; up, ûrge; ə = *a* as in *alone;* chief; sing; shoe; thin; that; zh as in *measure;* ə as in *button* (but′ən), *fire* (fīər). See the full key inside the front cover.

grasp. 3. to make less firmly fixed in place. 4. to let loose or set free from bonds, restraint, or constraint. 5. to make less close or compact in structure or arrangement. 6. to make less dense or coherent: *to loosen the soil in a garden.* 7. to relieve (the bowels) of a constipated condition. 8. to relax in strictness or severity, as restraint or discipline: *to loosen restrictions on trade.* —*v.i.* 9. to become loose or looser (sometimes fol. by *up*): *The shoes loosened up with wear.* [ME *loosne*] —**loos′en·er,** *n.*

**loose′ sen′tence,** a sentence that does not end with the completion of its main clause, but continues with one or more subordinate clauses or other modifiers. Cf. **periodic sentence.**

**loose′ smut′,** *Plant Pathol.* a disease of cereal grasses, characterized by uncovered, powdery masses of spores which replace the affected heads, caused by smut fungi of the genus *Ustilago.*

**loose·strife** (lo͞os′strīf′), *n.* 1. any of several primulaceous plants of the genus *Lysimachia,* as *L. vulgaris,* having yellow flowers, or *L. quadrifolia,* having leaves in whorls of four or five. 2. any of several lythraceous herbs of the genus *Lythrum,* as *L. Salicaria,* having purple flowers. [LOOSE + STRIFE, mistranslation of L *lysimachia* (< Gk; see LYSI-, -MACHY), plant said to be named after a certain *Lysimachos;* see -IA]

**loose-tongued** (lo͞os′tungd′), *adj.* unrestrained or irresponsible in speech; given to gossiping or chattering.

**loot** (lo͞ot), *n.* 1. spoils or plunder taken by pillaging, as in war. 2. anything taken by dishonesty, force, stealth, etc.: *a burglar's loot.* 3. *Informal.* a collection of gifts, purchases, etc.: *The children opened their Christmas loot.* 4. *Slang.* money. 5. act of looting or plundering. —*v.t.* 6. to carry off or take (something) as loot: *to loot a nation's art treasures.* 7. to despoil by taking loot; plunder or pillage (a city, house, etc.), as in war. 8. to rob, as by burglary, corrupt practice in public office, etc.: *conspiring to loot the public treasury.* —*v.i.* 9. to take loot; plunder. [< Hindi *lūṭ,* akin to Skt *luṇṭati* he steals] —**loot′er,** *n.* —**Syn.** 1. booty. 7. sack, ransack.

**lop**[1] (lop), *v.,* **lopped, lop·ping,** *n.* —*v.t.* 1. to cut off (branches, twigs, etc.) from a tree or other plant. 2. to cut off (a limb, part, or the like) from a person, animal, etc. 3. to cut off the branches, twigs, etc., of (a tree or other plant). 4. to eliminate as unnecessary or excessive: *They had to lop off whole pages of the report.* 5. *Archaic.* to cut off the head, limbs, etc., of (a person). —*v.i.* 6. to cut off branches, twigs, etc., as of a tree. 7. to remove parts by or as by cutting. —*n.* 8. parts or a part lopped off. 9. (of trees) the smaller branches and twigs not useful as timber. [late ME *loppe* (n.) parts or part lopped off, etymologically identified with OE *loppe* spider, both objects being marked by many projecting parts. See LOBSTER] —**lop′per,** *n.*

**lop**[2] (lop), *v.,* **lopped, lop·ping,** *adj.* —*v.i.* 1. to hang loosely or limply; droop. 2. to sway, move, or go in a drooping or heavy, awkward way. 3. to move in short, quick leaps: *a rabbit lopping through the garden.* —*v.t.* 4. to let hang or droop: *He lopped his arms at his sides in utter exhaustion.* —*adj.* 5. hanging down limply or droopingly: *a rabbit with lop ears.* [v. use of obs. *lop* spider or *lop* dangling part of a tree (see LOP[1]); lit., to behave like a *lop,* i.e., to dangle, hang loosely. See LOB[1]]

**lope** (lōp), *v.,* **loped, lop·ing,** *n.* —*v.i.* 1. to move or run with bounding steps, as a quadruped, or with a long, easy stride, as a person. 2. to canter leisurely with a rather long, easy stride, as a horse. —*v.t.* 3. to cause to lope, as a horse. —*n.* 4. the act or the gait of loping. 5. a long, easy stride. [< D *lope(n)* (to) run; c. G *laufen* to run, Icel *hlaupa* to jump. See LEAP]

**lop-eared** (lop′ērd′), *adj.* having lop or drooping ears.

**Lo·pe de Ve·ga** (lō′pā də vā′gə; *Sp.* lō′pe ᵺe ve′gä). See **Vega, Lope de.**

**lop·er** (lō′pər), *n.* a person or thing that lopes, as a horse with a loping gait.

**Ló·pez** (lō′pez; *Sp.* lō′pes), *n.* **Os·val·do** (ōs väl′dō), (*Osvaldo López Arellano*), born 1921, Honduran air force colonel: president of Honduras since 1963.

**loph·o·branch** (lof′ə brangk′, lō′fə-), *adj.* 1. belonging or pertaining to the *Lophobranchii,* the group of fishes comprising the pipefishes, sea horses, snipefishes, etc. —*n.* 2. a lophobranch fish. [< NL *Lophobranch(iī)* name of the group < Gk *lópho(s)* crest, tuft + *bránchi(a)* BRANCHIA + L -ī nom. pl. n. suffix] —**loph·o·bran·chi·ate** (lof′ə brang′kē it, -āt′, lō′fə-), *adj., n.*

**lop·py** (lop′ē), *adj.* **-pi·er, -pi·est.** lopping; hanging limply.

**lop·sid·ed** (lop′sī′did), *adj.* 1. lopping or inclining to one side. 2. heavier, larger, or more developed on one side than on the other; unevenly balanced; unsymmetrical. —**lop′sid′ed·ly,** *adv.* —**lop′sid′ed·ness,** *n.*

**loq.,** loquitur.

**lo·qua·cious** (lō kwā′shəs), *adj.* 1. talking or disposed to talk much or freely; talkative; garrulous. 2. characterized by excessive talk; wordy: *the most loquacious play of the season.* —**lo·qua′cious·ly,** *adv.* —**lo·qua′cious·ness,** *n.* —**Syn.** verbose, voluble. See **talkative.**

**lo·quac·i·ty** (lō kwas′i tē), *n., pl.* **-ties.** 1. the state of being loquacious; talkativeness; garrulity. 2. an instance of talkativeness or garrulity; a loquacious flow of talk. [< L *loquācitās* talkativeness = *loquāci-* (s. of *loquāx*) talkative + *-tās* -TY[2]]

**lo·quat** (lō′kwot, -kwat), *n.* a small, evergreen, malaceous tree, *Eriobotrya japonica,* native to China and Japan, but cultivated elsewhere for ornament and for its yellow, plumlike fruit. [< Chin (Cantonese) *lō-kwat,* lit., rush orange]

***lo·qui·tur*** (lō′kwi to͝or′; *Eng.* lok′wi′tər), *Latin.* he (or she) speaks.

**Lo·rain** (lō rān′, lô-), *n.* a port in N Ohio, on Lake Erie. 78,185 (1970).

**lo·ran** (lōr′ən, lôr′-), *n.* a device by which a navigator can locate his position by determining the time displacement between radio signals from two known stations. [*lo(ng) ra(nge) n(avigation)*]

**Lor·ca** (lôr′kə; *Sp.* lôr′kä), *n.* 1. See **García Lorca.** 2. a city in SE Spain. 71,757 (est. 1956).

**lord** (lôrd), *n.* 1. a person who has dominion over others; a master, chief, or ruler. 2. a person who exercises authority from property rights; an owner or possessor of land, houses, etc. 3. a person who is a leader in his profession: *one of the great lords of banking.* 4. a feudal superior; the proprietor of a manor. 5. a titled nobleman or peer; a person whose ordinary appellation contains by courtesy the title *Lord* or some higher title. 6. **Lords,** the Lords Spiritual and Lords Temporal comprising the House of Lords. 7. (*cap.*) *Brit.* **a.** the title of certain high officials (used with some other title or the like): *Lord Mayor of London.* **b.** the formally polite title of a bishop: *Lord Bishop of Durham.* **c.** the title informally substituted for marquis, earl, viscount, etc., as in the use of *Lord Kitchener* for *Earl Kitchener.* 8. (*cap.*) the Supreme Being; God; Jehovah. 9. (*cap.*) the Saviour, Jesus Christ. 10. *Astrol.* a planet having dominating influence. —*interj.* 11. (*often cap.*) (used in exclamatory phrases to express surprise, elation, etc.): *Lord, what a beautiful day!* —*v.i.* 12. to play the lord; assume airs of importance and authority; domineer (usually fol. by *it*): *to lord it over someone.* [ME *lord, loverd,* OE *hlāford, hlāfweard,* lit., loaf-keeper. See LOAF[1], WARD] —**lord′less,** *adj.* —**lord′like′,** *adj.*

**Lord′ Chan′cellor,** the highest judicial officer of the British crown: law adviser of the ministry, keeper of the great seal, presiding officer in the House of Lords, etc. Also called **Lord′ High′ Chan′cellor.**

**Lord′ Chief′ Jus′tice,** the presiding judge of Britain's High Court of Justice, the superior court of record for both criminal and civil cases.

**lord·ing** (lôr′ding), *n.* *Archaic.* 1. lord. 2. Often, **lordings.** lords; sirs; gentlemen (often used as a term of address). [ME; OE *hlāfording* prince, lit., offspring of a lord = *hlāford* LORD + *-ing* patronymic suffix]

**lord·ling** (lôrd′ling), *n.* a young or unimportant lord; petty or insignificant lord. [ME; see LORD, -LING[1]]

**lord·ly** (lôrd′lē), *adj.,* **-li·er, -li·est,** *adv.* —*adj.* 1. suitable for or befitting a lord; grand, magnificent, or elegant: *a lordly reception hall; lordly manners.* 2. insolently imperious; haughty; arrogant; overbearing: *lordly contempt.* 3. of or pertaining to a lord or lords. 4. having the character or attributes of a lord. —*adv.* 5. in the manner of a lord. [ME; OE *hlāfordlīc*] —**lord′li·ness,** *n.* —**Syn.** 1. majestic, regal, noble. 2. domineering. —**Ant.** 2. meek.

**Lord′ May′or,** (in Britain) the mayor of certain cities or the chief municipal officer of certain boroughs.

**Lord′ of hosts′,** Jehovah; God. Also, **Lord′ of Hosts′.**

**Lord′ of Misrule′,** (in England) a person formerly chosen to direct the Christmas revels and sports.

**lor·do·sis** (lôr dō′sis), *n.* *Pathol.* forward curvature of the spine. [< NL < Gk: lit., a bending back = *lord(ós)* bent backwards + *-ōsis* -OSIS] —**lor·dot·ic** (lôr dot′ik), *adj.*

**Lord′ Protec′tor,** protector (def. 2a).

**Lord's′ day′, the,** Sunday.

**lord·ship** (lôrd′ship), *n.* 1. (*often cap.*) a British term of respect used when speaking of or to judges or certain noblemen (usually prec. by *his* or *your*). 2. the state or dignity of a lord. 3. *Hist.* **a.** the authority or power of a lord. **b.** the domain of a lord. [ME; OE *hlāfordscipe*]

**Lord′ Spir′itual,** *pl.* **Lords Spiritual.** a bishop or archbishop belonging to the House of Lords. Cf. **Lord Temporal.** [late ME]

**Lord's′ Prayer′, the,** the prayer given by Jesus to His disciples, and beginning with the words *Our Father.* Matt. 6:9–13; Luke 11:2–4.

**Lord's′ Sup′per, the,** 1. the sacrament in commemoration of the Last Supper; Communion; Mass; Eucharist. 2. See **Last Supper.**

**Lord's′ ta′ble, the.** See **communion table.**

**Lord′ Tem′poral,** *pl.* **Lords Temporal.** a member of the House of Lords who is not a member of the clergy. Cf. **Lord Spiritual.** [late ME]

**lore**[1] (lōr, lôr), *n.* 1. the body of knowledge, esp. of a traditional, anecdotal, or popular nature, on a particular subject: *the lore of herbs.* 2. learning, knowledge, or erudition. 3. *Archaic.* **a.** the process or act of teaching; instruction. **b.** that which is taught; lesson. [ME; OE *lār;* c. D *leer,* G *Lehre* teaching. See LEARN] —**Syn.** 1. See **learning.**

**lore**[2] (lōr, lôr), *n.* *Zool.* the space between the eye and the bill of a bird, or a corresponding space in other animals, as serpents. [< NL *lōr(um),* special use of L: thong, strap]

**Lor·e·lei** (lôr′ə lī′; *Ger.* lō′rə lī′), *n.* a legendary nymph of the Rhine who lured sailors to shipwreck on her rock by singing. [< G, var. of *Lurlei,* cliff overlooking Rhine river, thought to be abode of a nymph: a creation of Klemens Brentano (1778–1842) in a poem of 1800]

**Lo·rentz** (lôr′ents, lōr′-; *Du.* lō′rents), *n.* **Hen·drik An·toon** (hen′drik än′tōn), 1853–1928, Dutch physicist: Nobel prize 1902.

**lor·gnette** (lôrn yet′), *n.* 1. a pair of eyeglasses mounted on a handle. 2. a pair of opera glasses for holding in the hand by a handle. [< F < *lorgn(er)* (to) eye furtively; see -ETTE]

**lor·gnon** (*Fr.* lôr nyôɴ′), *n., pl.* **-gnons** (*Fr.* -nyôɴ′). 1. an eyeglass or a pair of eyeglasses. 2. See **opera glasses.** [< F = *lorgn(er)* (see LORGNETTE) + *-on* n. suffix]

**lo·ri·ca** (lō rī′kə, lô-, -lə-), *n., pl.* **-cae** (-sē, -kē). 1. *Zool.* a hard protective case or sheath, as the protective coverings secreted by certain infusorians. 2. a cuirass or corselet, originally of leather. [def. 1: < NL, special use of L: corselet (orig. of leather), akin to *lōrum* thong; def. 2: < L]

**lor·i·cate** (lôr′ə kāt′, -kit, lor′-), *adj.* *Zool.* covered with a lorica. Also, **lor′i·cat′ed.** —**lor′i·ca′tion,** *n.*

**Lo·rient** (lô ryäɴ′), *n.* a seaport in NW France, on the Bay of Biscay. 63,924 (1962).

**lor·i·keet** (lôr′ə kēt′, lor′-, lôr′ə kēt′, lor′-), *n.* any of various small lories. [LORY + (PARA)KEET]

**lor·i·mer** (lôr′ə mər), *n.* a craftsman who makes hardware for harnesses and riding habits, as bits, spurs, etc. Also, **lor·i·ner** (lôr′ə nər). [ME < LL *lōrām(entum)* thong (L *lōrum* reins, thong + *-mentum* -MENT) + ME *-er* -ER[1]]

**lo·ris** (lōr′is, lôr′-), *n., pl.* **-ris.** 1. a small, slender, tailless, large-eyed, nocturnal lemur, *Loris gracilis,* of southern India and Ceylon. 2. a similar but stockier lemur of the genus